1            THE UNITED STATES DISTRICT COURT

2                   DISTRICT OF ARIZONA

3   United States of America              MJ-17-339-TUC-BPV

4   vs.

5   Natalie Renee Hoffman,                January 15, 2019
    Oona Meagan Holcomb,                       9:33 a.m.
6   Madeline Abbe Huse, and               Tucson, Arizona
    Zaachila Isabel Orozco-McCormick,

7
            Defendants.
8   _____

9

10

11      REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS

12                BENCH TRIAL DAY ONE

13      BEFORE THE HONORABLE BERNARDO P. VELASCO
              UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22   Court Reporter:        Erica R. McQuillen, RDR, CRR
                            Official Court Reporter
23                          405 W. Congress Street
                            Tucson, Arizona 85701
24                          (520)205-4267

25       Proceedings Reported by Stenographic Court Reporter
         Transcript Prepared by Computer-Aided Transcription

```
1                        A P P E A R A N C E S

2    For the Government:

3         Anna Roberta Wright
          Nathaniel Jacob Walters
4         United States Attorney's Office
          405 West Congress
5         Tucson, Arizona 85701

6

7    For the Defendants:

8         Anne Michelle Chapman
          Mitchell Stein Carey Chapman, PC
9         One Renaissance Square
          Two North Central Avenue
10        Suite 1450
          Phoenix, Arizona 85004
11

12        Christopher Baird Dupont
          Trautman Dupont, PLC
13        P.O. Box 431
          Phoenix, Arizona 85001
14

15        Louis S. Fidel
          Piccarreta & Davis, PC
16        145 South Sixth Avenue
          Tucson, Arizona 85701
17

18

19

20

21

22

23

24

25
```

```
 1                        EXAMINATION INDEX

 2   MICHAEL WEST
          DIRECT BY MS. WRIGHT  . . . . . . . . . . . . . 15
 3        CROSS BY MR. DUPONT . . . . . . . . . . . . . . 65
          REDIRECT BY MS. WRIGHT . . . . . . . . . . . . 117
 4

 5   BRIAN KRUKOSKI
          DIRECT BY MR. WALTERS . . . . . . . . . . . . .122
 6        CROSS BY MR. FIDEL . . . . . . . . . . . . . . .130
          REDIRECT BY MR. WALTERS . . . . . . . . . . . .152
 7

 8   GREGORY HESS
          DIRECT BY MR. DUPONT  . . . . . . . . . . . . .159
 9        CROSS BY MS. WRIGHT . . . . . . . . . . . . . .185

10   JOHN FIFE
          DIRECT BY MR. DUPONT  . . . . . . . . . . . . .191
11        CROSS BY MR. WALTERS  . . . . . . . . . . . . .205
          REDIRECT BY MR. DUPONT . . . . . . . . . . . . 206
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  Calling case 17-MJ-339, United States of
 3    America vs. Natalie Renee Hoffman, Oona Meagan Holcomb,
 4    Madeline Abbe Huse, and Zaachila Isabel Orozco-McCormick, all
 5    are on for trial.
 6            Counsel, please state your appearances.
 7            MS. WRIGHT:  Good morning, Your Honor.  Anna Wright
 8    and Nathaniel Walters on behalf of the United States.  With us
 9    at counsel table is United States Fish and Wildlife Officer
10    Michael West, our case agent.
11            THE COURT:  Good morning.
12            MR. FIDEL:  Good morning, Your Honor.  Louis Fidel,
13    Anne Chapman, and Chris Dupont on behalf of the defendants,
14    who are here in custody with us, or out of custody, excuse
15    me, with us at the defense table.
16            THE COURT:  Who is who?
17            MR. FIDEL:  We have Madeline Huse, who is closest to
18    Your Honor, Natalie Hoffman, and then Oona Holcomb and
19    Zaachila Orozco.
20            THE COURT:  Thank you.
21            You may proceed.
22            MS. WRIGHT:  Thank you, Your Honor.
23            There are three charges at issue in this case, three
24    misdemeanor charges:  Operating a motor vehicle in a
25    wilderness area; entering a national wildlife refuge without a
```

1  permit; and abandonment of property.

2          The evidence will show that, on August 13th of

3  2017, Defendant Hoffman drove a truck on a restricted

4  administrative road in a designated wilderness area in the

5  Cabeza Prieta National Wildlife Refuge with her three

6  codefendants as passengers.

7          The evidence will also show that, while in the

8  designated wilderness area, they cached various supplies for

9  use by illegal aliens as the illegal aliens crossed the desert

10  on the way to destinations further within the United States.

11          Finally, the evidence will show that the defendants

12  each admitted that they knew they had to obtain a permit to

13  enter the Cabeza Prieta National Wildlife Refuge and chose not

14  to.

15          The Government will call two witnesses in its case

16  in chief, first our case agent, Officer Michael West, will

17  testify about the events of August 13th and his interactions

18  with the defendants; and second, U.S. Fish and Wildlife

19  Officer Brian Krukoski will testify about the boundaries and

20  features of the Cabeza Prieta National Wildlife Refuge.

21          At the close of the defendant's case, the evidence

22  will show beyond a reasonable doubt that the defendants are

23  guilty as charged.

24          Thank you, Your Honor.

25          THE COURT:  Go ahead.

1          MR. DUPONT:  Yes, sir.

2          THE COURT:  Go ahead.

3          MR. DUPONT:  I'm waiting for this to come up.

4   Pardon me, Your Honor.  We tested this yesterday.

5          THE COURT:  No problem.

6          MR. DUPONT:  Your Honor, there is one basic

7   fundamental truth that describes and informs all religious

8   experience, and that is a deep and abiding love for all human

9   beings.

10          It's common to every religious tradition that we

11   know.  In the Christian tradition, we have Jesus Christ

12   telling us, my command to you is that you love one other; in

13   Islam, which teaches the love of all God's creatures; and the

14   teaching of the Buddha, where he talks about Mecca, loving

15   kindness, without considering whether a person is worthy or

16   not, to relentlessly work hard for the safety and welfare of

17   all sentient beings.

18          This religious experience can be both seen and

19   unseen.  It can happen inside of us through a prayer life, and

20   it can be expressed in what we do as well.  There are two

21   components to our religious experience, both contemplation and

22   action.

23          The evidence will show that the four young people

24   sitting with us today were living that universal truth, that

25   fundamental universal truth.  They were caring for others,

1    that's all they were doing, delivering water to those who were

2    dying of thirst and food to those who were dying of hunger.

3         They were acting out of compassion for those who

4    find themselves alone in the desert, dying of thirst and

5    hunger, and charity, without regard to whether they're worthy

6    or not.  The four young people with us are living, breathing,

7    walking, and talking examples of this fundamental truth, and

8    that's a defense in the United States of America.

9         We know from recent quotes in the paper that the

10   humanitarian situation on the border is a crisis of the soul.

11   Between 2000 and 2017, just here in the Pima County Medical

12   Examiner's office, there have been 2,816 remains delivered for

13   autopsy.  We also know from anthropologists and other workers

14   in the area that there have been thousands of others who have

15   simply disappeared, who have not been found yet.

16        We know exactly where this is happening.  We know

17   why it's happening, because of the extreme heat and the

18   desolation in a place where there's otherwise no water.

19   Natalie and Oona, Madeline and Zaachila, were doing something

20   about it.  This is not only a crisis of the soul.  It's a

21   public health crisis.

22            THE CLERK:  Do you want it published to the --

23            THE COURT:  I'm sure they came to see it.

24            MR. DUPONT:  Each red dot represents a person who

25   was found in the desert of Cabeza Prieta.  It's a person who

1   was found deceased, a veritable cemetery, a land of unmarked

2   graves.

3          The four people sitting with us walked into this

4   sacred ground to express their love and solidarity for their

5   fellow human beings, for those who have disappeared, and more

6   importantly, for those who may still be living along this

7   trail.  That's their mission, their mandate.  It's their

8   promise to God.

9          They're volunteers and paid employees of the mission

10  of the Universalist Unitarian Church called No More Deaths,

11  whose core mission is to end the death and suffering that's

12  happening in the desert so close to where we're sitting right

13  now.

14         We're going to present evidence about how this

15  crisis began to develop in the early 1990s.  At that time very

16  few people were dying in the desert.  I remember that time,

17  Your Honor.  It was a time when the parade used to cross right

18  through Ambos Nogales from one side to the other without

19  stopping.

20         Because of certain policies and procedures,

21  political action, people were forced into the desert deeper

22  and deeper.  In 1994, the Government published a report where

23  they said they knew this would happen, that people would

24  suffer and die.

25         So even as we see people funneled into this

1    dangerous and desolate area, and even though apprehensions are

2    down, year upon year, the deaths remain the same.  The deaths

3    per thousand crossers, per thousand apprehensions, have gone

4    up tenfold.

5         The Office of the Medical Examiner have studied the

6    factors that contribute to this, not only by developing this

7    map, this map was created in part by the Office of the Medical

8    Examiner, but by doing studies with the heat.  And what we've

9    learned is that heat above 104 degrees, when we reach that

10   mark inside the human body, the body's going to begin to die.

11        That heat outside the human body, in this area,

12   there's a 50 percent chance somebody's going to die that day,

13   and those numbers go up for every degree the temperature goes

14   up.  The chance that someone will die in this area go up every

15   degree the temperature goes up.  By the time the temperature

16   reaches 110 degrees, like it was on August 13th, 2017, the

17   statistical probability is 75 percent that someone's going to

18   die, that someone's dying in the desert on the day they went

19   to bring water.

20        All of these dots are marked by GPS.  Humanitarian

21   organizations including No More Deaths began to study the

22   patterns to figure out how best to deliver water to those who

23   are suffering and dying.  They developed what they call

24   waypoints.  So they mark where people are dead and dying, and

25   then they put water there.  It's that simple, except that they

1   also monitor how much water's being used so they know how

2   effective their work is.

3          And all the while they engage with the Government

4   agencies who know these deaths are happening but are not doing

5   enough to stop it.  They tell them about the need for placing

6   water.  They tell them they will be going to place water.

7   These maps have been created so they know the exact location

8   where water's being placed.

9          Unfortunately, in this particular area of the Forest

10  Service, they're only placing water on the roads, even though

11  in their own reports they know that people are not dying on

12  the roads.  They're avoiding the roads.  They know it's

13  completely ineffective, and the only way to deliver water to

14  people who need it is to go in the areas where they need it.

15         During these meetings with the Government agents,

16  they pled for access, and they were told by this very office

17  who prosecutes them today they were not interested in

18  prosecuting.  On July 6, 2017, shortly before this incident,

19  Assistant United States Attorney Larry Lee got up in front of

20  a courtroom, in front of all of the agencies, in front of No

21  More Deaths, and said, simply, we're not interested in

22  prosecuting these cases.

23         Ed McCullough is going to testify, and he is a

24  geologist who is an expert in mapping, and he creates these

25  maps to determine the trends on where to place water.  In July

of 2017, he sent this map along with a note identifying this as a trail of death, that migrants are dying on this trail at escalating numbers.  It's a crisis situation.  More and more people are being found.  Eleven on one day, four on another.

On July 19th, 2017, three people went missing in the area of this green cross right here.  Two of the people were recovered.  Two of the people were never -- one of the people was never found and remained in the desert, still in the wilderness.

When No More Deaths contacted the authorities about whether they were still searching, the response was, no, if that person wants to do the right thing and turn themselves in, they can be saved; if not, they can't.

Fundamental misunderstanding of what it is like to suffer and die in the desert, how your body breaks down, how your mind breaks down.  The nearest well that's usually empty, Charlie Bell Well right here.  How a person is going to walk 12 miles with no water in 110 degree heat, probably lost their mental facilities, is ignoring reality.  Not able to think clearly.  Probably not able to even move.

So people came down from No More Deaths into this area.  Two or three groups came down into the area.  By August 13th is when our group came down.  They came down just to where the mountains end and to the area of the flatlands where the person may be and where other people are most likely

1   dying, hopefully finding them before they die.

2          This is their mission.  This is their ministry.  And

3   they had every reason to think it would be okay.  They were

4   aware the Government had given permission to drive the roads

5   in the past.  They were aware the Government had given

6   permission to leave water in the past.  Every single case

7   brought by the Government, except one that was later reversed

8   by the Ninth Circuit, had been dismissed prior to this day.

9   They knew that.

10         On July 6th, as I've already mentioned, after years

11  of meetings about whether to go in or not, the Department of

12  Justice through their attorney said, we're not interested in

13  prosecuting these cases.  They had every reason to rely on the

14  Government's words, to believe they were true, because after

15  that meeting, and before, that's what was happening.

16         On June 1st, a group of No More Deaths volunteers

17  drove into this wilderness area, same area.  They were there

18  to leave water.  They talked to the Forest Service.  They were

19  not given a ticket.  They were asked to leave.

20         July 19th, the day two were rescued and one likely

21  died in this area, a group of No More Deaths volunteers drove

22  into the range to try to find the person.  They were stopped

23  by officials.  One person had his permit revoked.  They were

24  not ticketed in any way.

25         On July 19th, the same group went to leave water,

1    drove into this area, were stopped by Forest Service, not

2    ticketed, just asked to leave, and many other times they're

3    not even documented.  They heard the Government say they

4    weren't going to prosecute.  They had every reason to rely on

5    those statements.

6            But whether they had permission or not, they had a

7    fundamental right to be there.  People were suffering and

8    dying on August 13th, the very moment they were there.  Even

9    while politicians in Washington were yelling at each other

10   across the aisle, they were out there doing this religious

11   work, Your Honor.

12           And this is important, the distinction.  This was

13   not a political act.  The political system is broken.  While

14   people are endlessly debating whether a humane reaction fits

15   within some regulatory framework, people are suffering and

16   dying.

17           Their religious freedom, our religious freedom, is

18   not dependent on the feckless whims of the United States

19   Government.  They have a fundamental right to exercise their

20   religious beliefs, and no law can compel a person to sit by

21   while someone suffers and dies of thirst to not act and give

22   them water.

23           They have a right to practice their religion of

24   ending death and suffering, essentially of loving their

25   neighbor.  That's exactly what Oona, Natalie, Madeline, and

1  Zaachila did, as people of conscience.  And Your Honor, they

2  did it without bending a single blade of grass.

3          We're going to ask you at the end of this trial to

4  affirm that purest part of the human heart.  We're not

5  picketing or lobbying or protesting.  This isn't an act of

6  packing the courtroom.  It's not political at all.

7          There's no other reason, no other reason a person

8  would walk into the desert, at great personal risk to

9  themselves of also suffering and dying of heat exhaustion, no

10 other reason except they were trying to end death and

11 suffering, no other reason than they were practicing their

12 faith.

13         All they were doing is loving their neighbor, and

14 loving your neighbor is not a crime.

15         THE COURT:  Anyone else?

16         All right.  You may call your first witness.

17         MS. WRIGHT:  Your Honor, before we call the first

18 witness, I'd like to invoke the Rule so that any witnesses

19 from the Government or the defense are excused from the

20 courtroom for the time being.

21         THE COURT:  All right.  Where is your other witness?

22         MS. WRIGHT:  We have our witnesses out in a side

23 room, Your Honor, as well as a few Fish and Wildlife

24 employees.  I don't know if there are other defense witnesses

25 in the courtroom.

 1          MR. DUPONT:  Do we have any witnesses in the

 2  courtroom?

 3          I don't think so, Your Honor.  I haven't seen them.

 4          THE COURT:  All right.  The Rule has been invoked,

 5  and I'll ask counsel to admonish their witnesses.

 6          You may proceed.

 7          MS. WRIGHT:  Thank you, Your Honor.

 8          The Government calls as its first witness, Officer

 9  Michael West.

10              MICHAEL WEST, WITNESS, SWORN

11                  DIRECT EXAMINATION

12  BY MS. WRIGHT:

13  Q.  Officer West, if you will do me the favor first of making

14  sure that you speak clearly into that microphone for the

15  benefit of the court reporter.

16  A.  Can you hear me?

17  Q.  I think that will work.

18      And also, if you would please state your name and

19  position and spell your last name for the record.

20  A.  Michael West.  I'm a Federal Wildlife K-9 Officer with

21  U.S. Fish and Wildlife Service.  Last name is spelled

22  W-e-e-s-t -- W-e-s-t.

23  Q.  Like the cardinal direction?

24  A.  Correct.

25  Q.  All right.  Officer West, where are you employed and what

1   do you do for a living?

2   A.    Employed -- where am I employed?

3   Q.    Yes.

4   A.    Cabeza Prieta National Wildlife Refuge in Ajo, Arizona.

5   Q.    And who is your employer?

6   A.    The U.S. Fish and Wildlife Service.

7   Q.    How long have you held that position?

8   A.    Approximately 10 years.

9   Q.    And during your time with Fish and Wildlife, where have

10  your duty stations been?

11  A.    Cabeza Prieta.

12  Q.    And you said, I believe, that's in Ajo, Arizona?

13  A.    Correct.

14  Q.    And prior to beginning your duties as a Fish and Wildlife

15  officer, did you receive any training about your duties?

16  A.    Yes.

17  Q.    What sorts of training did you receive?

18  A.    We attend a 16-week training program in Brunswick,

19  Georgia, at the Federal Law Enforcement Training Center, and

20  then there's an add-on training in Shepherdstown, West

21  Virginia.  It's specific to the U.S. Fish and Wildlife Service

22  for law enforcement.

23  Q.    And what sorts of topics did you cover in those

24  trainings?

25  A.    General law enforcement training.  At FLETC at Brunswick,

1   Georgia, was just general Fourth Amendment and search and

2   seizure associated with that, law enforcement procedures, law

3   enforcement tactics, I guess you could say.  And at

4   Shepherdstown it was geared towards specifically U.S. Fish and

5   Wildlife policy and some of the acts and CFR that we enforce on

6   the refuge, throughout the refuge system.

7   Q.   Have you also received training specific to the Cabeza

8   Prieta National Wildlife Refuge?

9   A.   More just on-the-job training, just -- the training, you

10  basically do it while you're there, learning while you're

11  there.

12  Q.   And as -- in your role as a United States Fish and

13  Wildlife officer, what are your duties?

14  A.   Patrol the refuge and just look for any violations or

15  anything that would pertain to -- anything to protect the

16  resource.

17  Q.   And when you say you're looking for violations, can you

18  be more specific about that.

19  A.   There's -- our job is to protect the resource from

20  anything that threatens the resource, so any violations.  It

21  could be driving off road, driving off designated routes,

22  anything that might damage the resource in any way.  Poaching,

23  as far as protecting endangered species, anything to deal with

24  protecting endangered species from anything, like somebody

25  harassing the pronghorn antelope or the bighorn sheep, so on

 1   and so forth.

 2   Q.   So have there been regulations promulgated to protect

 3   this particular refuge?

 4   A.   Yes.

 5   Q.   And are you charged with enforcing those regulations?

 6   A.   Yes.

 7   Q.   So when we talk about violations, we're talking about

 8   violations of those regulations?

 9   A.   Correct.

10   Q.   Okay.  Now, on August 13th of last year, that's 2017,

11   were you on duty?

12   A.   Yes.

13   Q.   And were you stationed at Cabeza Prieta?

14   A.   Correct.

15   Q.   And on that day, just before noon, did anything happen to

16   draw your attention to an administrative road?

17   A.   I received some photographs that came in from a series of

18   trail cams that showed a vehicle that was driving off a

19   designated route into the wilderness.

20   Q.   And let's take a minute and talk about trail cams, and I

21   want us to use the phrase "trail cams" throughout so that it's

22   clear.

23   A.   Okay.

24   Q.   When you say you received some messages from a trail cam,

25   please tell the Court what the trail cams are and generally

1   where they are.

2   A.   There was a series of BuckEye cameras that are placed

3   throughout the area that monitor suspected smuggling routes for

4   illegal aliens and drug smugglers and other violations, and

5   we're on a system that gives us -- provides those photographs

6   off the trail cam.

7   Q.   And you've talked about -- you've mentioned photographs a

8   few times now.  How does the trail camera get from what it's

9   monitoring to sending a photograph?

10  A.   As far as scientifically, it's through cellular airwaves,

11  radio waves, and then it's transmitted to a server somewhere,

12  and then it's transmitted out on email.

13  Q.   And are the trail cameras constantly recording, or are

14  they activated somehow?

15  A.   Motion activated.

16  Q.   And you said on this day you received some emails from

17  the trail cameras?

18  A.   Correct.

19  Q.   What area of the Cabeza Prieta were those trail cameras

20  at?

21  A.   It's on a road called Charlie Bell Road and Charlie Bell

22  Pass.

23  Q.   And I want you to just give a little orientation for the

24  Court about where Charlie Bell Road is.  Can you access

25  Charlie Bell Road from the east, from Ajo, Arizona?

1    A.   Yes.

2    Q.   Okay.  And if you enter Cabeza Prieta on Charlie Bell

3    Road from the east, how far do you have to drive?  How far can

4    you drive as a member of the general public?

5    A.   From the blacktop, it's approximately 15 to 20 miles, I'm

6    guesstimating.

7    Q.   And these photos that you received that day, were they on

8    an -- were they from an area of the road that's open to the

9    general public?

10   A.   Not for vehicle traffic.  It's open to the public to walk

11   in but not for vehicle traffic.

12   Q.   And the photos you receive from this trail camera, do you

13   know where that camera's located?

14   A.   Approximate area, yes.  Yes.

15   Q.   And are you familiar with the designation of that area?

16   A.   Yes.

17   Q.   And how is that area designated?

18   A.   It's a designated wilderness area.

19   Q.   And in the area around that trail camera, is there any

20   part of it that it records that is not designated wilderness?

21   A.   Not in the immediate area, no.

22   Q.   Officer West, I'm going to show you what's been marked as

23   Government's Exhibits 11 through 15.

24              MS. WRIGHT:  Your Honor, may I approach the witness?

25              THE COURT:  Yes.

```
 1              MS. WRIGHT:  Thank you.
 2   BY MS. WRIGHT:
 3   Q.   Officer West, I want you to take a look through those,
 4   and when you've had a chance, look up to let me know you're
 5   ready to go on.
 6        Have you had a chance to look?
 7   A.   Yes.
 8   Q.   Officer West, do you recognize what's depicted in those
 9   exhibits?
10   A.   Say it again, please.
11   Q.   Yes.  Do you recognize what's in those exhibits?
12   A.   Yes.
13   Q.   What is it?
14   A.   It's a photograph of a BuckEye camera depicting a vehicle
15   on the Charlie Bell Road.
16   Q.   And are there time and date stamps on those exhibits?
17   A.   Yes.  Yes.
18   Q.   And could you tell the Court the date stamp on those
19   exhibits.
20   A.   The date is -- it says 8/13/2017.
21   Q.   And is that across all of the exhibits?
22   A.   Yes.
23   Q.   Are those the photos that you received from the trail
24   camera on August 13th that we've been discussing?
25   A.   Yes.
```

1  Q.   And are they -- what you see there, is that a fair and

2  accurate depiction of what you saw on August 13th?

3  A.   Yes.

4        MS. WRIGHT:  Your Honor, I'd move to admit

5  Government's Exhibits 11 through 15.

6        MR. DUPONT:  No objection.

7        THE COURT:  They'll be admitted.

8  BY MS. WRIGHT:

9  Q.   Officer West, I'm going to take those back from you, and

10 we're going to use the Elmo to talk about them.

11       Officer West, we're going to start with Exhibit 11, and

12 you've already said that this is date-stamped as August 13th.

13 Could you please read out the time stamp if you see it there?

14 A.   The time stamp on the photograph I'm looking at is 11:31.

15 Q.   And is that a.m. or p.m.?

16 A.   Be a.m.

17 Q.   Officer West, could you please describe what is shown in

18 this photo for us.

19 A.   Looks like the front driver's side door, the white Dodge

20 pickup, 2500.

21 Q.   And I'm going to -- you tend to trail off at the end of

22 your sentences, so I'm going to ask you to say that one again.

23 A.   Okay.  It's going to be the driver's side door and front

24 fender of a white Dodge 2500.

25 Q.   And looking at this photo, can you tell which direction

1    this vehicle is headed in?

2    A.    Westbound.

3    Q.    And how can you tell that?

4    A.    From the orientation of the camera, the general

5    orientation of the camera, and then on the top of the

6    photograph, it shows the direction of westbound, the top right

7    corner.

8    Q.    Thank you, Officer West.  Let's look at Exhibit 12.

9    A.    Okay.

10   Q.    I'm going to go through the same questions here.  Is this

11   also date-stamped August 13th?

12   A.    Yes.

13   Q.    And do you see the time stamp there?

14   A.    Yes.

15   Q.    What's the time stamp?

16   A.    12:22.

17   Q.    And is that a.m. or p.m.?

18   A.    p.m.

19   Q.    Can you tell if this is the same vehicle from Exhibit 11?

20   A.    White Dodge pickup.

21   Q.    And can you tell the direction of travel of this vehicle?

22   A.    That truck's headed eastbound.

23   Q.    Let's take a look at Exhibit 13.  Date stamp?

24   A.    Date stamp is 8/13/2017.

25   Q.    And the time stamp?

1   A.    12:22 and 04 seconds.

2   Q.    And can you describe what's shown in this photo, please.

3   A.    Looks like the right rear quarter panel of a -- I'm

4   assuming it is a Dodge pickup, yes.

5   Q.    And the direction of travel?

6   A.    Eastbound.

7   Q.    And I just want to take a moment, I'm going to show you

8   both 13 and 12 at the same time.

9         Looking at those time stamps, how far apart are they in

10  time?

11  A.    About three seconds.

12  Q.    Okay.  And based on that, can you draw any conclusion

13  about the relationship between 12 and 13, what we're seeing

14  here?

15  A.    Same truck.

16  Q.    Thank you.  And now let's look at Exhibit 14.  And what's

17  the date stamp on that?

18  A.    Date stamp is 8/13/2017.

19  Q.    And what's the time stamp, if you can see it?

20  A.    12:39 and 49 seconds.

21  Q.    And what do you see depicted in this photo?

22  A.    It's the driver's side door, front fender of a Ram 2500,

23  white.

24  Q.    And can you tell the direction of travel?

25  A.    Westbound.

1  Q.   Finally, let's look at Government's Exhibit 15.   What's

2  the date stamp, please.

3  A.   Date stamp is 8/13/2017.

4  Q.   And the time stamp?

5  A.   12:39 and 52 seconds.

6  Q.   And what are we looking at in this photo?

7  A.   The driver's side rear quarter panel of a white pickup

8  truck and a partial license plate.

9  Q.   Thank you.  And can you tell the direction of travel?

10  A.   Westbound.

11  Q.   And that partial license plate, could you please read out

12  what portions of that you can see.

13  A.   I can't in this photo.  I can't read it in this photo.

14  Q.   On August 13th, when you first saw this photo, were you

15  able to see --

16  A.   Yes.

17  Q.   -- the license plate then?

18  A.   Yes, correct.

19  Q.   Do you remember what you saw then?

20  A.   504.  I could see the numbers of 504 clearly.

21  Q.   Thank you.  And I'm sorry, the direction of travel?

22  A.   Westbound.

23  Q.   Thank you.  And let's compare 14 and 15 together.

24  Looking at those time stamps, how many seconds apart are they?

25  A.   Oh, shoot.  Roughly three seconds.

1  Q.   And from that, can you draw any conclusion about what

2  we're seeing in those two exhibits about what's happening

3  there?

4  A.   Same truck.

5  Q.   All right.  We'll take those down for now.

6       Now, based on the images that we just spoke

7  about, Exhibits 11 through 15, did you draw any conclusions

8  that day about what was happening in front of the trail

9  camera?

10 A.   Yes.  From the pictures, I could tell it was not a

11 Government vehicle or any vehicle that I recognized as being

12 authorized to be driving on that roadway.

13 Q.   Did you draw any conclusions about how many trips that

14 vehicle made over that road?

15 A.   From the photographs that I was provided, two trips at

16 least.

17 Q.   Now, we've mentioned in passing a few times this road and

18 the restrictions, et cetera.  Are there -- are there different

19 classes of road on the Cabeza Prieta Wildlife Refuge or

20 different classes of access to roads?

21 A.   As far as --

22 Q.   Let me ask you a less lawyerly question.

23      Are there roads the public can use their vehicles on and

24 roads that they can't use their vehicles on?

25 A.   Yes, correct.  Yes, there are.

1  Q.   Now, Charlie Bell Road, is it exclusively one or the

2  other across its whole distance?

3  A.   It's both.  It's not exclusively one or the other.  It's

4  both --

5  Q.   Okay.

6  A.   -- in some portions of it.

7  Q.   Is there a place on Charlie Bell Road where it goes from

8  being accessible by public vehicles, personal vehicles, to

9  being more restricted?

10  A.   Yes.

11  Q.   Where does that happen at?

12  A.   Charlie Bell Pass.

13  Q.   And when we say "more restricted," who is allowed to use

14  Charlie Bell Road once it goes to that restricted status?

15  A.   It's administrative to government vehicles only.

16  Q.   So government vehicles only?

17  A.   Yeah.

18  Q.   And how would the general public, if they were visiting

19  Cabeza Prieta National Wildlife Refuge, know which portions of

20  Charlie Bell Road they were allowed to drive on?

21  A.   When they -- to get onto the refuge, you're supposed to

22  have a -- you have to obtain a permit, and in the permitting

23  process, you're given a map, and the map depicts the open roads

24  that are open to the public to drive.

25       When you sign in at the -- at each entrance, there is a

1  kiosk, and there is a large map depicted at each kiosk, and on

2  that map it clearly designates the open roads to the public

3  that they can drive.

4  Q.   And are there any other ways that the public is made

5  aware of which portions of Charlie Bell Road they may drive

6  their vehicles on?

7  A.   Signage.  There are signage.  There is signage at each

8  road that depicts if it's an administrative trail for

9  authorized use only.

10  Q.   So let's take a minute to talk about this permitting

11  process that you mentioned.  If a member of the general

12  public, you know, a tourist or a resident of the community,

13  wants to go onto the Cabeza Prieta National Wildlife Refuge,

14  are there steps they need to take before they do that?

15  A.   Yes.

16  Q.   What are those steps?

17  A.   They have to go to a designated place, the headquarters

18  office in Ajo is one, to obtain a permit and sign a Hold

19  Harmless Agreement.

20  Q.   And so how does a person get a permit?  If you could

21  describe that in detail for the Court.

22  A.   They have to come in and just declare that they would like

23  to have a permit for the refuge, and they fill out paperwork,

24  there's certain pertinent information that's collected, and

25  they have to sign the Hold Harmless Agreement that has a series

1    of statements that they have to initial by, just agreeing that

2    they acknowledge that those statements are there, and they have

3    to watch a video to get onto the BMGR.

4    Q.   And BMGR, what's that?

5    A.   The Barry M. Goldwater Aerial Gunnery Range for the

6    Department of Defense.

7    Q.   And so you've discussed this Hols Harmless Agreement.

8    A.   Yes.

9    Q.   Is that agreement only for Cabeza Prieta National

10   Wildlife Refuge?

11   A.   No.

12   Q.   What areas does that cover?

13   A.   It covers the Sonoran National Monument, Sonoran Desert

14   National Monument, I believe it is, and the Barry M. Goldwater,

15   areas of the Barry M. Goldwater that are open to the public.

16   Q.   Officer West, if you'll just give me a minute here.

17       I'm going to show you what's been marked as Government's

18   Exhibit No. 2.

19             MS. WRIGHT:  If I may approach, Your Honor?

20             THE COURT:  You may.

21             MS. WRIGHT:  Thank you.

22   BY MS. WRIGHT:

23   Q.   Officer West, take a look at that, and when you're

24   ready, look up.

25   A.   Okay.

1    Q.    Do you recognize what is in Government's Exhibit No. 2?

2    A.    Yes.

3    Q.    What does that appear to be?

4    A.    It's the Acknowledgement and the Hold Harmless Agreement,

5    Acknowledgment of Danger and Hold Harmless Agreement that's

6    used to obtain the permit.

7    Q.    And was that Hold Harmless Agreement in effect on August

8    13th of 2017?

9    A.    Yes.

10   Q.    And is the photocopy there an accurate photocopy of that

11   Hold Harmless Agreement?

12   A.    It appears to be, yes.

13            MS. WRIGHT:  Your Honor, I'd move to admit

14   Government's Exhibit No. 2.

15            MR. DUPONT:  No objection.

16            THE COURT:  It'll be admitted.

17   BY MS. WRIGHT:

18   Q.    Officer West, I'll take that back from you.

19         Officer West, I'd like to turn your attention now to the

20   next steps that you took on August 13th, 2017.

21            THE COURT:  Let me ask a question of counsel.

22            Are the highlighted portions added, or is that the

23   way the document actually looks?

24            MS. WRIGHT:  Officer West, let me hand you Exhibit 2

25   back and see if you can answer the Court's question.

```
 1              THE COURT:  Pages -- the two-page exhibit has, on
 2   page one and page two, it has highlighted things.  Is that the
 3   way the exhibit is printed?
 4              THE WITNESS:  Your Honor, I don't issue the permit,
 5   so I can't answer that.  I don't know.
 6              MS. WRIGHT:  Your Honor, we can get that answer for
 7   the Court from another witness.
 8              THE COURT:  All right.  Thanks.
 9              MS. WRIGHT:  Officer West, I'll take that back from
10   you again.  Thank you.
11   BY MS. WRIGHT:
12   Q.   So let's pick back up with the events of August 13th.
13   A.   Okay.
14   Q.   So I believe where we left off before we got into some
15   more background information was that you had received these
16   photographs from the trail camera.
17   A.   Yes.
18   Q.   And as a result of getting these photographs, did you do
19   anything?
20   A.   I responded to the area of Charlie Bell Pass.
21   Q.   And when you say "responded," what do you mean?
22   A.   Drove.
23   Q.   Okay.
24   A.   Drove my patrol vehicle.
25   Q.   Did you eventually get to Charlie Bell Pass?
```

 1  A.   Eventually, yes.

 2  Q.   About what time was that?

 3  A.   Approximately around, what, 1:13.

 4  Q.   And when you got to Charlie Bell Pass, what did you see

 5  there, if anything?

 6  A.   There was an older model green Ford pickup parked there,

 7  legally parked there.

 8  Q.   And did you see anything else at Charlie Bell Pass?

 9  A.   No other vehicles, just the vehicle that was there.  No

10  persons there or nothing.

11  Q.   And when you got to Charlie Bell Pass, what did you do?

12  A.   I got out and I looked around for anybody that might be in

13  the immediate area.  I looked at the green Ford pickup, and I

14  walked around the truck to see if there was -- what was in the

15  back of the truck and to see if they had a permit posted on the

16  dashboard of the truck, as required.

17  Q.   Was anybody else in the area?

18  A.   No.

19  Q.   Did you see anything in the bed of the truck?

20  A.   I did.

21  Q.   What did you see?

22  A.   I saw that there was several green milk crates containing

23  one-gallon water jugs and some cases, cartons, of tin cans of

24  beans.

25  Q.   And did you see if there was a permit with that green

1  Ford truck?

2  A.   I did.

3  Q.   And what did you notice?

4  A.   No permit was present.

5  Q.   Now, Officer West, while you were there, did you do

6  anything else at Charlie Bell Pass?

7  A.   I looked around the area.  I kept looking in the area, and

8  then I looked down into -- Charlie Bell Pass obviously is

9  elevated above, looking to the west, and I looked down into the

10  valley to see if I could see any persons down there, and I

11  observed a white pickup, what looked to be a white pickup in

12  the distance, passed.

13  Q.   And did you do that with your naked eye, or did you have

14  some help there?

15  A.   I have binoculars.

16  Q.   Okay.  Now, before we move on to that, Officer West, I'd

17  like to show you Government's Exhibits 16 through 18.

18          MS. WRIGHT:  Your Honor, may I approach?

19          THE COURT:  Yes.

20          MS. WRIGHT:  Thank you.

21  BY MS. WRIGHT:

22  Q.   Same as before.  Take a look at those and look up when

23  you're ready.

24  A.   Okay.

25  Q.   Officer West, what do you see depicted in Exhibits 16

1   through 18?

2   A.   It's a green pickup, Ford pickup, and it shows the

3   contents of the bed of the truck.

4   Q.   Is that that same Ford pickup truck that you saw on

5   August 13th at Charlie Bell Pass?

6   A.   Yes.

7   Q.   And are those photos a fair and accurate depiction of

8   what you saw that day at Charlie Bell Pass?

9   A.   Yes.

10          MS. WRIGHT:  Your Honor, I'd move to admit

11  Government's Exhibits 16 through 18.

12          MR. DUPONT:  No objection.

13          THE COURT:  Be admitted.

14          MS. WRIGHT:  Thank you.  I'll take those back.

15  Thank you.

16  BY MS. WRIGHT:

17  Q.   So let's take a moment and take a look at these exhibits

18  with the Elmo.

19  A.   Sure.

20  Q.   And first I'd like to start with Exhibit 16.  If you

21  could briefly describe for the Court what we're seeing in this

22  picture and generally what's in this area at Charlie Bell

23  Pass.

24  A.   This is the top of Charlie Bell Pass.  It's cleared out.

25  This is generally where people come to hike the area.  They

 1  park in this area, so there is a cleared out area where people

 2  can park.  There is a rescue beacon at this particular area,

 3  and then the road that leads down into Charlie Bell Pass

 4  towards Charlie Bell Well.

 5  Q.  And the road that leads from Charlie Bell Pass towards

 6  Charlie Bell Well, which direction is that in?

 7  A.  It's going westbound.

 8  Q.  Okay.  And is that a road that the general public may

 9  drive on?

10  A.  No.

11  Q.  And in Government's Exhibit 16, do you see the truck that

12  we've been discussing?

13  A.  The green Ford pickup?

14  Q.  Yes.

15  A.  Yes.

16  Q.  Sorry.  More than one truck right now.

17  A.  Yes.

18  Q.  Let's take a look at Exhibit 17.  Please describe for the

19  Court what we see there.

20  A.  Milk crates, green milk crates with one-gallon jugs of

21  drinking water and individual crates of beans, tin cans of

22  beans.

23  Q.  Is this the green truck that we've been discussing here?

24  A.  Yes.

25  Q.  And Exhibit 18, just briefly what do we see there?

1   A.   Another angle of the same crates and more beans.

2   Q.   Thank you.  I'll take those down now.

3        So you said when you were at Charlie Bell Pass that you

4   looked out with your binoculars.

5        Was that to the west?

6   A.   Yes, correct.

7   Q.   And did you see the white Dodge truck that you were

8   looking for?

9   A.   Saw -- yes.

10  Q.   And when you saw that, did you do anything as a result?

11  A.   I drove into Charlie Bell Pass to go make -- see if I can

12  make contact with the driver of that vehicle.

13  Q.   And when you proceeded to drive west on Charlie Bell

14  Road, I take it that's the road that you took?

15  A.   Yes, correct.

16  Q.   Were -- did you see any signage designating the road at

17  that time?

18  A.   I did, yes.

19  Q.   And please tell the Court briefly what signage you saw.

20  A.   Immediately at the, I guess you could call it the mouth of

21  Charlie Bell Pass Road, Charlie Bell Road, there's two signs.

22  One depicts it as an administrative trail and for authorized

23  use only, and then the other side is a Carsonite sign that

24  clearly states it's for Government vehicles only.

25  Q.   And on August 13th, when you drove past the signs, did

1  you have any trouble seeing them?

2  A.   None at all.

3  Q.   I'd like to show you Government's Exhibit 19 through 22.

4            MS. WRIGHT:  Your Honor, if I could approach?

5            THE COURT:  You may.

6            MS. WRIGHT:  Thank you.

7  BY MS. WRIGHT:

8  Q.   Just look up when you're ready.

9  A.   Okay.

10  Q.   All right.  Do you recognize what you see in Exhibits 19

11  through 22?

12  A.   That's what I would -- that's what I previously described

13  as the mouth of the road leading into Charlie Bell Pass to

14  Charlie Bell Well, and it's the signs, the signage that was

15  there at the time.

16  Q.   And is that a fair -- are those 19 through 22 a fair and

17  accurate depiction of the signs in the road as it appeared

18  that day?

19  A.   Yes, correct.

20            MS. WRIGHT:  Your Honor, I'd move to admit

21  Government's Exhibits 19 through 22.

22            MR. DUPONT:  May I have a minute, Your Honor?

23            No objection.

24            THE COURT:  They'll be admitted.

25  BY MS. WRIGHT:

1   Q.   I'll take those back from you.  Thank you.

2        So Officer West, let's just take a look at these again.

3   Exhibit 19, if you could describe your orientation in taking

4   this photograph and what we're looking at here.

5   A.   Standing again on the -- in what we consider the parking

6   area of Charlie Bell Pass, the top of Charlie Bell Pass, I'm

7   looking towards the east, or correction, the west, looking into

8   Growler Valley, looking towards Charlie Bell Well.

9   Q.   And do you see these signs that you've described to us in

10  Government's Exhibit 19?

11  A.   Yes.

12  Q.   And please point out to the Court the two different signs

13  you were talking about.

14  A.   Point out the signs?

15  Q.   You can use left and right, different colors.

16  A.   Okay.  As I'm looking at the photograph, the sign to the

17  right, the white sign with the blue lettering, is the

18  administrative trail sign; and the sign to the left, it's got

19  the yellow strip on it, would be the Carsonite sign that

20  depicts as government vehicles only.

21  Q.   And let's take a look at Government's Exhibit 20.  What

22  do you see there?

23  A.   It's the Carsonite sign that depicts the yellow strip.

24  Q.   Government's Exhibit 21, what do you see there?

25  A.   The white sign with blue lettering to designate that as an

 1  administrative trail for authorized use.

 2  Q.   And Government's Exhibit 22?

 3  A.   It's a slightly different angle, looking from the side of

 4  the rescue beacon, looking at both of the signs in one photo.

 5  Q.   Now, at Charlie Bell Pass, are there any other signs

 6  designating roads there?

 7  A.   On further down the road there is.

 8  Q.   Sorry.  In this place where you took those photos, are

 9  there any other signs other than these two --

10  A.   No, not at this area, no.

11  Q.   And Officer West, just in the lower or towards the left

12  side of Government's Exhibit 22, what do we have there?

13  A.   You're talking about the structure with the yellow box?

14  Q.   I am.

15  A.   That's the rescue beacon that the Border Patrol provides,

16  a rescue beacon.

17  Q.   And when you say "rescue beacon," what does that mean?

18  A.   It's a beacon that's connected to -- directly to the U.S.

19  Border Patrol station in Ajo.  What they use or designate it

20  for is, it's a button that anybody can -- that's in distress

21  can push the button, and it'll signal -- immediately signal the

22  Border Patrol station, and they'll -- they can send people to

23  respond for whatever reason.

24       The yellow box has an emergency phone in it.  You can

25  actually open it up and actually speak to somebody.  And

1    there is a camera on this, on the beacon, that looks down.

2    Another -- it's one of the BuckEye trail cameras that gives the

3    realtime photos, so if somebody's standing there, you can see

4    somebody standing there.

5    Q.   Let's step back to our time line of events here.  So you

6    looked west and you continued to drive.  At some point did you

7    reach an area that's called Charlie Bell Well?

8    A.   Yes.

9    Q.   And can you just briefly describe for the Court what is

10   normally at Charlie Bell Well.

11   A.   Charlie Bell Well is an historic well that was -- there's

12   usually -- well, not usually.  There is an old windmill, a

13   large water tank, and a wildlife -- what we call a wildlife

14   drink or wildlife guzzler.

15   Q.   And the water tank that's there -- so we have a wildlife

16   guzzler.  Is that water that's usually fit for humans?

17   A.   Not out of the guzzler.

18   Q.   Okay.  And how about out of the water tank?

19   A.   Out of the water tank, yes.

20   Q.   And when you pulled up to Charlie Bell Well that day, did

21   you see anything other than the items you described to the

22   Court?

23   A.   There was a large stash or cache of the green milk crates

24   with the full one-gallon water jugs and the beans.

25   Q.   And I'd like to show you Government's Exhibits 3 and 24.

1            MS. WRIGHT:  Your Honor, if I could approach?

2            THE COURT:  You may.

3            MS. WRIGHT:  Thank you.

4            THE COURT:  What were the numbers again?

5            MS. WRIGHT:  3 and 24.  They're out of order, Your

6    Honor.

7            THE COURT:  All right.  Thank you.

8    BY MS. WRIGHT:

9    Q.   Actually, let's just start with Government's Exhibit 3.

10   What do you see in that exhibit?

11   A.   That's the Charlie Bell Well, the windmill, the

12   solar-powered windmill.  It has a solar pump that pumps water

13   into the large tank.  You can't see the wildlife guzzler there,

14   but I also see --

15   Q.   And Officer West, let me ask you this.  Is that photo a

16   fair and accurate depiction of Charlie Bell Well on that day?

17   A.   Yes.  Correct.

18           MS. WRIGHT:  Okay.  I'd move to admit Government's

19   Exhibit 3, please, Your Honor.

20           MR. DUPONT:  No objection.

21           THE COURT:  It'll be admitted.

22   BY MS. WRIGHT:

23   Q.   And let me take that back, and we'll deal with Exhibit 24

24   in a second here.

25       Exhibit 3 up on the Elmo, please just describe for the

1   Court which way you're facing, your orientation here, and what

2   the various features are that we see.

3   A.   So this is Charlie Bell Well.  This is the road leading

4   up.  You're coming from the east.  I'm facing westbound into

5   Growler Valley.  You see the windmill, the water tank, and then

6   the large cache of milk grates, the green milk crates, with the

7   water jugs and the beans.

8   Q.   Now, at Charlie Bell Well, did you see that white truck

9   that you were looking for?

10  A.   Not from Charlie Bell Well, no.

11  Q.   What did you do once you took note of these items here?

12  What did you do next?

13  A.   I proceeded down the road to see if I could locate the

14  vehicle.

15  Q.   And as you went down the road, was there any further

16  signage?

17  A.   Yes.  Immediately past this photograph, there is another

18  sign that designates the roadway as a management trail and for

19  authorized use only.

20  Q.   Take a look at Government's Exhibit 24 that you have

21  there with you, please.  Do you recognize what's in that

22  exhibit?

23  A.   Yes.

24  Q.   And what is that?

25  A.   It's a photograph of the management trail sign that I just

1  described from the driver's seat of my truck.

2  Q.   And is that a fair and accurate depiction of that sign on

3  that day?

4  A.   Yes.

5        MS. WRIGHT:  Your Honor, I'd motive to admit

6  Government's Exhibit No. 24.

7        MR. DUPONT:  No objection.

8        THE COURT:  Admitted.

9  BY MS. WRIGHT:

10  Q.   And Officer West, I'd like -- if you could please

11  describe for us what we're seeing in this photo and what your

12  vantage point was when you took this photo.

13  A.   Again, this is immediately just past the previous

14  photograph that we took driving along the trial.  This sign is

15  posted along just right there, and it's unobstructed, and it's

16  from the driver's seat of my patrol vehicle.

17  Q.   So you took this photo?

18  A.   I did, yes.

19  Q.   And where were you seated?  Where were you when you took

20  this photo?

21  A.   Seated in my front seat, the driver's seat of my patrol

22  vehicle.

23  Q.   Now, Charlie Bell Well, about how far is that from

24  Charlie Bell Pass?

25  A.   Approximately a mile, give or take.

1   Q.   Now, did you at some point find that white Dodge truck

2   that you were looking for?

3   A.   Yes.

4   Q.   And where did you find that?

5   A.   Driving -- I continued driving westbound on Charlie Bell

6   Road, and it was approximately .8 miles, a mile further, past

7   Charlie Bell Well.

8   Q.   And when you found the white Dodge truck, what did you do

9   next?

10  A.   Drove up and got out and looked, surveyed the area just to

11  see if there was anybody in the immediate area and if I could

12  find the driver.  I looked in the back of the truck, looked

13  around the truck, tried to look in the dash to see if there was

14  a permit in the dash, and took some photographs.

15  Q.   And you said, excuse me, that you looked to see if anyone

16  was around.  Was there anyone around?

17  A.   No.  There was nobody around at the time.

18  Q.   And did you observe anything when you went to look at the

19  truck?

20  A.   In the back of the truck, I could see that it was pretty

21  much completely full of more green milk crates containing the

22  one-gallon water jugs and more beans, cans of beans.

23  Q.   And during your inspection of the truck, did you notice

24  whether or not it had a permit displayed?

25  A.   There was no permit displayed.

1    Q.   Now, once you did your inspection, what did you do next?

2    A.   Just continued looking around the area.  I was seeing if

3    anybody was still right there.  It took me a few minutes, and

4    then I decided to drive further down the road to the west to

5    see if anybody was walking along the roadway.

6    Q.   Did you see anyone?

7    A.   No, nobody.

8    Q.   What did you do next?

9    A.   Turned around and went back, and then I sat and -- I sat

10   with the truck and waited for somebody to come out, come back.

11   Q.   Now, did somebody eventually come back to the truck?

12   A.   Yes.

13   Q.   And tell us how that happened.

14   A.   I was sitting there --

15           THE COURT:  Why don't we take a 15-minute break.

16   We'll stand at recess until, what, 10:45.  Thank you.

17           (Off the record.)

18           THE COURT:  You realize you're under oath?

19           THE WITNESS:  Yes, sir.

20           THE COURT:  You may proceed.

21           MS. WRIGHT:  Thank you, Your Honor, and before we go

22   on, and I asked defense if they had any objection, we checked

23   with some of the Fish and Wildlife employees on the Court's

24   question about Exhibit 2 and the highlights.  Those highlights

25   are not there usually when the public signs them.

 1              THE COURT:  All right.  Thank you.

 2   BY MS. WRIGHT:

 3   Q.   Let's see.  Officer West, I believe we left off talking

 4   about the point in time when you found the white pickup truck.

 5   A.   Yes.

 6   Q.   And I believe that you told us that you returned to the

 7   area to wait to see if anybody were to return to the truck.

 8   A.   Yes, I waited in my truck to see if -- just to wait until

 9   the driver showed back up, made contact.

10   Q.   And did anybody eventually show back up to the truck?

11   A.   They did, yes.

12   Q.   And about how long was that after you first found the

13   truck?

14   A.   I think it was approximately 15-20 minutes, maybe.

15   Q.   And was it one individual, or were there more than one

16   person there?

17   A.   I saw four people walk from the south back to the truck.

18   Q.   And did you have any reason to believe they were

19   associated with the truck?

20   A.   They immediately went to the truck and started getting

21   inside of it, so I made contact with them.

22   Q.   And when you say "made contact," what did you do?

23   A.   I got -- I approached the vehicle.  I got out on foot and

24   approached and identified myself as a Federal Wildlife Officer

25   with the U.S. Fish and Wildlife Service and asked who the

1   driver of the vehicle was.

2   Q.   Were you able to identify the driver?

3   A.   Yes.

4   Q.   And who did that person turn out to be?

5   A.   Turned out to be the person who was standing in the

6   driver's door at the driver's seat, and she identified herself

7   as, eventually, as Natalie Hoffman.

8   Q.   And do you see the driver of the vehicle here today in

9   court?

10  A.   Yes.

11  Q.   And can you please point out to the Court where she is

12  sitting and describe an article of clothing that she is

13  wearing.

14  A.   Black jacket overcoat, short hair and earrings, the white

15  young lady there.

16          MS. WRIGHT:  May the record reflect that the witness

17  has identified the defendant, Natalie Hoffman, Your Honor?

18          THE COURT:  Yes.

19          MS. WRIGHT:  Thank you.

20  BY MS. WRIGHT:

21  Q.   Now, Officer West, once you identified Ms. Hoffman as the

22  driver of the vehicle, what did you do next?

23  A.   I asked if anybody had asked her if she was the owner of

24  the truck, and she told me that it was -- it belonged to the

25  Unitarian Universalist Church of Tucson.

1  Q.   And once you heard that, did you ask her any further

2  questions?

3  A.   I asked her if she had -- I asked her if she was the

4  driver, and she did say she was the driver, and then I asked

5  for -- I believe I asked for insurance and registration, proof

6  of insurance and proof of registration on the vehicle.

7  Q.   Was she able to provide that to you?

8  A.   Eventually, yes.

9  Q.   And did you have any other conversation with Ms. Hoffman?

10 A.   Just asking her if she realized if she was in the

11 wilderness area, number one, and she advised she was aware that

12 she was in the wilderness area.  And then I asked her if she

13 realized that she was driving in the wilderness illegally, and

14 she said no.

15      I asked her if she had -- I also asked her if she had a

16 permit.  I asked the whole -- the rest of the crew if they had

17 a permit, and then I asked them to provide me with any ID or

18 anything, because they said they didn't have any permits.

19 Q.   All right.  Well, let's stay focused on Ms. Hoffman for a

20 minute, and then we'll get to the other three people.

21 A.   Okay.

22 Q.   In your conversation with Ms. Hoffman, did you have any

23 conversation about signage along Charlie Bell Road?

24 A.   I asked her if she observed -- after I had asked her if

25 she -- the wilderness questions, if she knew she was driving in

 1  wilderness illegally, I asked her if she observed the signage

 2  that was at the top of Charlie Bell Pass.

 3  Q.    And did she say anything?

 4  A.    She said she did not notice the signs.

 5  Q.    And during your conversation with Ms. Hoffman that

 6  day, did you have any conversation with her about why she was

 7  driving on the road?

 8  A.    They said that they were driving the road to -- for their

 9  -- to put out the humanitarian aid, to put out water.

10  Q.    And when you say "they" who said, was that Ms. Hoffman

11  that you're referring to?

12  A.    Hoffman said it, yeah.

13  Q.    And let's just go ahead and -- so there were three other

14  people there.  Did you eventually identify those people?

15  A.    Yes.

16  Q.    How did you do that?

17  A.    Through identification from driver's license, and then one

18  did not have a driver's license, so it was just by name and

19  date of birth.

20  Q.    And who did you identify those three people to be?

21  A.    There was a Madeline Huse, Oona Holcomb, and a Zaachila

22  McCormick, Orozco-McCormick.

23  Q.    Do you see any of those people here today in court?

24  A.    Yes.

25  Q.    And let's start with Ms. Huse.  Do you see her here in

1   court today?

2   A.   I do, yes.

3   Q.   Please point her out to the Court and describe an item of

4   clothing she is wearing.

5   A.   The first young lady with the long hair sitting at the

6   table there in the dark jacket, black-colored shirt.

7          MS. WRIGHT:  May the record reflect the officer has

8   identified Ms. Huse, Your Honor?

9          THE COURT:  Yes.

10  BY MS. WRIGHT:

11  Q.   And now let's turn to Ms. McCormick.  Do you see her here

12  in court today?

13  A.   Yes.

14  Q.   And the same.  Please point her out and describe a piece

15  of clothing --

16  A.   The young lady in the black dress, the black hair,

17  sitting -- the last young lady at the table there.

18         MS. WRIGHT:  And Your Honor, may the record reflect

19  that the witness has identified Ms. McCormick?

20         THE COURT:  Yes.

21  BY MS. WRIGHT:

22  Q.   And finally Ms. Holcomb, Officer West.

23  A.   That would be the young lady with the black sweater, white

24  shirt, and short dark hair.

25  Q.   Now, going back to the conversation you were having out

1   there that day, at any point in time did you ask these

2   defendants if they had permits to be in that area?

3   A.   Yes.  Yes, I did.

4   Q.   And did they give you a response?

5   A.   They did.

6   Q.   And did all four respond to you?

7   A.   Yes.

8   Q.   And did they have different responses?

9   A.   They all said, no, they didn't have one.

10  Q.   And did you make any inquiry about whether or not they'd

11  ever been out in Cabeza Prieta before?

12  A.   I had -- I did ask.  I asked in general if any of them had

13  been to Cabeza Prieta at any time.  At the time I think

14  Ms. Holcomb and Ms. Hoffman were directly in front of me and

15  directed, I guess, the response from them, and they said that

16  they had never been to Cabeza Prieta initially, and then

17  Ms. Hoffman did eventually say that she had been hiking on

18  Cabeza Prieta approximately two years earlier at some point,

19  somewhere.

20  Q.   Now, Officer West, as a result of your conversation and

21  interactions with the defendants, did you give them any

22  instruction about what to do?

23  A.   After -- after it was complete, I asked them that they

24  should leave the refuge since they didn't have a permit, that

25  they should leave the refuge and drive straight out.

1   Q.    And did the defendants do that?

2   A.    Eventually, yes.

3   Q.    And who drove?  Who got in the driver's seat when they

4   drove out?

5   A.    Ms. Hoffman did.

6   Q.    And after they got back in the Dodge truck, what happened

7   next?

8   A.    We -- eventually we made our way back to the east towards

9   the refuge exit, and in passing by Charlie Bell Well where the

10  crates were, they stopped.  I stopped and then they stopped.

11  Q.    Officer West, I want to show you what's previously been

12  admitted as Government's Exhibit 3.  Thank you.

13        And I'll leave this up here, and you can use Exhibit 3 to

14  describe what happened next at Charlie Bell Well.

15  A.    Okay.  We pulled up to the well.  They drove past, and I

16  guess they saw that I stopped.  So I stopped, and previously in

17  the contact, before we left the area, before I asked them to

18  leave, I asked them if the stash of crates and milk jugs

19  belonged to them, and they admitted that they were the ones

20  that left them there.

21        And so when I told them to -- that they needed to leave

22  the refuge, I explained that they needed to drive straight

23  out, don't stop, and then I stopped here to collect the crates

24  and the milk jugs, and they stopped, I guess, when they saw me

25  stop.

1  Q.   And so the -- what we see here on the left-hand or the --

2  well, the left-hand of how I have it displayed of Exhibit

3  3, are those the crates that we're talking about?

4  A.   Yes.

5  Q.   And so what happened with those crates when you stopped

6  at Charlie Bell Well?  What -- did you do anything with them?

7  A.   I collected them and put them in my patrol vehicle and

8  hauled them out.

9  Q.   And I want to take a minute to pause here and talk a

10 little bit further about the center of Exhibit 3.  Do you see

11 that white tank there?

12 A.   Yes.

13 Q.   Are you familiar with how that white tank operates and

14 what it does?

15 A.   Yeah.  That's the aboveground collection for the water

16 that's coming out of the well below the windmill.  The windmill

17 itself is serviced by a solar submersible pump that's down in

18 the well, and there's a float system inside the tank that, when

19 everything is functioning properly, the tank stays full, and

20 any gravity feeds the wildlife drinker that's on past the trees

21 there.

22 Q.   As part of your duties as a Fish and Wildlife officer, do

23 you ever check this tank and check on its operations?

24 A.   Yes.

25 Q.   Is that part of your routine, or is it a once-in-a-while

1   thing?  How does that happen?

2   A.   It's between myself and the other officers.  We check it

3   as often as we can.  If we're in the area, we'll check just to

4   make sure that everything is functioning properly and there is

5   water in the tank.

6   Q.   And in your experience, can you tell the Court whether

7   the tank is functioning properly more often than not?

8   A.   In my experience, yes, it is.

9   Q.   On that day did you particularly check the tank?

10  A.   I don't recall if I actually did that day.  I don't

11  recall.

12  Q.   Let's go back to our time line now.  So once you picked

13  up the crates at Charlie Bell Well, what happened next?

14  A.   After I picked up the crates, we proceeded out the rest of

15  the way, heading east towards the exit of the refuge, towards

16  the top of -- past Charlie Bell Pass.

17  Q.   Did you eventually arrive back at the Fish and Wildlife

18  Cabeza Prieta office in Ajo?

19  A.   Eventually, yes.

20  Q.   And when you got to the office, what happened there?

21  A.   I explained to them -- at one point they had stopped, and

22  I explained to them once we left the refuge that we could go

23  back to the headquarters, and I would take photographs of all

24  the crates and the beans, and then they could have their

25  property back.

1    And so when we got to the refuge, the headquarters, I

2  called BLM dispatch and did some inquiries of the driver's

3  license numbers that I had, and then I eventually unloaded my

4  truck, stacked all the crates and the beans in one spot,

5  photographed each crate individually, and then I photographed

6  them as a whole, and then I gave them back to the defendants.

7  Q.   Officer West, I'd like to show you Government's Exhibits

8  35, 36 -- 35 and 36.

9         MS. WRIGHT:  May I approach, Your Honor?

10         THE COURT:  Yes.

11         MS. WRIGHT:  Thank you.

12  BY MS. WRIGHT:

13  A.   Okay.

14  Q.   Do you recognize what is in those exhibits?

15  A.   Yes.

16  Q.   And what does that appear to be?

17  A.   That's the accumulation, overall accumulation of the

18  overall crates and milk jugs and beans that were collected from

19  Charlie Bell Well.

20  Q.   And those photographs, do you know who took them?

21  A.   I did.  I did.

22  Q.   And is that a fair and accurate representation of those

23  milk crates on that day?

24  A.   Yes.

25         MS. WRIGHT:  Your Honor, I'd move to admit Exhibits

1  35 and 36.

2           MR. DUPONT:  No objection.

3           THE COURT:  They'll be admitted.

4  BY MS. WRIGHT:

5  Q.   Officer West, let's take a look at Exhibit 35.

6       Now, once you're back at the Cabeza Prieta main office,

7  what did you do next regarding these jugs, these crates?

8  A.   After this photograph?

9  Q.   Yes, sir.

10 A.   I just -- I informed the young ladies that they could have

11 their property back, and then I turned around, and I got back

12 in my truck, turned it around, and actually I stood there and

13 watched them as they collected the crates and loaded them

14 into -- back into the white Dodge pickup.

15 Q.   At some point in time did you count the number of milk

16 jugs and cans of beans there?

17 A.   I did, yes.

18 Q.   And do you remember today how many there were?

19 A.   Not exactly.  I know there was at least 70 gallons of

20 water and probably almost as many cans of beans, not exact

21 amount, but --

22 Q.   Before we move on, I want to take a minute and show you

23 Government's Exhibits 25 through 28.

24          MS. WRIGHT:  If I could approach, Your Honor.

25          THE COURT:  You may.

```
 1              MS. WRIGHT:  Thank you.

 2  BY MS. WRIGHT:

 3  A.   Okay.

 4  Q.   All right.  Do you recognize what is in those

 5  exhibits, 25 through 28?

 6  A.   Yes.

 7  Q.   And just describe generally what we're seeing in those

 8  photographs, please.

 9  A.   This is the white Dodge truck as I found it parked in the

10  wilderness off of Charlie Bell Road.  It's facing to the north.

11  Q.   And are those photographs 25 through 28 a fair and

12  accurate depiction of what you saw at the truck's location

13  that day?

14  A.   Yes.

15              MS. WRIGHT:  Your Honor, I'd move to admit

16  Government's Exhibits 25 through 28.

17              MR. DUPONT:  No objection.

18              THE COURT:  They'll be admitted.

19  BY MS. WRIGHT:

20  Q.   Officer West, looking at Government's Exhibit No. 25, can

21  you -- do you see there the white truck?

22  A.   Yes.

23  Q.   And do you see a license plate?

24  A.   Yes.

25  Q.   Are you able to read any portion of that license plate?
```

1    A.    I can make it out.  It's very blurry.

2    Q.    If could you please read that out for the Court.

3    A.    Looks like the letters B-R-Z-0-5-0, Arizona.

4    Q.    Could you read the last three of that license plate

5    again?

6    A.    It's 0-5-4.  B-R-Z-0-5-4.  0-5-0-4.  I'm sorry.

7    Q.    Thank you, Officer West.

8    A.    Thank you.

9    Q.    And Officer West, this area -- and I'm going to -- let's

10   see.  Let's stick with Exhibit 25.  The area immediately

11   surrounding where the truck is in this photo, do you know what

12   the designation of that area is?

13   A.    That's designated wilderness area.

14   Q.    And to the south of where that truck is in that photo, do

15   you know what the designation of that land is?

16   A.    It's designated wilderness.

17   Q.    And for how far is it designated wilderness to the south?

18   A.    All the way to the international border of Mexico.

19   Q.    And when you say "designated wilderness," where does that

20   designation come from?

21   A.    The Wilderness act.

22   Q.    Is that a federal statute?  A state statute?  What is

23   that?

24   A.    Part of it comes from the designation of the Arizona

25   Wilderness Act of 1990, which is, I believe, what designated

1  Cabeza Prieta as the wilderness.

2  Q.  Now, we're going to jump forward in time again.  Sorry

3  for --

4  A.  Okay.

5  Q.  -- spinning around here.

6      Back to -- we left off with the activity at the Cabeza

7  Prieta office with the defendants being able to take back

8  those milk crates.

9  A.  Yes.

10  Q.  What happened next?

11  A.  I watched them.  I observed them loading the crates, and

12  then as they got the crates loaded, they left the parking lot.

13  Q.  What did you do next?

14  A.  I pulled forward to the edge of the driveway leading into

15  the parking lot and just observed them drive by.

16  Q.  And did anything happen after that?

17  A.  As they pulled out of the parking lot, they actually

18  drove -- they pulled out of our parking lot of the refuge

19  office, and they went back south, and then they turned around

20  and went back north, and as they passed in front of the

21  office, a single crate of beans fell off the stack of crates

22  that they had stacked on the truck and fell into the middle of

23  the road.

24  Q.  And what happened next?

25  A.  I pulled out.  They were somewhat blocking or obstructing

1  traffic, so I pulled out to go collect the crate, and a

2  sheriff's deputy pulled up, and we collected all the beans and

3  the crate and then the mess that it made in the road.

4  Q.    After the crate fell off of the back of the truck the

5  defendants were in, did the truck stop?

6  A.    No.

7  Q.    And did the truck return during the time that you were

8  picking up the beans?

9  A.    No.

10 Q.    I want to take one more minute with Exhibit 3 here, just

11 ask you a few more questions.

12       So we were talking earlier about the water tank, this

13 white tank in the middle here.  Do you have any information

14 about how humans might use that tank?

15 A.    Typically we see that illegal aliens, undocumented

16 aliens, they use the tank.  They draw water from the white tank

17 itself.  There is a spigot.  Just below the vertical pipes you

18 see in the photograph, there is a spigot right at the base of

19 that, down at the low part of it, where they can actually fill

20 jugs with water that comes straight out of the well itself.

21 Q.    And I'm going to take a guess that people who are

22 crossing the desert illegally don't do this with you standing

23 there; right?

24       MR. DUPONT:  Objection, Your Honor.  This is

25 irrelevant to the foundation on this, where he has this

```
 1  information and the identity of the people.

 2            THE COURT:  Overruled.  You may answer.

 3  BY MS. WRIGHT:

 4  A.    Could you repeat the question, please.

 5  Q.    I can.  My question was that, does your information come

 6  from you standing there and personally observing this happen?

 7  A.    No.

 8  Q.    Where does your information come from?

 9  A.    There is actually one of the BuckEye cameras there that's

10  mounted at the top of the tower there that looks down on the

11  spigot itself.

12  Q.    And you've said "BuckEye camera" a few times throughout

13  your testimony today.  Is that the same as a trail camera?

14  A.    Yes.

15  Q.    Or a version of a trail camera?

16  A.    Yes, correct.

17  Q.    All right.  Now, Officer West, during your duties that

18  day, did you have a body camera on you?

19  A.    Yes.

20  Q.    And was it running throughout your interactions that day?

21  A.    Yes.

22  Q.    And when I say "your interactions," that's not a very

23  precise question.  Was your body cam running when you first

24  encountered the defendants?

25  A.    Yes.
```

 1   Q.   And did it continue running until the end of your time

 2   with the defendants at the office?

 3   A.   Yes.

 4   Q.   Have you had a chance to review what's been marked as

 5   Government's Exhibit 40, a disk?

 6   A.   Yes.

 7   Q.   And when did you do that review?

 8   A.   This morning.

 9   Q.   And do you remember what was contained on that disk this

10   morning?

11   A.   There was videos that showed the initial contact from

12   where they walked out of the desert and then another video

13   showing the contact of the long drive out and then me unloading

14   and them obtaining their property, and then I asked them if

15   they got all their property back on the video, and they agreed

16   that they got all their property back.

17   Q.   And so the recordings that are in Government's Exhibit

18   40, are those accurate as they were recorded by your body

19   camera that day?

20   A.   Yes.

21           MS. WRIGHT:  Your Honor, I'd move to admit

22   Government's Exhibit No. 40.

23           MR. DUPONT:  No objection.

24           THE COURT:  Admitted.

25           MS. WRIGHT:  And Your Honor, I'm not going to play

 1  the exhibit at this time, just for the efficiency of the

 2  trial.  I'll leave that to the Court since the officer's

 3  testified to what's depicted on Exhibit 40.

 4           THE COURT:  Thank you.

 5  BY MS. WRIGHT:

 6  Q.  And a few last things with you, Officer West.

 7       First, throughout this -- we're just coming to 2019.

 8  What date did these events happen on?

 9  A.  The date itself --

10  Q.  Yes, please.

11  A.  -- is August 13th of 2017.

12  Q.  Of 2017?

13  A.  2017.

14  Q.  Thank you.

15       And we've been talking about various areas throughout

16  your testimony today, so I just want to make sure that it's

17  clear.  Is Charlie Bell Pass within a designated wilderness

18  area?

19  A.  The Charlie Bell -- the top of Charlie Bell Pass is the

20  designated line going into wilderness, so the pass itself or

21  the top of the pass is not.

22  Q.  Okay.  How about Charlie Bell Well?

23  A.  Charlie Bell Well, yes, it is in designated wilderness.

24  Q.  And the place where you found the white truck that the

25  defendants were using that day?

1   A.   Yes, it is in designated wilderness.

2   Q.   And about how far is it from Charlie Bell Well to where

3   you found the truck, the white truck the defendants were using

4   that day?

5   A.   I believe it's approximately 1.8 miles, give or take.

6   Q.   And to access all of this, Charlie Bell Pass, Charlie

7   Bell Well, and the place where the defendants were with the

8   truck they were using that day, is it a requirement that you

9   have a permit to do that?

10  A.   Yes.

11          MS. WRIGHT:  If I can have one moment, Your Honor.

12          THE COURT:  You may.

13          MS. WRIGHT:  And Your Honor, it's been pointed out

14  that I forgot to ask to let the record reflect that the

15  witness has identified Ms. Holcomb.  I believe he did that,

16  but I'm happy to do the questions again.

17          THE COURT:  Sure.

18          Yes, he did identify her.

19          MS. WRIGHT:  Thank you, Your Honor.  I appreciate

20  that.

21  BY MS. WRIGHT:

22  Q.   And Officer West, one last question about the -- let's

23  put Exhibit 3 back up so we know what we're talking about

24  here.

25       You testified previously that you stopped to pick up the

1   green crates that were there.  Why did you do that?

2   A.   Why did I stop to get the crates?

3   Q.   Yes.

4   A.   To remove them.  It's illegal to leave anything in the

5   wilderness or abandon any property on the refuge itself.  And I

6   needed to collect them to take photographs to get a proper

7   depiction of what exactly was there.

8   Q.   Did you have any concerns about leaving them there and

9   not collecting them that day?

10  A.   Just in violation of the CFR.  That was my concern then.

11            MS. WRIGHT:  That's all I have, Your Honor.  Thank

12  you.

13            THE COURT:  All right.  Cross?

14            MR. DUPONT:  Yes, Your Honor.  May I have a moment

15  to speak with my client?

16            THE COURT:  Certainly.

17            MR. DUPONT:  Thank you.

18                     CROSS-EXAMINATION

19  BY MR. DUPONT:

20  Q.   Good morning, Mr. West.

21  A.   Hello.

22  Q.   I'm Chris Dupont, and I represent the people that you

23  were with in the desert that day.

24  A.   Yes.

25  Q.   I just need to hook this up, and I'll be right with you.

1          So you've been in the west desert since 2011; is that

2     right?

3     A.    No, sir.  Since approximately 2009.

4     Q.    2009.  Living in Ajo?

5     A.    Sir?

6     Q.    Living in Ajo?

7     A.    Yes.

8     Q.    Working in the west desert?

9     A.    I started out with the service living in Yuma, and then I

10    eventually moved to Ajo.

11    Q.    And a lot of that time has been in the Cabeza Prieta?

12    A.    All of that time.  With the exception of training, all of

13    that time.

14    Q.    And in the wilderness area we're talking about, how often

15    do you go in there?

16    A.    To the wilderness?

17    Q.    Yeah.

18    A.    I mean, it's -- I'd say it's a daily patrol, responding to

19    different things.

20    Q.    You go in there every single day?

21    A.    I wouldn't say every single day, but it's pretty

22    regular, in designated routes that are designated as routes

23    that are in -- that are in the wilderness, yes.

24    Q.    And when you talk about routes, those are routes you

25    take?

1    A.    Excuse me?

2    Q.    Those are routes -- your routes that you take in the

3    wilderness?

4    A.    When you say -- they're not my routes.  There's routes.  I

5    mean, clarify what you're talking about.

6    Q.    Patrol routes or are you talking about routes that people

7    use or routes that animals use?  What do you mean by "routes?"

8    A.    Designated rotes.

9    Q.    And you stay on the roads?

10   A.    Yes.

11   Q.    Do you go off the road?

12   A.    Not typically, no.

13   Q.    Why not?

14   A.    Because I don't need to.

15   Q.    During your time in Cabeza Prieta, are you aware that

16   people are dying in that range?

17   A.    Yes.

18   Q.    How long have you been aware of that?

19   A.    Since I started there.

20   Q.    Have you seen or found human remains?

21   A.    Yes, I have.

22   Q.    How many times?

23   A.    I can't count.  I don't know.  I don't know specifically

24   right off my head.

25   Q.    More than one?

1    A.    More than one, yes.

2    Q.    More than five?

3    A.    At least five.

4    Q.    More than 10?

5    A.    I don't know the exact amount.

6    Q.    A hundred?

7    A.    I don't know the exact amount.

8    Q.    Maybe a hundred?

9    A.    I don't know the exact amount.

10   Q.    Is that possible?

11   A.    I don't know the exact amount.

12   Q.    Is it possible more, you found more than a hundred human

13   remains?

14   A.    I don't know the exact amount.

15   Q.    I'm asking you to estimate.  Is it possible there have

16   been more than a hundred human remains that you found?

17   A.    I would say no.

18   Q.    Have you come across live people there without water?

19   A.    Yes.

20   Q.    People close to death?

21   A.    I don't know their medical condition, so --

22   Q.    If you come across someone, have you found anyone in

23   distress that appeared to you to be in medical distress?

24   A.    That they claim to be in medical distress, I have come

25   across that, yes.

CROSS-EXAMINATION OF MICHAEL WEST

1  Q.   Are you a Spanish speaker?

2  A.   Somewhat, not very well.

3  Q.   At what proficiency do you speak Spanish?

4  A.   Give me a degree of measurement, because I can get out

5  basic words, ask somebody if they're sick or who they are, get

6  their name.

7  Q.   Is that about it?

8  A.   Probably about it, yeah.

9  Q.   If they -- if you ask somebody if they're well, how would

10  you say that in Spanish?

11  A.   "Qué pasó?"

12       MS. WRIGHT:  Objection.  Relevance, Your Honor.

13       THE COURT:  Sustained.

14  BY MR. DUPONT:

15  Q.   You're aware, because of the number of people dying at

16  Cabeza Prieta, it's a public health crisis?

17       MS. WRIGHT:  Objection.  Foundation, speculation,

18  relevance.

19       THE COURT:  Sustained.

20  BY MR. DUPONT:

21  Q.   Are you aware of where people are dying in Cabeza Prieta

22  Wilderness Area?

23       MS. WRIGHT:  Objection.  Relevance, Your Honor.

24       THE COURT:  Sustained.

25       MR. DUPONT:  Your Honor, this goes to the necessity

1    of the clients' actions.

2              THE COURT:  Well, actually, what he knows, thinks,

3    or believes has got nothing to do with what you're asserting

4    in terms of what your clients believe or think.

5              MR. DUPONT:  I believe conditionally our clients are

6    aware that they are not -- that nobody's reacting to the

7    deaths along the border, and we've got a right to not only

8    present our clients' knowledge, but this knowledge is correct

9    as well, and it's true, objectively true, that it's just not

10   happening, and that's what I'm establishing with this agent.

11             THE COURT:  Well, I suppose you can ask him what his

12   duties are and what his duties are not.

13             MR. DUPONT:  Do you want to ask him or should I?

14             THE COURT:  No, no, no.

15             MR. DUPONT:  Okay.

16             THE COURT:  You do it.

17             MR. DUPONT:  Thank you.

18   BY MR. DUPONT:

19   Q.   Do you have any duties to provide water to people in the

20   wilderness area?

21   A.   When you ask my duties, are you asking me am I required

22   to?

23   Q.   Is this a part of your official duty?

24   A.   I will.  If I come across somebody that needs water, I

25   will.

CROSS-EXAMINATION OF MICHAEL WEST                    71

1  Q.   You will give it to them?

2  A.   Sure.

3  Q.   All right.  Are you aware of the No More Deaths ministry?

4  A.   Am I aware of the organization?

5  Q.   Yes.

6  A.   Yes.

7  Q.   How long have you been aware?

8  A.   I don't know exact day.  Since I've worked for the Fish

9  and Wildlife Service.

10 Q.   And you're aware they leave food and water in the

11 wilderness area?

12 A.   Yes.

13 Q.   And you're also aware they're leaving that food and water

14 in areas that people are dying?

15         MS. WRIGHT:  Objection.  Foundation, speculation.

16         THE COURT:  Overruled.  You may answer.

17 BY MR. DUPONT:

18 A.   Repeat the question, please.

19 Q.   Are you aware that No More Deaths are leaving food and

20 water in those areas where people are dying?

21 A.   From what they tell me, yes.  From my contact with people

22 in the organization, that's what they say they're doing, yes.

23 Q.   And in your experience, people are dying in the same area

24 where you found them, north of there and south of there;

25 correct?

1          MS. WRIGHT:  Objection.  Foundation, relevance.

2          THE COURT:  "Them" being the bodies or "them" being

3    No More Deaths people?

4          MR. DUPONT:  The bodies.

5          THE COURT:  Do you have an opinion on that?

6          THE WITNESS:  Can you repeat the question, please?

7    BY MR. DUPONT:

8    Q.   Do you have knowledge there are people dying north and

9    south of where you found No More Deaths volunteers that day?

10   A.   I do have knowledge of that, yes.

11   Q.   Tell him.

12   A.   Okay.  I do have knowledge, yes.  There have been bodies,

13   deceased people, found both north and south of that.

14   Q.   Along the eastern side of the Growler Mountains?  Sorry.

15   The western side of the Growler Mountains?

16   A.   Yes.

17   Q.   Which is where you found the volunteers?

18   A.   Yes.

19          MS. WRIGHT:  Objection.  Foundation.  That's a

20   pretty wide area we're talking about there, Your Honor.

21          THE COURT:  Overruled.

22          MR. DUPONT:  Do you have Exhibit 2?

23          MS. WRIGHT:  All the admitted ones should be there.

24   BY MR. DUPONT:

25   Q.   Do you remember Ms. Wright asking you about Exhibit 2 --

 1  if we could publish again, please.

 2      Do you remember being asked questions about this?

 3  A.   Yes.

 4  Q.   And admitting this as an exhibit?

 5  A.   Yes.

 6  Q.   This particular Exhibit 2 you know did not come into

 7  effect until July 1st, 2017?

 8          MS. WRIGHT:  Objection.  Foundation.

 9          MR. DUPONT:  I'm just asking if he knows, Judge.

10          THE COURT:  Sustained.  I mean overruled.  You may

11  answer the question, sir.

12  BY MR. DUPONT:

13  A.   I don't know the exact date of when this came to -- this

14  particular version.  I don't know the exact date.  I didn't

15  make it, so I don't know.

16  Q.   Do you know it happened at the beginning of the fiscal

17  year?

18  A.   Again, I don't know.  I can't recall that.

19  Q.   You know it happened within a couple of months before

20  August 13th; right?

21  A.   I don't know.  I don't recall when they enacted this.

22  Q.   You knew they were making changes to the old permit?

23  A.   After the permit was changed.

24  Q.   Yeah, and this is the changed permit; right?

25  A.   I believe it is, yes.

CROSS-EXAMINATION OF MICHAEL WEST

1  Q.   And the only real difference with this permit is

2  paragraph 13?

3  A.   Of the one you're showing here?

4  Q.   Yes.

5  A.   I only see one page here.

6  Q.   The highlighted section.

7  A.   Repeat your question.  What are you asking me?

8  Q.   You're aware that the only difference between the old

9  permit and the new permit is the addition of this paragraph

10  13?

11  A.   I believe that's correct.  I can't say for certain, but

12  yes, I believe that's correct.

13  Q.   Well, you were aware there was a lot of talk around the

14  office about changing the permit to add paragraph 13; right?

15  A.   I had heard that, yes.  I heard some stuff, yes.

16  Q.   And it was in reaction to No More Deaths people leaving

17  water; is that right?

18         MS. WRIGHT:  Objection.  Calls for speculation,

19  foundation, relevance, and hearsay.

20         THE COURT:  Sustained.

21  BY MR. DUPONT:

22  Q.   This new paragraph talks only about abandonment of

23  personal property or possessions; right?

24  A.   As I read it, yes.

25  Q.   And in fact, it says that nobody's allowed to leave water

 1   bottles or water containers; right?

 2   A.   Among other things, yes.

 3   Q.   And some of those other things, nobody's allowed to leave

 4   food, food items, or food containers; right?

 5   A.   As I read it, yes.

 6   Q.   And that if somebody violates this provision in the

 7   permit, the permit can be suspended or revoked; right?

 8   A.   Correct.

 9   Q.   And that a person could be subject to judicial penalties,

10   including fines, civil action, or debarment; right?

11   A.   Yes.

12   Q.   What is debarment?

13   A.   I don't know what that means.  I didn't write that.  I

14   don't know what that means.

15   Q.   This doesn't say anything about criminal prosecution;

16   right?

17            MS. WRIGHT:  Objection.  Relevance.

18            THE COURT:  Sustained.

19            MR. DUPONT:  Your Honor, this goes to our estoppel

20   by entrapment argument.  If the Government is going to tell

21   our clients repeatedly again and again and again --

22            THE COURT:  Wait a minute.  Wait a minute.

23            MR. DUPONT:  -- that they're only subject to --

24   sorry.

25            THE COURT:  The interpretation of this document is

 1  going to be up to the Court, and so the objection is

 2  sustained.

 3          MR. DUPONT:  The contents of the document are not

 4  relevant or --

 5          THE COURT:  Well, he -- they may be relevant, but if

 6  he -- he doesn't know what debarment is, so it appears that he

 7  didn't draft this document, and I don't know what more you

 8  expect to get from him.  Do you want to ask him what judicial

 9  penalties are?

10          Do you have any idea what judicial penalties are?

11          THE WITNESS:  Not for this.  Not off the top of my

12  head, no.

13          MR. DUPONT:  I just want to -- I was asking him if

14  there were any criminal penalties involved with this

15  paragraph, 13.

16          THE COURT:  And that's going to help me?

17          MR. DUPONT:  Potentially, Your Honor, because it's a

18  lay interpretation.

19          THE COURT:  Oh, okay.  Let's hear the answer then.

20          MS. WRIGHT:  Objection, Your Honor.  Foundation.

21  None of the defendants signed this or have testified that they

22  were aware of the contents of this permit, so at this point

23  the contents of the permit are completely irrelevant until

24  they lay some foundation about their beliefs or their

25  understanding.

1        THE COURT:  Overruled.  Let's hear the answer.

2   BY MR. DUPONT:

3   Q.   Does paragraph 13 mention any criminal penalties?

4   A.   Not as the paragraph itself is written, no.

5   Q.   Look at paragraph number 11, if you will.  This says that

6   anyone who violates the parameters of the permit are also

7   subject to civil penalties that only includes fines, civil

8   actions, and/or debarment; right?

9   A.   As it's written, yes.  That's the way I read it, yes.

10  Q.   Doesn't say anything about criminal penalties, does it?

11  A.   I don't see that in paragraph 11, no.

12  Q.   Well, let's try and find it somewhere else.

13       Paragraph 12.  It says a person has to have a valid

14  permit at all times; right?

15  A.   I'm reading.

16  Q.   Is that right?

17  A.   I'm reading.

18  Q.   Oh, pardon me.  I'll give you -- tell me when you're

19  done, sir.  Excuse me.

20  A.   Yes, it says you have to have a permit and present it upon

21  request by a law enforcement officer.

22  Q.   And by request of several categories of law enforcement;

23  right?

24  A.   Yes.

25  Q.   And a person who does not have a valid permit or present

1    it when requested -- let me back up.

2         This is what happened here.  You asked for a valid permit

3    and nobody presented it, right, on August 13th, 2017?

4    A.    That's correct, yes.

5    Q.    And according to paragraph 12, when a person fails to do

6    that, they can be fined or barred from the area; right?

7    A.    Yes.

8    Q.    Is there a difference between being barred and debarred?

9    A.    Difference between what, sir?

10   Q.    Well, one paragraph -- remember, the other two said

11   "debarment?"

12   A.    Okay.

13   Q.    And this one just says "barred."  Is there a difference

14   between those two?

15   A.    I don't know the relevance of why that verbiage is in

16   there, so I don't know what they meant by that.

17   Q.    You don't know the difference between those two words?

18   A.    I don't know --

19             MS. WRIGHT:  Objection.  Asked and answered, Your

20   Honor.

21             MR. DUPONT:  If it helps, Judge, I don't know

22   either, so I'll just move on.

23             THE COURT:  Okay.  Thank you.

24   BY MR. DUPONT:

25   Q.    Paragraph 12, there is no mention that anybody's subject

1   to criminal penalty; right?

2   A.   Not as I read it, no.

3   Q.   Could you read paragraph 10?

4   A.   Do you want me to read it out loud?

5   Q.   No, just to yourself, because I'm going to ask you

6   questions.

7   A.   Okay.  You have to go to the next page to complete the

8   paragraph, I believe.

9   Q.   Oh, I keep thinking you've got a copy with you.  Pardon

10  me, sir.

11  A.   Okay.

12  Q.   Have you read it, sir?

13  A.   Yes.

14  Q.   And basically what that says is don't fly a drone in the

15  area; right?

16  A.   Basically.

17  Q.   And that's the only place in this document that says you

18  could be subject to criminal penalty, is if you fly a drone in

19  the area; right?

20  A.   As that paragraph is written, yes.

21  Q.   And when you were with the four young people sitting with

22  us on August 13th, 2017, you asked them why they didn't get a

23  permit; right?

24          MS. WRIGHT:  Objection.  Relevance.  This is a

25  strict liability offense, Your Honor.

1           THE COURT:  Overruled.  Repeat the question, please.

2   BY MR. DUPONT:

3   Q.   When you were with the young people sitting at our table

4   on August 13th, 2017, you asked them why they didn't have a

5   permit; right?

6   A.   I did, yes.

7   Q.   And they basically told you, because paragraph 13 says we

8   can't leave water, and we came out here to leave water; right?

9           MS. WRIGHT:  Objection.  Calls for hearsay, Your

10  Honor.

11          THE COURT:  Overruled.

12          MR. DUPONT:  It's already in the record.  It's

13  already in the exhibit you admitted; right?

14          Okay.

15  BY MR. DUPONT:

16  Q.   Is that right, sir?

17  A.   Repeat the question, again.

18  Q.   Let me think.

19       Oh, when you asked each of the four people why they

20  didn't have a permit, they told you because there was a new

21  clause in the permit that did not allow them to leave water;

22  right?

23  A.   I believe they said that they didn't want to violate, they

24  didn't want to be in violation of the permit.

25  Q.   They didn't want to lie by signing that document; right?

1    A.    I can't speculate.  They just said they didn't want to

2    violate the permit is what they told me.  That's what I went

3    by.

4    Q.    Because there was a new part of the permit; right?

5    A.    It was in the permit at the time, yes.

6    Q.    And they told you they fully intended to leave water out

7    there; right?

8    A.    Yes, they did.

9    Q.    And food; right?

10   A.    Yes.

11   Q.    And Natalie Hoffman, when you first spoke with her, told

12   you she's there from the church?

13   A.    I didn't hear that.  She was there from where?

14   Q.    Natalie Hoffman, when you first asked her, she told you

15   she was there from the church?

16   A.    She said that the vehicle was from the Unitarian

17   Universalist Church, and she was a member of the No More Deaths

18   organization.

19   Q.    She said, and I'll quote, "I'm from the church."

20   A.    I don't recall that.

21   Q.    Are you disputing that was said?

22   A.    I'm saying I don't recall that.

23   Q.    It's on your body cam; right?

24   A.    Okay.

25   Q.    I mean, is it?  It would be on the body cam or not;

1    right?

2    A.   If it is, yes.

3    Q.   And the vehicle was registered to the church?

4    A.   Eventually I found that out, yes.

5    Q.   And at some point you told them there at the scene, 1.1

6    miles past Charlie Bell Well --

7    A.   1.8.

8    Q.   Pardon me.  1.8 miles past Charlie Bell Well, you just

9    told them to leave; right?

10   A.   After -- after the contact was completed, yes, I asked

11   them to leave.

12   Q.   That was the enforcement action you took at that time?

13   You evicted them from the wilderness; right?

14   A.   Yes.

15   Q.   You did not issue a notice of violation?

16   A.   Not at that time, no.

17   Q.   You did not inform them there would be a notice of

18   violation?

19   A.   I did not.

20   Q.   And their response to you, "Can we leave the rest of the

21   water?"

22   A.   They did say, that, yes.

23   Q.   What was your answer?

24   A.   "No."

25   Q.   When -- as an officer in the field encountering people in

1    the wilderness, you've got jurisdiction to or discretion to

2    decide whether to cite or not; right?

3    A.    I do, yes.

4    Q.    Whether to refer someone to criminal prosecution or not;

5    right?

6    A.    Yes.

7    Q.    And your jurisdiction extends to things like not having a

8    permit; is that right?

9    A.    That's part of my enforcement authority, yes.

10   Q.    Or abandonment of property?

11   A.    Yes.

12   Q.    And that's just the Forest Service that has jurisdiction

13   to enforce those laws; right?

14   A.    I don't know anything about the Forest Service.

15   Q.    I'm sorry.  Fish and Wildlife.  Pardon me, sir.

16   A.    Can you ask the question again?

17   Q.    Fish and Wildlife is the agency that has jurisdiction to

18   issue or not issue citations for coming on the wilderness

19   without a permit and abandoning property; right?

20   A.    Correct.

21   Q.    Or driving?

22   A.    Or driving, yes.

23   Q.    Now, were you aware that, before this permit was amended,

24   the Department of Justice was dismissing all the notice of

25   violations that were filed for these types of violations?

1           MS. WRIGHT:  Objection.  Foundation, relevance,

2  speculation, hearsay.

3           MR. DUPONT:  Goes to his decision-making process in

4  selective enforcement, Your Honor.

5           THE COURT:  No.  Your question was the Department of

6  Justice.  He's not with the Department of Justice, so it

7  doesn't go to his discretion.

8           MR. DUPONT:  Well, it's just his --

9           THE COURT:  The objection is sustained.

10           MR. DUPONT:  Your Honor, it's just his knowledge of

11  what they're doing, and I'm not asking anything else except

12  his knowledge to lay that foundation at this point.

13           THE COURT:  Overruled.  You're -- no.  The objection

14  remains sustained.

15           MR. DUPONT:  Sustained and my explanation is

16  overruled?

17           THE COURT:  Yes.

18           MR. DUPONT:  Thank you, Your Honor.

19           Did I just thank you for overruling my objection?

20           THE COURT:  If it happened to me, it happens to

21  you, I guess.

22  BY MR. DUPONT:

23  Q.   At any rate, at some point you decided to refer for

24  criminal charges; right?

25  A.   Yes.

CROSS-EXAMINATION OF MICHAEL WEST                    85

1  Q.   Never told any of the four young people sitting with us

2  you were going to do that?

3  A.   Not at the time, no.

4  Q.   Now, you're trained to -- about desert survival; is that

5  right?

6  A.   I'm not like an expert in it, no.

7  Q.   You have basic training in desert survival?

8  A.   Basic knowledge.  Drink plenty of water.

9  Q.   This area of the Cabeza Prieta Wilderness is a rugged

10  area.

11  A.   Are you asking me or are you telling me?

12  Q.   I'm asking you to agree with that factual statement.

13  A.   Yes.

14  Q.   And it's a dangerous area to travel?

15  A.   Sure.

16  Q.   Particularly in the heat; right?

17  A.   Any time.

18  Q.   If you can look at Exhibit 2 again.  Excuse me, just

19  straighten this up.

20       Can you read section two, paragraph two.

21  A.   Okay.

22  Q.   All right.  This area is so dangerous that even letting

23  someone have access presents the danger of permanent, painful,

24  disabling, and disfiguring injury or death.

25       Is that right?

1   A.   So ask the question again.  You said -- ask it

2   again, please.

3   Q.   Access -- this area is so rugged and extreme in danger

4   that even granting access presents the danger of permanent,

5   painful, disabling, and disfiguring injury or death; right?

6   A.   Yes.  You could say that, yes.

7   Q.   And you believe that to be true too?

8   A.   That it's dangerous in the area?  Is that what you're

9   asking me?

10  Q.   I'm asking if it -- if this paragraph two is a true

11  statement in your experience.

12  A.   Yes.

13  Q.   Same dangers could apply, as we read in paragraph three,

14  to unexploded ordnance?

15  A.   Can I read paragraph three?

16  Q.   Sure.

17  A.   Okay.  So your question is?

18  Q.   The same dangers that apply to access to the area, part

19  of that is because there's unexploded ordnance throughout the

20  wilderness area; right?

21  A.   Yes.

22  Q.   Some of it's buried, some of it's right on the top of the

23  ground; right?

24  A.   I've never -- I'm assuming, yes, according to what they're

25  saying, yes.

1  Q.   Paragraph six, please, if you could read that.

2  A.   I can't see it.

3       Okay.

4  Q.   So would you agree with what it says in this statement,

5  that the wilderness area is one of the most extreme

6  environments in North America?

7  A.   Yes.

8  Q.   Partly due to the high temperatures and remoteness of the

9  area; right?

10 A.   Yes.

11 Q.   The area contains no sources of safe drinking water; is

12 that true?

13 A.   It contains -- there are sources of water.  I don't know

14 the -- I don't know the condition of the water.  We don't test

15 it.

16 Q.   Is this a true statement?  "The Wilderness contains no

17 sources of safe drinking water."

18         MS. WRIGHT:  Objection.  Asked and answered, Your

19 Honor, and foundation.

20         THE COURT:  Overruled.  Overruled.  You may

21 answer, sir.

22 BY MR. DUPONT:

23 A.   I don't know the condition of the drinking water out

24 there, the water that's out there in the tanks, so I can't tell

25 you if it's safe or not.  I don't know.

1   Q.   You haven't drank it?

2   A.   No, I have not.

3   Q.   If this was not a true statement, I mean -- I'll withdraw

4   that.  Excuse me, Your Honor.

5        You, yourself carry your own water?

6   A.   I do, yes.

7   Q.   How much?

8   A.   Varies.  A couple gallons at a time.

9   Q.   All year long?

10  A.   Sure.

11  Q.   Summer, winter?

12  A.   Uh-huh, yes.

13  Q.   And is that just for you or you and your dog?

14  A.   For both, and whoever else may need it.

15  Q.   Do you carry extra water for your dog?

16  A.   I do, yes.

17  Q.   Is it fair to say that the hotter it is, the more water

18  you need?

19  A.   Depends on what I'm doing.

20  Q.   If you're in the truck, it's the same either way?

21  A.   Yeah.  I regulate what I do according to how much water I

22  might have.  If it looks like I might need more, I regulate

23  from there.

24  Q.   When -- during your training, are you trained to spot

25  symptoms of a person in heat distress, either in yourself or

1    others?

2    A.    Not -- I guess I wouldn't say professionally.  Just from

3    my own experience from myself and then what I've seen, but I've

4    never been trained by a medical professional of that sort.

5    Q.    The Fish and Wildlife Service has never trained you to

6    recognize --

7    A.    I should back up.  Through basic first aid.  I mean, it's

8    covered in basic first aid, yes.

9    Q.    So just a short class.

10   A.    Yes, that we do every three years.

11   Q.    Do you know when a person becomes susceptible to death or

12   serious injury by the heat?

13            MS. WRIGHT:  Objection.  Relevance, Your Honor.

14            THE COURT:  Sustained.

15   BY MR. DUPONT:

16   Q.    How hot was it on August 13th?

17   A.    I don't recall the specific temperatures that day.  I

18   think they probably ranged in the high 90s up into the triple

19   digits.

20   Q.    Like, when you say "triple digits," what does that mean?

21   A.    It can reach anything over a hundred degrees.

22   Q.    And so when you say -- how high -- what do you think the

23   daily high temperature was that day, August 13th?

24   A.    I don't know.

25            MS. WRIGHT:  Objection.  Speculation.

1          THE COURT:  Overruled.  Exhibit 14 says it was 102

2    degrees, right-hand corner.

3          MR. DUPONT:  I'm going to just present something to

4    the judge and to the witness next.

5          Can you see Exhibit No. --

6          THE WITNESS:  There is nothing on my screen here.

7          THE CLERK:  Do you have it plugged in?  Give it a

8    minute.

9          MR. DUPONT:  I'm going to unplug it and then plug it

10   in and see if that works.

11         THE CLERK:  Try it.

12         It still says, "Searching."

13         MR. DUPONT:  Your Honor, could you tell me those

14   numbers again that you were just looking at?

15         THE COURT:  The numbers I was looking at were the

16   photographs of the trail cam, and it starts out at --

17   actually, probably the one you want is Exhibit -- oh, that

18   hasn't been admitted, I don't think.  Exhibit 14 had it at

19   102.  The one you want to introduce is Exhibit 9, which

20   shows --

21         MR. DUPONT:  This is HDMI.

22         I'm sorry, Your Honor.  It shows?

23         THE COURT:  110.

24         THE CLERK:  There it is.

25         MR. DUPONT:  Exhibit 9?

CROSS-EXAMINATION OF MICHAEL WEST

1          THE COURT:  Yeah, Government's Exhibit 9.

2          MR. DUPONT:  Is that admitted?

3          THE COURT:  No, but if you offer it, I'll admit it.

4          MR. DUPONT:  That's what I'm about to do.

5          THE COURT:  Okay.  Good.

6          MR. DUPONT:  Okay.  And Exhibit 10.

7          MS. WRIGHT:  Chris, the originals are over here.

8          THE COURT:  And why don't we stand at recess until

9    1:15 while you do that.

10          MR. DUPONT:  I've got it now.

11          MS. WRIGHT:  Those aren't the originals.

12          THE COURT:  Are you about done?

13          MR. DUPONT:  No, no, no, sir.

14          THE COURT:  Okay.  Then we'll start at 1:15.

15          (Off the record.)

16          THE COURT:  All right.  The record should reflect

17    the presence of counsel, the defendants, witness.

18          You realize you're still under oath, sir?

19          THE WITNESS:  Yes, sir.

20          THE COURT:  You may proceed.

21    BY MR. DUPONT:

22    Q.   Good afternoon, Mr. West.

23    A.   Yes, sir.

24    Q.   Are you ready?

25    A.   Getting some water here.

1   Q.   Okay.

2          MR. DUPONT:  May I approach, Your Honor?

3          THE COURT:  Yes.

4          MR. DUPONT:  Thank you.

5   BY MR. DUPONT:

6   Q.   Mr. West, do you recognize Exhibits 9 and 10?

7   A.   Yes.

8   Q.   What are those?

9   A.   BuckEye cameras of the white Dodge pickup driving

10  eastbound on Charlie Bell Road.

11  Q.   Back toward Charlie Bell Well?

12  A.   No, back towards Charlie Bell pass.

13  Q.   Between Charlie Bell Well and Charlie Bell Pass?

14  A.   Correct, past the well, going towards the pass, going

15  towards the exit of the refuge.

16  Q.   And those are the BuckEye camera shots from that same

17  day?

18  A.   Yes, sir.

19         MR. DUPONT:  I'd ask for introduction of 9 and 10,

20  Your Honor.

21         THE COURT:  They'll be admitted.

22         MR. DUPONT:  If I could publish No. 9?

23         THE COURT:  Yes.

24  BY MR. DUPONT:

25  Q.   Now, of the camera photos, these were the two -- these

1  were the only two that you put in your report that weren't

2  introduced earlier through the Government?

3  A.    I don't know that.

4  Q.    And when the BuckEye camera takes a photograph, it also

5  implants certain information; is that correct?

6  A.    Yes.

7  Q.    For example, in the upper-right corner?

8  A.    Yes.

9  Q.    What is that information?

10 A.    That's indicating that it's Charlie Bell Road, west of the

11 rescue beacon, and it's giving the direction.

12 Q.    And it also, in the lower left, gives you the date?

13 A.    Yes, correct.

14 Q.    The middle is the time?

15 A.    Yes.

16 Q.    And the right-hand side is the temperature?

17 A.    According to that camera.

18 Q.    110 degrees?

19 A.    According to that camera.  I don't know the -- I don't

20 know the -- the calibration of that, I don't know of.

21        MR. DUPONT:  If I could publish the photo just to

22 the witness of Exhibit No. 205.

23        THE CLERK:  Do you have to put it on there?

24        MR. DUPONT:  No, it's on the computer.

25        THE CLERK:  Okay.  Which computer, sir?

```
 1              MR. DUPONT:  It's on the one -- not the one -- yes.

 2              THE CLERK:  There.

 3              MR. DUPONT:  Yes.

 4   BY MR. DUPONT:

 5   Q.  Now, sir, do you -- I'm going to roll through eight

 6   photos here, and you tell me if you recognize them.  Okay?

 7   A.  If I recognize the photos?

 8   Q.  Yes, sir.  Can you see them?

 9   A.  Yes.  You're going pretty fast there.

10   Q.  I think most of these are photos that have already been

11   admitted.

12   A.  Looks like it, yes.

13   Q.  Is that right?

14   A.  Looks like it, yes.

15   Q.  So are these photos of the green truck, the white

16   truck, Charlie Bell Well, on August 13, 2017?

17   A.  Looks like it, yeah, from the way you were scrolling.

18   Q.  And these are mostly the same photographs you just

19   admitted through the others; correct?

20   A.  Looks like it.

21              MR. DUPONT:  I'd ask to admit 205.

22              MS. WRIGHT:  Your Honor, it's cumulative.  The

23   Government already admitted these photos.  But otherwise I

24   don't have an objection.

25              THE COURT:  All right.  They'll be admitted.
```

 1              MR. DUPONT:  And if we could publish, Your Honor?

 2              THE COURT:  Sure.

 3              MR. DUPONT:  Thank you.

 4   BY MR. DUPONT:

 5   Q.   So page one of Exhibit 205, that is the green truck?

 6   A.   It looks like it, yes.

 7   Q.   And that's parked up on top of the hill?

 8   A.   Top of Charlie Bell Pass.

 9   Q.   Before you enter the restricted wilderness area?

10   A.   Correct, yes.

11   Q.   That truck, did it have anything to do with any of the

12   four people?

13              MS. WRIGHT:  Objection.  Calls for speculation.

14              THE COURT:  Overruled.

15   BY MR. DUPONT:

16   A.   I don't know.  I didn't contact anybody in association

17   with this truck, so I don't know.

18   Q.   All right.  And this is the road.  What's that road

19   called?

20   A.   Which road is that?

21   Q.   This road right here.

22   A.   You're pointing with the cursor?

23   Q.   Yes.

24   A.   That's like -- I guess you could say that's still part of

25   Charlie Bell Road.

CROSS-EXAMINATION OF MICHAEL WEST                    96

1   Q.   And Charlie Bell Road -- and this Charlie Bell Road goes

2   down a hill?

3   A.   From here, going -- if you're looking at the photograph to

4   the left side, it goes downhill.  Actually, it goes downhill on

5   either side of it, but to the left it goes downhill.

6   Q.   And we're looking north here?

7   A.   Correct.  Yes, sir.

8   Q.   And how -- elevation, how much elevation is lost between

9   here and the well?

10  A.   I don't know.  I don't know that.

11  Q.   It's about a mile away?

12  A.   It is about approximately a mile.

13  Q.   It would be a strenuous hike coming back up that hill?

14  A.   Can be, yeah.

15  Q.   Especially in the heat?

16  A.   Depending on your -- yes, depending on your cardio level,

17  I guess.

18  Q.   Acclimation, cardio level?

19  A.   Yeah, sure.

20  Q.   Fitness, all that kind of stuff?

21  A.   Sure.

22  Q.   How much water you had?

23  A.   Sure.

24  Q.   If you're well-hydrated; right?  Would it depend on that

25  too?

CROSS-EXAMINATION OF MICHAEL WEST                    97

```
 1   A.   Sure.
 2   Q.   And then page two, another angle, same truck.
 3        Page three.  Nice view of the mountain.  I'm actually
 4   going -- I'm just making it -- okay.
 5        And this is the road?  What's the name of this road,
 6   Charlie Bell Road?
 7   A.   Charlie Bell Road, correct.
 8   Q.   And it starts to go downhill here?
 9   A.   Yes.
10   Q.   Well-established road?
11   A.   Sure.
12   Q.   How long has that road been there?
13   A.   Oh, I don't know that.  I don't know the history of it.
14   Q.   10 years?  20 years?  50 years?  Do you know?
15   A.   It's been there since I've been there, so I can say 10
16   years.
17   Q.   And it's always been a well-established road like this?
18   A.   Since I've been there, yes.
19   Q.   It's not like a new road or trail; right?
20   A.   It's been there since I've been there.  I don't know the
21   history of it.
22   Q.   No vegetation on this road to protect?
23   A.   What do you mean?
24   Q.   I mean, there's no plants growing on this road.
25   A.   Not on the road itself, no.
```

```
 1   Q.   Another angle of that same road going down?

 2   A.   Yes, sir.

 3   Q.   And there's the tank?

 4   A.   Yes.

 5   Q.   And this is a little pull-off area to park?

 6   A.   Yes.  Still part of the roadway, I guess you could say.

 7   Q.   And then this is another 1.8 miles away?

 8   A.   From where?

 9   Q.   From Charlie Bell Well.

10   A.   No.  This is .8 from Charlie Bell Well.

11   Q.   And this is the road behind it?

12   A.   Yeah, essentially.

13   Q.   And this is a little pull-off parking area?

14   A.   No.

15   Q.   It's just an area that --

16   A.   It's just a barren area.

17   Q.   Barren area with no plants, nothing; right?

18   A.   (No verbal response.)

19   Q.   Right?

20   A.   I'm sorry?

21   Q.   Little barren area, by "barren" you mean --

22   A.   Yes, a barren area.

23   Q.   And then this is the back of the truck, page eight?

24   A.   Looks like it, yes.

25   Q.   With empty bottles?
```

1    A.   I see two there.

2    Q.   Of the empty gallon jugs?

3    A.   I see two there.

4    Q.   And did you see when the people sitting with us brought

5    those empties back?

6    A.   I didn't see that, no.

7    Q.   You saw them drinking water back at the truck though;

8    right?

9    A.   Seems like it, yes, I did.

10   Q.   But they weren't drinking out of the gallon waters.  They

11   were drinking out of their own different water vessels; right?

12   A.   I think I saw one of the young ladies pouring water from

13   one of the jugs into a different vessel.

14   Q.   Not one of the gallon jugs, a different --

15   A.   It was a gallon jug that looked like the ones in the back

16   of the truck, yeah.

17   Q.   It's on the video, whatever it is; right?

18   A.   Sir?

19   Q.   It's on the video --

20   A.   Sure.

21   Q.   -- what kind of jug it was?

22   A.   Sure, should be.

23   Q.   I want to show you Exhibit 197.

24            THE COURT:  That hasn't been admitted so I guess it

25   shouldn't be published.

CROSS-EXAMINATION OF MICHAEL WEST

1    MR. DUPONT:  Yes, Your Honor.  That's correct.  I'm

2  just showing it to the witness.

3    THE COURT:  I know.  I'm just commenting to the

4  courtroom clerk.

5    MR. DUPONT:  Thank you, Your Honor.

6  BY MR. DUPONT:

7  Q.   Do you recognize Exhibit 197?

8  A.   Of the portion I can see.  I can't see the whole entire

9  document, but yes, it looks like the case report.

10 Q.   Page one of your case report?

11 A.   Yes, looks like.

12 Q.   From that day?

13 A.   Yes.

14 Q.   This incident; right?

15 A.   Yes.

16 Q.   And you marked there a latitude and longitude?

17 A.   Yes.

18 Q.   And where did you get that information?

19 A.   From a GPS unit.

20 Q.   What GPS unit?

21 A.   The one that I carry with me.

22 Q.   Why do you carry that with you?

23 A.   So I can record GPS coordinates wherever I'm at.

24 Q.   Can people find you with your -- if you have your hand-

25 held device with you?

 1   A.    If I give them the coordinates.  Not just by holding the

 2   unit, no, but if I give them the coordinates, I can.

 3   Q.    And this particular number of longitude and latitude,

 4   what is that?

 5   A.    I'm sorry?  What are you asking?

 6   Q.    What are you recording there?  Longitude and latitude of

 7   what?

 8   A.    Are you asking me where it is, or are you asking me how --

 9   Q.    You're recording a GPS location?

10   A.    Yes.

11   Q.    What location?

12   A.    This is the location where I made contact with the white

13   Dodge pickup.

14   Q.    The white --

15   A.    In the wilderness.

16   Q.    White Dodge pickup?

17   A.    Yes.

18   Q.    Okay.  And can you just say into the record what those

19   numbers are, please, latitude and longitude?

20   A.    You want me to read them off the page here?

21   Q.    Well, unless you can remember them from your head, yeah.

22   A.    I can't remember them off my head, no, so it's

23   32.381083/113.11575.  Should be a negative 113.

24   Q.    And Exhibit No. 209, I'm going to show you next.

25         Do you remember -- do you recognize this exhibit?

 1    A.    I've never seen this before.  I've never looked at this

 2    case before, so I just -- I recognize it as being one of our

 3    case files.

 4    Q.    Pardon?

 5    A.    I recognize this as one of our case files, but I've never

 6    seen this particular one.

 7    Q.    Did you see it yesterday or any time?

 8    A.    No.

 9    Q.    Okay.  If you look at it, do you know what this is about?

10    A.    I'd have to read it.

11    Q.    Sure.

12    A.    Do you want me to read the whole thing?  I can't scroll

13    through it like you can.

14    Q.    Tell me when to scroll.

15    A.    I'm sorry?

16    Q.    I'll start at the top.  You tell me when to push --

17              MS. WRIGHT:  Objection.  Relevance, foundation, and

18    hearsay, Your Honor.  This is not that officer's report.  I'm

19    not sure what he can testify to from this.  This also relates

20    to a completely separate incident.

21              THE COURT:  What's the relevance?

22              MR. DUPONT:  Your Honor, the relevance is I'm seeing

23    if it refreshes his memory about this particular incident and

24    the location of this incident.

25              THE COURT:  Of the incident that's on the exhibit

 1  that you're showing him?

 2           MR. DUPONT:  Yes, sir.

 3           THE COURT:  Are you asserting that he was there?

 4           MR. DUPONT:  No, sir.

 5           THE COURT:  Are you asserting that he had something

 6  to do with preparing that?

 7           MR. DUPONT:  No, sir.

 8           THE COURT:  What are you asserting?

 9           MR. DUPONT:  What we're trying to do is establish

10  whether or not he knew about this particular incident and

11  location because it's relevant to what we were doing out in

12  the desert that day.

13           Basically what I'm trying to do, Your Honor, is save

14  us time and see if I can get it through this witness and not

15  have to call another.  That's basically what I'm doing.  All I

16  want is the latitude and longitude of this and to know what he

17  knows about this incident.

18           THE COURT:  Okay.  For that limited purpose, sure.

19  BY MR. DUPONT:

20  A.   So what's your question?  I'm sorry.

21  Q.   Do you want to look at this?  Do you know about the

22  incident on July 19, 2017?

23  A.   I've heard about it, yes.  I've never read the report, but

24  I've heard about it.

25  Q.   The three missing people?

1    A.    I don't know anything about that.

2    Q.    You don't know anything about the missing people on July

3    19, 2017?

4    A.    I didn't read that report, no.

5    Q.    I'm not talking about the report right now.

6    A.    Only what you said.  Only from --

7    Q.    Three missing people, July 19, 2017.

8    A.    Okay.

9    Q.    Two of them were rescued.  One of them was left behind.

10         MS. WRIGHT:  Objection, Your Honor.  Counsel's

11   testifying.

12         THE COURT:  Yeah, I thought you were going to ask

13   him about the latitude.

14         MR. DUPONT:  I am, but I want to -- I'm just going

15   to ask him if he knows about this incident and then about the

16   latitude.  I was going to ask him about both things.  They're

17   both relevant to what was going on.

18         MS. WRIGHT:  Your Honor, I'm not sure what relevance

19   what this witness knows about this incident he wasn't involved

20   in is.

21         THE COURT:  All right.  Let's hear it.

22   BY MR. DUPONT:

23   A.    What's your question now?

24   Q.    Did you know about three people who were in distress July

25   19, 2017, and --

 1   A.   I don't recall that.  I don't have any pertinent

 2   information in relation to that.

 3   Q.   All right.  You didn't know there was still a person

 4   missing out there on July 19th, 2017?

 5   A.   No.

 6   Q.   Nobody told you?

 7            THE COURT:  We don't even know if he was on duty, do

 8   we?

 9            MR. DUPONT:  Well, he -- that is a good question.

10   BY MR. DUPONT:

11   Q.   Were you on duty in July?

12   A.   I'd have to look at the schedule and see what day that

13   was.

14   Q.   Were you on duty between July 19th and August 13th any

15   other days?

16   A.   I'm sure I was, yes.

17   Q.   So nobody told you there was a missing person out there,

18   a living human being in distress?

19   A.   I don't recall that.

20   Q.   Do people tell you that, when people go missing in Cabeza

21   Prieta?

22   A.   We get that information.

23   Q.   So you can go look for them?

24   A.   I don't -- I don't know that particular case, no.  I

25   didn't -- I don't recall anything of that particular case.

```
 1   Q.   When people call you and say someone's missing, do you go

 2   looking for them?

 3            MS. WRIGHT:  Objection.  Relevance, Your Honor.

 4            THE COURT:  Sustained.

 5   BY MR. DUPONT:

 6   Q.   Can you see 198 up on your screen?

 7   A.   I can see part of it.

 8   Q.   I'm going to try and figure out how to move this.

 9            MR. DUPONT:  Louis, do you know how to move this?

10   BY MR. DUPONT:

11   Q.   Do you recognize 209?

12   A.   From the part I see.  I can only see part of it.  It looks

13   like --

14   Q.   I'll go up and down on it.

15   A.   Keep scrolling.  Yes.

16   Q.   And what is that?

17   A.   It looks like a map we've created that shows where the

18   white truck and the defendants were contacted and shows the

19   route of Charlie Bell Road and the pictures associated with --

20   if you can scroll up -- it shows Charlie Bell Well and the

21   picture taken of the green crates that I observed and then the

22   signage along the road.

23   Q.   All right.  And it has the location of the incident?

24   A.   Looks like it, yes.

25   Q.   And that's the GPS you took of the location of the white
```

 1   truck?

 2   A.    That's GPS coordinates in a different what you call

 3   position format.

 4   Q.    And how is that different?

 5   A.    That would be -- there is in degrees, minutes, minutes,

 6   and the other one was in decimal degrees.

 7   Q.    It would show up the same place on a map?

 8   A.    Give or take.  It should, as long as everything else is

 9   the same.

10              THE CLERK:  Did you put it on the Elmo?

11              MR. DUPONT:  I'll move for admission of 198.

12              THE COURT:  For illustrative purposes, any

13   objection?

14              MS. WRIGHT:  No, Your Honor.

15              THE COURT:  It'll be admitted.

16   BY MR. DUPONT:

17   Q.    I want to come back to this in a minute.

18         We talked a little bit about where --

19              THE COURT:  Do you want it published?

20              MR. DUPONT:  Not just yet, Your Honor, if that's all

21   right.

22              THE COURT:  Okay.

23   BY MR. DUPONT:

24   Q.    Remember we talked about locations where deceased people

25   were being recovered at Cabeza Prieta?

 1   A.   Yes.

 2   Q.   Have you ever looked at any maps that show where people

 3   are being found deceased?

 4   A.   I saw your map.

 5   Q.   That's the first time you've seen the map?

 6   A.   I've seen the map.

 7   Q.   Have you seen the one created by the Office of the

 8   Medical Examiner?

 9   A.   I don't recall that map.

10        MR. DUPONT:  If I can show the witness what's on my

11   computer right now?  This is Exhibit 189, I think.

12        So as we go -- and Your Honor, I would like to admit

13   what I'm going to go through, 189, as evidence.  It's a public

14   record kept in the course of, it's authenticated by the web

15   site itself, and I'm going to show the officer some images

16   from this web site that show where deceased people are.

17        So I'm moving for admission of these photographs.

18   Rule 803.8.  Yes.

19        THE COURT:  Okay.

20        MR. DUPONT:  It's interesting.  You'll like it.  It

21   would be helpful to you.

22        THE COURT:  Well, the hearsay objection -- I'm

23   curious about the answer.  It may not be admissible, but I'm

24   curious.  All right.  We'll admit it.

25        MR. DUPONT:  Thank you, Your Honor.  Can we publish?

 1              THE COURT:  Publish what?

 2              MR. DUPONT:  Well, I'm just going to go on the thing

 3  and show you, and before I press a button, I'll make sure it's

 4  going to be relevant to what we're talking about.  Or you'll

 5  make sure it'll be relevant after I ask permission.

 6              THE COURT:  Why don't you show me the first one and

 7  let's see what the first one is.

 8              MR. DUPONT:  Thank you.  I'm just going to walk him

 9  through a couple of things here.  So are you on, Your Honor?

10  Are you looking at it?

11              THE COURT:  What I'm seeing right now is something

12  that says, "Pima County Medical Examiner," a "Mission," it

13  says "Resources and Reports," three items under it.  Then the

14  "Medical Examiner Annual Reports," and it's got from 2017 to

15  2010.

16              MR. DUPONT:  Right.

17              THE COURT:  That's what I'm looking at.

18              MR. DUPONT:  The 2017 one, I'm going to admit that

19  separately through -- I'm going to request permission to admit

20  that through Dr. Hess, but he'll be later.

21              And then, you look on the very bottom, and they're

22  keeping this on "Deceased Migrant Lookup."

23              THE COURT:  I see that.

24              MR. DUPONT:  This public record here.  And then it

25  goes to this interactive map.

1              THE COURT:  And you want to show him that?

2              MR. DUPONT:  A map of, yeah, a map of migrant

3    mortality.

4              THE COURT:  Sure.  Show it to him.

5              MR. DUPONT:  Okay.  Can we publish it too, Your

6    Honor?

7              THE COURT:  Oh, certainly.

8              MR. DUPONT:  Okay.  Thank you.

9    BY MR. DUPONT:

10   Q.   So have you seen this before?

11   A.   No, I have not.

12   Q.   Or any images associated with something like this?

13   A.   I don't remember anything like this, no.

14   Q.   So if I look at, "Land Corridor," "Cabeza Prieta" would

15   be right?

16             MS. WRIGHT:  Objection, Your Honor.  Foundation.

17   The witness just testified he's not familiar with this map.

18             THE COURT:  I know.  Go ahead.

19             MR. DUPONT:  Thank you, Your Honor.

20   BY MR. DUPONT:

21   A.   Question?

22   Q.   Yes.  Is Cabeza Prieta the appropriate land corridor?

23   A.   I'm assuming it is.

24   Q.   All right.  You can see these names on the bottom of the

25   people who have deceased; is that correct?

 1              MS. WRIGHT:  Objection.  Foundation.  Calls for

 2    speculation.  This witness has no information about this map.

 3              THE COURT:  I know that.

 4              MR. DUPONT:  And that's kind of my point, Your

 5    Honor, with this witness, you don't know, and our clients are

 6    the ones who need to know to do this work.

 7              THE COURT:  Well, no.  It'll be admitted as a public

 8    document.  What he's -- and that's what it'll be admitted as.

 9    BY MR. DUPONT:

10    Q.   Do you know if this is how many people who have died in

11    your area?

12    A.   I don't know anything about this.

13    Q.   They don't tell you when someone's died in your area?

14    A.   We get information, but I don't know where -- I don't know

15    if it comes from this.  It usually comes from -- comes from

16    other groups, different people that might find remains out on

17    the refuge.

18    Q.   So when -- you can see my cursor?

19    A.   Move.  Okay.  Yes, I see it.

20    Q.   This is Ajo?

21    A.   Yes.

22    Q.   The road basically goes up along here.

23    A.   Somewhat.  Somewhat, yes.

24    Q.   Somewhat.  Just kind of up here is the pass?

25    A.   Maybe, yes.

1    Q.   Right around where?

2    A.   Not -- not pinpointed, but it's probably in that area.

3    Q.   Kind of around there?

4    A.   Yeah.

5    Q.   And then this is where you found the volunteers sitting

6    with us?

7              MS. WRIGHT:  Your Honor, I'm going to object as to

8    foundation on these questions.  We have nothing to tell us

9    what this map is or what scale it's on or where anything is on

10   this map.

11             THE COURT:  Noted.  Go ahead.

12   BY MR. DUPONT:

13   A.   The question?

14   Q.   Where the finger is right there, that's about where you

15   found the volunteers?

16   A.   I can say it's in that valley.  I can't say if it's

17   pinpointed right there, but it looks like, if that's Growler

18   Valley, yes.

19   Q.   I mean, do you recognize that as Growler Valley?

20   A.   I don't -- if you can zoom in -- no, I don't know as far

21   as specifically where that is.

22   Q.   Is there another mountain range just west of Ajo?

23   A.   There's several mountain ranges out there.

24   Q.   And the first one is Growler Mountains; right?

25   A.   I guess you could say at that.

 1  Q.   And then right on the west side is where the Growler

 2  Valley starts.

 3  A.   Okay.

 4  Q.   Right?  Is that right?

 5  A.   On the west side of the Growler Mountains, yes, that's

 6  where Growler Valley starts, yes.

 7  Q.   And then what's this little range over here?

 8  A.   If that's the first mountain range, that would be the

 9  Granite Mountain Range.

10  Q.   All right.  Can you see the road from here?

11  A.   I cannot.

12  Q.   I can't either, so --

13          MR. DUPONT:  May I approach the witness, Your Honor?

14          THE COURT:  Sure.

15          MR. DUPONT:  Thank you.

16  BY MR. DUPONT:

17  Q.   From that particular map, can you -- can you estimate

18  about where you found the four people who are sitting with us?

19  A.   If you want me to assume it, I can.

20  Q.   Well, estimate.

21  A.   Somewhere in this area.

22          THE COURT:  You can get up and see where he pointed.

23          MS. WRIGHT:  No, Your Honor, I was going to lodge an

24  objection, but the answer came, so --

25          MR. DUPONT:  What does he have to do, hit the lower

 1  left to make a pointer?

 2          THE CLERK:  Sure.

 3          MR. DUPONT:  Can I do it?

 4          MS. WRIGHT:  Your Honor, objection.  Mr. Dupont

 5  cannot testify.

 6          MR. DUPONT:  I'm going to let him touch it.  I'm

 7  just going to activate it.

 8          THE CLERK:  Activate the cursor.

 9          MS. WRIGHT:  I would ask that the witness be the one

10  to manage the technology, Your Honor.

11  BY MR. DUPONT:

12  Q.  So, Officer, you pointed right about in that area; is

13  that correct?

14  A.  Seems like it, yes.

15          MR. DUPONT:  Your Honor, I'd like to have this

16  particular image photographed and marked as 189-1.

17          THE COURT:  If you know how to do it, I'll grant it.

18  I don't know how to do it.

19          THE CLERK:  I'm doing it, Judge.

20          THE COURT:  Okay.  It's so marked.

21          MR. DUPONT:  Oh, I'm sorry.  Can you take us off.  I

22  only want to show the witness this first.

23          I want to figure out how to go from that one to this

24  one.  This one's probably going.  I'll start here.  Okay?

25          THE CLERK:  I don't know what you're asking.

1           MR. DUPONT:  Can we put this one back up on the

2    screen?

3    BY MR. DUPONT:

4    Q.   So we're back on 198, defense exhibit that's been

5    admitted, and we talked about this incident report number;

6    right?

7    A.   We did talk about that.

8    Q.   And can you -- is that the same number on your report?

9    A.   No.  As I described, this is in a different format than

10   what's on the report.

11   Q.   All right.  So -- but they're both supposedly the same

12   exact location?

13   A.   They should be.  If it's all in the right data and

14   everything else is correct from this program, as far as my GPS

15   and anything else, it would show the same coordinate.

16   Q.   You're using the same program on the cover sheet that you

17   read out loud and this particular Exhibit 209; right?  Or 198;

18   right?

19   A.   Say that one more time.

20   Q.   The number you read to us from the your police report --

21   A.   Yes, that number, yes.

22   Q.   -- it's the same coordinates, same system, as what you're

23   trying to record in 198; right?

24   A.   The program on the report automatically generates that

25   particular number, so if I plug it in under this format, it

1   generates the other number.

2   Q.   All right.  When we look at Charlie Bell Pass here -- I

3   think we showed the pictures of starting down the hill here --

4   A.   Okay.

5   Q.   -- on this established road; right?

6   A.   Okay.

7   Q.   And this road is established all the way down; correct?

8   A.   Yes.

9   Q.   All the way down to where -- here; correct?

10  A.   Correct, yes.

11  Q.   And what you've done is put this on a topographical map

12  showing contour lines; right?

13  A.   Looks like it, yes.

14  Q.   So that, kind of when you get down to this area, is when

15  it flattens out, looking to the northeast of the valley.  So

16  now looking this way is going to be flat for walking; right?

17  A.   Relatively flat, flatter.

18  Q.   You know, flatter than this; correct?

19  A.   Yes.

20  Q.   Easier hiking?

21  A.   Matter of opinion.

22  Q.   All right.  And gives you access to the northeast valley?

23  A.   That gives you access to the north of Charlie Bell Road to

24  the north Growler Valley.

25  Q.   And Sheep's Peak is up this way?

```
 1  A.    Somewhere in there.  I don't know if that's where your pen

 2  is exactly pointing, but it's up there somewhere.

 3            MR. DUPONT:  No other questions, Your Honor.

 4            THE COURT:  Any redirect?

 5            MS. WRIGHT:  Yes, please, Your Honor.

 6            I was hoping you would leave 189-1 up there.

 7            MR. DUPONT:  I can.  Well --

 8            MS. WRIGHT:  If you can't do it, that's fine.

 9            MR. DUPONT:  I can show 189, but I don't know, can

10  you pull up 189-1?

11            MS. WRIGHT:  It's fine, Chris.  Go ahead.

12            MR. DUPONT:  Do you want this up here?

13            MS. WRIGHT:  I'll work without it.  Thank you.

14            MR. DUPONT:  Do you want me to take it with me?

15            MS. WRIGHT:  Yep.

16                       REDIRECT EXAMINATION

17  BY MS. WRIGHT:

18  Q.    Officer West, these last series of exhibits and maps

19  we've been talking about here, 189-1, the interactive map that

20  you were shown, do you remember that?

21  A.    Yes.  It's on there now.

22            THE CLERK:  It's up.

23            MS. WRIGHT:  Thank you.

24  BY MS. WRIGHT:

25  Q.    Did you have anything to do with compiling this map?
```

REDIRECT EXAMINATION OF MICHAEL WEST

1   A.   Nothing whatsoever.

2   Q.   Have you ever talked to anybody about how this map became

3   what it is?

4   A.   No.

5   Q.   Have you ever done any research about the accuracy of

6   this map?

7   A.   None.

8   Q.   Can you -- have you ever used this map before?

9   A.   Never.

10  Q.   Do you have anything to do with the image that we have

11  here with the red dots?

12  A.   Only where I pointed my finger, where the arrow is at this

13  point in time.

14  Q.   Now, let's look down.  I want you to look to the data

15  entries below, and I want you to take a look there and

16  see, are all the entries there for Cabeza Prieta, or are there

17  other entries there?

18  A.   It looks like there's some for other areas.

19  Q.   And what other areas are those?

20  A.   I see Organ Pipe National Monument and the State of

21  Arizona.

22  Q.   Okay.

23  A.   On what I see here.  I mean --

24  Q.   That's all that I asked you, so that's fine.  Thank you.

25       Let's talk about Exhibit 2.  Actually, before I finish

 1   up, I'm sorry, with 189-1, to the extent you were answering

 2   Mr. Dupont's questions, were those based on your expertise

 3   with this map?

 4   A.   I have no expertise with this map.

 5   Q.   Let's look at Exhibit 2, please.

 6            MS. WRIGHT:  Thank you, Sarah, if we can move to the

 7   Elmo.

 8            (A discussion was had off the record between

 9            counsel.)

10            THE COURT:  They're talking about the permit.

11            THE WITNESS:  Sir?

12            THE COURT:  They're talking about the permit.

13            THE WITNESS:  Okay.

14            MS. WRIGHT:  Yes.  Thank you, Judge.

15   BY MS. WRIGHT:

16   Q.   The permit that you were shown, do you remember Exhibit

17   2, the Hold Harmless Agreement?

18   A.   Yes.

19   Q.   Did you have any part in writing that agreement?

20   A.   No.

21   Q.   Do your duties require you to interpret that agreement?

22   A.   Say it again.  I'm sorry.

23   Q.   Do your duties require that you interpret that agreement?

24   A.   Only knowing, I guess, some of the related facts to the

25   enforceable CFR that we do.

1  Q.   Okay.  So in terms of the paragraphs and the language in

2  the agreement, do you ever -- are you ever called upon to

3  interpret a particular sentence in that agreement?

4  A.   No, no, none whatsoever.

5  Q.   Now, I want to talk for a moment about this green truck,

6  and let me put one of the exhibits of it up again here.

7  Actually, I'll just bring it up to you.

8              THE COURT:  The truck is Exhibit 16 or 18?

9              MS. WRIGHT:  16, I wanted.  It was the very last

10 one, Judge, thank you, so let me -- if I could approach, Your

11 Honor, with 16?

12             THE COURT:  You may.

13             MS. WRIGHT:  Thank you.

14 BY MS. WRIGHT:

15 Q.   Officer West, the area where that vehicle is parked, is

16 that a designated wilderness area?

17 A.   Not that spot, no.

18 Q.   And that's all the questions I have about that one, so

19 I'll take that back.

20       Now, on August 13th of 2017, during any of your

21 interactions with the defendants, did you ever make them any

22 promises about what would happen to them later on?

23 A.   No.

24 Q.   Did you ever make them any promises about whether or not

25 they could be cited or charged later on?

REDIRECT EXAMINATION OF MICHAEL WEST

1   A.   No.

2   Q.   Did you discuss those possibilities at all with them?

3   A.   None, no.

4   Q.   Finally, I'd like to talk to you a little bit about how

5   you deal with medical emergencies out on the Cabeza Prieta

6   National Wildlife Refuge.

7   A.   Okay.

8   Q.   Let's say you encounter someone in some kind of medical

9   emergency situation.

10  A.   Okay.

11  Q.   Do you have resources other than your own personal

12  knowledge and supplies that you can call on to deal with

13  those?

14  A.   You can call, get in contact with the Border Patrol.  They

15  have trained EMTs.  They're usually probably the quickest to

16  get to wherever I am, if it's a remote location, and they can

17  deal with what the situation is.

18  Q.   Okay.  So you said they're trained as EMTs.  Do they have

19  other equipment that makes them responsive to medical

20  emergencies?

21  A.   They may have access to helicopters or their vehicles or,

22  just knowing the area where we're at, they may be close by.

23          MS. WRIGHT:  If I could have a moment, Your Honor?

24          That's all I have, Your Honor.  Thank you.

25          THE COURT:  You may step down, sir.

1              MR. WALTERS:  Your Honor, the Government next calls

2    Fish and Wildlife Officer Brian Krukoski.

3                    BRIAN KRUKOSKI, WITNESS, SWORN

4                         DIRECT EXAMINATION

5    BY MR. WALTERS:

6    Q.   Sir, could you please introduce yourself to the Court and

7    spell your last name.

8    A.   My name is Brian Krukoski, K-r-u-k-o-s-k-i.

9    Q.   I'm going to ask you to slow down just a bit.  Okay?

10   A.   Yes, sir.

11   Q.   All right.  Where are you employed?

12   A.   Cabeza Prieta National Wildlife Refuge.

13   Q.   Do you work for any Government agency?

14   A.   United States Fish and Wildlife Service, sir.

15   Q.   How long have you worked for Fish and Wildlife?

16   A.   This is my sixteenth year.

17   Q.   And you said your sixteenth year?

18   A.   This is my sixteenth year, yes.

19   Q.   What is your official title with Fish and Wildlife?

20   A.   Senior Federal Wildlife Officer.

21   Q.   What are your job duties as a Senior Fish and Wildlife

22   Officer?

23   A.   I supervise a law enforcement program for Cabeza Prieta

24   and its officers.

25   Q.   Before joining Fish and Wildlife, did you have any other

1    law enforcement experience?

2    A.    Yes, sir.  I was a United States Air Force law enforcement

3    officer.

4    Q.    Let's talk about the Cabeza Prieta National Wildlife

5    Refuge.  Okay?

6    A.    Yes.

7    Q.    Where is the refuge located, generally speaking?

8    A.    Ajo, Arizona, and in between Ajo and Wellton, Arizona.

9    Q.    How big is it?

10   A.    Approximately 860,000 acres.

11   Q.    What is the southern geographical boundary of the refuge?

12   A.    We have a 56-mile international border with the United

13   States and Mexico.

14   Q.    What is the western boundary?

15   A.    Western boundary is the Marine Corps version of the Barry

16   Goldwater Range.

17   Q.    What about the northern and eastern boundaries?

18   A.    Northern boundary is also partially the Marine Corps, and

19   the other part is Air Force.

20   Q.    Are you familiar with Charlie Bell Pass?

21   A.    Yes, sir.

22   Q.    What about Charlie Bell Well?

23   A.    Yes, sir.

24   Q.    Where is Charlie Bell Pass in relation to, let's say, the

25   Fish and Wildlife headquarters office on the refuge?

DIRECT EXAMINATION OF BRIAN KRUKOSKI                    124

1   A.    From the headquarters, I'd say it's approximately 15

2   miles.

3   Q.    In what direction?

4   A.    To the west.   I'm sorry.

5   Q.    That's okay.

6         Is Charlie Bell Pass within the geographical boundaries

7   of Cabeza Prieta National Wildlife Refuge?

8   A.    Yes, sir.

9   Q.    Where is -- what is Charlie Bell Well?

10  A.    Charlie Bell Well is an animal drinker that we have out

11  there for usually desert horn sheep, and it's also -- there is

12  a tank there for people who are traveling through the refuge

13  illegally.

14  Q.    Where is Charlie Bell Well in relation to Charlie Bell

15  Pass?

16  A.    Approximately two miles to the west.

17  Q.    Is Charlie Bell Well within the geographical boundaries

18  of the Cabeza Prieta National Wildlife Refuge?

19  A.    Yes, sir.

20  Q.    If you are at Charlie Bell Well, approximately how far

21  are you from that Fish and Wildlife headquarters office?

22  A.    Approximately about 17 miles.

23  Q.    Let's talk about whether the refuge has any wildlife

24  area.   Okay?

25  A.    Yes, sir.

1   Q.   Are there wilderness areas on the refuge?

2   A.   Cabeza Prieta is approximately 93 to 94 percent

3   wilderness.

4   Q.   Is that wilderness area -- well, let me ask it this way.

5   Who or what designates a certain area as a wilderness area as

6   it relates to Cabeza Prieta?

7   A.   The Cabeza Prieta was designated by the 1990 Arizona

8   Wilderness Act, and it falls under the Wilderness Act itself.

9   Q.   And the Wilderness Act, what is that?  Is that a state or

10  federal thing?

11  A.   It's federal.

12  Q.   Are there any restrictions about members of the public

13  entering a wilderness area?

14  A.   The public is required to get an access permit and to read

15  and fill out the Hold Harmless Agreement.

16  Q.   Are the public allowed to operate a motor vehicle in a

17  wilderness area?

18  A.   No, sir.

19  Q.   Why not?

20  A.   Wilderness area is supposed to remain untrammeled by

21  people and to remain in its original state for generations to

22  come.  It's supposed to be pristine, no structures.  People are

23  allowed to enter by foot, and they must leave.  They're not

24  allowed to stay, and they must not leave anything.

25  Q.   So is that restriction, then, correct me if I'm wrong,

1   supposed to preserve the natural resources of the wilderness

2   area?

3   A.   Yes, sir.

4   Q.   Is it supposed to also help protect any wildlife and

5   their migration patterns that live in the wilderness area?

6   A.   Yes.

7   Q.   Are law enforcement vehicles allowed to drive or operate

8   a motor vehicle in a wilderness area?

9   A.   Yes, sir.

10  Q.   So why are law enforcement officers allowed to drive but

11  members of the public are not?

12  A.   Law enforcement officers are allowed to pursue crimes or

13  to help with search and rescue.

14  Q.   In terms of Fish and Wildlife, and based on your training

15  and experience, is it safe to assume that law enforcement

16  officers try to stay out of the wilderness area as much as

17  possible?

18  A.   Yes, sir.

19  Q.   Why?

20  A.   If it's not necessary, you're supposed to be, you know,

21  any kind of minimal footprint in the wilderness.

22  Q.   Are there times when a member of the public can drive in

23  a wilderness area?

24  A.   Yes, sir.

25  Q.   What are those times?

DIRECT EXAMINATION OF BRIAN KRUKOSKI                127

1    A.   Usually surveys for either animal or the actual

2    environment itself or for artifacts and the cataloging of

3    artifacts.

4    Q.   What type of permission would people in those situations

5    need in order to operate a motor vehicle in a wilderness area?

6    A.   They would have to attain a special-use permit from the

7    refuge manager.

8    Q.   Are you the refuge manager?

9    A.   No, sir.

10   Q.   Let's talk about permits.  Okay?

11   A.   Yes, sir.

12   Q.   Do members of the public need any type of permit to enter

13   Cabeza Prieta National Wildlife Refuge?

14   A.   Yes.

15   Q.   When someone gets a permit, is she required to sign

16   anything else?

17   A.   Yes, the Hold Harmless Agreement.

18   Q.   Can a person get a permit without signing the Hold

19   Harmless Agreement?

20   A.   No, sir.

21   Q.   What is the purpose of the Hold Harmless Agreement?

22   A.   It was established by the military to let the public know

23   the dangers that may occur while they are on the different

24   properties because of ordnance and military equipment.

25   Q.   Is there anything else that a person must do when they

DIRECT EXAMINATION OF BRIAN KRUKOSKI

1  get a permit?

2  A.   They watch a video that kind of goes over those issues.

3  Q.   And again, can you get a permit if you do not watch the

4  video?

5  A.   No, sir.

6  Q.   Is the video a one-time requirement?

7  A.   They watch it every year.

8  Q.   Okay.  So every time you get a permit, you have to sign a

9  new Hold Harmless Agreement.  Is that fair?

10  A.   Yes.

11  Q.   And you have to watch the video again?

12  A.   Yes, sir.

13  Q.   Does Cabeza Prieta keep a record of all people that are

14  issued a permit?

15  A.   Yes, sir.

16  Q.   How are those records kept?

17  A.   Mostly in files.

18  Q.   Okay.  Are you familiar with how to search those records

19  and files?

20  A.   Yes.

21  Q.   Did you conduct a check into whether the four defendants

22  here today had a permit on August 13th of 2017?

23  A.   Yes, sir.

24  Q.   And what was the result of that check?

25  A.   I did not find any.

1   Q.   When did you complete that check?

2   A.   About a week-and-a-half ago.

3   Q.   Does Cabeza Prieta keep a record of all people who are

4   issued a special-use permit?

5   A.   Yes, sir.

6   Q.   Are you familiar with how to search those records?

7   A.   Yes, sir.

8   Q.   As a Fish and Wildlife -- well, let me put it this way.

9   Are Fish and Wildlife officers given notice by the refuge

10  manager whenever a special-use permit is issued?

11  A.   Yes, sir.

12  Q.   Why?

13  A.   So the officer knows if they encounter somebody that is

14  doing something outside the norm, how to handle it.

15  Q.   And why is that important to you as a Fish and Wildlife

16  officer?

17  A.   So I don't think somebody's committing a crime.

18  Q.   Were -- to your knowledge, were any of the officers

19  notified about a special-use permit?

20  A.   No, sir.

21  Q.   On August 13th -- well, let me ask, did you conduct a

22  recent check of Cabeza Prieta's special-use permit records to

23  determine whether any of the defendants had a special-use

24  permit?

25  A.   Yes.

1   Q.   When did that check happen?

2   A.   About a week-and-a-half ago.

3   Q.   And what did your check reveal, if anything?

4   A.   I did not find any.

5              MR. WALTERS:  May I have a minute, Your Honor?

6              THE COURT:  Yeah.

7              MR. WALTERS:  I have no further questions, Your

8   Honor.  Thank you.

9                         CROSS-EXAMINATION

10  BY MR. FIDEL:

11  Q.   Good afternoon.

12  A.   Good afternoon, sir.

13  Q.   Just give me a minute and let me get some computer stuff

14  set up.

15       Agent Krukoski, Mr. Walters asked you some questions

16  about Border Patrol officers driving within the refuge.  Do

17  you recall that?

18  A.   Yes, general law enforcement.

19  Q.   Law enforcement.  Are you aware of Border Patrol officers

20  driving within the refuge?

21  A.   Yes.

22             MR. WALTERS:  Objection, Your Honor.  Relevance.

23  Border Patrol is not a part of this case.

24             MR. FIDEL:  Mr. Walters asked the witness --

25             THE COURT:  Overruled.

1              MR. FIDEL:  Thank you.

2    BY MR. FIDEL:

3    Q.   And in fact, law enforcement officers drive all over the

4    refuge, do they not?

5    A.   Yes, sir.

6    Q.   On established roads and on nonestablished roads?

7    A.   Yes, sir.

8    Q.   And are you familiar with a study that was conducted to

9    determine just how many miles of roads have been established

10   all over the refuge?

11   A.   Which one, sir?

12   Q.   There was a study in 2011.  Are you familiar with that?

13   A.   I believe I -- I believe I know which one you're talking

14   about.

15              MR. FIDEL:  All right.  Could we publish just to the

16   witness what's on the computer?  That's not it.  That was on

17   the computer.

18              THE CLERK:  Right.  It's not.  Is it plugged in?

19              MR. DUPONT:  You've got 181-1 up, Sarah.

20              THE CLERK:  Whatever he's got.

21              MR. DUPONT:  No.  I think 181-1 that's still from

22   your disk on your system is up and not the HDMI or AG,

23   whatever you need.

24              THE CLERK:  I don't know how to clear that, then.

25   Maybe that?  That did it.

1           MR. FIDEL:  That's it.  Okay.

2    BY MR. FIDEL:

3    Q.   So I'm going show you here Exhibit 107.  Do you recognize

4    that as the study of those -- that match those roads all over

5    the refuge?

6    A.   I don't have anything yet, sir.

7           MR. FIDEL:  Oh, can we show that to the witness,

8    please?

9    BY MR. FIDEL:

10   A.   I have seen that picture before.

11   Q.   Okay.  Have you seen this study before that was conducted

12   in 2011?

13   A.   I think I've seen maps.  I don't think I've read an actual

14   study.

15   Q.   Are you familiar -- you are familiar, though, that the

16   Cabeza Prieta Refuge and Fish and Wildlife conducted this

17   study to figure out just how much roads are crisscrossing the

18   refuge area?

19   A.   I honestly don't know who did the study.

20   Q.   Okay.  Do you see on the front page there that it was

21   conducted by the Department of the Interior?

22   A.   Yes, sir.

23          MR. FIDEL:  All right.  Your Honor, I would offer

24   Exhibit 107 for admission into evidence as a public record

25   under Rule 803.8.

1          MR. WALTERS:  Your Honor, I think we have foundation

2  problems as well as relevance objections.

3          THE COURT:  What's the relevance?

4          MR. FIDEL:  Well, the relevance is that he was asked

5  on direct about roads in the wilderness.  Our clients are

6  charged with driving on a road in the wilderness, and this

7  establishes just the extent of roads that are there and the

8  minimal intrusion that they were doing.

9          It's relevant to the least -- to the minimal nature

10  of the work -- of their efforts to get into the refuge, that

11  they're taking a road, an existing road, an established road,

12  and not -- not creating any new intrusions on wildlife or on

13  the refuge.

14          THE COURT:  The objection's sustained.

15  BY MR. FIDEL:

16  Q.   Are you aware that the study concluded that there were

17  8,000 miles of road that were created by law enforcement

18  agencies throughout the refuge?

19          MR. WALTERS:  Objection, Your Honor.

20  Foundation, hearsay, and relevance.

21          MR. FIDEL:  Well, I'm asking to find out if there's

22  foundation.

23          THE COURT:  Well, the objection's sustained, but I

24  understand your point.

25          So do you have something else to ask him?

 1              MR. FIDEL:  Well, can I get an answer to that

 2   question?

 3              THE COURT:  No.  I sustained the objection.

 4              Basically what you're saying is, if they can travel

 5   without a permit, why can't your clients?  I guess that's the

 6   question being asked; right?

 7              MR. FIDEL:  Well, I'd just like to know if he's

 8   aware --

 9              THE COURT:  No, no, no, that's the question you're

10   asking me to decide.

11              MR. FIDEL:  Well, that's part of it, the larger --

12              THE COURT:  It doesn't matter what he says.

13              MR. FIDEL:  I mean, he's aware of the answer or he

14   isn't.  Let me ask another question.

15   BY MR. FIDEL:

16   Q.   Have you seen a map of these roads through the refuge?

17   A.   Yes, sir.

18   Q.   Would you recognize that map if I showed it to you?

19   A.   Possibly, yes.

20   Q.   Let me show you page nine of that study.

21   A.   I couldn't hear you.  I'm sorry.

22   Q.   I'm going to show you page nine of that study.  Does that

23   look like a map of those roads?

24   A.   I don't remember seeing that map, no.

25   Q.   Okay.  Have you seen a map that shows extensive roadways

1    and vehicle travel throughout all regions of the refuge?

2    A.    I have seen a map similar to that, yes.

3    Q.    Okay.  Thank you.

4          Now, Charlie Bell Road, that's an established road;

5    right?

6    A.    Yes.

7    Q.    I want to show you a map that we have here.  This is

8    going to be -- can we get the Elmo up?  Let me show you, this

9    is Government's Exhibit 38.  Are you familiar with this map?

10   A.    Yes.

11   Q.    Okay.  Would you agree that this is an accurate map of

12   the Cabeza Prieta Wildlife Refuge?

13   A.    Yes, sir.

14          MR. FIDEL:  All right.  I would move to admit

15   Government's Exhibit 38.

16          MR. WALTERS:  No objection, Your Honor.

17          THE COURT:  It'll be admitted.

18   BY MR. FIDEL:

19   Q.    And so looking at this map, Exhibit 38 here -- can we

20   publish this, please?

21          Looking at this map here, I think you testified about the

22   relative locations of the boundaries of the Cabeza Prieta

23   Refuge previously.

24          Did I recall that right?

25   A.    You're talking about the neighboring lands?

1    Q.    Yeah.

2    A.    Yes, sir.

3    Q.    All right.  So on this map here, the Cabeza Prieta Refuge

4    is within these borders that I'm running over with my finger;

5    right?

6    A.    Yes, sir.

7    Q.    Okay.  And then down here on the bottom right, that's

8    where we have Organ Pipe?

9    A.    Yes, sir.

10   Q.    And just above Organ Pipe, we have state land.  There's

11   the town of Ajo right here.

12   A.    Yes, sir.

13   Q.    And then, if we go north of the refuge, this is the

14   bombing range?

15   A.    The Barry Goldwater Range.

16   Q.    Thank you.  West of the refuge, what did you say was out

17   there?

18   A.    The Marine Corps portion of the Barry Goldwater Range.

19   Q.    Okay.  Got it.  So the Charlie Bell Road, looking at this

20   map, if I zoom in here, goes from the town of Ajo here, and

21   then is this the Charlie Bell Road, this one?

22   A.    Yes, sir.

23   Q.    And this first set of mountains here that runs

24   north/south, first set of mountains west of Ajo, that's the

25   Growler Mountains; is that right?

1    A.   Yes, sir.

2    Q.   And so then on this side of the valley, of the mountains,

3    the west side, that's the Growler Valley?

4    A.   Yes, sir.

5    Q.   And then we see that Charlie Bell Road comes through the

6    Growler Valley.  This is that administrative portion; is that

7    right?

8    A.   Yes, sir.

9    Q.   And the administrative portion goes down basically

10   through the middle of the Growler Valley.  What, is there a

11   wash there or something?

12   A.   It goes in and out of a wash, yes.

13   Q.   Okay.  It's usually dry; right?

14   A.   Say that one more time.

15   Q.   The wash is usually dry; is that right?

16   A.   Yes, sir.

17   Q.   Have you ever seen that wash running?

18   A.   Yes, sir.

19   Q.   Okay.  That happens, what, if there's a monsoon storm?

20   A.   Yes, sir.

21   Q.   Other times there's no water in there; right?

22   A.   No.

23   Q.   Okay.  And what's the -- how big is this valley?

24   A.   How big is the valley?

25   Q.   Yeah.  How -- was it 20 miles from Growler Mountains

1    to -- well, are these the Granite Mountains here on the

2    western side?

3    A.    Those are the Granite Mountains, yes.

4    Q.    How far is that from the base of the Growlers to the base

5    of the Granites?

6    A.    I would have to look at the key and look at the --

7    Q.    Well, let's do this.  Here.  Does that help you answer

8    it?

9    A.    Looks about, say, 15 miles.

10   Q.    Okay.  And there's nothing out there; right?  It's

11   wilderness?

12   A.    Yes, sir.

13   Q.    Okay.  There is a water tank at Charlie Bell Pass; right?

14   A.    Yes, sir.

15   Q.    And is there another water tank somewhere on that stretch

16   of the Growler Mountains?

17   A.    You just covered a large area.  Can you specify?

18   Q.    Well, do you know, is there a water tank somewhere else

19   along the western face of the Growler Mountains?

20   A.    On the western face?

21   Q.    Yeah.

22   A.    Yes.  On the bombing range.

23   Q.    On the bombing range.  And so could you -- well, I'm

24   going to run my finger north along the Growlers.  You tell me

25   when to stop.

1    A.    You just passed it.

2    Q.    Is it this blue dot?

3    A.    Yes.  No, no, no, no, no.

4    Q.    Oh.

5    A.    Where your finger is, to the left of your finger.

6          This is weird.

7                MR. FIDEL:  Maybe -- is there -- can he --

8                THE WITNESS:  Can I point to it?

9                MR. FIDEL:  -- do something up there?

10               THE COURT:  Can you see it?

11               THE WITNESS:  This is where it's at, right here.

12               THE COURT:  I can't see where it's pointing.

13               MR. FIDEL:  Can he -- is it possible for him to put

14   a dot?

15               THE COURT:  I don't have any idea.

16               THE CLERK:  It should be annotating.

17          (Off the record to address technical issues.)

18               THE COURT:  How many inches on the map is it from

19   the Charlie Bell Well?

20               THE WITNESS:  If he can put his finger back where it

21   was --

22   BY MR. FIDEL:

23   Q.    Sure.  Why don't I start -- this is the --

24   A.    So you follow that boundary line down until you get to

25   that road, and to the left --

1   Q.   This road here?

2   A.   Yes, sir.

3   Q.   Okay.

4   A.   There is a tank there.

5   Q.   To the left, just somewhere in this --

6   A.   It's just kind of like, in the flat, it's an animal

7   drinking tank.

8   Q.   Got it.  And so that's for animals?

9   A.   Yes, sir.

10  Q.   Not potable for humans?

11  A.   No.  I would not think so.

12  Q.   Okay.  And that's -- how far would you say that is?

13  That's, just looking at the scale, another 10 miles, 5-10

14  miles?

15  A.   Looks about eight, sir.

16  Q.   Okay.  What about south of the Charlie Bell Tank?  Is

17  there another one somewhere south of here, along the -- on the

18  Growlers?

19  A.   No, sir.

20  Q.   Okay.  For the whole Cabeza Prieta Range?

21  A.   I didn't understand the question, sir.

22  Q.   So along the western face of the Growlers, from the

23  southeastern border of Cabeza Prieta up to Charlie Bell Tank

24  or Charlie Bell Well, there is no other water tank there?

25  A.   None that I know, sir.

1  Q.   Okay.  What about out here in the valley, in the Growler

2  Valley?  One out there?

3  A.   There is a -- once again, it's kind of hard for me to show

4  you without this pen working.

5  Q.   Sure.  Why don't I do this.  It looks like there's some

6  kind of intersection here in the middle of the administrative

7  road.  Charlie Bell Administrative Road hooks south.  If I

8  start there, should I go up or down or left or right?

9  A.   Go down, sir.  Right about in there.

10  Q.   Okay.  Got it.

11       THE CLERK:  Do you want to try it again?  Try

12  touching the screen.

13       THE WITNESS:  Yes, ma'am.

14  BY MR. FIDEL:

15  Q.   There you go.

16       So somewhere there.  So somewhere around where there is a

17  blue dot there.

18       Now I --

19       THE CLERK:  Now you zoomed in.

20       MR. FIDEL:  Let me put it back.  Sorry.

21  BY MR. FIDEL:

22  Q.   Okay.  So somewhere in there, that's where there is

23  another water tank; right?

24  A.   Yes, sir.

25  Q.   And that's, what, another -- another 10, 15 -- 10, 12, 15

 1   miles from Charlie Bell Well?

 2   A.    Approximately.

 3           MR. FIDEL:  Okay.  I think, unless the Court wasn't

 4   clear where the one is north, we can go back and drop another

 5   arrow on that, but --

 6           THE COURT:  No.

 7           MR. FIDEL:  Okay.  Thank you.

 8   BY MR. FIDEL:

 9   Q.    That road that --

10           MR. FIDEL:  Here, maybe we can -- can we undo this

11   if I push clear?

12           THE CLERK:  Uh-huh.

13           MR. FIDEL:  Good.  All right.  I'm learning.

14   BY MR. FIDEL:

15   Q.    This road, this Charlie Bell Road, I think you mentioned

16   it's about 15 miles from Ajo out to Charlie Bell Pass, this

17   one?

18   A.    Yes, sir.

19   Q.    Roughly.  You need high clearance for that road, right, a

20   high-clearance vehicle?

21   A.    Are you asking me, sir?

22   Q.    Yes.

23   A.    I don't think so.

24   Q.    Do you know that the paperwork to get into the refuge

25   tells you to have a high-clearance vehicle?

CROSS-EXAMINATION OF BRIAN KRUKOSKI

1   A.   It does say for portions of the refuge, yes.

2   Q.   Okay.  What about for that road?  You don't think so?

3   A.   I don't think so.  I've seen vehicles who didn't have high

4   clearance make it.

5   Q.   Have you ever had to rescue a vehicle out of that road?

6   A.   Yes, sir.

7   Q.   Because it got, what, stranded on a rock or broke down?

8   A.   No, sir.  Battery.

9   Q.   This is not a paved road; right?

10  A.   No, sir.

11  Q.   Rocks and obstacles and things of that nature?

12  A.   Yes, sir.

13  Q.   Are you familiar with the group No More Deaths?

14  A.   I am, sir.

15  Q.   When did you become familiar with them?

16  A.   Read the court case from the Buenos Aires National

17  Wildlife Refuge.

18  Q.   When was that, though?

19  A.   I don't recall the year the court case occurred.

20  Q.   Okay.  Was it while you were working at the Cabeza?

21  A.   It might have been when I was working for Kofa, sir.

22  Q.   For who?

23  A.   Kofa.

24  Q.   Okay.  That's another --

25  A.   K-o-f-a.

1    Q.   -- wildlife refuge in the west desert?

2    A.   Yes, sir.

3    Q.   Did you receive emails from time to time from Sid Slone

4    about things that were going on at the refuge?

5    A.   Yes, sir.

6    Q.   Sid Slone is the refuge manager; right?

7    A.   Yes, sir.

8    Q.   And so what's the -- what's the working relationship

9    between you as chief wildlife officer and Mr. Slone as refuge

10   manager?

11        Do you understand what I'm asking?

12   A.   No, sir.

13   Q.   Is it -- he's not the superior officer to you?

14   A.   He is my supervisor.

15   Q.   Oh, he is your supervisor?

16   A.   Yes.

17   Q.   Okay.  Got it.  And so I'm thinking of, like, a

18   traditional law enforcement police department; right?

19   A.   It's not.

20   Q.   It's not.  Is there any kind of analogy we could draw,

21   like you're a sergeant or a lieutenant and he's something

22   else?

23   A.   I couldn't think of an analogy, no.

24   Q.   All right.  But at any rate, he's your supervisor?

25   A.   He's my supervisor, yes.

 1   Q.   Okay.  You received an email from Mr. Slone in June of

 2   2017.  Do you recall that?

 3   A.   Regarding?

 4   Q.   Regarding No More Deaths.

 5   A.   I may have.

 6   Q.   Let me show you -- can we go back to the computer?

 7        Let me show you what's been marked as Exhibit 178, and I

 8   wonder if I can zoom out so you can see.  So if we look

 9   here, this is an email from Sid Slone; right?  You see that --

10   A.   I have nothing, sir.

11   Q.   You have nothing.

12            MR. FIDEL:  Oh, can we send this to the witness?

13            THE CLERK:  Such a pain.

14   BY MR. FIDEL:

15   Q.   Okay.  Do you see it now?

16   A.   Yes, sir.

17   Q.   So we see in the "From" line, that's from Sid Slone;

18   right?

19   A.   Yes, sir.

20   Q.   And the date, June 19th, 2017?

21   A.   Yes, sir.

22   Q.   And it comes to you and a bunch of other people; right?

23   A.   Yes, sir.

24   Q.   Is this an email from Sid Slone to you?

25   A.   Yes, sir.

 1           MR. FIDEL:  Your Honor, I would move for admission

 2   of this email.

 3           MR. WALTERS:  Object on relevance grounds, Your

 4   Honor.

 5           MR. FIDEL:  The relevance is going to be --

 6           THE COURT:  Overruled.

 7           MR. FIDEL:  All right.  Thank you.

 8   BY MR. FIDEL:

 9   Q.   Now, Mr. Slone in this email -- this is not just to

10   you, but it's to other Cabeza staff; right?

11   A.   Yes, sir.

12   Q.   Do you recognize all these people on this list?

13   A.   Yes, sir.

14   Q.   Some of these are law enforcement agents; right?

15   A.   Law enforcement officers, yes, sir.

16   Q.   I'm sorry.  Thank you.  And others are civilians?

17   A.   Yes, sir.

18   Q.   Is this basically the staff of Cabeza Prieta?

19   A.   Yes, sir.

20   Q.   And in this email, you're told that the Hold Harmless

21   Agreement is being modified; is that right?

22   A.   I'm reading right now.

23        Yes, sir.

24   Q.   Is that the first you learned that the permit was being

25   modified?

1    A.    I expect, yes.

2    Q.    Okay.  Do you recall anything prior to receiving this

3    email?

4    A.    No, sir.

5    Q.    Are those discussions that you as the chief wildlife

6    officer would have been involved with?

7    A.    As a senior wildlife officer, sir, I am not part of those

8    decisions, no.

9    Q.    Okay.  At any rate, this is the first time you learned of

10   it?

11   A.    Yes, sir.

12   Q.    Okay.  I said chief wildlife officer.  Is "senior" the

13   right title?

14   A.    I wish I was a chief but, no, I'm not.

15   Q.    There is a chief?

16   A.    There is a chief.

17   Q.    Okay.  Is Mr. Slone above -- a supervisor of the chief as

18   well?

19   A.    It's a whole different structure.

20   Q.    Got it.

21   A.    Yes, sir.

22   Q.    And so you're told that the permit's being amended, but

23   it's expected to be in place by July 1st.  That would be July

24   1st, 2017; right?

25   A.    Yes, sir.

CROSS-EXAMINATION OF BRIAN KRUKOSKI

1  Q.   And that, what's happening is that the Air Force and
2  refuge solicitors are reviewing the language, and some
3  language is being added; right?
4  A.   Yes, sir.
5  Q.   You're also told that there's a Do Not Issue -- that
6  there are some individuals who are not to be issued permits;
7  right?
8  A.   Yes, sir.
9  Q.   And you're told that, if individuals from the group No
10 More Deaths, well, individuals who appear to be part of the No
11 More Deaths group, come in to get a permit, people should talk
12 to Sid or Mary; right?
13 A.   Yes, sir.
14 Q.   Is that the first time you've been aware of any -- any
15 groups of people who had to be -- who would need to be
16 directed to Sid or Mary?
17 A.   No, sir.
18 Q.   Were you given any guidance on how to determine if
19 somebody appeared to be with No More Deaths?
20 A.   No, sir.
21 Q.   Okay.  And were you aware of a Do Not Issue Permit list
22 that was kept by Cabeza Prieta?
23 A.   Yes.
24 Q.   Is that something that was circulated within -- within
25 this email list on this email?

1    A.    I do not believe so, sir.

2    Q.    How often would you get an update to a Do Not Issue

3    Permit list?

4    A.    I believe it was the first one we ever had was from the

5    court cases, and we were ordered by a judge not to allow them

6    to come back onto the refuge.

7    Q.    When was that?

8    A.    I don't recall when this happened, sir.

9    Q.    Are you saying that was 2017 or before 2017?

10   A.    I would say it was 2017.

11   Q.    Do you recall what that court case was?

12   A.    These court cases.

13   Q.    And it's your belief that a judge issued an order?

14   A.    My understanding was yes.

15   Q.    Where did you get that understanding from?

16   A.    From the U.S. Attorney's Office.

17   Q.    Okay.  Do you recall when you were told that?

18   A.    I can only say it was 2017, I believe.

19   Q.    Do you think -- do you think it was before June, though?

20   A.    I cannot say for sure.

21   Q.    Okay.  There are some names here who are on this Do Not

22   Issue list.  Do you know of anyone else who was on that list?

23   A.    Not off the top of my head, no, sir.

24   Q.    Okay.  The new -- let me show you -- this has already

25   been admitted.  This is Government's Exhibit 2.

1          Can we go back to the Elmo, please?

2          Can you see it up there?  I see a light on your face.

3   A.    It's a little bit blurry.

4   Q.    Blurry.  Well, let me see if I can auto focus this or

5   manual focus it.  There we go.  How's that?

6   A.    It's better.

7   Q.    Okay.  Is this that permit that you've talked about, the

8   Hold Harmless permit?

9   A.    Yes, sir.

10  Q.    All right.  And this is the permit that is referenced in

11  that email, Exhibit 178?

12  A.    I'd have to read all the verbiage, make sure this is the

13  new one, if that's what you're asking.

14  Q.    Would you like to take a minute to do that?

15  A.    If you can scroll up, it would be easier.

16  Q.    Yeah, if I zoom out, is that too small?  You can see the

17  whole thing at once.

18         I cannot zoom out.

19              THE COURT:  Here (supplying document).

20              MR. FIDEL:  Thank you, Judge.

21              THE WITNESS:  Thank you, sir.

22  BY MR. FIDEL:

23  A.    Yes, sir.

24  Q.    All right.  And do you recognize on the second page

25  there, paragraph 13, that's the new language that was added to

 1   the permit?

 2        Is that right?

 3   A.   Yes, sir.

 4   Q.   All right.  Do you know why that language was added?

 5   A.   The refuge manager and other land managers got together

 6   and they added it.

 7   Q.   But were you involved in those discussions?

 8   A.   No, sir.

 9   Q.   Are you privy to what their thought process was on that?

10   A.   No, sir.

11   Q.   So the land manager, that would be Mr. Slone?

12   A.   Yes, sir.

13   Q.   Got it.

14            MR. FIDEL:  May I have a moment, Your Honor?

15            THE COURT:  Yes, sir.

16            THE WITNESS:  Do you want this back, sir?

17            THE COURT:  No.  They might want you to read more of

18   it.

19   BY MR. FIDEL:

20   Q.   I'd just like to go back and make sure I understand as

21   best I can, when you -- when you learned that there was a Do

22   Not Issue list or that there was to be a Do Not Issue list,

23   that's sometime in 2017?

24   A.   I believe so, sir.

25   Q.   And did you receive that information directly from the

1   U.S. Attorney's Office or from somebody else?

2   A.   From the U.S. Attorney's Office.

3   Q.   Do you recall who it was?

4   A.   I believe it was Anna Wright.

5   Q.   Do you recall what was said about a court case, if there

6   had been --

7   A.   Until further notice, these individuals that are going to

8   be in the court case are not allowed to come back onto the

9   refuge until the trials are over.

10  Q.   And could you give us with any, I mean, if possible, any

11  specificity?  Do you think it was weeks, months, days, before

12  this June 19th email came out?

13  A.   I honestly do not remember, sir.

14            MR. FIDEL:  Okay.  nothing further.

15                     REDIRECT EXAMINATION

16  BY MR. WALTERS:

17  Q.   Officer Krukoski, in terms of the defendants and the

18  email that may have come from Ms. Wright, did she ever tell

19  you, do not issue a permit to these defendants?

20  A.   No, sir.

21  Q.   Did the email simply say, these defendants, as part of

22  their pretrial release conditions, could not come back onto

23  Cabeza Prieta?

24  A.   Yes, sir.

25  Q.   Okay.  So it had nothing to do with whether Fish and

1   Wildlife could issue permits; correct?

2   A.   Yes.

3   Q.   The U.S. Attorney's Office, whether it be myself,

4   Ms. Wright, or anybody else, do they have any authority --

5   authority to control who Fish and Wildlife issues a permit to?

6   A.   No, sir.

7   Q.   In terms of the permits, do you personally take part in

8   issuing permits?

9   A.   No, sir.

10  Q.   Do you personally have a decision in who is denied a

11  permit?

12  A.   No, sir.

13  Q.   Who handles that decision?

14  A.   Sid Slone.

15  Q.   Anybody else?

16  A.   No, sir.

17  Q.   Does Mary have a part in that?

18  A.   No.

19  Q.   Okay.  Other than the water tanks on the refuge, are

20  there any other life-saving measures that Fish and Wildlife

21  has taken?

22  A.   Yes, sir.

23  Q.   What are those?

24  A.   We've worked with DHS in maneuvering rescue beacons

25  throughout the Growler Valley.

REDIRECT EXAMINATION OF BRIAN KRUKOSKI

1   Q.   What are the rescue beacons?  Just explain to the Court

2   what those are.

3   A.   Rescue beacons are solar powered.  It's a tower that can

4   be seen from a distance.  It's got a bright flashing light that

5   can be seen at night for miles.  And when somebody needs

6   assistance, they can get to that tower, and they can hit a

7   button, and it's activated through the Ajo Border Patrol

8   station.

9       There's also on some of them a satellite phone where they

10   can actually call and contact somebody.

11   Q.   Approximately, if you know, how many beacons are located

12   throughout the refuge?

13   A.   I would be taking a guess.  About 15.

14   Q.   I understand.  You said that there is a light at the top

15   of the beacon that can be seen at night; correct?

16   A.   Yes.

17   Q.   How far away can -- how far away do you have to be in

18   order to see the light?

19   A.   You can see up to five, six miles.

20   Q.   Is it possible from certain places on the refuge you can

21   actually see multiple rescue beacons at one point, at one

22   time?

23   A.   Yes, sir.

24   Q.   If a person were to push -- I think you referenced

25   pushing a button; correct?

1  A.    Whether or not they push a button, if they stand on the

2  plate of the rescue beacon, it's still going to go off.

3  Q.    Okay.  Has -- and who gets -- if a person were to push

4  the button or make a phone call on a rescue beacon, who gets

5  that call or who gets that notification?

6  A.    United States Border Patrol.

7  Q.    So Fish and Wildlife doesn't have any -- any involvement

8  once that happens?

9  A.    No, sir.

10 Q.    Okay.  Have you ever encountered illegal aliens who had

11 used the rescue beacon?

12 A.    Yes, sir.

13 Q.    Approximately how many times?

14 A.    I'd be taking a guess.  It's been a while.

15 Q.    I understand.  I understand.  Is there a sign or any

16 signs on the rescue beacon that instructs people what to do?

17 A.    Yes, sir.

18 Q.    And generally speaking, have you read that sign?

19 A.    Yes, sir.

20 Q.    Generally speaking, what does it say?

21 A.    It says to activate the button and stay right here, that

22 help will be coming.

23 Q.    Is it in English?

24 A.    It's in a couple different languages.

25 Q.    Spanish?

1  A.    Spanish, yes, sir.

2  Q.    Is there also a Central American dialect that's on there?

3  A.    Yes, sir.

4           MR. WALTERS:  Sarah, can I have the Elmo, please?

5  BY MR. WALTERS:

6  Q.    I'm showing you what's been -- I'm showing you

7  Government's Exhibit No. 22.  Is that a picture of the rescue

8  beacon?

9  A.    The backside, yes, sir.

10  Q.    Where is that rescue beacon located?

11  A.    Charlie Bell Pass.

12  Q.    And so if a person was standing at Charlie Bell Well, how

13  long would they need to hike in order to get to this rescue

14  beacon?

15  A.    The two-mile distance.

16  Q.    Can you see -- can you see the light from this rescue

17  beacon at night from Charlie Bell Well?

18  A.    Yes.

19           MR. WALTERS:  May I have a minute, Your Honor?

20           THE COURT:  Yes.

21           MR. WALTERS:  I have no further questions, Your

22  Honor.  Thank you.

23           THE COURT:  Let me have Exhibit 2 and you can step

24  down.

25           THE WITNESS:  Yes, sir.

 1          MR. WALTERS:  Your Honor, at this time, subject to

 2   rebuttal, the Government rests.

 3          THE COURT:  All right.  You may call your next

 4   witness.

 5          MS. CHAPMAN:  Your Honor, we have some preliminary

 6   motions under Rule 29 we'd like to raise.  Would you like to

 7   do that now, or would you like to do that after a break, or

 8   how would you like to handle it?

 9          THE COURT:  Well, what would you like to do?

10          MS. CHAPMAN:  Your Honor, I think we can be very

11   brief.

12          THE COURT:  All right.  Go ahead and make your

13   motion.

14          MS. CHAPMAN:  We think the Government has failed to

15   meet their burden under Rule 29(a).  We'd ask Your Honor to

16   dismiss the charges with a directed verdict, particularly with

17   respect to abandonment of property.

18          The Government hasn't presented any evidence that

19   these four people intended to abandon anything.  They intended

20   to temporarily place water for the use of others.  Likewise,

21   they've made no showing that this was personal property.  They

22   made a showing that there were -- that there was water for use

23   by others.  That was the intent.

24          So we'd ask Your Honor for a directed verdict on all

25   charges, but particularly with respect to the abandonment of

1   property.

2           THE COURT:  How do you deal with the part that they

3   took the property with them?  Doesn't that make it personal

4   property?

5           MS. CHAPMAN:  I'm sorry, Your Honor.  Could you

6   repeat the question?

7           THE COURT:  Yes.  When they got to the station, they

8   took the property with them; right?

9           MS. CHAPMAN:  Yes, Your Honor, at the direction of

10  the Fish and Wildlife Service officer.

11          THE COURT:  Well, the motion will be denied.  Let's

12  take a 20-minute break.

13          MR. DUPONT:  Your Honor, we're going to organize --

14  we have our witnesses in a holding pattern.  Are we going to

15  start at 9:30 tomorrow morning?

16          THE COURT:  Right.

17          MR. DUPONT:  Thank you, sir.

18          (Off the record.)

19          THE COURT:  You may proceed.

20          MS. CHAPMAN:  Your Honor, we're getting the witness.

21          THE COURT:  Okay.  Thank you.

22          THE CLERK:  Come on up into the box.  You can step

23  into the box and then just remain standing.

24          Raise your right hand, please.

25                  GREGORY HESS, WITNESS, SWORN

1                        DIRECT EXAMINATION

2     BY MR. DUPONT:

3     Q.   Good afternoon, Doctor.  Would you please state your

4     name.

5     A.   It's Greg, G-r-e-g, Hess, H-e-s-s.

6     Q.   And what is your occupation?

7     A.   I am a forensic pathologist and the Chief Medical Examiner

8     for Pima County.

9     Q.   Can you tell the Court your education and experience that

10    qualified you for this position.

11    A.   I received my bachelor's of science in biochemistry from

12    Beloit College in Beloit, Wisconsin, in 1993.  Medical degree

13    from the Medical College of Wisconsin in Milwaukee in 1997.

14    Did a year of internal medicine at Good Samaritan Hospital in

15    Phoenix from '97 to '98.  Served in the Air Force as a flight

16    surgeon/family practice physician at Edwards Air Force Base in

17    California from '98 to 2002.

18         I did a residency in anatomic and clinical pathology here

19    at the University of Arizona from 2002 until 2006.  Did a

20    fellowship in forensic pathology at the Milwaukee County

21    Medical Examiner's office from 2006 to 2007.  I've been

22    employed as a forensic pathologist by Pima County since July

23    2007.

24    Q.   And do you hold any faculty positions?

25    A.   I've had nonpaid teaching positions at the University of

1    Arizona in the Department of Pathology.

2    Q.   What licenses do you have?

3    A.   An Arizona medical license.

4    Q.   And do you have any professional affiliations,

5    licensures?

6    A.   Board certification in anatomic clinical and forensic

7    pathology from the American Board of Pathology.

8    Q.   Professional memberships?

9    A.   National Association of Medical Examiners, American

10   Academy of Forensic Sciences, and College of American

11   Pathologists.

12   Q.   With the National Association of Medical Examiners, have

13   you had any special offices or worked on any special

14   projects, committees?

15   A.   I've been on certain committees over time.

16   Q.   Have you done publications or given talks, particularly

17   as they relate to undocumented border crossings and the

18   deaths?

19   A.   Both.

20   Q.   Can you tell the Court a little bit about what you're

21   doing to examine this issue or present about it, papers,

22   presentations.

23   A.   A couple publications in regards to these types of deaths

24   in forensic literature and then lots of talks to various groups

25   who are interested in knowing about these types of deaths.

1    Q.   As a Medical Examiner, can you broadly talk about what

2    your responsibilities are, what the core responsibilities are

3    of the office?

4    A.   Certified deaths that fall under the jurisdiction of the

5    Medical Examiner, so those are typically deaths that are

6    nonnatural, that are not expected.  About 30 percent of the

7    total deaths in Pima County are reported to us, and then we

8    will perform an examination to certify the cause and manner of

9    death.

10   Q.   Do you work with anthropologists as well?

11   A.   Yes.

12   Q.   Why is that?

13   A.   What's an anthropologist?

14   Q.   Yeah, why do you work with anthropologists?  What's their

15   role?

16   A.   So forensic anthropologists do the examination of skeletal

17   remains for us and develop biological profiles and make

18   estimations of postmortem interval and attempt to try to

19   identify those decomposed remains.

20   Q.   Have you worked at all with an anthropologist named Robin

21   Reineke?

22   A.   Yes.

23   Q.   In what capacity?

24   A.   She's a professor at the University of Arizona, and she

25   runs the Colibri Center, which is a missing persons

1  organization that we funnel our missing persons calls to.

2  Q.   What you do you mean "missing persons calls?"

3  A.   So when we have family members call our office looking for

4  a missing person, we forward all that information to them for

5  them to collect that information and compare against the

6  remains that we may have recovered.

7  Q.   Do you refer all the requests for information about

8  disappeared people to Robin Reineke?

9  A.   Well, it's family members trying to file missing persons

10 reports, so the decedent information or the remains that we

11 find, we do.

12 Q.   I see.  So these are just for the people who are

13 disappeared.

14 A.   Correct.

15 Q.   Would it be right to say one of the core functions of the

16 Pima County Medical Examiner's Office is to screen deaths for

17 public health significance?

18 A.   Yes.  We interface with public health all the time,

19 provide them information about the deaths that we certify.

20 Q.   And as you notice patterns and trends, for example, with

21 maybe drug overdose deaths or --

22 A.   Right.  So we put out an annual report every year that

23 goes over the types of deaths that we certify, and certainly

24 public health is invested in that information.

25 Q.   You're collecting data so that you can have an

DIRECT EXAMINATION OF GREGORY HESS

1   evidence-based approach to figure out what's going on and how

2   to prevent and address problems?

3   A.   Yes.

4   Q.   And does part of that process or one of the public health

5   issues you've identified have to do with deaths of

6   undocumented border crossers?

7   A.   Yes.

8   Q.   If I could show you what's marked as Exhibit 226.  Can

9   you see that?

10  A.   Yes.

11  Q.   And what is that?

12  A.   That looks like a .pdf copy of my 2017 annual report.

13  Q.   And this is kept as part of your office's activities?

14  A.   Yes.

15  Q.   And this is while you're under a legal duty to report

16  these things?

17  A.   Well, there's actually no statutory requirement for us to

18  produce an annual report.  This is a document we produce

19  locally to, again, tell people the types of deaths that we

20  examine.

21  Q.   And to include data for this evidence-based approach

22  you're talking about?

23  A.   That's correct.

24           MR. DUPONT:  Move for admission of Exhibit 226.

25           MS. WRIGHT:  We object, Your Honor.  It is

 1   irrelevant, large portions of it are, and we don't have a

 2   sufficient foundation for this.

 3            THE COURT:  It'll be admitted.

 4            MR. DUPONT:  If we can publish, Your Honor?

 5            THE COURT:  Yeah.  Oh, sure.

 6   BY MR. DUPONT:

 7   Q.   I've gone up to page 30.  Can you talk to us a little bit

 8   about what, starting at page 30, what kind of evidence you're

 9   presenting at this point.

10   A.   Well, this is our section on undocumented border crosser

11   remains.

12   Q.   And what is the data you're reporting here?

13   A.   Well, the number of remains that we recovered during --

14   over different periods of time, sex, age, cause of death,

15   condition of the remains, how we identified people, who's still

16   unidentified, the usual questions we may get about these types

17   of deaths.

18   Q.   How many remains in 2017?

19   A.   We examined 128 remains that were recovered in calendar

20   year 2017 of people we believed to be undocumented border

21   crossers.

22   Q.   How does that compare to the national number of

23   undocumented border crossers who are recovered?

24   A.   Well, nobody knows what the total number of these types of

25   remains there are across the whole border.  We just know what

1  we recover here.  And this is more than just Pima County.  This

2  is Pima, Santa Cruz, and Cochise County.  We are the Medical

3  Examiner for those three counties in southern Arizona.

4  Q.   Do you have the highest volume in Arizona?

5  A.   Yes.

6  Q.   In the country?

7  A.   Probably.

8  Q.   And what are the total numbers recovered since year 2000

9  up through 2017.

10  A.   2,816.

11  Q.   Page 31.  What does this show?

12  A.   These are the number of remains recovered by both calendar

13  year and federal fiscal year from 2000 to 2017.

14  Q.   Calendar year 2017, 128; fiscal year, 147?

15  A.   Correct.

16  Q.   Page 32.  What are we learning from this data?

17  A.   Well, this just shows a number of people that were

18  recovered by month, and the top graph is just a single year,

19  2017.  The bottom is over time, so 2000 to 2017.  And basically

20  it just shows a bell curve over the warmer months of the year,

21  May, June, July, August, and September.

22  Q.   Page 36.  What are you reporting here?

23  A.   I'm sorry.  What was the question again?

24  Q.   What are you reporting here?

25  A.   This is the cause of death as we've certified the death on

 1   a death certificate for this group of people.  Again, the top

 2   one is remains that we examined in 2017.  The bottom one is

 3   looking at all the remains from 2000 to 2017.

 4   Q.   And what is the primary cause of death in cases you are

 5   able to determine?

 6   A.   Exposure for those that we're able to determine, so

 7   exposure would be any type of environmental-related death, so

 8   that could be hyperthermia, which is being too hot, which is

 9   heatstroke and heat exhaustion, dehydration, even hypothermia,

10   being too cold.  We lump it into one category that we just call

11   exposure.

12   Q.   And page 38, what is this reporting?

13   A.   This is just a breakdown of the people that we have

14   identified and the people that we have not yet identified.

15   Again, on the right of the top graph is 2017 in isolation, and

16   then the left side of the top graph shows 2000 to 2017.  Again,

17   a total of 2,816 people, and we've identified about 65 percent

18   of those, which is 1,828.  We still have 988 as of the end of

19   2017 that we had not identified.

20   Q.   And the numbers for 2017 are kind of reversed.  You've

21   only identified 35 percent.

22   A.   Well, everybody comes in unidentified, so if we were to

23   run those numbers again today, a little bit over a year or so

24   later, it would be different.  So we will have identified

25   people over the last year since we put out this publication.

DIRECT EXAMINATION OF GREGORY HESS

1  Q.   You're also reporting remains that you find, not people

2  who died in that particular year.

3  A.   Right.  That's correct.  So this is showing the number of

4  people recovered.  It may not necessarily represent that they

5  died during that time frame they were found.

6  Q.   So for example, people who are found in 2017 may have

7  actually died in 2016?

8  A.   Yes.

9  Q.   So if you were to report that, the numbers in '16 would

10  be higher and '17 would be lower?

11  A.   Well, we don't know if someone's not present exactly when

12  people die, so we don't -- that's why we report it during the

13  time frame that someone's found, since we don't know exactly

14  when they died.

15  Q.   I see.  So it's possible people recovered in 2018

16  actually died in 2017?

17  A.   Correct.

18  Q.   Even in the summer of 2017?

19  A.   That's possible.

20  Q.   And they may still be out there?

21  A.   Correct.

22  Q.   What does it mean to say these findings are a public

23  health issue, these deaths?

24  A.   Well, it's just, when we have a cause of death for a

25  specific group of people, what public health does is look at

DIRECT EXAMINATION OF GREGORY HESS

 1   initiatives or things it can do to try to decrease death in

 2   whatever that group is, be it overdoses or motor vehicle

 3   accidents or whatever someone might be interested in, including

 4   undocumented border crosser deaths.

 5   Q.   So the simple part is just to address the cause of death

 6   itself, physiologically, scientifically.  Would that be right

 7   to say?

 8   A.   Yes.

 9   Q.   What does it mean to die of dehydration?  How does that

10   happen?

11   A.   Well, it's basically -- dehydration in and of itself is

12   having an electrolyte imbalance, so you're going to have a

13   hypernatremia or too much sodium or low potassium, and so it's

14   an electrolyte problem.  Most of the time people don't die

15   solely just of dehydration.  There is other components like

16   heatstroke or even cold that accompany it.

17        So we typically don't certify the death purely as

18   dehydration.  We do it, again, we'll just say exposure or

19   hyperthermia or hypothermia, although dehydration can be a

20   component of any of those things.

21   Q.   What does it look like to die of hyperthermia?

22   A.   Well, that's when --

23             MS. WRIGHT:  Objection.  Relevance, Your Honor.

24             THE COURT:  Overruled.

25   BY MR. DUPONT:

DIRECT EXAMINATION OF GREGORY HESS

1  A.   So essentially the body needs to maintain a standard core

2  temperature, and we -- our body has ways to do that, so if we

3  get too cold, we shiver or put on more clothing to try to raise

4  core temperature.  If you get too hot, then we perspire, which

5  is our main mechanism to evaporate, a cooling evaporation

6  mechanism to maintain that core temperature.

7       If someone's in an environment or doing something that

8  they can't maintain that core temperature and they overcome

9  their body's ability to adapt, then they get too hot.  So

10  that's heatstroke, heat exhaustion, hyperthermia, and

11  potentially, eventually, death, if it's not reversed.

12  Q.   And one of the ways a person can lose the ability to

13  maintain their core temperature is by being dehydrated?

14  A.   That's correct.

15  Q.   Not having enough water to sweat?

16  A.   Yes.

17  Q.   What are the symptoms of hyperthermia for the individual?

18  A.   It's individual-dependent, but it typically can be

19  dizziness, nausea, vomiting, disorientation.

20  Q.   Disorientation would be a cognitive symptom?

21  A.   Yes.

22  Q.   Hallucinations?

23  A.   It's possible.

24  Q.   Would a person suffering from hyperthermia having these

25  cognitive symptoms be expected to make rational decisions?

1   A.   Well, certainly if they're impaired, you know, I don't

2   know at what point someone loses the ability to make rational

3   decisions, but their thinking might be impacted.

4   Q.   And there's ample evidence people suffering from

5   hyperthermia in the desert have been making poor decisions

6   while out there; is that correct?  People hanging themselves,

7   eating dirt instead of water, that type of stuff?

8   A.   That does happen.

9   Q.   And there comes a certain point in time where someone

10   cannot be expected to walk five miles, say, to a beacon,

11   because of their cognitive and physical impairments?

12   A.   I'm sure there is.

13   Q.   So we've identified the problem, a public health crisis.

14   Is it a long-term public health crisis?  Would that be fair to

15   say?

16   A.   It's been a problem for us since about 2000.

17   Q.   And a lot of people dying of exposure in the desert;

18   right?

19   A.   Yes.

20   Q.   And you've started to -- your office, you and your

21   predecessor and the people associated, have started to look at

22   some of the causes of that; is that correct?

23   A.   Yes.

24   Q.   And my understanding is there are complicated social,

25   economic, and political factors?

```
 1              MS. WRIGHT:  Objection.  Leading, Your Honor.

 2              THE COURT:  Sustained.

 3  BY MR. DUPONT:

 4  Q.   What are some of the factors that have contributed to --

 5  A.   Well, we -- this was not an issue, we did not have these

 6  types of deaths in the '90s, so really it started in 2000.  It

 7  was just in response to a different place that people would

 8  cross into the United States.  People used to do that in urban

 9  areas.  They stopped doing that in the mid '90s and started

10  crossing in southern Arizona.

11  Q.   One of the factors, then, would be the location where

12  they're crossing, away from -- oh, I'm sorry.  I just threw

13  that up there.  I'm putting up the GIS initiative map right

14  now.

15       Is the location where they are crossing now more desolate

16  areas?  Correct?

17  A.   The majority of the deaths have been more remote areas,

18  not in the city.

19  Q.   And one of the other physical factors is the daily high

20  temperatures?

21              MS. WRIGHT:  Objection.  Leading, Your Honor.

22              MR. DUPONT:  I'm just setting up the next question,

23  Judge.

24              THE COURT:  It's overruled.

25  BY MR. DUPONT:
```

 1   Q.   Did you understand the question?

 2   A.   If you could do it again.

 3   Q.   All right.  I think what I've heard so far and what I'm

 4   going to get to next is how you identified the locations as

 5   being an issue, but you said two critical factors in what's

 6   happening in this long-term public health crisis, the location

 7   where they're crossing and the daily high temperatures.

 8   A.   Yes.

 9   Q.   And your office, I understand, received some type of

10   grant to start tracking where people are being recovered?

11   A.   We did.

12   Q.   I've got up on the screen what looks like your web site.

13   A.   It is.

14   Q.   And what is -- what are you doing on this particular

15   "Resources and Reports" page?

16   A.   This is just an area for people to access our annual

17   reports and also the map that I think you're going to click on.

18            MR. DUPONT:  All right.  181-2, if I could mark this

19   particular screen shot as an exhibit, please, Your Honor?

20            THE COURT:  Sure.

21            MR. DUPONT:  Thank you.

22            THE CLERK:  Let it sit for a second, if you want to

23   do that.  See it counting?  Can you see it counting?  No?

24            MR. DUPONT:  Oh, yes.  Okay.  And then go once it

25   quits counting?

 1              THE CLERK:  What?

 2              MR. DUPONT:  I go once it quits counting?

 3              THE CLERK:  Right.  I'm just asking you to leave it

 4   until it saves.

 5              Thank you.

 6   BY MR. DUPONT:

 7   Q.   And this is the 2017 annual report?

 8   A.   Yes.

 9   Q.   Was that the exhibit we just introduced and talked about?

10   A.   Yes.

11   Q.   And is this the web site you're talking about to track

12   recoveries?

13   A.   This is the mapping web site.

14   Q.   Can you tell the Court how this got established, how this

15   works?

16   A.   We've always been very interested in where remains have

17   been located, because if someone is decomposed or skeletal, we

18   will oftentimes not receive the entire skeletal remains,

19   because they'll be spread over distance by animal activity or

20   the weather or by whatever else.

21        So for example, if somebody reports that they found a

22   skull at a particular location in the desert today, we will

23   look at this map to see what we have recovered in that area or

24   close to that area where the skull was found in the past as a

25   quick way to determine if it could potentially be additional

 1    portions of someone who was previously recovered or if it looks

 2    like it's a new reported death.

 3         So anyway, we received a grant to develop this map, and we

 4    did it with the nonprofit organization Humane Borders, because

 5    they are also very interested in where remains are located for

 6    the purposes of large water stations, the blue barrels with the

 7    flags.  So different purposes, but two groups who were

 8    interested in exactly where remains were found.

 9    Q.   The blue flags that have been allowed in a lot of the

10    other areas in southern Arizona?

11    A.   I'm not sure where they've been allowed or where they're

12    not, but they're in various places in the desert.

13    Q.   As you're trying to determine if new recoveries are

14    individual people or already on the map, do you only try to

15    include individuals in this particular map?

16    A.   Well, this map has all our data through the end of 2000 --

17    December of 2018, so it should be complete for our data, so

18    yes, we do use it.

19              MR. DUPONT:  And if I could have this marked as

20    181-3, please.

21    BY MR. DUPONT:

22    Q.   What is this on the screen now, sir?

23    A.   Well, this is just a cover sheet for this.  If you press

24    "Search," you'll see all the -- where the remains are.

25    Q.   So for example, we could just search for females, and if

1   we push that button, it would only be the females, but all

2   across this range; is that correct?

3   A.   Yeah.  So just to elaborate on what I said earlier, it's

4   clear that there's different search parameters that you can put

5   in to narrow down if you're -- if you're interested in a

6   particular year, a particular group of people, or a location,

7   and if you don't put anything in, just hit "Search," it'll pull

8   up all the remains without any narrowing.

9   Q.   And what's on the map right now are the females recovered

10  just in your jurisdiction?

11  A.   No.  Some information may be from Maricopa County, who

12  also shares data to this map, but there's it looks like 438

13  female remains you pulled up with your search without limiting

14  by year or anything else.

15       You've just got to put something else in, and it'll --

16  Q.   Oh, I see.  Okay.

17       The other factors you put in are cause of death?

18  A.   Yes.

19  Q.   The county of discovery?

20  A.   Yes.

21  Q.   Looks like these are mostly, well, Cochise, La Paz,

22  Maricopa County, Pima, Pinal, Santa Cruz, Yuma.

23       Are those -- those are all pretty close to the border?

24  La Paz may be just north of Yuma County?

25  A.   Yeah.

1    Q.   Okay.  And the land management company?

2    A.   Well, not a company, but just the land management or

3    surface management is more of a GIS label for an area where

4    remains are located.

5    Q.   That information, once you plug in the GPS coordinates,

6    will automatically generate the land management agency, or is

7    this the agency that actually recovers the remains?

8    A.   No, it's not the recovery agency.  It's the region where

9    the remains were found.

10   Q.   And then different land corridors?

11   A.   Yes.

12   Q.   So if we push "Cabeza Prieta" and "Search," we have an

13   idea of the deaths between 2007 -- 2000 and 2017?

14   A.   Well, this map goes down to 2001, does not include

15   2000, so this would be all deaths that we have recovered from

16   2001 through the end of 2018 in that corridor you just

17   selected.

18   Q.   And of the corridors, there's no corridor for Organ Pipe;

19   is that right?

20   A.   Correct.  On "Land Management" above, there may be some

21   Organ Pipe options, but not in the corridor.

22   Q.   So this shows Cabeza and Organ Pipe?

23   A.   Right.  Yes.  It does not exclude Organ Pipe.

24   Q.   In this time frame, in that corridor, it looks like a

25   line, a corridor; right?

 1              MS. WRIGHT:  Objection.  Leading, Your Honor.

 2              THE COURT:  It's okay.

 3   BY MR. DUPONT:

 4   A.   Right, so these are all in that -- in that Cabeza Prieta.

 5   Q.   And how many?

 6   A.   249.

 7   Q.   And you go up here and push "2017."  How many then?

 8   A.   48.

 9   Q.   Do you know geography?

10   A.   Depends on the question.

11   Q.   Do you know if these are the Growler Mountains and this

12   is the Growler Valley here?

13   A.   Right, so the Growler Mountains are west of Ajo, so it's

14   probably them.  I don't know.  I haven't, like, studied that.

15   Q.   And do you know, is this area basically the same

16   percentage of people dying of exposure?

17   A.   I haven't looked at it to that detail, but if it's

18   anything like all the other remains we've examined for people

19   that we can do a full examination, the number one cause of

20   death is exposure.  For people that are too decomposed, the

21   number one is undetermined.

22   Q.   So assuming these people are dying of exposure,

23   hyperthermia, dehydration, would this be a good place to have

24   water?

25              MS. WRIGHT:  Objection.  Speculation and foundation,

 1  Your Honor.  He just said he doesn't know what's happening

 2  here.

 3          THE COURT:  Sustained.

 4          MR. DUPONT:  Well, I'm missing what's the foundation

 5  that's missing.  Can you help me with this witness, Judge?

 6          THE COURT:  I think it goes without saying that, in

 7  a desert, you need water.

 8          MR. DUPONT:  And where people are dying.

 9          THE COURT:  Well, I think people without water will

10  die, and where does that get us?

11          I mean, you agree with that; right?  You need water

12  to survive in a desert?

13          THE WITNESS:  I agree with that.

14          MR. DUPONT:  Okay.  Thank you, Your Honor.

15  BY MR. DUPONT:

16  Q.  So location we've talked about a little bit, and one of

17  the other factors is daily high temperature.

18  A.  Sure.  Yes.

19  Q.  Are you familiar with -- I'm going to call it Exhibit

20  102, but it's an article -- I'm sorry -- Exhibit 111, an

21  article called, "Validation of a Temperature Prediction Model

22  For Heat Deaths in Undocumented Border Crossers," in 2013?

23      Do you know this article?

24  A.  Yes.

25  Q.  And do you know the authors Bruce Parks and Samuel Keim?

1   A.   I do.

2   Q.   Who are they?

3   A.   Bruce Parks was the former Chief Medical Examiner for Pima

4   County.  He retired in 2011.  Sam Keim is an emergency room

5   physician at the University of Arizona.

6   Q.   And what does this article say?

7   A.   Essentially, it is just trying to validate that

8   temperature may play a role in the risk of death in the

9   environment that they -- in the group that they studied, which

10  were undocumented border crosser remains over a period of

11  years.

12       And essentially they were trying to link an average daily

13  high temperature with a risk of dying from hyperthermia, plus

14  or minus dehydration.

15  Q.   So in this study they had to make a determination of the

16  exact day somebody died?

17  A.   No.  They put confidence intervals around it, because

18  sometimes we don't know the exact day that someone died.  If

19  remains are in good enough condition, we know that it was

20  relatively shortly before they were found, and we have a graph

21  for that type of thing in our annual report that they were --

22  were not using that at the time, but that's essentially what

23  they were doing.

24  Q.   And those people qualified for the studies, the ones that

25  you could get pretty close to the day?

1   A.   Yeah, correct, so they were excluding remains like

2   skeletal remains which clearly had been out there for longer.

3   Q.   And they were comparing -- were they comparing that to

4   daily high temperatures?

5   A.   They were.

6   Q.   And running a logistic regression analysis?

7   A.   They ran some statistics.

8   Q.   Okay.  All right.  Good.  And what were the findings?

9   A.   Well, off the top of my head, it was essentially a daily

10  high temperature of 104 degrees, they were predicting that

11  there would be about a 50 percent chance that somebody would

12  die out in an environment.

13  Q.   104 degrees is also an internal body temperature that's

14  significant for human beings?

15  A.   Well, any kind of sustained elevated body temperature that

16  would classify as hyperthermia.  You know, 104 degrees would

17  certainly be hyperthermia.

18  Q.   Were they able to develop a formula to determine the

19  chances somebody would die as the temperature climbed above

20  104 degrees?

21  A.   They did.

22  Q.   What are the percent -- what was the reported percent

23  chance someone would die at 110 degrees?

24  A.   It was above 70.  It might have been 80.  I'd have to look

25  at the article to definitively say, but it was much higher than

 1  50 percent.

 2  Q.   What else do you do with this data other that just

 3  publish it on your web site?  Do you engage in any education?

 4  A.   Yes.  So there's groups of people that we will send our

 5  information to all the time that are interested in different

 6  categories of death, give presentations to groups concerning

 7  overdoses, undocumented border crosser deaths, motor vehicle

 8  accidents, whatever the topic they may be interested in.

 9  Q.   And as such, have -- you've worked with Colibri, you've

10  already said?

11  A.   I'm sorry.  One more time?

12  Q.   You've worked with Colibri sharing data?

13  A.   Yes.

14  Q.   And you've sent the GPS coordinates so that other people

15  could track the deaths too?

16  A.   Yes.  And this is accessible to anyone, so anybody can

17  download this as an Excel file, so it's available to everyone.

18  Q.   Have you worked or talked to Customs and Border Patrol

19  about how to address this long-term public health crisis?

20          MS. WRIGHT:  Objection, Your Honor.  Relevance.

21          THE COURT:  Sustained.

22  BY MR. DUPONT:

23  Q.   Have you talked with Fish and Wildlife Service about how

24  to address this long-term public health crisis?

25          MS. WRIGHT:  Objection, Your Honor.  Relevance.

DIRECT EXAMINATION OF GREGORY HESS

1      THE COURT:  Sustained.

2      MR. DUPONT:  Your Honor, this goes to the reason why

3  our clients went out there or it was so important, because

4  relying on them to address this long-term public health

5  crisis --

6      THE COURT:  What role does he have in that?  Does he

7  have any role in that?

8      MR. DUPONT:  That's the question.  Did they ever

9  come to him for this information?  Does he work with them?

10      THE COURT:  No, no.  That's not the question.  The

11  question is, he has a job to do, and he does it.  Now, why are

12  people supposed to come to him?  What does he do with his

13  information other than publish it?

14      MR. DUPONT:  Well, we've got two ways to determine

15  whether they're doing anything about it.  Three ways.

16      THE COURT:  Well, this trial is not about the

17  Government's obligation.

18      MR. DUPONT:  I agree.

19      THE COURT:  Okay.

20      MR. DUPONT:  It's not.  But part of the

21  exigency, the emergency defense, is that our clients had no

22  other alternatives because no one was looking at it.

23      THE COURT:  He doesn't know that.

24      MR. DUPONT:  Right, so there are three ways we can

25  figure it out.  One is the deaths could go down.  It can be

DIRECT EXAMINATION OF GREGORY HESS

 1  addressed, and the data would show us it's being addressed by

 2  the Government, particularly since they are maintaining a

 3  monopoly on this area.

 4        The second way is that they can go looking for

 5  answers on how to address the problem.

 6        THE COURT:  Who is "they?"

 7        MR. DUPONT:  Government.  The only way to answer

 8  that question is if they're coming to him, who has the data,

 9  or they're acknowledging it themselves that they're going to

10  look for this data.  We tried to ask the Government about that

11  already.  Are you going to look for the data?  Now I'm asking

12  him.  Are they coming to him to look for the data?

13        THE COURT:  The objection's sustained.

14  BY MR. DUPONT:

15  Q.  Have you spoken with some of the humanitarian groups

16  about how to address this long-term public health crisis?

17        MS. WRIGHT:  Objection, Your Honor.  Relevance.

18        THE COURT:  Overruled.

19  BY MR. DUPONT:

20  A.  Yes.

21  Q.  And who would that be?

22  A.  Well, we mainly work with the Colibri Center and Humane

23  Borders.  We've also talked with the Samaritans, No More

24  Deaths, Derechos Humanos.

25  Q.  And are you aware of the No More Deaths models of leaving

DIRECT EXAMINATION OF GREGORY HESS

1   water where people are dying?

2            MS. WRIGHT:  Objection, Your Honor.  Foundation.

3   Calls for speculation.

4            THE COURT:  If he -- well, go ahead.

5   BY MR. DUPONT:

6   A.   One more time.

7   Q.   Are you aware of the No More Deaths practice of

8   identifying locations where people are dying so they can leave

9   water?

10  A.   Yes.

11  Q.   And is leaving water where people are dying a reasonable

12  response to this?

13           MS. WRIGHT:  Objection, Your Honor.  Foundation.

14  BY MR. DUPONT:

15  Q.   In your medical opinion?

16           THE COURT:  Go ahead.  Answer it.

17           THE WITNESS:  Potentially.

18           MR. DUPONT:  No other questions, Your Honor.

19           Thank you, Doctor.

20           THE COURT:  Are you telling them to break the law in

21  order to achieve that goal?

22           THE WITNESS:  No.  They don't come with specific

23  instructions.  It's just the --

24           THE COURT:  The general medical opinion that water

25  will help people in the desert?

```
 1              THE WITNESS:  It certainly could.

 2              THE COURT:  All right.

 3                       CROSS-EXAMINATION

 4  BY MS. WRIGHT:

 5  Q.   This is afternoon.  Good afternoon, Dr. Hess.

 6  A.   Good afternoon.

 7  Q.   I'm Anna Wright.  I'm one of the prosecutors in this

 8  case, and I have a few questions for you that I wanted to

 9  clear up.

10       And I want to look at two main areas.  First, looking at

11  your 2017 annual report, I'm going to put it up on the Elmo.

12  I'm a little less high-tech.  I just wanted to look at a few

13  of the findings here and just see if I'm reading your charts

14  and graphs right.

15       So first we're looking at page 31, and my understanding

16  is that this -- these two bar graphs talk about recovered

17  remains; is that correct?

18  A.   Yes.

19  Q.   And so these numbers are not the actual deaths in those

20  years.  These are simply the remains found?

21  A.   Correct.

22  Q.   And a lot of different factors can go into when remains

23  may be found; right?

24  A.   Yes.

25  Q.   And sometimes you may not be able to determine at all
```

1  when remains were -- when somebody died as opposed to when

2  their remains were found?

3  A.   Well, we do assess a postmortem interval.  The more

4  decomposed the remains, the larger that window is.

5  Q.   I think you have another chart -- and let's get to that

6  in a minute.  But I just wanted to note, if you'll take a look

7  at the bar for 2010 for both of these charts, which are just

8  kind of different windows of time, as I understand it, 2010,

9  is that the highest bar in your entire chart?

10 A.   Yes.

11 Q.   And comparing 2010 and the next few years to 2017, do we

12 have a gradual downward trend there?

13 A.   Yes.

14 Q.   Now, let's look at page 31.  Actually, not 31.  Let's

15 keep going.  Let's look at page 33.

16      Am I right in reading this, that in terms of age, the

17 vast majority of the remains you cannot determine the age?

18 A.   Not exactly, no, not unless we've identified them.

19 Q.   Okay.  So for the remains that are in this top chart

20 here, 96 have an unknown age, and then if we look at the other

21 age ranges, none of them get above 20 individuals; is that

22 correct?

23 A.   Yes.

24 Q.   Okay.  And my understanding is, looking at these graphs

25 now, we're at 34, and I think this comes back to the comment

1   you made earlier, looking at condition seven, which is

2   complete skeletonization with bone degradation -- so that

3   means no flesh remaining; right?

4   A.   Correct.

5   Q.   And that actually means the bones have started to

6   deteriorate a little bit; correct?

7   A.   Yes.

8   Q.   And so of these, for the top graph, 57 remains fell in

9   that column for seven, and the next closest was only 27

10  remains in column six, which is also partial skeleton; right?

11  A.   Correct.

12  Q.   Now, looking at sex on page 35, in both of these -- I

13  guess these are pie graphs.  It's been a while since I took

14  that math.  But the vast majority are unsure.  Is that

15  correct?

16       Oh, I read it opposite.  I'm sorry.  So I will take that

17  one back.  I'm looking at this as male is the vast majority,

18  and you were able to do that.  Okay.  This is why we ask the

19  questions.

20       That's all I have on your annual report, and there is

21  another area I wanted to talk to you -- well, one more thing.

22  Most of the remains, when you cover skeletal remains, let's

23  say six and seven, those body conditions, looking at a body's

24  condition, you can't tell whether or not that person has

25  permission from the immigration authorities to come into the

1  United States, can you?

2  A.   No.

3  Q.   Now -- and I wanted to talk to you a little bit about

4  this idea of exposure and dehydration and this cause of death.

5  Am I right that, if a person suffers, let's say -- let's take

6  dehydration, let's take one of them -- over a course of

7  several days, that they become weaker over a course of several

8  days?  The condition worsens unless there is an intervention?

9  A.   Yes.

10  Q.   And would it also be fair to say that prevention of

11  dehydration is the preferable route to go rather than having

12  to intervene after it's happened?

13       So if you could stop it from happening, that would be

14  preferable?

15  A.   That would be nice.

16  Q.   Okay.  And so steps taken to prevent dehydration or these

17  other exposure conditions would be preferable to steps to

18  create an intervention later; correct?

19  A.   That would be good too.

20  Q.   Now, would it also be true that steps taken to remove a

21  person from the condition causing the dehydration or exposure

22  would be preferable to steps taken that leave the person in

23  the place where they are being exposed?

24  A.   Accessing treatment would be paramount.

25  Q.   And so let's say you have access and treatment, and you

CROSS-EXAMINATION OF GREGORY HESS

```
 1  put the person right back out in 110 degrees.  Is that more or

 2  less preferable than taking the person out of the 110 degrees?

 3  A.   It would be best to keep them out of that environment.

 4  Q.   Now, I'm reading my notes, and I wanted to talk to you a

 5  little bit about interventions that could be reasonable.  If

 6  somebody had access to a rescue beacon that brought trained

 7  medical staff, wouldn't that be a reasonable response to a

 8  condition of exposure?

 9          MR. DUPONT:  Objection.  Foundation.

10          MS. WRIGHT:  I can lay a little foundation, Your

11  Honor.

12          THE COURT:  Okay.

13  BY MS. WRIGHT:

14  Q.   So are you aware of rescue beacons that are used out in

15  the west desert?

16  A.   Yes.

17  Q.   And are you aware that, if someone were to activate a

18  rescue beacon, trained medical personnel could respond to that

19  beacon?

20  A.   Yes.

21  Q.   And are you aware that the trained medical personnel that

22  respond can sometimes have access to things like helicopters

23  to evacuate someone?

24  A.   They do.

25  Q.   And so my question to you is, is having access to that
```

 1  resource a reasonable response to exposure?

 2          MR. DUPONT:  Objection.  Foundation, Your Honor.

 3          What we're leaving out here is the degree of their

 4  cognitive impairment, their distance from beacons, and any

 5  other number of factors that makes this question

 6  inappropriate.

 7          THE COURT:  Do you feel you can answer that?

 8          THE WITNESS:  I can answer it, yeah.

 9          THE COURT:  Go ahead.

10  BY MS. WRIGHT:

11  A.   If they have access to it, that would be great.

12  Q.   So access is key.  Is the level of intervention

13  appropriate or matter in your assessment of whether or not

14  something's reasonable?

15  A.   One more time with that one.

16  Q.   You know what?  That was a bad question.  I'll take that

17  one back.

18      And one last -- actually, let me see.

19          MS. WRIGHT:  If I could have just a moment, Your

20  Honor.

21          Your Honor, that's all I have.

22          THE COURT:  How do you define "crisis?"

23          THE WITNESS:  That's good one.  I wasn't ready for

24  that one.  How do you define "crisis?"

25          THE COURT:  In context.

```
 1              THE WITNESS:  Well, this is -- you know, we don't
 2    usually use the word "crisis."  We just track trends.  This
 3    has been a long-term, ongoing trend here in southern Arizona
 4    that we didn't used to have.  So we don't have, like, a
 5    minimum threshold of number to essentially call something a
 6    crisis.  We just -- we want people to be aware of the problem.
 7              THE COURT:  All right.  Thank you.
 8              Redirect?
 9              MR. DUPONT:  That would do it, Your Honor.  Your
10    question was plenty.  Thank you.
11              THE COURT:  You may step down.  Thank you.
12              THE CLERK:  You can step all the way into the
13    witness box and then remain standing.
14              Raise your right hand, please.
15                     JOHN FIFE, WITNESS, SWORN
16                        DIRECT EXAMINATION
17    BY MR. DUPONT:
18    Q.   Good morning.
19    A.   Good morning.
20    Q.   Good afternoon.
21    A.   Afternoon.
22    Q.   We've been at this.
23         Could you please introduce yourself to the Court.
24    A.   My name is John Fife.  I'm a retired pastor of a
25    Presbyterian church in Tucson and one of the founding
```

1    volunteers with No More Deaths.

2              MR. DUPONT:  Do you two know each other, Judge?

3    John Fife?  Do you two know each other?

4              THE COURT:  Yeah, a long time ago.  A long time ago.

5              MR. DUPONT:  Okay.

6              THE COURT:  We met right before the Carter

7    Administration.

8              MR. DUPONT:  Oh.

9    BY MR. DUPONT:

10   Q.   And you know Judge's son?  I just want to make sure all

11   this is out in the open.  You know the judge's son and met

12   Judge Velasco at your church?

13   A.   Yes.  Judge Velasco's son is a member of the congregation

14   I served and currently attend.

15   Q.   And his son --

16   A.   And his family.

17   Q.   And his son is a minister too?  He's preached in your

18   church?

19   A.   He's an ordained minister who then fled the faith and went

20   to law school.

21             MR. DUPONT:  Okay.  Just full disclosure, Your

22   Honor.

23             THE COURT:  No, don't worry about it.

24   BY MR. DUPONT:

25   Q.   So tell everyone about your career in the ministry.

1   A.   I was educated at Washington & Jefferson College in

2   Pennsylvania with a biology major and a chemistry minor and

3   then went to theological seminary for my graduate work.

4   Graduated from Pittsburgh Theological Seminary in 1967.

5        And then my first -- well, my first job in ministry was to

6   work for seven downtown churches in Canton, Ohio, of different

7   denominations, to do inner-city -- they called the non-profit

8   they formed the Inner-City Ministry of Canton.

9        Basically my job was to relate those downtown churches to

10  the neighborhoods around those churches that the churches had

11  really had little or no relationship with and to do street

12  ministry and community organizing, and I worked a lot with

13  gangs on the street, that kind of ministry.

14       And then I was called to be the pastor at Southside

15  Presbyterian Church in Tucson, Arizona --

16  Q.   And where is --

17  A.   -- in 1969.

18  Q.   '69.  And what part of town is that?

19  A.   It's located in the oldest and poorest barrio in Tucson.

20  Barrio Viejo.

21  Q.   Your ministry, you're called to serve the poor, the

22  dispossessed?

23  A.   That's the neighborhood I was called to, yes, and to a

24  congregation that cared deeply about ministry with and among

25  the poor and those who were in the greatest need in that

1  neighborhood.

2  Q.   That led to your work with migrants?

3  A.   My sons went to Ochoa School, and about somewhere between

4  35 and 45 percent of the students in their school were from

5  undocumented families, and so as a pastor in that community, I

6  had to help people with all of the issues that immigration

7  status produces in the needs of families, yes.

8  Q.   How did that lead you into the Sanctuary Movement and

9  your felony convictions?

10  A.   A crisis emerged on the border beginning in 1980, and that

11  crisis was people who were refugees fleeing the death squads

12  and the torture chambers and the massacres of literally

13  hundreds of villages in El Salvador and Guatemala were fleeing

14  for their lives and were arriving at this border, because

15  Mexico was not a safe place for Central Americans who were

16  undocumented in Mexico, and when they arrived at this

17  border, their status as refugees was not being recognized by --

18  by the United States Government.

19       The way we began was at the suggestion of the local head

20  of the Immigration and Naturalization Service.  I went to

21  him, because my son was a classmate of his daughter at

22  Salpointe High School, and so we knew each other, and so I went

23  to him and said, what --

24            MR. WALTERS:  Objection, Your Honor.  Self-serving

25  hearsay.

DIRECT EXAMINATION OF JOHN FIFE

1  BY MR. DUPONT:

2  Q.   Mr. Fife, you recognized a problem, and you began to

3  directly address this problem --

4  A.   Yes.

5  Q.   -- which led to your --

6  A.   And we followed his advice, and we formed a legal aid

7  organization to help refugees apply for political asylum and to

8  represent them in immigration court, and what we learned was

9  that no one, if they were from El Salvador or Guatemala, was

10 being granted political asylum.

11 Q.   And your reaction to that in terms of the migrants coming

12 across?

13 A.   The reaction to that was pretty much defined by a

14 colleague of mine by the name of Jim Corbett who came to me and

15 said, John, under the circumstances, if the United States

16 Government is not willing to recognize these people as

17 refugees, even though the United Nations High Commissioner on

18 Refugees and Amnesty International and virtually every

19 international organization had informed the United States that

20 these people were refugees and should be recognized as such, he

21 said, I don't think we have any choice under the circumstances

22 except to help protect those refugees from capture, detention,

23 and deportation back to death, in many instances.

24 Q.   What was the spiritual foundation of that motivation?

25 A.   Spiritual foundation --

 1              MR. WALTERS:  Objection, Your Honor.  Relevance.

 2     This case has nothing to do with his spiritual background.

 3              MR. DUPONT:  He's the spiritual leader of the No

 4     More Deaths movement, Your Honor.  It'll become clear how this

 5     is relevant as we go on.

 6              THE COURT:  What time period are we talking about

 7     now?

 8              THE WITNESS:  1980 to 1989.

 9              THE COURT:  Are we going to work our way to 2017

10     that way?

11              MR. DUPONT:  Yes, we are.  Yes, sir.

12              THE COURT:  All right.  Let's find out what he was

13     thinking back then.

14     BY MR. DUPONT:

15     A.   Basically he came to me and said, I think we must find

16     ways to protect those refugees from capture, detention, and

17     deportation, because their very lives are at stake.

18          And I basically said to him, how do you figure that?

19          And he pointed to two moments in history.  One was the

20     abolition movement, Judge, when some people of faith helped

21     runaway slaves cross state lines and to move them through an

22     underground railroad to safer and safer places.  And he said to

23     me, as we read history, those were faithful people who did

24     that.  They -- they got the faith right, and they acted

25     faithfully.

1          And I said, well, yes.

2          And then he pointed to almost the complete failure of the

3    church to protect Jewish refugees who were fleeing the Nazi

4    Holocaust and were crossing national borders and were being

5    captured and detained and deported back to the tender mercies

6    of the Holocaust in Nazi Germany.  And he said that was a

7    complete failure of the church to be faithful under those

8    circumstances.

9          And I said, well, yes, that's how I read history.

10         And he looked me right in the eye, and he said, I don't

11   think we should allow that to happen on our border, in our

12   time.

13         And I said, I agree, because it was a question of faith

14   for me, and so we began to try protect refugees, and the upshot

15   of it was, in 1982, on the anniversary of Archbishop Romero's

16   assassination in El Salvador, we declared the church a

17   sanctuary for Central American refugees and informed the

18   Justice Department and the United States Government that we

19   believed that they were failing in their responsibility to

20   protect -- recognize and protect refugees under the United

21   States 1980 law.

22   Q.   Was this part of your ministry with the poor, the

23   dispossessed, the abused?

24   A.   Absolutely.

25   Q.   As a result of that, did you suffer conviction?

1    A.   The Immigration Service infiltrated us with undercover

2    agents recording worship services in our churches in Phoenix

3    and Tucson and Nogales.

4    Q.   Were you ultimately convicted?

5    A.   And we were convicted.  I guess I was sworn to tell the

6    whole truth.  Basically we were convicted because we didn't put

7    on a defense.  The judge in that case ruled that we couldn't

8    say anything in our defense in that court.

9    Q.   Mr. Fife, ultimately, did you suffer three felony

10   convictions in that case?

11   A.   Yes.

12   Q.   And I understand you had three other misdemeanor

13   convictions --

14   A.   Yes.

15   Q.   -- for your work.

16   A.   Yes.

17   Q.   Can you tell the Court about your work forming No More

18   Deaths.

19   A.   Once we succeeded in reaching an agreement with the

20   Government in 1989 that they would stop all deportations to El

21   Salvador and Guatemala and Congress passed legislation granting

22   undocumented Salvadoran and Guatemalan refugees temporary

23   protected status, then a new crisis emerged on the border in

24   1994.

25        And that crisis was different than the one in the 1980s

 1  but had much the same faith mandate that we had been a part of

 2  in the 1980s, and that was that, in 1994, the first walls went

 3  up on the border, and the United States decided for the first

 4  time in history to secure the border from migration, and the

 5  strategy was fairly easy to understand.

 6       They said that almost everyone who migrates back and forth

 7  across this border, and has historically, migrates through the

 8  urban areas of the border.

 9  Q.   Mr. Fife, I don't mean to cut you off, but we have --

10  A.   That's okay.

11  Q.   -- some experts on migration who are here, and we'd

12  really like to talk about the religious foundation for No More

13  Deaths.

14       It's my understanding this is not a sanctuary

15  organization; is that correct?

16  A.   No, it's not.

17  Q.   What is the purpose of No More Deaths?

18  A.   We formed No More Deaths as a humanitarian aid

19  organization to provide food and water and medical care in the

20  desert because there was a dramatic increase in this sector of

21  the border, beginning about the year 1999, when the enforcement

22  in Texas and California began to funnel the migration pattern

23  right through the Tucson sector of the border, and we became

24  the kind of epicenter not only of migration, but of deaths.

25  Q.   And you started to track those deaths?

1    A.    I'm sorry?

2    Q.    Your group started to recognize where the deaths were

3    taking place?

4    A.    Yes, we did.

5    Q.    And developed plans to address that?

6    A.    We had earlier formed an organization called Humane

7    Borders that had begun to map, in cooperation with the Medical

8    Examiner's Office, the sites where the deaths were occurring.

9          And so we had clear evidence of not only the pattern of

10   deaths, but the precise locations where those were occurring.

11   Q.    When we start talking about direct action as a spiritual

12   expression, can you talk to us about that, how religion and

13   spiritual ideas lead a person into this kind of work and how

14   No More Deaths ended up as a ministry of Universalist

15   Unitarian Church?

16              MR. WALTERS:  Objection, Your Honor, to relevance.

17   I think you have a foundation objection as well.  None of

18   these defendants have testified that they -- about their

19   religious purposes.  Frankly, there's been no testimony that

20   they are a part of the UUC, nor has there been any testimony

21   that there is a religious requirement to be a part of No More

22   Deaths.

23              So until any of that testimony happens, you have

24   foundational issues, as well as relevance issues.

25              MR. DUPONT:  Your Honor, they put in an --

 1         THE COURT:  (Gesturing.)

 2         MR. DUPONT:  Thank you.

 3  BY MR. DUPONT:

 4  A.   Sorry.  Could you repeat the question?

 5  Q.   Do you need a question?

 6  A.   No.

 7  Q.   Okay.  It has to do with how a person engages in these

 8  activities as part of a spiritual practice and the Unitarian

 9  Universalist Church.

10  A.   When we organized No More Deaths, it was organized out of

11  the faith communities that had been involved not only in the

12  Sanctuary Movement, but were becoming more and more involved

13  with the terrible tragedy of all of those hundreds of deaths of

14  the poorest of the poor in the desert.

15       And we did so grounding that organization in the -- as a

16  ministry of faith community, and we did that for two reasons.

17  One was we believe that No More Deaths needed to be recognized

18  as a faith-based organization, a ministry of the Unitarian

19  Universalist Church of Tucson; and secondly, because that was

20  our motivation.

21       We organized No More Deaths to try and save as many lives

22  as we can through the provision of humanitarian aid directly

23  where most of the death was occurring in the desert.  And we

24  did it by saying, we're going to be out there with volunteers

25  in the desert providing food and water and medical care where

1    those deaths are occurring, and it was out of a clear faith

2    motivation that we not only organized but practiced our faith

3    out there in the desert through No More Deaths.

4    Q.   So how is that a religious practice?

5    A.   As a pastor, I had the responsibility to interpret our

6    sacred writings and texts, our scripture, for a congregation

7    and had been responsible for that for 30 years, and so I was

8    well-versed in the requirements of the faith.

9         A Jewish rabbi sometime before had said to me, John, God

10   only said once in the Torah, the Hebrew scriptures, that you

11   have to love your neighbor as yourself, he said, but God says

12   37 times in Hebrew scriptures you have to love the alien in

13   your midst as though that person were one of the citizens of

14   your community.  Remember, you were once aliens in the land of

15   Egypt, so you must love the alien among you as you would treat

16   your neighbor.  And he said to me, God had to say that 37 times

17   because he knew we'd struggle with that part of scripture, and

18   he was right.

19        But then, as a pastor of a Christian congregation, I

20   opened Christian scriptures in the New Testament, and that

21   mandate is profound.  As the parable that describes the Last

22   Judgment for all of us, for all of our lives, how God is

23   ultimately going to judge us, the parable says, clearly, I was

24   hungry, I was thirsty, I was sick, I was naked, I was in

25   prison, I was an alien, and as you do it to the least of

1  these, my brothers and sisters, you do it to me.

2       That didn't leave a lot of wiggle room as far as the

3  mandate of scripture is concerned, and it's clear that the life

4  of faith is not simply a matter of belief or creed.  It is a

5  matter of what you do in relationship to those who are in most

6  need, and "most need" got described pretty clearly, I assume,

7  by the last witness of all of the suffering and dying that was

8  going on out here in the Sonoran Desert.

9  Q.   The poor, the dispossessed, and the abused?

10  A.   The most desperate of the poor in this hemisphere were

11  dying out there, yes.

12  Q.   But the Unitarian Universalist Church, is that a

13  Christian church or a Jewish temple?

14  A.   No.  They are a much more inclusive faith community that

15  includes not only the Judeo-Christian tradition, but all of the

16  wisdom traditions of the major faith traditions of Buddhism and

17  Hinduism and beyond that.

18  Q.   And the universal religious experience or expression?

19  A.   Yes, yes.

20  Q.   What would those be?

21  A.   Which is one of the reasons we became a ministry of the

22  Unitarian Universalist Church here, is because they are broadly

23  inclusive of all of the faith traditions and the spiritualty of

24  those traditions, but more important, the common wisdom of all

25  of those traditions, which reminds us that all people are loved

 1  by whatever name you give to God or to Allah or to the

 2  Unutterable Name in Jewish tradition, and in Hindu and in

 3  Buddhist tradition, that we are all commanded to love without

 4  exception, no exceptions.

 5  Q.   What does that mean, no exceptions?

 6  A.   That means you cannot simply love those who are acceptable

 7  or included or in your faith community or in your nation or in

 8  your social circle.  It is an absolute mandate to love

 9  unconditionally and unequivocally.

10  Q.   What -- how does No More Deaths function to carry on that

11  spiritual practice?

12  A.   We are a ministry recognized and supported by the

13  Unitarian Universalist Church of Tucson, but beyond that, of

14  all of the major faith traditions.  We have representatives

15  from every faith tradition and spiritual understanding, and we

16  make that very clear in our training, that that is the faith

17  basis for our organization and the spiritualty and the

18  spiritual principles that have founded this organization and

19  formed that community.

20            MR. DUPONT:  Can I have a minute, Your Honor?

21            THE COURT:  Uh-huh.

22            MR. DUPONT:  Thank you, Mr. Fife.

23            No more questions, Your Honor.

24            MR. WALTERS:  May I have one minute, Your Honor?

25            THE COURT:  Yes.

1          MR. WALTERS:  Very briefly, Your Honor.

2                    CROSS-EXAMINATION

3    BY MR. WALTERS:

4    Q.   Mr. Fife, you were not at Cabeza Prieta on August 13th of

5    2017; is that correct?

6    A.   I'm sorry?

7    Q.   You were not present at Cabeza Prieta National Wildlife

8    Refuge on August 13th of 2017?

9    A.   No, I was not.

10   Q.   You have no personal or firsthand knowledge of anything

11   that these defendants are charged with, is that correct,

12   meaning you were not there?

13   A.   I was not there.

14   Q.   Okay.

15   A.   I have a great deal of knowledge about the training and

16   why those folks were there on that date.

17   Q.   But you were not there?

18   A.   No.

19          MR. WALTERS:  Thank you.  I have no further

20   questions, Your Honor.

21          THE COURT:  Does this faith encompass any of its

22   adherents being martyrs?

23          THE WITNESS:  Would you repeat the question, Your

24   Honor?

25          THE COURT:  Does this faith encompass any of the

 1    adherents being martyrs suffering something in the exercise of

 2    these rights and beliefs?

 3            THE WITNESS:  Every faith tradition has encompassed

 4    that risk.  In my faith tradition, Your Honor, a cross is the

 5    symbol of my faith, which --

 6            THE COURT:  Well, that -- that was one person who

 7    did it.  What I'm asking you is if it's taught to the

 8    adherents.

 9            THE WITNESS:  I have taught my congregation when I

10    was the pastor that certainly that included -- that the faith

11    included taking risks on behalf of those who are suffering or

12    those who are being persecuted, and we are all aware of the

13    long tradition in my faith community of those who have been

14    martyred because of their faith, yes.

15            When we declared sanctuary for Central American

16    refugees, it was on the anniversary of Archbishop Romero's

17    assassination in El Salvador.

18            THE COURT:  Thank you.

19            Anything further?

20            MR. DUPONT:  May I, Your Honor?  Thank you.

21                          REDIRECT EXAMINATION

22    BY MR. DUPONT:

23    Q.  So in support and ministry of the poor and dispossessed

24    and abused, one principle of religion is to be selfless?

25            MR. WALTERS:  Objection, Your Honor.  Completely

1  outside the scope of cross.

2        THE COURT:  Overruled.

3  BY MR. DUPONT:

4  Q.   Is that right?

5  A.   That's correct.

6  Q.   People -- do people make sacrifices for their religious

7  beliefs?

8  A.   I think that's essential to the practice of faith.

9  Q.   Anything from putting themselves in harm's way in the hot

10  desert to crucifixion.  Would that be right?

11  A.   One must make appropriate sacrifices to serve the

12  life-saving needs of those whose lives are in jeopardy.  In the

13  desert, it's -- it means that our volunteers take risks every

14  day out there in a very harsh desert environment, and they

15  undertake those risks willingly in order to provide life-saving

16  food and water and medical care for those risking death in the

17  desert, yes.

18  Q.   So sometimes loving your neighbor involves personal

19  sacrifice?

20  A.   It does.

21  Q.   The prosecution just asked you if you were there on

22  October -- August 13, 2017?

23  A.   Right.

24  Q.   You weren't there?

25  A.   I was not there.

1   Q.   Have you been there to leave water after that time?

2   A.   Yes, I have.

3            MR. WALTERS:  Objection.  Relevance.

4            THE COURT:  Overruled.

5   BY MR. DUPONT:

6   Q.   Can you tell the judge about that.

7   A.   Because of this case, Judge, I think, an entire delegation

8   of somewhere over 60 rabbis and members of the Christian clergy

9   and members/clergy from the Unitarian Universalist Church went

10  to Ajo and publicly informed Cabeza Prieta that we were going

11  out and put water.

12  Q.   Did you go up to Charlie Bell Pass?

13  A.   No.  We -- the one group of us went over Charlie Bell

14  Pass.  I went to -- through Organ Pipe Cactus National Monument

15  and to a more southern part of the trail that leads to Charlie

16  Bell Pass to put out water.

17  Q.   Did you cross into the wilderness to do that?

18  A.   We did.

19  Q.   Was Fish and Wildlife there to see it?

20  A.   Fish and Wildlife checked our permits as we went in and

21  knew that we were carrying --

22  Q.   Life-saving water?

23  A.   Well, a great deal of water to put out for migrants.

24            MR. DUPONT:  No further questions, Your Honor.

25            THE COURT:  You may step down.  Thank you.

1          I'm ready to quit, but I don't know what you're

2   ready to call.

3          MR. DUPONT:  We're with you, Judge.

4          THE COURT:  All right.  Stand at recess until 9:30.

5          MR. WALTERS:  Your Honor, just a couple of house --

6   one housekeeping matter.

7          THE COURT:  Yes.

8          MR. WALTERS:  So Friday morning, are we still

9   planning on starting at 9:30?

10         THE COURT:  Sarah, is that what I'm planning?

11         THE CLERK:  Uh-huh.

12         THE COURT:  Yes.

13         MR. WALTERS:  Your Honor, just with the Court's

14  permission, I have a personal matter in the morning, and I

15  would just ask that we start at 9:45, if the defense is okay

16  with that.

17         MR. DUPONT:  That's fine, Your Honor.  And one of

18  our defendants has something they absolutely need to leave for

19  before then.  If she's going to testify, we'll arrange for her

20  to do it before that.  We might be asking you to excuse her

21  for the rest of the trial because this is such a priority.

22  Already this process has been an extreme punishment to them.

23         THE COURT:  Well, we'll talk to her about that when

24  it's time to leave.

25         MR. DUPONT:  Thank you, sir.

1          THE COURT:  All right.  We'll stand at recess.

2          MR. WALTERS:  Thank you, Your Honor.

3          (Proceedings conclude at 4:29 p.m.)

```
 1                    C E R T I F I C A T E

 2

 3          I, Erica R. McQuillen, Federal Official Realtime

 4    Reporter, in and for the United States District Court for the

 5    District of Arizona, do hereby certify that, pursuant to

 6    Section 753, Title 28, United States Code, the foregoing is a

 7    true and correct transcript of the stenographically reported

 8    proceedings held in the above-entitled matter and that the

 9    transcript page format is in conformance with the regulations

10    of the Judicial Conference of the United States.

11              Dated this 29th day of January, 2019.

12

13                        s/Erica R. McQuillen
                       Erica R. McQuillen, RDR, CRR
14                     Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```