1            IN THE UNITED STATES DISTRICT COURT

2                    DISTRICT OF ARIZONA

3    United States of America              MJ-17-339-TUC-BPV

4    vs.

5    Natalie Renee Hoffman,                January 16, 2019
     Oona Meagan Holcomb,                        9:59 a.m.
6    Madeline Abbe Huse, and               Tucson, Arizona
     Zaachila Isabel Orozco-McCormick,

7
              Defendants.
8    _____

9

10

11        REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS

12                  BENCH TRIAL DAY TWO

13        BEFORE THE HONORABLE BERNARDO P. VELASCO
              UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22   Court Reporter:        Erica R. McQuillen, RDR, CRR
                            Official Court Reporter
23                          405 W. Congress Street
                            Tucson, Arizona 85701
24                          (520)205-4267

25        Proceedings Reported by Stenographic Court Reporter
          Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2   For the Government:

 3        Anna Roberta Wright
          Nathaniel Jacob Walters
 4        United States Attorney's Office
          405 West Congress
 5        Tucson, Arizona 85701

 6

 7   For the Defendants:

 8        Anne Michelle Chapman
          Mitchell Stein Carey Chapman, PC
 9        One Renaissance Square
          Two North Central Avenue
10        Suite 1450
          Phoenix, Arizona 85004
11

12        Christopher Baird Dupont
          Trautman Dupont, PLC
13        P.O. Box 431
          Phoenix, Arizona 85001
14

15        Louis S. Fidel
          Piccarreta & Davis, PC
16        145 South Sixth Avenue
          Tucson, Arizona 85701
17

18

19

20

21

22

23

24

25
```

```
 1                        EXAMINATION INDEX

 2   SIDNEY SLONE
           DIRECT BY MR. FIDEL . . . . . . . . . . . . . . . . 4
 3         CROSS BY MS. WRIGHT . . . . . . . . . . . . . . . .48
           REDIRECT BY MR. FIDEL . . . . . . . . . . . . . . .61
 4

 5   YURIE AITKEN
           DIRECT BY MR. FIDEL . . . . . . . . . . . . . . . .64
 6         CROSS BY MR. WALTERS  . . . . . . . . . . . . . . .68
           REDIRECT BY MR. FIDEL . . . . . . . . . . . . . . .71
 7

 8   EDGAR McCULLOUGH
           DIRECT BY MR. DUPONT  . . . . . . . . . . . . . . .76
 9         CROSS BY MS. WRIGHT . . . . . . . . . . . . . . . .110

10   ROBERT BARTELS
           DIRECT BY MS. CHAPMAN . . . . . . . . . . . . . . .116
11         CROSS BY MS. WRIGHT . . . . . . . . . . . . . . . .129
           REDIRECT BY MS. CHAPMAN . . . . . . . . . . . . . .142
12

13   OONA HOLCOLM
           DIRECT BY MR. DUPONT  . . . . . . . . . . . . . . .144
14         CROSS BY MR. WALTERS  . . . . . . . . . . . . . . .175
           REDIRECT BY MR. DUPONT . . . . . . . . . . . . . . 190
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S

 2            THE CLERK:  Calling Case 17-MJ-339, United States of

 3   America vs. Natalie Renee Hoffman, Oona Meagan Holcomb,

 4   Madeline Abbe Huse, and Zaachila Isabel Orozco-McCormick.  All

 5   are on for bench trial.

 6            Counsel, please state your appearances.

 7            MS. WRIGHT:  Good morning, Your Honor.  Anna Wright

 8   and Nathaniel Walters on behalf the United States.  With us at

 9   counsel table is Officer West, our case agent.

10            MR. FIDEL:  Good morning, Your Honor.  Louis Fidel,

11   Anne Chapman, and Chris Dupont here on behalf of the

12   defendants, Oona Holcomb, Madeline Huse, Zaachila Orozco, and

13   Natalie Hoffman.

14            THE COURT:  Thank you.  You may proceed.

15            MR. FIDEL:  We'd like to call Sid Slone.

16            THE CLERK:  You can step on into the jury box, sir.

17   I'm sorry, the witness stand.  Yes.  There's a step.

18            If you'd remain standing and raise your right

19   hand, please.

20                 SIDNEY SLONE, WITNESS, SWORN

21                      DIRECT EXAMINATION

22   BY MR. FIDEL:

23   Q.   Good morning, Mr. Slone.

24   A.   Good morning.

25   Q.   Do you work out in Ajo?
```

1   A.   Yes, sir.

2   Q.   You live out there as well?

3   A.   Pardon?

4   Q.   Do you live out there as well?

5   A.   Yes, sir.

6   Q.   How long have you worked in Ajo?

7   A.   Almost ten years.

8   Q.   And what do you do out there?

9   A.   I'm the refuge manager at the Cabeza Prieta National

10  Wildlife Refuge.

11  Q.   Is that under the Fish and Wildlife Service?

12  A.   Yes, sir.

13  Q.   Have you worked for Cabeza Prieta the whole time that

14  you've lived out there?

15  A.   Yes, sir.

16  Q.   All right.  Had you worked for Fish and Wildlife previous

17  to Cabeza Prieta?

18  A.   No.

19  Q.   Okay.  And maybe it goes without saying, but is Cabeza

20  Prieta the first job you had with the Fish and Wildlife

21  Service?

22  A.   Yes.

23  Q.   Okay.  And did you say what your job is out at the

24  refuge?

25  A.   Yes, refuge manager.

1   Q.   And what does that mean, refuge manager?

2   A.   I'm responsible for the overall management of the refuge.

3   Q.   Okay.  And how many people are employed out on the refuge

4   there?

5   A.   Including myself, 13.

6   Q.   All right.  And so are you the -- as the manager, are you

7   in charge of all of them?

8   A.   Yes, sir.

9   Q.   All right.  And above you, is there a regional manager?

10  Is that the way that works?

11  A.   Regional supervisor.

12  Q.   Okay.  And that's based in New Mexico?

13  A.   Yes.

14  Q.   Where did you move to Ajo from?

15  A.   Mexico.

16  Q.   Old Mexico or New Mexico?

17  A.   Old Mexico.

18  Q.   Got it.  And as part of your job, how often are you out

19  on the refuge versus behind a desk?

20  A.   Maybe five percent of the time.

21  Q.   Five percent of the time on the refuge?

22  A.   Actually in the field, yes.

23  Q.   All right.  And when you go out into the field, if you're

24  going to spend a full day out in the field, what kind of

25  preparation do you do?  What kind of gear do you take with

 1   you?
 2   A.   We have a tool kit.  I take water.  That's mostly it.
 3   Q.   How much water do you take for yourself?
 4   A.   Maybe a gallon.
 5   Q.   Okay.  Are you familiar with the pamphlets and fliers
 6   that get handed out to people who are visitors to the refuge?
 7   A.   Yes.
 8   Q.   Do you review those things as part of your job?
 9   A.   When you say do I review them --
10   Q.   Yeah.
11   A.   -- if they're new, new documents.
12   Q.   Do you know that the flier that gets handed out advises
13   people to bring two gallons per person, per day, when they go
14   out onto the refuge?
15   A.   Yes.
16   Q.   Okay.  And you agree that's a wise practice to do?
17   A.   Yes.
18   Q.   Okay.  When you go out on the field in the refuge, do you
19   drive out or do you hike out?
20   A.   Drive out.
21   Q.   Truck has air conditioning?
22   A.   Yes.
23   Q.   All right.  And do you mostly stay in the truck?
24   A.   While I'm driving.
25   Q.   Okay.  And the time that you're on the refuge, what

1   percentage of the time when you're out in the field are you in

2   the truck versus out walking around in the heat?

3   A.   Given distances, probably most of the time.

4   Q.   Most of the time which?

5   A.   In the truck.

6   Q.   Okay.  Thank you.

7        The refuge itself, that was established when?

8   A.   1939.

9   Q.   And what was the purpose of the refuge?

10  A.   Primarily for the conservation of wildlife and plant

11  resources.

12  Q.   And is that the primary purpose of the refuge today?

13  A.   Yes, sir.

14  Q.   Is that -- is that what you do as refuge manager, is make

15  sure that that purpose is being carried out?

16  A.   Yes, sir.

17  Q.   Okay.  And the policies that you adopt, are those geared

18  towards protecting the wilderness and the plants and animals

19  on the refuge?

20  A.   I'm sorry?

21  Q.   The policies that you are enacting as an administrator,

22  are those geared towards protecting animals, wildlife, plants,

23  on the refuge?

24  A.   Yes, sir.

25  Q.   Okay.  Now, part of protecting the animals on the

1    refuge, that involves setting out water for them; right?

2    A.   Yes, sir.

3    Q.   And are there -- what are the main animals that are being

4    protected on the refuge?

5    A.   Well, all the animal species are protected, but the

6    primary species we deal with is desert bighorn sheep and

7    Sonoran pronghorn, which is a federally endangered species.

8    Q.   Okay.  And for each of those, does the refuge put out

9    water tanks?

10   A.   Over the years we've developed water developments.

11   Q.   What does that mean, "water development?"

12   A.   There are various kinds, but they're collection mechanisms

13   to collect rainwater and store water, and we provide it through

14   a trough.

15   Q.   And are there other methods of delivering water to those

16   developments?

17   A.   Is there what?

18   Q.   Are there other methods that you use to get water out to

19   those developments?

20   A.   We haul water when we need to.

21   Q.   Like with a truck?

22   A.   Yes, sir.

23   Q.   What about helicopters.  Ever use helicopters?

24   A.   We have in the past.  Depends on the location.

25   Q.   Okay.  And how big are these water developments?

1    A.    They vary.

2    Q.    What's the range?

3    A.    A few thousand gallons to 11,000 gallons of storage.  When

4    you talk about size, that's very variable.

5    Q.    How many of those 11,000-gallon -- I'm going to call

6    them -- what's the best thing to call those?

7    A.    Catchments.

8    Q.    Okay.  How many of those 11,000-gallon catchments are

9    there on the refuge?

10   A.    Off the top of my head, I couldn't say.  We have 22 waters

11   total, I believe.

12   Q.    And when you say "waters," you're talking about waters --

13   water catchments?

14   A.    There's a variety.  There's tenajas.  There is catchments

15   that we put in.  There's also old -- the windmills.

16   Q.    Okay.  And what's that?  That's like a pump?

17   A.    Yes.

18   Q.    Driven by a windmill?

19   A.    Well, we converted them over to solar power, but yes.

20   Q.    Okay.  And are those sort of scattered around the refuge?

21   A.    Yes, sir.

22   Q.    Let me show you -- well, we'll get to an exhibit later

23   on.  In your capacity as the refuge manager, are you aware of

24   the issue that migrants are dying on the Cabeza Prieta Refuge?

25   A.    I'm aware of illegal border crossers dying, yes.

1  Q.    Do you know the nature of immigration status of people

2  who are dying on the refuge?

3  A.    I have -- in my conversations with law enforcement, most

4  of the people crossing the Cabeza are smuggling drugs.

5  Q.    Excuse me.  Have you ever met one of these people who's

6  crossing through the refuge?

7  A.    I have.

8  Q.    You have.  Have you interviewed that person about what

9  the status of his immigration was?

10  A.    No.  No.

11  Q.    Interviewed him about what he was doing?

12  A.    Pardon?

13  Q.    Have you interviewed him about why he was crossing

14  through the refuge?

15  A.    I don't interview illegal border crossers.  Law

16  enforcement does.

17  Q.    Have you -- you said you didn't interview him about what

18  his immigration status was; right?

19  A.    Correct.

20  Q.    So how do you know that he was an illegal border crosser?

21  A.    I rely on my law enforcement and Border Patrol law

22  enforcement as to the individuals they encounter on the refuge.

23  Q.    Well, I'm asking about your personal knowledge.

24  A.    I'm telling you my personal -- I have no personal

25  experience in interviewing illegal border crossers.  I rely on

1    my law enforcement and Border Patrol to advise me as to what

2    they find.

3    Q.   So your description of these people as illegal border

4    crossers, it sounds like that's based on what you have been

5    told by other people.

6    A.   That's the term that I believe Border Patrol currently

7    uses, so I use the same term.

8    Q.   And I'm asking you about your own personal experience.

9    It sounds like you have not talked to these people to

10   determine what their status is.

11   A.   That's correct.

12   Q.   Okay.  Now, you are aware, though, that these people are

13   dying on the refuge; right?

14   A.   Yes, sir.

15   Q.   And that their remains are being found on the refuge;

16   right?

17   A.   Yes, sir.

18   Q.   Regardless of what their status is?

19   A.   Correct, yes.

20   Q.   And I assume you agree that is a problem?

21   A.   Yes, sir.

22   Q.   All right.  Now, the refuge itself, I'm going to show you

23   an exhibit.

24        Can we have the Elmo, please?

25        This has been admitted.  This is Exhibit -- okay.  So

1   this has been previously admitted.  This is Exhibit 38.  Do

2   you recognize this map?

3   A.   I can't say this map.

4   Q.   Do you recognize what is depicted on this map?

5   A.   Yes, sir.

6   Q.   What is depicted on this map?

7   A.   The Cabeza Prieta National Wildlife Refuge.

8   Q.   All right.  Now, you have taken some efforts, I take it,

9   as refuge manager to install some beacons on the refuge?

10  A.   The Border Patrol installs the beacons.  I make

11  recommendations to them, yes.

12  Q.   What kinds of recommendations do you make?

13  A.   As to where they might do the most good.

14  Q.   And that's based on what?

15  A.   On experience on how many mortalities are found out

16  there, how many remains are found, where they're found at.

17  Q.   And where are you getting that information?

18  A.   Mostly through law enforcement, when they notify the Pima

19  County Sheriff's Office, so it depends on who -- who reports

20  it.

21  Q.   But how do you determine where to recommend to place new

22  beacons?  Is there someone you call, some data you access?

23  A.   Over time I've seen data, yes.

24  Q.   Prepared by who?

25  A.   By our own data we have.  We don't get all the reports,

DIRECT EXAMINATION OF SIDNEY SLONE                    14

 1  but whatever information we get.  We gather our intel from

 2  Border Patrol, perhaps.  We do get data that leads us -- we

 3  kind of know where a lot of the mortalities are occurring at.

 4  Q.   And when you say "we," you're talking about Fish and

 5  Wildlife?

 6  A.   Yes.

 7  Q.   Okay.  Have you ever consulted with the Pima County

 8  Office of the Medical Examiner?

 9  A.   No, sir.

10  Q.   Have you ever reviewed the maps that they prepare?

11  A.   I've seen some maps.  I can't recall the details on them.

12  Q.   Okay.  Can you show us on this map, Exhibit 38, where --

13  and I guess I'm really interested in Charlie Bell Pass, which

14  is, as I understand it, right here; is that right?

15  A.   That's correct.

16  Q.   Can you show us --

17          MR. FIDEL:  Are we going to be able to --

18          THE CLERK:  You should be able to.  He has to just

19  touch it.

20          MR. FIDEL:  Okay.

21  BY MR. FIDEL:

22  Q.   So that's a touch screen up there.

23  A.   Okay.

24  Q.   Can you show us where -- let me zoom in just a little bit

25  just on that area.

 1   A.   Show where?

 2   Q.   Yeah, just if you can, where the beacons were around

 3   Charlie Bell Pass.  So I'll circle Charlie Bell Pass here.

 4        Is that -- that's basically Charlie Bell Pass; right?

 5   A.   Yes, sir.

 6   Q.   Okay.  So can you point out where the beacons were nearby

 7   there?

 8   A.   When you say "were," what do you mean?

 9   Q.   Sorry.  In August 2017.

10   A.   Okay.  We had one right under where your red circle is

11   just to the right, on top of the pass.

12   Q.   Can you just touch the screen and put a dot.

13   A.   Right about there.

14   Q.   Okay.  And --

15   A.   And what was the -- what was the date again?

16   Q.   August of 2017.

17   A.   Okay.  (Indicating.)

18   Q.   Okay.

19   A.   And there's more out there.

20   Q.   Got it.  But those would be the closest ones?

21   A.   Yes, sir.

22   Q.   Okay.  So you've got one at the top of the path, or there

23   was one at the top of the pass, and then there's one out

24   basically in the middle of the Growler Valley; right?

25   A.   Correct.

1   Q.   And so if we look at the scale of this map -- let me zoom

2   out so we can see that.  Oh, shoot.  Let me not do that.  Let

3   me move the map.

4        And we see the scale here.

5   A.   I think it's easier, on these squares you see there, I

6   think those are townships, I believe.

7   Q.   Oh, perfect.  Does that help?  Can I put the map back

8   where it was?

9   A.   Each subsquare would be where we have a mile.

10  Q.   There I think we got it -- well, here.  There.  We got

11  it --

12  A.   Correct.

13  Q.   -- basically back; right?

14  A.   Yes.

15  Q.   So how far between the one here at the top of the pass

16  and the one here out in the middle of the Growler Valley?  Not

17  exactly, but what do you think that is, roughly, five, ten

18  miles?

19  A.   Probably seven miles.

20  Q.   Okay.  And what about from the one at the top of the pass

21  here to this one down here.  Further than that; right?

22  A.   Correct.

23  Q.   Ten, twelve, something like that?

24  A.   Yes.

25  Q.   Okay.  And you mentioned or you asked specifically what

1  time I was asking about.  Has there been a new beacon

2  installed since August 2017?

3  A.   There's been two more.

4  Q.   Where are those?

5  A.   Just to about where your circle is on the left line as it

6  intersects the road, so it would be right (indicating).

7  Q.   Right there?

8  A.   (Indicating.)

9  Q.   And that's down at the Charlie Bell Well, basically?

10  A.   Just to the west of it.

11  Q.   Okay.  And the second one you mentioned?

12  A.   (Indicating.)  About in there.

13  Q.   Okay.  So further away?

14  A.   Yes.

15  Q.   Got it.  And the one that was put in at Charlie Bell

16  Well, was that based on your recommendation?

17  A.   Actually, mine and the public lands liaison gentleman from

18  Border Patrol.

19  Q.   Okay.  And is that because of a trail of deaths that had

20  emerged on this western flank of the Growler Mountains?

21  A.   Yes.

22  Q.   Okay.  When was that beacon installed?

23  A.   I believe in May of 2018.

24  Q.   All right.  Thank you.

25       Do you think there need to be more beacons on the refuge?

1           MS. WRIGHT:  Objection.  Relevance, foundation.

2           THE COURT:  Sustained on relevance.

3    BY MR. FIDEL:

4    Q.   Have you recommended the placement of more beacons on the

5    refuge?

6           MS. WRIGHT:  Same objection, relevance, Your Honor.

7           THE COURT:  Sustained.

8    BY MR. FIDEL:

9    Q.   You're familiar with the group No More Deaths, are you

10   not?

11   A.   Pardon?

12   Q.   You're familiar with the group No More Deaths?

13   A.   Yes, sir.

14   Q.   How long have you known about them?

15   A.   I probably became aware, I think, in the winter, around

16   December or January -- well, about December 2015, going into

17   2016, somewhere around that period, I believe.

18   Q.   Got it.  And how did you become aware of them?

19   A.   I don't recall.

20   Q.   Okay.  Was it -- do you think it was because they had

21   started to become active on the refuge?

22           MS. WRIGHT:  Objection.  Calls for speculation.  He

23   just testified he doesn't remember how he became aware.

24           THE COURT:  Sustained.

25   BY MR. FIDEL:

 1  Q.   Do you recall the first time that you learned that No

 2  More Deaths volunteers were working on the refuge?

 3  A.   I don't recall when.

 4  Q.   Okay.  Do you recall the first time you personally met

 5  with representatives from No More Deaths?

 6  A.   Not really, no.  I say that because I'm trying to -- you

 7  say "met with representatives."

 8  Q.   Yeah.

 9  A.   I recall the April 2016 meeting.  That's the first meeting

10  I recall having a formal meeting with anybody.

11  Q.   Okay.

12  A.   You know, I may have talked to individuals before then,

13  but I can't recall specifics, who or dates or when or where.

14  Q.   All right.  So the first one that you definitively

15  remember was April 2016?

16  A.   Yes, sir.

17  Q.   Were there others since April 2016, other meetings with

18  No More Deaths people?

19  A.   Not meetings, I don't believe, no.

20  Q.   Okay.  Through those meetings, do you recall learning

21  what No More Deaths was doing on the refuge?

22  A.   In the April meetings, yes.

23  Q.   What did you learn that they were doing?

24  A.   They were putting out food, water, medical supplies,

25  blankets, whatever, as they refer to, International Red Cross

DIRECT EXAMINATION OF SIDNEY SLONE

1   standards, to -- in the desert.

2   Q.   Okay.  You said April 2016.  Can I show you -- I'd like

3   to show you an exhibit here.  Let me just ask you, do you

4   think it's possible that it was April 2017?

5   A.   I think it was 2016.

6   Q.   Let me show you an exhibit.  This is marked and this is

7   not --

8            MR. FIDEL:  Oh, there we go.  Thanks.  Can we just

9   send this to the witness?

10           THE CLERK:  Uh-huh.  That's how it is.

11  BY MR. FIDEL:

12  Q.   This is going to be Exhibit 245.  Do you recognize this

13  email?  And you can take a minute to review it.

14           THE COURT:  Do you need it bigger?

15           THE WITNESS:  I can read it.

16  BY MR. FIDEL:

17  A.   I don't recall necessarily writing this, but if it's, you

18  know -- I'm looking at the date.  It says May 2017.  So maybe

19  the meeting was in April 2017.

20  Q.   Well, let me just ask you, this email, this is from

21  you, Sid Slone; right?

22  A.   That's what it says, yes.

23  Q.   Okay.  And this is sent to Mary Kralovec?

24  A.   Yes.

25  Q.   Who is that?

1   A.   She was my assistant manager at the time.

2   Q.   And who is Brian Krukoski?

3   A.   He's the senior wildlife refuge specialist.

4   Q.   And the title of this?

5   A.   No.  I'm sorry.  Excuse me.  He's a senior federal

6   wildlife officer.

7   Q.   Okay.  Thank you.

8        And the title of this email is "Summary of No More Deaths

9   Meeting."

10  A.   Okay.

11  Q.   Is that right?

12  A.   If that's what it's pertaining to, yes.

13  Q.   And is that what it says on the page?

14  A.   Yes, sir.

15  Q.   And the date is Monday, May 1st; right?

16  A.   Yes.

17  Q.   2017; right?

18  A.   That's what it says, yeah.

19  Q.   And in this you're discussing a meeting last Friday, so

20  that would be back in April; right?

21  A.   Yes.

22           MR. FIDEL:  Your Honor, I'd move to admit this

23  Exhibit 245 as an email from Sid Slone.

24           MS. WRIGHT:  Your Honor, we would object.  This is

25  hearsay, and the relevance hasn't been established.

1         MR. FIDEL:  Well, it's not hearsay.  It's a

2   statement from him, and it's a public record.

3         THE COURT:  What's it going to tell me?

4         MR. FIDEL:  Well, it tells us the date of a meeting

5   he had with No More Deaths.

6   BY MR. FIDEL:

7   Q.   Is that what this describes?

8   A.   Yes, sir.

9   Q.   All right.  And this describes a meeting in April 2017;

10  right?

11  A.   Apparently.

12  Q.   Do you think there was a different meeting in April 2016?

13  A.   I couldn't say.  I go back and try to think when things

14  happened and dates, and I was thinking the meeting we had with

15  No More Deaths was in April 2016.  Maybe it was April 2017.

16        THE COURT:  I'll admit it.  Go ahead.

17        MR. FIDEL:  All right.  Thank you.

18  BY MR. FIDEL:

19  Q.   In that meeting, No More Deaths people told you that they

20  were placing water and food and other first aid supplies on

21  the refuge; right?

22  A.   That or they at least intended to, yes.

23  Q.   Okay.  And did they ask for this meeting, or how did this

24  meeting come about?  Do you recall?

25  A.   They requested it.

1  Q.   Okay.  And they asked -- did they ask to do anything else

2  on the refuge?

3  A.   I believe that's pretty much it.

4  Q.   Let me have you look at -- let me direct you to a

5  particular part of this email.  Down here -- well, do you

6  recall them asking if they could drive on administrative

7  roads?

8  A.   Yes.

9  Q.   All right.  And you recall telling them that -- well, do

10  you recall what you told them?

11  A.   Pardon?

12  Q.   Do you recall what you told them?

13  A.   That they could not.

14  Q.   Do you recall telling them you needed to check with your

15  higher-ups about that?

16  A.   The discussion, yes.  At one point, yes.

17  Q.   Okay.  That --

18  A.   I told them I could not -- I would not give them

19  permission.

20  Q.   All right.  You were not authorizing it, but you needed

21  to check with the higher-ups?

22  A.   Well, the policy was I could not.

23  Q.   Okay.  But did you tell them you would check with the

24  higher-ups?

25  A.   I did tell them that I would, I would check, you know, and

 1  they gave me the response, I thought, that it's against policy.

 2  Q.   I just want to make sure I understand.  In this email

 3  here on page two, did you not tell them, "I would need

 4  direction from a higher level before I would be willing to do

 5  that"?

 6  A.   Yes.

 7  Q.   Okay.  So is that basically the substance of what you

 8  said?

 9  A.   Yes.

10  Q.   You're not prepared to do it, But you need to check --

11  A.   Well, the decision was no, okay, and we told them no, that

12  I would not give them permission.  To change that decision, I'd

13  have to consult with my higher-ups.  And I -- they also

14  suggested that they contact my supervisor, and I gave them her

15  information so they could contact her.

16  Q.   All right.  So you told them you couldn't give

17  permission, you need to check with your supervisor.  They

18  said, we'd like to do it, and you gave them her information?

19  A.   Well, they wanted to talk to the person.

20  Q.   I'm sorry?

21  A.   They wanted to talk to the person.

22  Q.   And you facilitated that by giving them the information?

23  A.   I believe so.

24  Q.   And so is that about where that discussion ends off, that

25  there's going to be further discussions?

1    A.    No, we didn't talk about having further discussions.  We

2    ended the meeting with them saying, we're going do what we have

3    to do, i.e., put water and food out, driving wilderness area if

4    we need to, and really we need to, and put the stuff out where

5    they weren't supposed to.

6          And I said, well, we'll have to enforce the law.

7    Q.    And that perhaps there would be some citations --

8    A.    Yes.

9    Q.    -- if they do that?

10   A.    Yes, sir.

11   Q.    All right.  And they could be fined?

12   A.    Pardon?

13   Q.    And they could be fined?

14   A.    Yes, sir.

15   Q.    And they left off saying that they intended to speak with

16   the supervisor?

17   A.    Pardon?

18   Q.    They left the meeting saying they intended to speak with

19   the supervisor; is that right?

20   A.    To see my supervisor?

21   Q.    To speak with her.

22   A.    I'm not clear that they were -- if they were going to

23   follow through or not.

24   Q.    But they asked for her information and you gave it?

25   A.    My recollection I did, yes.

DIRECT EXAMINATION OF SIDNEY SLONE                    26

1   Q.   All right.

2   A.   I told them who she was anyways.

3   Q.   And they also wanted to have a meeting with the U.S.

4   Attorney's Office, did they not?

5   A.   Someone brought that up at some point.

6   Q.   Do you think it was in that meeting?

7   A.   I don't think it was in that meeting.

8   Q.   Perhaps a separate meeting?

9   A.   I don't think it was any meeting at all.  I don't know who

10  brought it up.  I can't recall who brought it up and when.  It

11  wasn't in a meeting that I was at that was brought up, to my

12  knowledge.

13  Q.   Would you read on page two the second-to-last paragraph

14  on the page.  Just read that to yourself.

15  A.   Okay.

16  Q.   Does that refresh your memory?

17  A.   It does.

18  Q.   It was in that meeting that people with No More Deaths

19  said they would look to set up a meeting with the U.S.

20  Attorney?

21  A.   I guess so, if I wrote it, yes.

22  Q.   And to discuss these issues, the driving on the road, the

23  leaving water bottles in the desert?

24  A.   Yes.

25  Q.   To your knowledge, did that meeting take place?

1   A.   Yes.

2   Q.   Were you at that meeting?

3   A.   Not at it.

4   Q.   Okay.  Would that have been in July of 2016?

5   A.   Somewhere in the summer.

6   Q.   Okay.  So July's in the ballpark?

7   A.   Yes, sir.

8   Q.   Okay.  Now, do you recognize -- do you know some of the

9   No More Deaths volunteers who have been on the refuge, like,

10  personally?

11  A.   Very, very casual.

12  Q.   Yeah --

13  A.   Well, not even that.

14  Q.   And I don't mean to suggest that you guys are friends --

15  A.   No.

16  Q.   -- and you get together, but I mean, if they come into

17  the office, you know them on sight; right?

18  A.   Well, my -- to be honest, my recognition and name together

19  is not very good, but I do occasionally recognize a few of the

20  folks that have been in the office getting permits or with

21  groups getting permits before.  So I've seen them.  I've seen a

22  few in other meetings.

23  Q.   Okay.  And you've talked to them; right?

24  A.   Yes.

25  Q.   Okay.  Now, in June of 2019 (sic), do you recall sending

```
 1   out an email to your staff about No More Deaths volunteers?

 2   A.    Wow, I mean, that's been a while.

 3   Q.    Let me show you an email.

 4   A.    Okay.

 5   Q.    This is going to be Exhibit 178.  It's previously been

 6   admitted, and just take a minute.  You can scan this email.

 7   A.    Do I recall it?

 8   Q.    Yeah.  Do you recall sending this email?

 9   A.    I don't remember.  I don't remember when I did it.  So I

10   don't recall.  You're saying I'm writing it, but if this is a

11   true document --

12   Q.    Do you see a date here?

13   A.    Yes.

14   Q.    June 19, 2017?

15   A.    Yes, sir.

16   Q.    Do you have any reason to believe that's inaccurate?

17   A.    No.

18   Q.    Do you see in the "From" line "Sid Slone"?  That's you;

19   right?

20   A.    Yes.

21   Q.    Do you have any reason to believe that's inaccurate?

22   A.    Assuming it's a document I wrote.

23   Q.    Do you have some reason to think this is not a document

24   you wrote?

25   A.    I don't recall whether I did it or not.  I don't recall
```

1  the specifics of writing this email, but I may very well have.

2  Q.   Do you recall in June 2019 -- well, let me go back a

3  second.   These folks here in the "To" field line, these are

4  Cabeza Prieta staff; is that right?

5  A.   Yes, sir.

6  Q.   Some are law enforcement?   Some are civilians?

7  A.   Yes.

8  Q.   And the title of this is "Access Permits;" right?

9  A.   Yes.

10  Q.   And in this email, you tell staff that there are one,

11  two, three, four people who are not to be issued permits;

12  right?

13  A.   Yes.

14  Q.   Do you recognize these names?

15  A.   Yes.

16  Q.   Do you recognize them to be No More Deaths volunteers?

17  A.   I'm not certain.   I'm not certain that they all are No

18  More Deaths volunteers.   I don't know the membership of the

19  organization.

20  Q.   Okay.   I get that.   But do you recognize these

21  individuals as being associated with No More Deaths?

22  A.   I recognize the names.

23  Q.   Just that's it?

24  A.   Yes.

25  Q.   All right.   And this mentions a Do Not Issue -- this

1    creates, I suppose, a Do Not Issue list.  Was it Cabeza

2    Prieta's practice to keep a list of people who are not to be

3    issued permits?

4    A.   It was only a list put together so that we knew whose

5    permit was revoked for a violation of refuge rules and

6    regulations.

7    Q.   And is this email the first time that there -- that

8    people wound up on such a list?

9    A.   Probably.

10   Q.   Okay.  In this email, you also say, "If somebody appears

11   they are part of No More Deaths group, get myself or Mary to

12   talk to them."

13        Is that Mary Kralovec?

14   A.   Yes.

15   Q.   How do you determine if somebody appears to be with No

16   More Deaths?

17   A.   A number of ways.  Usually when folks or volunteers are

18   coming in to obtain permits to access -- and sometimes they're

19   accessing Barry Goldwater and not the Cabeza.  Sometimes the

20   Cabeza and Barry Goldwater.  It's all the same permit.  And the

21   Barry Goldwater is managed by the U.S. Air Force.

22   Q.   Got it.

23   A.   But they come in groups, seven to ten individuals.

24   Sometimes they'll come in with folks that I have met before

25   that I knew was with No More Deaths.  They came in for permits.

1   We were pretty certain what the intentions were, and we always

2   gave them the permits.

3   Q.   So -- but to determine if somebody appears to be with No

4   More Deaths, is there some set of criteria, or is it just if

5   they're with somebody from No More Deaths?

6   A.   Well, they come in, and it's the same story.  We're going

7   to go hike Hat Mountain and Barry Goldwater.  A couple times

8   when I asked them what they plan on doing, somebody in the

9   group would kind of make a mistake and say they're with No More

10  Deaths.  Sometimes I'd actually ask them.

11  Q.   Well, you're assuming that's a mistake, but sometimes

12  somebody would say they're with No More Deaths; right?

13  A.   When you asked -- when I'd ask them, some would say no,

14  some would say yes, in the same group.

15  Q.   Okay.  So some might be with -- some people in the group

16  might be with No More Deaths; some people might not.

17       Is that fair?

18  A.   It didn't matter who they were with.

19  Q.   Except that in this email you say that, if they appear to

20  be with No More Deaths, contact you or Mary?

21  A.   Because of people coming in here, coming into the refuge

22  for a permit, based upon experiences over the past, I don't

23  know, year maybe, based upon that experience, if they're with

24  No More Deaths, they were -- had intentions to go and put water

25  out.

 1  Q.   And they told you that they were doing that?

 2  A.   Sometimes they did.

 3  Q.   Like the April meeting?

 4  A.   Yes.

 5  Q.   Okay.  There was another update to this Do Not Issue list

 6  that went out in August.  Do you recall that?

 7  A.   I have no idea when I --

 8  Q.   Actually, let me, before we skip forward to August, do

 9  you recall also in June receiving an email about No More

10  Deaths?

11  A.   That's a broad question.

12  Q.   It is a broad question.  It's not a great question.

13       Let me show you an exhibit that's been marked as, well,

14  as 242.  Did you sometimes receive emails from civilians about

15  No More Deaths?

16  A.   I don't recall.

17  Q.   Let me show you what's been marked as Exhibit 242.

18       Can you see this okay?

19  A.   Yes.

20  Q.   Okay.  Do you know who this --

21  A.   I know Fred Goodsell, yes.

22  Q.   And do you recognize this email?

23  A.   I don't recognize the email, no.

24  Q.   Do you recall receiving this?

25  A.   I don't recall receiving it.

1   Q.   Do you have any reason to question the accuracy of this

2   email?

3   A.   No.  I mean, I just don't recall, recall it.

4   Q.   Who is Fred Goodsell?

5   A.   He's a person that was active in environmental issues on

6   the refuge and formed a group called Desert Protectors.

7   Q.   Okay.

8   A.   A strong wilderness advocate.

9   Q.   Okay.  And he, it looks like, on June 21st sent you an

10  email that included a No More Deaths circular about what

11  they're doing.

12  A.   Yeah.  I don't recall this document, but --

13  Q.   Do you have any reason to doubt that this document is

14  accurate?

15  A.   No.

16            MR. FIDEL:  Okay.  I would move for admission of

17  Exhibit 242.

18            MS. WRIGHT:  Objection, Your Honor.  Hearsay,

19  foundation, and relevance.

20            MR. FIDEL:  Well, it's --

21            THE COURT:  What's the relevance?

22            MR. FIDEL:  The relevance is that it establishes

23  discriminatory -- well, it's part of our case for

24  discriminatory effect and discriminatory intent, which --

25            MS. WRIGHT:  And, Your Honor, that's not been the

 1  testimony today.  We know nothing about what's in this email.

 2              MR. FIDEL:  Well, we heard what's in the email.  We

 3  heard what's in the email is it's a piece of information

 4  circulated by No More Deaths that is forwarded to Mr. Slone.

 5              If the Court wishes, I can lay more foundation.

 6              THE COURT:  From an individual who purports to

 7  represent a group called Desert Protectors?

 8              MR. FIDEL:  Yes.

 9              THE COURT:  It'll be admitted.

10              MR. FIDEL:  Okay.  Thank you, Your Honor.

11  BY MR. FIDEL:

12  Q.   And he asks, "What is going on in the Growler Valley,"

13  does he not?

14  A.   Yes.

15  Q.   Now, you forward an email.  The very next day you sent an

16  email to No More Deaths -- or to Cabeza Prieta staff.  Do you

17  recall that?

18  A.   You have to show me.

19  Q.   Sure.  Let me show you Exhibit 241.  This is an email,

20  June 22nd.  All right?

21  A.   That's what it says, yes.

22  Q.   And you sent -- if we look down here, you sent this

23  email.  Well, it looks like it has been forwarded multiple

24  times; right?

25  A.   Yes.

1  Q.   All right.  And in one of them, if we go through here, it
2  looks like somebody, Justin Tade -- well, let's -- maybe the
3  simplest one is right here.
4       You send this email on June 22nd, on page three, to
5  Juliette Gutierrez.  Who is Juliette Gutierrez?
6  A.   She's my supervisor.
7  Q.   All right.  The regional manager?
8  A.   No.  She's -- this is the regional -- well, actually,
9  she's the refuge supervisor for refuges for Arizona and New
10 Mexico.
11 Q.   Got it.  And you forwarded her an article about No More
12 Deaths on Cabeza Prieta?
13 A.   Okay.
14 Q.   And this is a link to it looks like a No More Deaths web
15 page?
16 A.   That's what it looks like.
17 Q.   Okay.  Why were you forwarding to Ms. Gutierrez the link
18 to the No More Deaths web page?
19 A.   Forwarding to who?
20 Q.   Forwarding to Ms. Gutierrez.  Or is it Fernandez,
21 Ms. Fernandez?
22 A.   Yes.
23 Q.   The link to the No More Deaths web page?
24 A.   Because the regional office was aware that we had an
25 organization that was deliberately violating our rules by

 1   putting out food, water, and driving roads, that kind of

 2   activity.

 3        So when you have those kinds of activities, I notify my

 4   superiors.

 5             MR. FIDEL:  Got it.  I would move to admit Exhibit

 6   241, Your Honor.

 7             THE COURT:  Sure.  It'll be admitted.

 8             MR. FIDEL:  Thank you.

 9             THE COURT:  What's the number now?

10             MR. FIDEL:  241.

11   BY MR. FIDEL:

12   Q.   Okay.  Now, let's get back to August, because in August,

13   you update the Do Not Issue permit list, August of 2017; is

14   that right?

15   A.   I don't know.

16   Q.   Let me show you an email.

17   A.   Okay.

18   Q.   This is going to be Exhibit 179.  Do you recognize this

19   email?

20   A.   I don't recognize it because, you know, I write thousands

21   of emails.

22   Q.   Sure.

23   A.   I communicate with -- so I can't, say, go back and do I

24   recognize this.  No, I don't recognize it.

25   Q.   Well, let me ask you -- and I get that.  Let me ask you a

1  question I've asked before, which is, do you have any reason

2  to question the accuracy of this email?

3  A.   Yeah, I don't question the accuracy, no.

4  Q.   Okay.  So August 8th, you send out an email to -- who are

5  these people in the "To" field?  Some of them are Cabeza

6  Prieta staff; right?

7  A.   This are -- the "To," those are other agency folks.

8  Q.   Okay.  Agencies that have some interest on what goes on

9  in the Cabeza?

10 A.   Those are agency -- when we issue permits, they cover not

11 only the Cabeza, they cover Barry Goldwater East, Barry

12 Goldwater West, and a piece of BLM land and vice versa, so --

13 Q.   And in this email, you're sending out a new Do Not Issue

14 list, right, or updating it?

15 A.   If that's what it says.

16 Q.   Well, it says, "The attached list of persons or

17 individuals that either drove or rode along with individuals

18 that drove in a motorized vehicle in the designated

19 wilderness, we will not issue permits for them for the

20 remainder of this permit year."

21 A.   Okay.

22 Q.   Right?  So this is updating the Do Not Issue list; right?

23 A.   Evidently.

24 Q.   And do you recognize the names on this list?

25 A.   Some I do.  Some I don't necessarily know.

1   Q.   Do you recognize them to be volunteers of No More

2   Deaths, the ones that you do recognize?

3   A.   I can't say that.

4   Q.   Okay.  When I compare this list to the list on page 178,

5   or excuse me, Exhibit 178, which is right here, does it looks

6   like Exhibit 179 just adds to the list in Exhibit 178?

7   A.   You're saying on the left?

8   Q.   Yes.  The one on the left --

9   A.   That's what this does, this document does, yes.

10  Q.   Okay.

11  A.   But I can't say -- I don't know those individuals.

12  Q.   Okay.

13  A.   I know a couple of them, but most of them I don't know.

14  So I can't say who they're with.  If they were with somebody in

15  the violation, you know, committing -- breaking the law out

16  there and riding with somebody, that doesn't mean -- I don't

17  know who they're with, necessarily.

18  Q.   All right.

19  A.   It was the violation, the issue, not the organization.

20  Q.   Got it.  So then let me show you Exhibit 180.  This is

21  another email from now August 14th; is that right?

22  A.   Yes.

23  Q.   And this email from you, is this the same people who

24  you're sending Exhibit 179's email to?  Exhibit 180's on the

25  left.  179 is on the right.

 1  A.    It appears to be, yes.

 2  Q.    Okay.  And the -- you have attached on this 170 -- 180

 3  email a Do Not Issue Permits to These Individuals list; right?

 4  A.    That's what it says, yes.

 5  Q.    And this list says, "Updated August 14th, 2017;" right?

 6  A.    Okay.

 7  Q.    Is that right?

 8  A.    That's what it says.

 9  Q.    And does this appear to be an update to the list on

10  Exhibit 179?  180's on the left; 179's on the right.

11  A.    That's what it appears.

12          MR. FIDEL:  Okay.  I'd move to admit Exhibit 179 and

13  180.

14          THE COURT:  Sure.  Sure.

15          MR. FIDEL:  Thank you.

16          THE COURT:  That last exhibit I admitted was what?

17          THE DEFENDANT:  180.

18          THE COURT:  And that's dated?

19          MR. FIDEL:  August 14th.

20          THE COURT:  The day after this event?

21          MR. FIDEL:  Yes, correct.

22  BY MR. FIDEL:

23  Q.    How often do individuals come into contact with law

24  enforcement on the refuge?  Do you know?

25  A.    How often do law enforcement?

1   Q.   Yeah, do individuals come into contact with law

2   enforcement officers on the refuge?

3   A.   I couldn't say.

4   Q.   Do law enforcement officers contact you when they come

5   into contact with individuals?

6   A.   If there's a violation they encounter.  They don't -- no.

7   I sometimes find out after the fact.  If they do a violation, I

8   generally hear about it later.  They don't call me up and tell

9   me, you know.  They do their job.

10  Q.   Okay.  And not all people who get contacted get placed on

11  the Do Not Issue Permit list, correct?

12  A.   If you can -- well, read the question again.

13  Q.   Sure.  Let me ask it another way.  Have there been

14  individuals that you learned contacted by law enforcement who

15  are not placed on the Do Not Issue permit list?

16  A.   If they're not in violation, no.

17  Q.   If they are in violation?

18  A.   Folks on that list were folks caught violating our rules

19  and regulations.

20  Q.   Are there people who violate, who get caught violating

21  rules and regulations, that do not get placed on that list?

22  A.   Yes.

23  Q.   Okay.  Individuals who enter the permit without a refuge

24  (sic), perhaps, do not get put on that list?  Enter the refuge

25  without a permit?

1   A.   I don't know -- I don't know if we had that situation of

2   individuals without an access permit.  I couldn't tell you.

3   Q.   Do you know if there are any individuals who have been

4   caught violating the requirement that you have a permit to

5   enter the refuge?  In other words, they enter the refuge

6   without a permit, get caught, and do not get placed on that

7   list?

8   A.   I just don't, off the top of my head, recall anybody --

9   that's a law enforcement issue.  I couldn't say, because I'm

10  unaware of that, of someone not having an access permit.

11  Q.   But you became aware of these individuals that you did

12  put on that list?

13  A.   Yes.

14  Q.   Is that because law enforcement contacted you about them?

15  A.   Of the violations, yes.

16  Q.   Would you be surprised to know that there are other

17  individuals who have been caught in violation of the permit

18  requirement by law enforcement and you are not notified?

19          MS. WRIGHT:  Objection.  Relevance.

20          THE COURT:  Overruled.

21  A.   Am I aware of?

22  Q.   Would it surprise you to know that law enforcement

23  officers have caught other individuals on the refuge without a

24  permit but have not notified you?

25  A.   That have not notified me?

 1  Q.   Yes.

 2  A.   Would it surprise me if they caught folks -- yeah, I'm not

 3  sure if I'm aware of any time that they might issue a citation

 4  or something like that.  I don't track that.

 5  Q.   Oh, all right.  So you don't track every citation they

 6  issue?

 7  A.   No.

 8  Q.   And you don't ask for, like, daily updates on citations

 9  they issue or people that they encounter who are in violation

10  of a permit requirement?

11  A.   No, I don't think so.

12  Q.   All right.  But for the folks on this Do Not Issue

13  list, you -- what, did you get some kind of updates from law

14  enforcement?

15  A.   If there's a violation by folks putting out food and water

16  on the refuge, yes.  Well, I can't say every time, but

17  generally they did notify me, because this was an ongoing

18  issue.  It was an ongoing thing where folks were deliberately

19  in violation of our rules and regulations.

20  Q.   Let me show you --

21          MR. FIDEL:  Can I have a moment, Your Honor?

22          THE COURT:  Sure.

23  BY MR. FIDEL:

24  Q.   Let me show you a document.  This is Exhibit 146.

25      Do you recognize the format of this document?  Let me --

1  A.   I don't usually read these.

2  Q.   Okay.  But it sounds like you recognize what this is.

3  A.   It's a law enforcement report.

4  Q.   Okay.  I'll move on from this.

5       Now, in June -- well, was it June of 2017 that the access

6  permit was amended?

7  A.   July, I think.

8  Q.   July?  Became effective July?

9  A.   Yeah, permit year is July 1st through June 30th.

10 Q.   Okay.  Let me put up here -- this has been previously

11 admitted.  This is Exhibit 132.  Is this the access permit

12 that you're talking about?

13 A.   I couldn't say.  I'd have to read the whole thing, and I'd

14 have to compare it to -- I don't know which permit this is

15 because we did make a modification.

16 Q.   Sure.  Well, if you like -- if you like, I can flip pages

17 here.  Maybe I can just walk this up to you, and you can flip

18 pages yourself.

19 A.   Okay.

20          MR. FIDEL:  May I approach the witness, Your Honor?

21          THE COURT:  Yes.

22          MR. FIDEL:  Thank you.

23 BY MR. FIDEL:

24 A.   Okay.  The question?

25 Q.   Yeah, do you recognize that to be the access permit?

1    A.    Yes, sir.

2    Q.    And is that the amended one that became effective July

3    1st, 2017?

4    A.    We didn't amend it.

5    Q.    You didn't?

6    A.    No.

7    Q.    Is that the same permit that was effective in -- for the

8    2016-'17 --

9    A.    We made modifications but we didn't amend it.  "Amendment"

10   implies you're doing some process.  We're not doing a process.

11   We're trying to -- we did a clarification and we made changes.

12   Q.    Okay.  So --

13   A.    We didn't -- the rules were -- everything was the same in

14   2016 as in 2017.

15   Q.    But the language on the permit is different?

16   A.    The language is different.

17   Q.    And as you say, it's a modification, but there's no

18   process to that?  Did I hear that right?

19   A.    No.  A process?

20   Q.    Yeah.  That's what you said; right?

21   A.    To do an amendment you may, you may have a process.

22   Q.    And you did not use any type of process here?

23   A.    What we did is we made these changes here, and we did it

24   to clarify what the rules were.  We think people maybe couldn't

25   -- on the previous permit, it specifically said you can't

 1   violate rules and regulations and federal and state laws on the

 2   refuge.

 3   Q.   So --

 4   A.   And the thing was, evidently people -- we presumed people

 5   understood that, so we just clarified that by putting language

 6   in that made it pretty upfront and clear what you can and can't

 7   do.

 8   Q.   So for the -- is it the fiscal year beginning July 1st?

 9   Is that --

10   A.   I don't know how -- no, because their fiscal year's

11   October 1st, so I'm not sure if that's military, July 1st, or

12   the old days that July 1st was the beginning of the fiscal

13   year.

14   Q.   So let's just call it the permit year beginning July

15   1st, 2017.

16   A.   Permit year, yes.

17   Q.   That document, Exhibit 132, that is the new permit for

18   July 1st, 2017, through June 30th, 2018?

19   A.   On or about, because I'm not sure it's totally ready on

20   the 1st.

21   Q.   Got it.  And it is different from the one that was

22   effective on or about July 1st, 2016, to June 30th, 2017?

23   A.   You said what?

24   Q.   It is different from the previous year's permit; right?

25   A.   A little different, yes.

1    Q.   And the difference is that paragraph 13 on that document,

2    Exhibit 132, has been added; right?

3    A.   Has been what?

4    Q.   Has been added.  Has been added.

5    A.   Yeah, I think this is an expansion of a previous item but

6    expanded upon --

7    Q.   Okay.

8    A.   -- to clarify on that rule.

9    Q.   And it has definitions for the term "personal property;"

10   right?

11   A.   It lays out examples.

12   Q.   Okay.  And it has definitions for what "abandoning"

13   means; right?

14   A.   I don't know if it has the definition of "abandonment" or

15   not.  It just tells you kind of what it is.

16   Q.   Okay.  Is that not a definition, something that tells you

17   what it is?

18   A.   Not necessarily.  I mean, a definition is a definition.

19   It's the terminology to it.  An example is a little different,

20   necessarily.

21   Q.   Was that -- whether that paragraph was added wholesale or

22   expanded upon, was that change made in response to what you

23   had learned No More Deaths was doing on the refuge?

24   A.   Well, not only them but other folks.

25   Q.   Leaving water bottles?

1    A.   Yes.

2    Q.   Were there other folks, to your knowledge, who had been

3    stopped on the refuge doing that?

4    A.   Not stopped, but we know they were putting water out on --

5    we know for sure on BLM lands, but they were putting water out,

6    we suspect, on us too.

7    Q.   Okay.  And these are -- do you know if any of those folks

8    were on the Do Not Issue Permit list?

9    A.   We never caught -- we never caught them on the refuge

10   violating the rules and regulations.  Had we, we would have

11   done the same thing.

12   Q.   I'd like to -- did you have any input in the language

13   that is found in paragraph 13 on Exhibit 132?

14   A.   This language may have came from the Air Force, because

15   they had the same issues, and it was a joint effort by us, the

16   Air Force, and the Bureau of Land Management to make these

17   changes, because we wanted it made upfront, these are the

18   rules, so you're really clear about it.

19   Q.   So did you have input in that language?

20   A.   Yes, I did.

21   Q.   And after you had input, did that go up to -- is it the

22   solicitor's office, to review it?

23   A.   Yes, sir, it is.

24   Q.   And then did it come back down from the solicitor's

25   office and go straight into the permit?

1  A.   It went to not only our solicitor, but the BLM solicitor

2  and the solicitor for the Air Force and the Marine Corps.

3  Q.   Okay.

4  A.   All the respective solicitors reviewed the document to

5  make sure the language was appropriate.

6  Q.   So let me see if I can get it right.  You and the other

7  land managers had some input, the language goes up to the

8  lawyers, the lawyers send it back down, and it winds up in the

9  permit?

10 A.   Yes, sir.

11             MR. FIDEL:  Okay.  No further questions.  Thank you.

12             MS. WRIGHT:  Your Honor, can we take a break, just

13 about 10 minutes maybe?

14             THE COURT:  Sure.

15             MS. WRIGHT:  Thank you.

16             THE COURT:  Stand at recess.

17             (Off the record.)

18             THE COURT:  You realize you're still under oath,

19 right, sir?

20             THE WITNESS:  Yes.

21             THE COURT:  You may proceed.

22             MS. WRIGHT:  Thank you, Your Honor.

23                         CROSS-EXAMINATION

24 BY MS. WRIGHT:

25 Q.   Mr. Slone, as refuge manager, are you a law enforcement

1  officer?

2  A.   No, ma'am.

3  Q.   Are you trained in law enforcement?

4  A.   No, ma'am.

5  Q.   And the law enforcement officers who do work out at

6  Cabeza Prieta refuge, they're under your supervision in the

7  hierarchy of things; correct?

8  A.   Yes, ma'am.

9  Q.   But they do not report to you every single violation that

10  they encounter on the refuge, do they?

11  A.   No.

12  Q.   And they do not report to you every single time there's a

13  violation on the refuge, do they?

14  A.   No.

15  Q.   Now, if the officers reported to you someone of

16  particular concern on the refuge, you might know about that;

17  right?

18  A.   Yes.

19  Q.   But that's only if the law enforcement officer brings it

20  to your attention; correct?

21  A.   Correct.

22  Q.   Now, in your managing of the refuge, would you -- you

23  would say that, when violations are committed deliberately,

24  those are of greater concern to you than those that might be

25  committed because of a lack of education or through

1    negligence; correct?

2    A.    Correct.

3    Q.    And as the refuge manager, you are generally aware that

4    illegal immigration is an issue on the refuge that needs to be

5    managed; correct?

6    A.    I'm sorry?

7    Q.    As the refuge manager, you are generally aware that

8    illegal immigration is an issue on the refuge that you need to

9    manage; correct?

10   A.    Yes.

11   Q.    Let me rephrase.  There's a bad relation there.

12         You're aware that illegal immigration happens on the

13   refuge; correct?

14   A.    You say -- "immigration" implies one thing.

15   Q.    You are aware that there is illegal activity on the

16   refuge; correct?

17   A.    Yes, yes.

18   Q.    You are aware that some of that illegal activity includes

19   people crossing illegally into the United States; correct?

20   A.    Yes, ma'am.

21   Q.    And you're also aware that some of that illegal activity

22   includes drug smuggling activity; correct?

23   A.    Yes, ma'am.

24         MR. FIDEL:  Objection.  Relevance.  This is not a

25   case about drug smuggling.

1          THE COURT:  Overruled.  You may proceed.

2          MS. WRIGHT:  Thank you, Your Honor.

3    BY MS. WRIGHT:

4    Q.   Let's talk for a minute about beacons that are present on

5    the refuge.  Are you aware -- you're aware that those beacons

6    can be viewed up to five miles away at night; correct?

7    A.   Yes.

8    Q.   You're also aware that, as of August of last year, August

9    of -- sorry, August of the year before, 2017, at Charlie Bell

10   Well, there were three rescue beacons within five to ten miles

11   of Charlie Bell Well; right?

12   A.   Yes.

13   Q.   And one of those beacons was to the south of Charlie Bell

14   Well; right?

15   A.   Yes.

16   Q.   And so a person who had walked as far as Charlie Bell

17   Well would have walked past at least one beacon at that time;

18   correct?

19   A.   Within viewing distance.

20          MR. FIDEL:  Objection.  Calls for speculation.

21          THE COURT:  Overruled.

22   BY MS. WRIGHT:

23   Q.   And as of today there are now two additional beacons to

24   the south of Charlie Bell Well; correct?

25   A.   Yes.

1   Q.   And so if a person were to walk as far as Charlie Bell

2   Well today from the southern border, they would have to walk

3   past three beacons before reaching Charlie Bell Well; correct?

4           MR. FIDEL:  Objection.  Foundation of the route

5   they're walking.

6           THE COURT:  Yes, I understand that.  With that

7   understanding, you may answer.

8   BY MS. WRIGHT:

9   A.   They would be from the border to -- what's the question?

10  Q.   If a person were walking from the southern border up

11  through generally Growler Valley, in that dry area there, to

12  get to Charlie Bell Well the most direct route, they would

13  walk past three rescue beacons before they got there?

14  A.   Within some distance, yes.

15  Q.   Now, as the refuge manager, would it be fair to say that

16  you receive several emails a day?

17  A.   Oh.

18  Q.   Is that a "yes?"

19  A.   Yes.

20  Q.   Would it also be fair to say that you send several emails

21  a day?

22  A.   Yes.

23  Q.   Would it be fair to say that each day you encounter

24  several individuals, several public -- members of the public

25  at the refuge office?

 1    A.    Yes.

 2    Q.    And over the course of a week or a year, would it be fair

 3    to say that you send and receive hundreds of emails each day?

 4    A.    Yes.

 5    Q.    Not -- I'm sorry.  Hundred of emails over the course of

 6    that time?

 7    A.    (Nodding.)

 8    Q.    And would it be fair to say that you may encounter

 9    hundreds of members of the public over the course of a year?

10    A.    Yes.

11    Q.    Do you remember every email you send or receive?

12    A.    No.

13    Q.    Do you remember every person you meet at the office?

14    A.    No.

15    Q.    I'd like to talk to you about that April 2017 meeting

16    between your office and members of No More Deaths.

17    A.    Okay.

18    Q.    And Margo Cowan, a member of No More Deaths, was present

19    at that meeting; correct?

20    A.    Yes.

21    Q.    And you were present; correct?

22    A.    Yes.

23    Q.    And Mary Kralovec was present; correct?

24    A.    Yes.

25    Q.    And there were some other members of No More Deaths

1  there; correct?

2  A.   Yes.

3  Q.   Now, during that meeting, you told everyone at the

4  meeting that you preferred to use rescue beacons as a method

5  for saving lives because they actually led to rescues;

6  correct?

7  A.   Yes, ma'am.

8  Q.   And you also said that the reason you preferred the

9  rescue beacons was because they did not leave trash behind on

10  the refuge; correct?

11  A.   Yes.

12  Q.   You indicated that placing more beacons on the refuge was

13  the way to proceed forward; correct?

14  A.   Yes.

15  Q.   You also indicated that, on the refuge, it was rare to

16  see illegal aliens crossing through who were not carrying

17  drugs; correct?

18  A.   Yes.

19         MR. FIDEL:  Relevance.

20         THE COURT:  Who are not what?

21         MS. WRIGHT:  Not carrying drugs.  So if I flip it to

22  the affirmative --

23         THE COURT:  Overruled.  I mean, the objection is

24  overruled.  You may answer.

25         MS. WRIGHT:  Thank you, Your Honor.

1   BY MS. WRIGHT:

2   Q.   So on the refuge, more often than not, illegal aliens

3   crossing through are carrying drugs; correct?

4   A.   That's --

5            MR. FIDEL:  Objection.  Foundation.

6            THE COURT:  Sure.  You want to add some foundation.

7   Go ahead.

8   BY MS. WRIGHT:

9   Q.   At that same meeting, you told the folks there, including

10  the No More Deaths representatives, that they could not have

11  access to restricted wilderness roads; correct?

12  A.   Correct, for driving, for driving motorized vehicles.

13  They could hike in.

14  Q.   So you told many members that they could not use their

15  personal vehicles to drive on the restricted roads in the

16  wilderness at that meeting; correct?

17  A.   Correct.

18  Q.   You told them they had no permission at that time to do

19  that; correct?

20  A.   Correct.

21  Q.   You also told them that, if they wanted to have further

22  access in vehicles to the refuge, that they could think about

23  doing ridealongs with other law enforcement officers; correct?

24  A.   Correct.

25  Q.   And that would be members of maybe the Pima County

1   Sheriff's Office to do remains recovery; correct?

2   A.   Correct.

3   Q.   Now, as part of this conversation, Ms. Cowan made several

4   statements to you; correct?

5   A.   Pardon?

6   Q.   Ms. Cowan made several statements to you at this meeting;

7   correct?

8   A.   Yeah.  Yes.

9           MR. FIDEL:  Object to the hearsay, Your Honor.

10          MS. WRIGHT:  And it goes to effect on the listener,

11  Your Honor.

12          THE COURT:  On this listener?

13          MS. WRIGHT:  On this listener, Your Honor.  He was

14  asked several questions about the Do Not Issue list.

15          THE COURT:  All right.  Overruled.

16  BY MS. WRIGHT:

17  Q.   Ms. Cowan told you at that time that No More Deaths was

18  going to continue their activities without regard to what you

19  said at that meeting; correct?

20  A.   Yes.

21  Q.   She also told you that members of No More Deaths were

22  going to continue to put out supplies on the refuge in

23  violation of the regulations?

24  A.   Yes.

25  Q.   Correct?

1   A.   Correct.

2   Q.   And she also told you that, even if they received

3   citations, No More Deaths volunteers would continue to violate

4   the regulations; correct?

5   A.   Correct.

6   Q.   And she said that they would take the issue up in court;

7   correct?

8   A.   Correct.

9   Q.   So as of that meeting, there was absolutely no agreement

10  and no understanding that No More Deaths could put supplies

11  out on the refuge or drive on restricted trails on the refuge

12  without violating the law; correct?

13  A.   That's correct.

14  Q.   I want to talk to you a little bit about the Hold

15  Harmless Agreement and the history there.  The Hold Harmless

16  Agreement, which is Exhibit 2 and also 132 that you saw, that

17  was started at the request of the Air Force and the Marines;

18  correct?

19  A.   Correct.

20  Q.   And that was because, in the past, the Air Force and the

21  Marines used the area encompassed by the Hold Harmless

22  Agreement as a bombing range; correct?

23  A.   Correct.

24  Q.   And that the Air Force and Marines were concerned that

25  there were still unexploded ordnances on those lands; correct?

1    A.    Correct.

2    Q.    And their concern was that, if the public traveled over

3    that land and was injured by an unexploded ordnance, there

4    could be liability consequences for the Air Force and the

5    Marines; correct?

6    A.    Correct.

7    Q.    And so the Hold Harmless Agreement serves in one aspect

8    to protect the lands and the managers of those lands from

9    liability from unexploded ordnance; correct?

10   A.    Correct.

11   Q.    Now, in your capacity as a refuge manager for Fish and

12   Wildlife, do you have the ability to bind the other agencies

13   that are a part of the Hold Harmless Agreement?

14   A.    No.

15   Q.    And in fact, in the past, the other agencies have asked

16   you not to issue permits because of activities on their land;

17   correct?

18   A.    Correct.

19   Q.    And that's done as a courtesy for the overall management

20   of those lands; correct?

21   A.    Correct.

22   Q.    Now, as part of your work as the refuge manager, did you

23   become aware of certain information about individuals

24   attempting to receive permits from BLM in Phoenix?

25   A.    Yes.

1   Q.   And that information that you received was that

2   individuals were going to go to BLM in Phoenix in order to

3   work around the issues that were happening on the refuge;

4   correct?

5   A.   Correct.

6   Q.   And that issue was that people may have been told they

7   could not have permits from you or from the other managers

8   there, and they were going to BLM in Phoenix in order to avoid

9   that consequence; correct?

10  A.   Correct.

11  Q.   And so the Do Not Issue list was a formalized way to let

12  everyone know, regardless if they were in Phoenix or Tucson,

13  that certain people had violated the regulations and were not

14  to be issued permits; correct?

15  A.   Correct.

16  Q.   Now, the Hold Harmless Agreement, prior to July 2017, it

17  did not allow people to leave supplies out on the refuge;

18  correct?

19  A.   No.

20  Q.   It did not allow people to leave gallon jugs of water on

21  the refuge; correct?

22  A.   No.

23  Q.   It did not allow them to leave beans or blankets;

24  correct?

25  A.   Correct.

1    Q.   In fact, it didn't matter what it was.  Everyone was

2    required to pack back out what they packed in prior to July of

3    '17; correct?

4    A.   Correct.

5    Q.   And so -- and the Hold Harmless Agreement is necessary to

6    get a permit to access the refuge; correct?

7    A.   Correct.

8    Q.   And that has never changed, that you must sign the Hold

9    Harmless Agreement to get the permit; correct?

10   A.   Correct.

11            MS. WRIGHT:  Your Honor, could I have a

12   moment, please?

13            THE COURT:  Uh-huh, yes.

14            MS. WRIGHT:  Thank you.

15   BY MS. WRIGHT:

16   Q.   I want to take us back a minute to the idea of unexploded

17   ordnance, and it's correct that an unexploded ordnance is an

18   item that could blow up if triggered; correct?

19   A.   Correct.

20   Q.   And if it blew up, it could injure someone or kill

21   someone; correct?

22   A.   Correct.

23   Q.   And that person could be a member of the public out on

24   these lands; correct?

25   A.   Correct.

CROSS-EXAMINATION OF SIDNEY SLONE                61

1   Q.   It could be a member of your staff or another federal

2   employee out on these lands; correct?

3   A.   Correct.

4   Q.   It could be someone who is volunteering with a

5   humanitarian organization; correct?

6   A.   Correct.

7   Q.   And it could also be anybody who's crossing through those

8   lands illegally; correct?

9   A.   Correct.

10  Q.   So the ordnance doesn't care who triggers it.  Anyone

11  could be killed or injured by that ordnance.

12       Correct?

13  A.   Correct.

14           MS. WRIGHT:  Your Honor, that's all I have.

15           THE COURT:  Redirect?

16           MR. FIDEL:  Sure.

17           THE COURT:  It's not required.

18           MR. FIDEL:  Just a couple questions.

19           THE COURT:  Okay.

20                     REDIRECT EXAMINATION

21  BY MR. FIDEL:

22  Q.   About the ordnance, the unexploded ordnance, those are

23  like bombs and missiles?

24  A.   And rounds of, I don't know, 50 millimeter or 200

25  millimeter rounds or whatever that are like, you know, giant

1  bullets out there also, and missile, missile-type --

2  Q.   And those could be --

3  A.   -- bombs.

4  Q.   And those could be -- and just for the record, because

5  there's a court reporter, you've got your hands, like, a

6  foot-and-a-half apart or something?

7  A.   Oh.

8  Q.   To show the size?

9  A.   Sure.

10 Q.   Okay.

11 A.   Or bigger.

12 Q.   And these are all -- could be anywhere on the refuge;

13 right?

14 A.   Yes.

15 Q.   When somebody gets a permit, you don't, like, give them a

16 map of where those things are; right?

17 A.   No one knows where they're at.

18 Q.   They could be anywhere?

19 A.   Yes.

20 Q.   How long was Cabeza Prieta a bombing range for?

21 A.   1941 I believe is when it began.

22 Q.   It began.  And when did it stop?

23 A.   It stopped after World War II, and the Korean War it

24 picked up again.

25 Q.   Okay.  And it's been -- do you know when it stopped being

1    a bombing range?

2    A.    It's still used as an aerial gunnery range, so the Air

3    Force and Marine Corps both still use -- the Barry Goldwater

4    airspace is managed and controlled by them, and so when they

5    have -- the Air Force has certain equipment on the refuge.  So

6    they still use -- you know, the airspace on the refuge is

7    controlled by the military and the FAA.

8    Q.    So there's still bombs and missiles that could be flying

9    overhead anyways?

10   A.    Well, they're not dropping them on the refuge.

11   Q.    They're not dropping them on the refuge, but they could

12   be shooting them across or something?

13   A.    I don't think they -- no, I don't think they shoot them

14   across.  They use the airspace to maneuver, but they

15   actually -- everything they release is on the Barry Goldwater

16   now.

17   Q.    Got it.  But the planes are overhead?  Is that what

18   you're saying?

19   A.    Yes.

20           MR. FIDEL:  All right.  No further questions.

21           THE COURT:  You may step down, sir.  You're excused.

22           THE WITNESS:  Thank you, sir.

23           MR. FIDEL:  Call Yurie Aitken next.

24           THE COURT:  If you'd come over here, sir.

25           THE CLERK:  You can step up and then raise your

1    right hand, please.

2                       YURIE AITKEN, WITNESS, SWORN

3                          DIRECT EXAMINATION

4    BY MR. FIDEL:

5    Q.    Good morning.

6    A.    Good morning.

7    Q.    Is it Mr. Aitken or Officer Aitken, Agent Aitken?

8    A.    Whatever you'd like.  Mr. or Officer.  That's fine.

9    Q.    Okay.  Are you with a law enforcement agency?

10   A.    I'm with the United States Fish and Wildlife Service.

11   It's not a law enforcement agency.

12   Q.    What's your position with Fish and Wildlife?

13   A.    I'm a federal wildlife zone officer.

14   Q.    And what does that mean?

15   A.    It's essentially a middle management law enforcement

16   position with no supervisory authority.

17   Q.    Okay.  And what's the day-to-day -- what do you do

18   day-to-day?

19   A.    Day-to-day, I try to help the Regional Law Enforcement

20   Program, which is Region 2 in this particular instance.  I try

21   to help the managers who are non-law enforcement and the law

22   enforcement officers who are supervised by the non-law

23   enforcement managers.  I try to help them with the Regional Law

24   Enforcement Program.

25   Q.    Got it.  I'd like to take you back to July 6th, 2017.  Do

1  you recall summer 2017?

2  A.   I believe July 6th was a conference call, if I remember

3  correctly.

4  Q.   Yeah.  And do you recall who was on that conference call?

5  A.   I believe there were representatives from No More Deaths,

6  from the Fish and Wildlife Service, the solicitor's office, the

7  U.S. Attorney's Office, and some other agencies, not Fish and

8  Wildlife, but some other agencies with the Department of

9  Interior.

10 Q.   Do you recall what the discussion was about?

11 A.   The discussion was about No More Deaths and being on the

12 property with the United States Fish and Wildlife Service in

13 the area, past violations that may have occurred, people being

14 on the wilderness area and the refuge.

15 Q.   And do you recall who was there on behalf of the U.S.

16 Attorney's Office?

17 A.   I was on a conference call.  I wasn't actually physically

18 present for the meeting, and I don't recall.

19 Q.   All right.  Do you recall somebody from the U.S.

20 Attorney's Office speaking?

21 A.   Yes.

22 Q.   Do you recall them saying something about how the U.S.

23 Attorney's Office, the Department of Justice, would handle

24 cases of violations on the refuge?

25 A.   I heard him state how he handled things or perceived how

1    things were handled at the court district.  I didn't hear if

2    that was an official policy.

3    Q.    What did you hear him say?

4    A.    I believe he made statements along the lines that, if

5    there were violations that occurred with No More Deaths on the

6    U.S. Fish and Wildlife Service lands, that if they came to

7    court, he would hold them accountable to not or commit to not

8    violate again, and then the case would be dismissed.

9    Q.    I'm going to show you what's been marked as Exhibit

10   139-1.  Does this look like a briefing report that you

11   prepared?

12   A.    It does.

13   Q.    Is that, in fact, what this is?

14   A.    It is.

15   Q.    All right.  And I'm going to turn to the second page.

16         Well, some of this is in black font.  Some of this is in

17   red font.  Is that you who did that?

18   A.    I believe it is, yes.

19   Q.    What does that mean, the red font and black font?

20   A.    The black font are notes and statements taken from the

21   meeting.  The red font, I believe, are courses of action that

22   might be helpful to the Government, so the recommendations that

23   I had.

24   Q.    Okay.  And does here on page two, under subheading F,

25   does this have -- do I understand that to be your description

 1  of what you're hearing or your interpretation of what you're

 2  hearing?

 3  A.   That would be my opinion on what I perceived from the

 4  conversation that was on the conference call.

 5  Q.   All right.  And there you write that DOJ does not appear

 6  to want to prosecute violations regarding this group.  Is that

 7  right?

 8  A.   Yes, that's correct.

 9  Q.   Okay.  There's another section here on page one, under

10  the Roman Numeral I, you have listed the manner in which these

11  tickets are handled.

12       Do I understand that right?

13  A.   That was information taken from the statements of the

14  Department of Justice representative on -- his take on how

15  things were handled.  I don't know the official policy of the

16  Department of Justice.

17  Q.   Okay.  So the way he was doing it, if I'm reading this

18  right, "Tickets issued are dismissed/not prosecuted if the

19  person shows up to court (DOJ has them commit to not violate

20  again)."

21  A.   Yes, that's the statements I heard him make.

22  Q.   Got it.  In the conclusion of the meeting, turning to

23  page two, in the red font, it looks like, "No More Deaths has

24  expressed a common goal of working with the Government to save

25  lives."

1          Is that your understanding of the meeting?

2    A.   Yes.  It was generally a cordial conference call, and

3    that's the information I put in there.

4              MR. FIDEL:  Okay.  I would move to admit this

5    exhibit, Your Honor.

6              MR. WALTERS:  No objection, Your Honor.

7              THE COURT:  It'll be admitted.

8              MR. FIDEL:  Thank you.  No further questions.

9              THE WITNESS:  Thank you.

10                        CROSS-EXAMINATION

11   BY MR. WALTERS:

12   Q.   Mr. Aitken, you were not at Cabeza Prieta the day of this

13   offense; correct?

14   A.   I was not.

15   Q.   So you were not there on August 13th, 2017?

16   A.   I was not.

17   Q.   You have no personal or firsthand knowledge regarding the

18   charges that these defendants are charged with; correct?

19   A.   I do not.

20   Q.   Let's talk about this meeting.  After that meeting

21   happened back in, I believe, July of 2017, did you -- you

22   never followed up with any AUSA about that meeting; correct?

23   A.   I did not.

24   Q.   You didn't follow up with any member from the U.S.

25   Attorney's Office; correct?

1  A.   I did not.

2  Q.   You didn't follow up with emails or follow up in any way

3  with No More Deaths?

4  A.   I did not.

5  Q.   So is it fair to say, then, that had there been emails

6  between the U.S. Attorney's Office and No More Deaths, that

7  was not something that you were privy to?

8  A.   I was not.

9  Q.   Okay.  During this meeting, did you ever hear anybody

10  from the U.S. Attorney's office specifically state that No

11  More Deaths had permission to drive in a wilderness area?

12  A.   I did not.

13  Q.   Did you ever hear anybody from the U.S. Attorney's Office

14  say that No More Deaths had permission to go onto a refuge

15  without a permit?

16  A.   I did not.

17  Q.   Did you ever hear anybody from the U.S. Attorney's Office

18  say that No More Deaths had permission to abandon property on

19  a national wildlife refuge?

20  A.   I did not.

21  Q.   Did you ever hear anybody from the Department of Interior

22  say that No More Deaths had any authority to do any of those

23  things?

24  A.   I did not.

25  Q.   With regard to those things, did any person from the U.S.

 1  Attorney's Office say that any of those actions were legal

 2  under federal law?

 3  A.    No.

 4  Q.    Did anybody from the Department of Interior say that

 5  those actions were legal under federal law?

 6  A.    No.

 7  Q.    After that July meeting, you never clarified with any

 8  member from the U.S. Attorney's Office, again, by email, phone

 9  call, or otherwise; correct?

10  A.    No.

11  Q.    Did you ever have a face-to-face meeting about that

12  meeting with any member of the U.S. Attorney's Office?

13  A.    No.

14         MR. WALTERS:  Can I have a minute, Your Honor?

15         THE COURT:  Yeah.

16         MR. WALTERS:  Couple more questions.

17  BY MR. WALTERS:

18  Q.    At that July meeting, did you ever hear any

19  representative of No More Deaths say they were not going to

20  get permits?

21  A.    I don't recall that, no.

22  Q.    Do you recall any member of No More Deaths saying,

23  regardless of permissions or not, they were going to drive in

24  a wilderness area?

25  A.    I believe the statement I heard was that saving lives was

1    going to be permissible regardless of the legal ramifications.

2    Q.   So whether they had permission, they were going to do it

3    anyway?

4    A.   That's what I took from the meeting, yes.

5             MR. WALTERS:  I have no further questions, Your

6    Honor.

7                      REDIRECT EXAMINATION

8    BY MR. FIDEL:

9    Q.   Officer Aitken, looking at Exhibit 139-1, Mr. Walters

10   asked you if anyone from No More Deaths stated they, I

11   forget, would or would not apply for a permit.

12        Do you recall that?

13   A.   I don't recall those specific words at that specific time.

14   Q.   Some question to that -- some question to that effect

15   from Mr. Walters.

16        Do you recall that?

17   A.   On the legality of what they would and would not do, yes,

18   I have.

19   Q.   Yeah.  And do you recall that No More Deaths advised

20   that, as you document here on your report, they have no

21   ability to apply for permits to do humanitarian aid?

22   A.   That was their assertion, yes.  No More Deaths made that

23   statement.

24   Q.   And when you take these notes, when you prepared this --

25   what do I call it this?  Briefing report?

1   A.   I believe it's a briefing paper.

2   Q.   This briefing paper, are you taking notes during the

3   conference call?

4   A.   Yes.  I usually take notes during conference calls.

5   Q.   And then you prepared the report -- the briefing paper

6   based on the report?

7   A.   From the report and from the stuff in my memory.

8   Q.   Sure.  And who gets this report?

9   A.   This was sent up to the Division of Refuge Law Enforcement

10  Regional Chief Joseph Mojica, who is my direct supervisor.

11  Q.   And does it go up the chain, so to speak, from there?

12  A.   I'm not sure where it goes after it goes to his office.

13  Q.   At any rate, I take it when you prepare this report, your

14  objective is for it to be accurate and relied upon by others?

15  A.   Yes, for the briefing paper.

16  Q.   And did you review the briefing paper and ensure that it

17  was accurate to the best of your memory before you sent it up

18  to your supervisor?

19  A.   Yes.

20  Q.   And so the way you have described things in this report,

21  is that your best recollection of them as documented at the

22  time?

23  A.   Yes.

24  Q.   And I take it you prepared this shortly after the meeting

25  actually took place, the conference call?

1    A.    I believe so, but I'm not certain.

2    Q.    Okay.  Is this dated?  Is it your practice to date these

3    papers?

4    A.    This one has the date of July 6th, 2017, which I believe

5    was the date of the conference call.

6    Q.    Do you know if you prepared it the same day?

7    A.    I do not.  If there is an email chain, it possibly has a

8    date on that.

9              MR. FIDEL:  Okay.  Judge, this exhibit has been

10   admitted.  Can we publish it?

11             THE COURT:  Sure.  What's the number?

12             MR. FIDEL:  139-1.

13   BY MR. FIDEL:

14   Q.    As part of this meeting, No More Deaths informed the

15   Government that it had no agenda other than humanitarian aid

16   work and that they were not political; right?

17   A.    That was their assertion, yes.

18   Q.    And their objective here was to work cooperatively with

19   the Government to establish some kind of working relationship?

20   A.    That was their assertion, yes.

21   Q.    And I think you testified that the attitude was cordial

22   during the meeting.  Was it cordial, did it appear to be

23   cordial, at the conclusion of the meeting as well?

24   A.    The entire meeting, that would have been cordial.

25   Q.    Was there a commitment to further discussion?

1  A.   I didn't hear any concrete commitments to do anything.

2  Q.   Okay.  I see in your notes, the red part -- oh, here it

3  is.  At the bottom of page one, is this your recommendation

4  for future face-to-face meetings?

5  A.   This is a possible course of action that might be

6  beneficial, so I included that in what is there under my

7  general observations and possible action items for the future.

8  Q.   That's -- so this is, like, your perception of what might

9  be a good idea?

10  A.   Yeah, my opinion, perception.

11  Q.   Okay.  And the next issue down is a review of the permit

12  process; is that right?

13  A.   Review of the permit -- yes, sir.

14          MR. FIDEL:  Okay.  That's all.

15          THE COURT:  Is there anything about this -- is

16  this -- how would you characterize this briefing paper?  Is it

17  for your information to your boss?

18          THE WITNESS:  It was.  My boss was unable to

19  attend, so he --

20          THE COURT:  Is it an action memo, this is what

21  happened and this is what I recommend?

22          THE WITNESS:  Yes.  It would be a one-page briefing.

23          THE COURT:  And did you ever get a response?

24          THE WITNESS:  I don't recall ever receiving a

25  response, no, after I sent it up.

```
 1              THE COURT:  So you said something to your boss, and

 2   your boss ignored you?

 3              THE WITNESS:  On those particular items, I don't

 4   know if it was ignored.  I have -- I have no knowledge where

 5   it was passed up to or who --

 6              THE COURT:  You didn't get anything back saying,

 7   from now on this is what we're going to do?

 8              THE WITNESS:  No, sir.

 9              THE COURT:  From now on this is what's acceptable?

10              THE WITNESS:  No, sir.

11              THE COURT:  So you just sent some information up to

12   your boss, and it says, we should have more meetings?

13              THE WITNESS:  I said that's one possible action that

14   I could see that might be beneficial, and what they did with

15   that information, I don't know.

16              THE COURT:  You never heard back?

17              THE WITNESS:  No, sir.

18              THE COURT:  So nothing came of the meeting?

19              THE WITNESS:  Not to my knowledge.

20              THE COURT:  All right.  If there's nothing further,

21   you may step down.

22              MR. FIDEL:  Nothing further.

23              MR. WALTERS:  (Shaking head.)

24              MR. DUPONT:  May I suggest a lunch break, Your

25   Honor?
```

1          THE COURT:  All right.  I have -- I have a meeting.

2   We'll start at 1:20.  I have a meeting about what we're going

3   to do without a budget.

4          (Off the record.)

5          THE COURT:  You may proceed.

6          MR. DUPONT:  Thank you, Your Honor.  Ed McCullough

7   is coming to the witness stand.

8          THE CLERK:  If you'd raise your right hand, please.

9              EDGAR McCULLOUGH, WITNESS, SWORN

10                  DIRECT EXAMINATION

11  BY MR. DUPONT:

12  Q.   Good afternoon.

13  A.   Hi there.

14  Q.   Can you please introduce yourself to the Court.

15  A.   My name is Ed McCullough.

16  Q.   And could you talk to us a little bit about your

17  professional experience and the education you had leading up

18  to that profession.

19  A.   I received my Ph.D. in geology from the University of

20  Arizona, 1964.  I was on the -- and then went on to the faculty,

21  and I went up through the -- through the ranks.  I was an

22  instructor and assistant professor, associate professor, and

23  then I became a department head in 1970 of the geology

24  department.  And then in 1982 I was appointed dean of the

25  faculty of science.  And then I retired in 1994.  No, 2000 --

1  no, yeah, 1994.  It's been a long time.

2  Q.   And as part of geology, are you familiar with mapping?

3  Do you make maps?  Can you talk a little bit about that?

4  A.   The specific area of geology that I was in required

5  working in the outdoors and doing mapping, and you're

6  completely dependent on the maps if you're going to collect

7  that information because you need to show where particular rock

8  formations and various properties of the rocks are, and they

9  need to be -- need to be shown on the map.

10      And many places where we didn't have maps or the details

11  were not enough, we actually made -- constructed our own maps

12  using what's called the plane table method of mapping.

13  Q.   I imagine mapping techniques changed between 1980s and

14  the present time.

15  A.   It's night and day.  I had a guy come out to survey my

16  property.  He drove out in a car, set up a unit, and in two

17  hours he had mapped my whole property, including contour

18  lines, and it would have taken me weeks to do that and a

19  half-dozen people working with me.

20      The GPS, the development of the GPSs, I could have been

21  twice as productive as a geologist if we'd had a GPS, because

22  half the time I was out there, I didn't know where I was.

23  Q.   Well, I'm glad you found your way here.

24      As technology advanced, did you advance with it?  Did you

25  learn GPS and mapping --

1   A.   I moved along with using the new instruments.  I did not

2   move along with the -- all the changes in surveying.  Those are

3   quite sophisticated now, and I didn't really need to know that

4   sort of thing.  I needed the basic instruments that you need to

5   use to find out where you are and keep from getting lost.

6   Q.   And you're familiar with how to use GPS and do you have

7   GPS software?

8   A.   Yes.  I have -- on my computer I have the software that I

9   need to do what I'm doing.  I've got a half-dozen GP units of

10  my own, and I'm in the Tucson Samaritans, and I've been in

11  charge of obtaining and instructing people on the use of the

12  GPS.

13  Q.   And GP units, what are those?

14  A.   I'm sorry?

15  Q.   What is a GP unit?  You said you've got six GP units.

16  A.   Oh, it's a hand-held, the hand-held GPS, Garmin, which I

17  think most people are familiar with.  300 -- you can get them

18  now for $300 or so, and that has everything.  It does

19  everything that you need to do in terms of what we do.

20  Q.   When you retired in 1994, did you continue with a

21  professional career, or did you devote more time to volunteer

22  work?  What have you been doing?

23  A.   I actually thought that I would do consulting, and I had a

24  couple bad experiences, so after a year I got out of that.  I

25  won't tell you what the bad experiences were.  But then we

 1  started volunteering with the Tucson Samaritans, and it turns

 2  out that developed into pretty much a full-time job for a

 3  number of years.

 4  Q.    What is Tucson Samaritans?

 5  A.    It's a humanitarian group.  It works out of the Southside

 6  Presbyterian Church.

 7  Q.    Where John Fife --

 8  A.    I'm sorry?

 9  Q.    Where John Fife was the minister?

10  A.    Yes, where John Fife was the minister.

11        And the mission of the Samaritans is to relieve pain and

12  suffering and prevent deaths in the desert, and --

13  Q.    And how long has Tucson Samaritans been operating?

14  A.    Well, the first group -- well, when we started having

15  deaths, deaths in the desert.

16        And we don't report deaths.  We report recovered human

17  remains, because what you do is you find a body.  One of the

18  things that's done, people believe that we find everybody that

19  dies, and that's not true.  We may not find more than one in

20  ten.  So we can't talk about the total number of deaths, but

21  what we can do is talk about the recovered human remains.

22        But there's starting to be more and more of those.  The

23  number of those increased exponentially essentially for a few

24  years, and the group of humanitarian people in Tucson,

25  including John Fife, put together the Humane Borders, and

1  Humane Borders was a group that -- they took a look at why the

2  deaths were occurring, and the obvious thing that causes most

3  of the deaths is lack of water.

4      And so they thought that they would put water in the

5  desert, and they were putting 55-gallon drums out, but there

6  were limitations on that in that, if you have a 55-gallon drum

7  of water, it's very heavy.  You gotta have a heavy truck.  So

8  it limited the places that you could go.

9      And in 2002, the same group of people decided we needed to

10 have more of a presence in the desert, and we formed the Tucson

11 Samaritans.  Tucson Samaritans go out every day.  Sometimes we

12 have two trips of two cars going out on a given day.  They

13 drive the roads in the general Arivaca area, and then they walk

14 short distances on the trails hunting for people.  And we hope

15 to find people before -- before they die.

16     Oh, and in 2004, the No More Deaths was formed.  It was

17 actually originally in the Tucson Samaritans, and they split

18 off two or three years after they formed.

19 Q.   Why did you need another organization like No More

20 Deaths?

21 A.   The deaths kept going up, and it was decided what we

22 really needed was a 24/7 presence in the desert, and so No More

23 Deaths was set up, had a permanent camp down east of Arivaca,

24 and we actually stayed in that camp, and we could walk from the

25 camp.  The camp that was established was on one of the main

1  corridors of trails, so you could walk right from the camp to

2  the trails and hunt for people who needed help.

3  Q.   And my understanding is at some point the places where

4  there were more remains recovered were more remote areas, and

5  No More Deaths may have attracted younger people who were able

6  to access those areas?

7  A.   Well, the thing that attracted the younger people is that

8  walking the trails, you're doing 10 or 12 miles a day, and many

9  of the Samaritans are retired people, and they just can't

10 handle that kind of walking.  No More Deaths tends to be

11 much, much younger people, and they have the capability or the

12 stamina to walk the trails.

13 Q.   During -- during your work with the Samaritans, did you

14 begin to develop mapping systems for your work?

15 A.   Oh, the first -- I was down there the first week of the

16 first camp, and what we were doing was just getting out and

17 walking from the camp and finding the trail and walking the

18 trail and then coming back to camp at night, and we'd sit

19 around the campfire talking.

20      And one of the first things that became apparent was,

21 people would go out, and they'd wander until they'd find a

22 trail and then walk it, and they'd get back, and they couldn't

23 tell -- tell us -- couldn't really tell us where they'd been,

24 and not only that, when we would attempt in some cases to go

25 back where they'd been, we were unable do it.

1        So it became apparent to me that what you really needed

2   was a map, and so that was the -- that summer was the

3   initiation of the mapping program, and the -- the mapping

4   program was developed to meet these needs, that we need to be

5   able to tell -- to tell other people where -- where the trails

6   were.

7        And then, as we extended the network of trails, we needed

8   to make sure our people didn't go out and get lost.  One of my

9   biggest fears was people going out and dying, themselves dying

10  in the desert because they just weren't able to get back.

11       This is a -- this is an area with lots of ranches, very

12  few residences, and you can go all day and never see anybody,

13  so it would be plausible to get lost and actually have a

14  serious situation.

15  Q.   All day without seeing any ranches or other sources of

16  water?

17  A.   I'm sorry?

18  Q.   You could go all day even without seeing any sources of

19  water?

20  A.   Yeah, if you're right there in the dry period, you can go

21  long distances without seeing water.

22  Q.   Can we show the witness Exhibit 190.

23       Is it on your screen, Dr. McCullough?

24  A.   Yes.

25  Q.   Can you tell the Court what this is.  I'm going to go

1    through all three pages.

2    A.   This is the trail system as we know it.  The green lines

3    are trails.  The black lines are roads.  There are blue lines

4    on here somewhere that represent the drainage areas.

5    Q.   Did you -- were you responsible for putting together

6    these maps?

7    A.   Just -- just the green, the green part.  The base map was

8    a map that National Geographic was using, and they have a

9    mapping program called Topo which they've sold and is no longer

10   available, but it allows you to walk a trail with a GPS unit

11   and record that trail, and then, when you get home at night,

12   you download it into the computer, and it leaves a line, a line

13   of any color.  I just happened to pick green.

14        And so each one of those green lines represents a trail.

15   That's the status of the trail today.  We haven't finished the

16   mapping.  I'm not even sure we're halfway done.  By finishing

17   the mapping, that would mean extending all the trails to

18   Mexico, because that's where they're all coming from.

19   Q.   And so you're charting GPS points along trails and then

20   uploading the data to this program?

21   A.   Right.  They actually -- you've got waypoints that you use

22   that you can actually mark a --

23   Q.   Can I just ask if this, these maps in 190, are they

24   accurately reflecting the work you've done and the trails

25   you've created?  This program is accurate?

1    A.   Yes, yeah.

2            MR. DUPONT:   Okay.  We'll ask for admission of

3    Exhibit 190.

4            MS. WRIGHT:   Your Honor, we object.  There are

5    foundation issues here as to the testimony of who recorded all

6    of this information on this map and how it was inputted.

7            THE COURT:   It'll be admitted.

8    BY MR. DUPONT:

9    Q.   Okay.  You were saying about the waypoints -- or

10   actually, let's just talk about these maps, because I'm

11   curious about the red lines now too.

12   A.   Well, the --

13           MR. DUPONT:   Oh, can we publish?  I'm sorry.

14           THE COURT:   Sure.

15           MR. DUPONT:   Thank you, Your Honor.

16   BY MR. DUPONT:

17   Q.   Okay.  I'm sorry, sir.

18   A.   It was apparent early on that the deaths were taking place

19   because of the lack of water, and we -- the Humane Border --

20   Humane Border problem was that they had 55-gallon tanks, and

21   they couldn't put them very -- very many places, so we thought

22   we'd put gallon jugs of water out.

23        And to ensure that we hit as many -- made the water

24   available to as many migrants as possible, what we wanted to do

25   was to locate the places on the trails where the migrants were

1  walking.

2       Those red lines, that's a -- there was a road that went --

3  the trails, as you can see, go north-east, south-west, and

4  these red lines go essentially east-west.  And those are roads

5  that cross the trail.  So every place that the road crossed a

6  trail, we would use the GPS and make a waypoint and just record

7  the location of that point.  And we'd -- as you can see from

8  the red lines, we've got water drops on -- someplace on all the

9  -- all the trails, and some places we have several sets.

10       In the lower -- in that southwest quarter, that's Buenos

11 Aires National Monument Wildlife Refuge, and they don't allow

12 the Samaritans -- they don't allow anyone to leave water on

13 that, so we don't have any, we don't have any marked water

14 drops on that southwest portion.

15 Q.   Where do you see the markings for the water drops?  Are

16 they on this map?

17 A.   They're -- wherever a red line crosses a trail is a water

18 drop.

19 Q.   Oh, I see.  And what's that red flag there?

20 A.   Oh, that's the No More Deaths.  That was the first -- that

21 was the place we set up the first camp, and you can see that

22 it's just adjacent to that whole set of -- that corridor of

23 trails.

24 Q.   And this is the area around Arivaca?

25 A.   Yes.  We work in that area from just west -- just east of

```
1  Nogales to the -- going west to the Tohono O'odham boundary and
2  north to Tucson, about 40 miles by 60 miles.  2400 square
3  miles.
4  Q.   And how many miles are marked here?
5  A.   It's about 2,000.  2,000 miles of trails.
6  Q.   Just in the Arivaca area?
7  A.   Yes.
8           MR. DUPONT:  I'm going to change out now.
9  BY MR. DUPONT:
10 Q.   So we started to talk about the water drops, and I put up
11 here Exhibit 191.  Do you see that?
12 A.   Yes.
13 Q.   And what are these pages about?
14 A.   Could you back up to the previous?
15 Q.   Yes, sir.  We're on page one now.
16 A.   Oh, there was one on there before this.
17 Q.   Any of these?
18 A.   It's -- that.  That.  That shows everything, and then all
19 those others are the same thing, but this shows it better, I
20 think.
21      If you're going to put water out, you really want to put
22 it in a place where it's going to get used and where it's
23 needed, and so we've put together a program that we think
24 enables us to do that.
25 Q.   And in the -- is this program -- you developed this?
```

1   A.   Yes.

2   Q.   And is this the same program they're using in No More

3   Deaths now?

4   A.   I'm not really sure.  It started out that way, but they've

5   pretty much gone their own way on this.  I know they have water

6   drops, but I'm not sure how they collect data.

7   Q.   But this is the model they used --

8   A.   Yes.

9   Q.   -- then and to begin, and as far as you know --

10  A.   Yeah, I suspect that they do something similar to this.

11           MR. DUPONT:  All right.  I'd ask for admission of

12  191, Your Honor.

13           MS. WRIGHT:  Objection, Your Honor.  He just

14  testified he doesn't know if this is what's being presently

15  used.

16           THE COURT:  Sustained.

17  BY MR. DUPONT:

18  Q.   Can you talk about the system that was developed for use

19  and that No More Deaths originally adopted.

20  A.   Yes.

21           MS. WRIGHT:  Objection, Your Honor.  Relevance.

22  What they used in the past is not relevant to the matters in

23  this case.

24           MR. DUPONT:  Your Honor, conditional relevance.

25  We're going to tie it up with our clients later.  There is

 1  no -- there is no reason to keep objecting like this.  This

 2  should all come in.  Your Honor, I'm not doing anything novel.

 3  Our people use this method.  We know they do already.

 4          THE COURT:  Sure.  Let's hear it.

 5          MR. DUPONT:  Can we just get this admitted now too,

 6  Your Honor?

 7          THE COURT:  No, no.  I'll let him talk, but -- let

 8  him tell me what he wants.

 9          MR. DUPONT:  Yes, sir.

10  BY MR. DUPONT:

11  Q.   So can you talk about what you're doing to get water to

12  the people who are dying, the people who need it.

13  A.   They --

14  Q.   Just talk to us.

15  A.   You need -- you need some -- to do this, you need some

16  evidence that people are coming across, and we collect what

17  we're calling artifacts.  This is material that's dropped by

18  the migrants on their way from the south to the north, and the

19  presence of those artifacts, empty water jugs, tuna cans, items

20  of clothing and so forth, indicate that they've been through

21  there, and the concentration of those are an indication of the

22  quantity or the number of people there going on those -- on

23  those trails.

24          And at each water drop, we -- the Samaritans go out once

25  -- once a week or try to go out once a week to each of the

1   water drops, and they'll put -- they get to the water drop, and

2   there will be a number of water jugs there, and we know how

3   many jugs are left in the previous week, so if you left 10 and

4   there are five, five of them are being -- have been used.

5        And the problem, of course, is how are they being

6   used, and are they being used by migrants?  Are they being

7   picked up by Border Patrol and carried away?  We have a lot of

8   vandalism.  We lose about 15 to 20 percent of the water we drop

9   to vandalism, slashing the jugs and so forth.  There is also

10  damage by animals.  The birds that have learned to peck these

11  things to get water was another 10 percent or so.  So about 70

12  percent of the water we put out we think is being used by

13  somebody.

14       The evidence that we have that it's being used by the

15  migrants is that we will find empty bottles that they've

16  carried that are filled with water from cattle tanks.  You can

17  tell -- it's brown and greenish, and that's what -- that's what

18  they've been drinking when the cattle tanks are full, and

19  that's generally during the monsoon season.  Once the monsoon

20  season passes, they dry right up.

21       But we find their bottles with the water in it at the --

22  at our water drops, indicating to us they came in with dirty

23  water, left that water, and took our water away.

24  Q.   Is that dangerous, to drink that dirty water?

25  A.   Oh, it's devastating.

1              MS. WRIGHT:  Objection to foundation, Your Honor.

2              THE COURT:  Overruled.

3    BY MR. DUPONT:

4    A.   It's devastating.  It creates all sorts of intestinal

5    problems, diarrhea, and there's cryptosporidium and all those

6    organisms in that water.

7    Q.   So you don't want to --

8    A.   No, you don't want to --

9    Q.   -- drink the animal's water.

10   A.   You don't want to drink it.

11            But then one of the things that we do, when we drop a

12   jug, we write the date and the location of that jug on it, and

13   we'll be walking trails that are north of our water drops, and

14   we will find empty bottles, and since they have a label on it

15   that tells us where it came from and the date, we're assuming

16   that that was used by the migrants.

17            If I were a migrant, and I were walking along and I found

18   a pile of water, I might well be suspicious that there was

19   someone there watching that pile, so I'd pick the jug up and

20   carry it a mile or so and then use it.  And that's what we

21   find.  A mile or so north of these water drops we'll find the

22   jugs, and they will have the date on it, so we know where it

23   came from, and we know the approximate time that it was

24   dropped.

25            So that's the indication to us that the water we're

1    putting out there is being used.

2    Q.   So you monitor it in this way, and how do you chart it?

3    A.   That's what this -- that's what this item is.  This is a

4    -- well, this is a summary of what we did, in this case,

5    between January 2018 to June 2018.  And this is -- we have the

6    waypoint on the far left.  The waypoint, that's where the water

7    is left.

8    Q.   And that's a place you can go back and find again with

9    your GPS unit?

10   A.   Yes, yeah.  And the efficiency is -- our intent is to get

11   out to every waypoint, every week.  We don't -- we just don't

12   have enough people to do that.  The efficiency is a measure of

13   how close we are to that.  And then the quantity of water

14   indicates, for that period of time, on those waypoints, we put

15   out 308 gallons.  The usage was 140 gallons.

16   Q.   And that's presumably used by human beings, excluding the

17   other?

18   A.   Yeah.  Yes.  They might have been carried away by someone

19   other than the migrants.  There's just no way for us to tell.

20   Q.   But human beings?

21   A.   Yeah, by human beings.

22   Q.   Got it.

23   A.   And inadequate supply, what we do is, if we go into a

24   water drop and there's no water there, that means that, when

25   the migrant comes into that place, there is not any water for

1    him, so we say there is an inadequate supply of water, and this

2    is a measure of how many times that happened during that period

3    of time.

4         And the vandalism indicates how many jugs were slashed or

5    holes punched in the bottom.  And then the animal -- and we

6    also keep track of how many empties were picked up at each of

7    the sites.  I think an empty is a sign that a migrant has used

8    it.  Most of our experience is that Border Patrol or hunters or

9    something will slash the jugs instead of just pouring the water

10   out.

11        And then the last column is the -- is an indication of how

12   many times that you get to a water drop and there was the same

13   amount of water there that was there the previous week, so no

14   water had been used during that period of time.

15   Q.   So once you've collected data and charted it and analyzed

16   it, what do you do with the analysis, the information that

17   you --

18   A.   Well, we've got all those, all those trails, and there are

19   actually too many trails and not enough people to do -- to do

20   as much hiking and so forth as we would like.  What this allows

21   us to do is to tell where -- where the usage is.  If you've got

22   high usage, that indicates to us that you've had a lot of

23   migrants coming through that area, so that ought to be a top

24   priority.

25        If you've got an area that's very low usage, then you

```
 1   would put that -- move that down toward the bottom in terms of

 2   priorities.  If we had enough people and stuff, we'd do every

 3   one of these every week.

 4   Q.   So you've been walking these trails since '94?

 5   A.   No.  I didn't start with the Samaritans until about 2002.

 6   Q.   Oh, 2002.

 7   A.   I --

 8   Q.   16 years.

 9   A.   Well, yeah.  I worked with Bosnian refugees before that.

10   Q.   And during these 16 years, you've seen paths develop and

11   not develop.  Where -- do these paths develop on flat land?

12   Contoured land?

13   A.   This whole area is mountainous, and one of the reasons

14   that the Government was reluctant to put border walls and

15   resources into it was they said that the mountains would deter

16   anyone from coming through.

17          MS. WRIGHT:  Objection.  Foundation, speculation,

18   and nonresponsive, Your Honor.

19          THE COURT:  Sustained on foundation.

20   BY MR. DUPONT:

21   Q.   So without talking about the Government policies --

22   A.   Uh-huh.

23   Q.   -- your observations about where --

24   A.   It's all mountains.

25   Q.   So are -- so you'd find a trail in a valley, but not on
```

1  the mountain, the flat --

2  A.    If you look at that map, those lines are straight.  They

3  were straight as they can be.  They're headed for Tucson, and

4  they go over the mountains and down the other side.  They don't

5  -- there are a couple of places they go around the

6  mountains, but in -- essentially it's a straight line.  They

7  just go straight from the Mexican border toward Tucson and the

8  Avra Valley.

9  Q.    Okay.  Well, hopefully they're going straighter than my

10 questions, because I'm not.

11       Do paths form on flat ground?  Do they form where there's

12 a channel?  Do you know what I mean?

13 A.    Well, there are paths on flat ground.  Then you have

14 pastures and meadows there, and the trails cross those.

15 Q.    Okay.

16 A.    There are problems with the pastures since you've got cows

17 on it, and the cows walking out would destroy the trail, so

18 you're following a trail, you get to a pasture, you've got to

19 walk completely around the pasture to find out where it comes

20 out the other side.  But you've got a trail on both sides, so

21 they're obviously walking across the pasture.

22       They -- in going over the mountains, they go over the

23 passes, which is what you would expect.

24 Q.    Okay.  When --

25 A.    When they go up the streams, in general, they don't go up

 1   the stream bottoms because it's full of debris, big rocks and

 2   stuff, and also during the rainy season, they're full of water,

 3   so the trails tend to be up on the side, 10-15 feet above the

 4   bottom of the water course.

 5   Q.    And you've seen these paths either develop into bigger

 6   roads or disappear altogether during your 16 years?

 7              MS. WRIGHT:  Objection.  Leading, Your Honor.

 8              MR. DUPONT:  It's foundational question, Your Honor.

 9              THE COURT:  Sure.

10   BY MR. DUPONT:

11   Q.    Do you know what I'm asking about now?

12   A.    I can give one example.  I was -- I mapped this trail, and

13   it went up a hillside in a fairly straight line, and someone

14   started driving ATVs up that trail, and then they started

15   driving other vehicles.  And that trail is now a road.  It was

16   not created by the migrants, I don't think, but it was created

17   by people.

18              MS. WRIGHT:  Objection.  Speculation, Your Honor.

19              THE COURT:  Overruled.

20   BY MR. DUPONT:

21   A.    The road -- the road is there.  It started out as a trail

22   and has now become a road, and I saw ATV tracks and road

23   tracks, so that's obvious what -- obviously what caused the

24   road.

25   Q.    And when there's only a walking path, what happens during

 1  monsoon?

 2  A.   Well, over the course of it, they become water courses.

 3  The water will run along them.

 4       I guess maybe I don't understand.

 5  Q.   We had talked before about whether they grow over.

 6  A.   Oh, yeah.  During the monsoon season, even the roads down

 7  there get covered with grass.  The grass just comes out

 8  incredibly.  And at times I've had real problems navigating the

 9  roads because of the cover, but once the rain stops and dries

10  out, then the roads are apparent.

11       Same thing for trails.  But on the trails, it's dependent

12  on the usage.  So if you've got a high-usage trail, it becomes

13  more apparent after the monsoon season than some of the other

14  trails.

15  Q.   Have you run into any migrants in that area?

16  A.   Hundreds of them.

17  Q.   Have you ever run into anyone carrying packs or smuggling

18  drugs?

19  A.   No.  The closest thing was I did find a backpack full of

20  plastic pouches, but I reported it to the Border Patrol.

21  Q.   What are the condition of the migrants you've

22  encountered?

23            MS. WRIGHT:  Objection.  Relevance, Your Honor.

24  This testimony has all been about an area that is not on the

25  Cabeza, Your Honor.

1              THE COURT:  I understand that.  Sustained.

2              MR. DUPONT:  Your Honor, may I respond, or have you

3    decided for good?

4              THE COURT:  Well, part of my job is to listen.  Part

5    of my job is to listen.  What do you want him to -- what are

6    you going to tell me to answer that question?

7              Do you ever find people in distress out there?

8              THE WITNESS:  Oh, yes, all the time.  I think maybe

9    I guess, I don't know, 30 percent of the people that I've

10   found were in what I would call distress, and in some cases,

11   as soon as I see them, we immediately call 911 to get help.

12   BY MR. DUPONT:

13   Q.   Let me put up Exhibit 192 for the witness.  I'm going to

14   kind of go through these and ask you, are you collecting the

15   data from the same -- the Medical Examiner's data that's going

16   out to Humane Borders?

17   A.   Yes.  If could you back up to that first one, the next

18   one, yeah, this one --

19   Q.   Before you go, I'd like to see if I can get it admitted.

20   A.   Oh.

21   Q.   So are you collecting the data from --

22   A.   Yeah, this -- every month I get a report from the Pima

23   County Coroner's Office that tells me how many -- they assign a

24   case number, and then we have the date that the human remains

25   were found and then the coordinate, the coordinates of the

1    location, latitude and longitude.

2    Q.   The GPS locations?

3    A.   Yes, uh-huh.  GPS is based upon latitude.  Well, GPS can

4    use the latitude/longitude.

5    Q.   That's the same data that's being inputted into that

6    interactive map by Humane Borders?

7    A.   Humane Borders, yes.

8    Q.   And the Medical Examiner's Office?

9    A.   I think all that data comes from the -- all the data we

10   use comes from the Medical Examiner's Office.

11   Q.   And then you're just putting into your National

12   Geographic --

13   A.   Yeah, whatever they send us.  There are occasionally

14   corrections that they make, but we enter those when they come

15   in.

16   Q.   And this Exhibit 192 is an analysis of that data, both

17   has the data, some of the data points, and analysis and

18   mapping of that data; is that right?

19   A.   On this one, yes.

20            MR. DUPONT:  Move for admission of 192, Your Honor.

21            MS. WRIGHT:  Objection on foundation, Your Honor.

22            THE COURT:  Is this the Medical Examiner's report?

23            MR. DUPONT:  No, sir.  This is just the same

24   data, but this is actually the data, then, that he's going to

25   be sending to No More Deaths that they're using to -- so I'm

 1  not going to go over all that Medical Examiner stuff again.  I

 2  just want to get this stuff in and get you the data, the

 3  evidence, and how it gets to our clients.

 4          THE COURT:  Okay.  So you want to admit an exhibit

 5  that he gets from the Medical Examiner that he creates that he

 6  transmits to No More Deaths?

 7          MR. DUPONT:  Yes, sir, and the only difference --

 8          THE COURT:  It'll be admitted.

 9          MR. DUPONT:  Thank you.

10  BY MR. DUPONT:

11  Q.   So if we could talk about, then, on page two here, what

12  is that?

13  A.   This is a summary going back to 2010-2011 of what's

14  happened by month.  What we're interested in is that we want to

15  put water in the -- in the best areas, and one -- one guideline

16  that we're using is, if you have recovered human remains,

17  someone died there, and if you have human remains concentrated

18  in certain areas, that ought to be a high priority area for the

19  work that we're doing, either trail walking or leaving water.

20      So what happens, this data goes to -- goes out to the

21  whole membership, and it tells for any given month where all of

22  the deaths have taken place.  So that guides us in using the

23  other things that we have, guides us in to where we want to put

24  water and do hiking.

25  Q.   And so this page two is a chart showing when things are

DIRECT EXAMINATION OF EDGAR McCULLOUGH

1  happening?

2  A.   Right.

3  Q.   And this page three, four -- three and four?

4  A.   Yeah, that's copies of the Medical -- what comes from the

5  Medical Examiner.

6  Q.   So that might actually be if it was enough room on the

7  page?

8  A.   It's an Excel chart that comes.

9  Q.   So for example, the top line here that talks about male,

10  fully fleshed, from Mexico, and then this next part would be

11  the GPS coordinates?

12  A.   Those are the -- yeah, those are the latitude/longitudes.

13  Q.   And then you enter that data into your National

14  Geographic map?

15  A.   Each month we put a map together that shows the location

16  of all of the recovered human remains, and that goes out to the

17  -- to the membership, and then, at the end of the year, we do a

18  summary for the year.

19  Q.   And each month you're sending out information to No More

20  Deaths?

21  A.   I send it to -- and I've forgotten her name.

22  Q.   Catherine Gaffney?

23  A.   Yes.  And she sends it -- she sends it out and sends me a

24  copy of what she sends out.

25  Q.   And these other examples, like page six and page seven,

1   these are the maps you're creating?

2   A.    Yes.

3   Q.    And sending out?

4   A.    And we're interested in what's happening monthly, but

5   we're also interested in what's happening on a yearly basis.

6   In fact, the last few years, the major migration routes have

7   shifted over to the Organ Pipe area, and I think our maps

8   picked that up early on, indicating that more and more

9   migration was taking place over there, and we ought to put more

10  emphasis over there, which No More Deaths has done.

11          MR. DUPONT:  Did you take it off display?

12          Thank you, Sarah.

13  BY MR. DUPONT:

14  Q.    Sir, you may have Exhibit 157 in front of you.  Do you

15  see it?

16  A.    That's a letter from Catherine.

17  Q.    And is it a letter she's sending back to you?

18  A.    That's the copy.  Yeah, that's what I got from her.  I

19  think she sent it out.  Well, it tells who she sent it out to.

20  And she just sent me a copy of what she sent out.

21  Q.    Because you're part of the desert aid group or you're on

22  that distribution list?

23  A.    No, I worked with the -- I worked with No More Deaths and

24  the Samaritans until about 2010, and then there was plenty of

25  stuff to do in Samaritans, so -- and I dropped the work with

 1   the No More Deaths, other than this mapping, and I'm spending

 2   my time now with the Samaritans.

 3   Q.   So she sent you an email right back that you had just

 4   sent her?

 5   A.   Yeah, yes.

 6   Q.   And this is -- what's the date on this?

 7   A.   March 2, '17.  2017.

 8   Q.   What was the point of sending this to No More Deaths?

 9   A.   Just -- I just do it for information.  If it's something

10   that I think would be of interest to them, I send it.

11   Q.   And does this have mapping and analysis of where the

12   deaths are happening?

13   A.   The written part points out what I think are interesting

14   things and --

15   Q.   Before you read from it, sir --

16   A.   I'm sorry?

17   Q.   I don't mean to interrupt you, because we want to hear

18   this, but I need to get this admitted first.

19   A.   Oh, okay.

20   Q.   So you're informing them so they've got knowledge where

21   the trends are for where people are dying?

22   A.   Yeah, I'd like for them to know everything that I know.

23            MR. DUPONT:  Move for admission of Exhibit 157, Your

24   Honor.

25            MS. WRIGHT:  Objection, Your Honor.  Hearsay and

1   foundation, as well as relevance.

2           THE COURT:  You're trying to introduce an email he

3   received as opposed to one he sent?

4           MR. DUPONT:  Is it on your screen too, Your Honor?

5           THE COURT:  Well, it's on the screen, but I can't

6   read it.  What I'm asking you is --

7           MR. DUPONT:  Excuse me.  What happens, I think, to

8   summarize his testimony, is he creates this map and sends it

9   to No More Deaths.  Automatically they send it back to him,

10  whether it's to show that they've received it or because he's

11  part of just the distribution list that they've developed on

12  their own.

13          So he sent this to them, is what he's testified to,

14  and so now they've got the knowledge.  Whether it's the truth

15  of the matter --

16          THE COURT:  So you want to introduce it as a copy of

17  an email he sent them about trends.

18          MR. DUPONT:  Yes, for the effect on the listener.

19  We think we've also established the truth of the matter, that

20  the people are dying in all these places, but yes.

21          MS. WRIGHT:  And Your Honor, it's not clear to me

22  which listener this is.  This email lists Caitlin Deighan as

23  the sender, as well as Catherine Gaffney, but it doesn't list

24  any of the defendants as someone who received this

25  information.

1          MR. DUPONT:  We're asking for conditional admission,

2   Your Honor.

3          THE COURT:  It'll be admitted.

4          MR. DUPONT:  So if we could publish, please.

5   BY MR. DUPONT:

6   Q.   Can you tell us the -- what you're sending to them and

7   the reason why.

8   A.   Well, these are things that I thought were important, and

9   I noted at this time that -- that there were reports going out

10  that the number of deaths was falling, and this then indicated

11  to me that, if you look at the total number of RHRs over the

12  last eight years, that this was the time for the highest

13  number, indicating that something had happened, for some reason

14  the number of deaths was not decreasing but staying at about

15  the same.

16  Q.   But shifting?

17  A.   I'm sorry.

18  Q.   But it was shifting to another location?

19  A.   Yes.  The second sentence there points out that what we

20  were starting to see over just north of, well, through Organ

21  Pipe, up through the Growler Mountains -- and I called it a

22  trail of death, because it was a definite trail of these RHRs.

23  Q.   Numerous deaths in that?

24  A.   Numerous, yes.  And I also pointed out that, in the third

25  paragraph, is that there was a -- what looks like the beginning

 1   of such a trail along Avra Valley, on Highway 286 north of

 2   Sasabe.

 3       And what this thing does is it indicates to us trends and

 4   where we ought to start -- things that we ought to start

 5   looking at and places where we ought to expend more resources.

 6   Q.   And then to that, did you attach a map?

 7   A.   Yes.

 8   Q.   I'm going to bring up another exhibit.  And can you see

 9   Exhibit 158?

10   A.   I'm sorry?

11   Q.   Can you see Exhibit 158 in front of you?

12   A.   One?

13   Q.   You can kind of see up here where it says "Exhibit 158."

14   A.   Oh, up there.  Exhibit 158.  Yes, okay.

15   Q.   And what is this?

16   A.   This is a copy of the map that I sent to Catherine which

17   she then distributed.

18   Q.   And does that show more deaths on the west side of the

19   Growler Mountains?

20   A.   This was a map for just April, and in April there were two

21   deaths.  If you connect -- I hesitate to draw much conclusion

22   from two points.  You can draw a line through any two points.

23   But if you look at the data for the whole year, there are

24   dozens of other points that all align along this line between

25   those two.

1   Q.   Okay.  So this is just showing evidence from one month --

2   A.   Yeah.

3   Q.   -- that deaths are still happening on the west side of

4   the valley?

5   A.   And along the same path.

6           MR. DUPONT:  Move for admission of 158, Your Honor.

7           THE COURT:  It'll be admitted.

8           MR. DUPONT:  If I could go back, I might as well let

9   people see it, if we could publish just briefly.

10          THE COURT:  Certainly.

11          MR. DUPONT:  Okay.  Thank you.

12  BY MR. DUPONT:

13  Q.   Exhibit 159.  Can you tell us what this is.

14  A.   I think it's the same thing we talked about a minute ago.

15  Oh, this is the summary chart that we put out every month, and

16  I sent this -- the first sentence is, "Attached is the data for

17  RHR for June 2017."

18       That data is last entry in that last two columns, but it

19  includes all the data going back to 2010-2011.

20  Q.   And you're trying to warn them that the numbers are

21  higher even than in the past?

22  A.   Yes.  We look at it by the month, and this happens to be

23  the -- this was sent out in June, and so in July I had another

24  one going out that had July data on it.

25  Q.   Now, we're seeing that -- do you ever compare this data

1   to the data put out by Border Patrol on apprehensions?

2   A.   Yeah, yes.  In fact, the first few columns starting back

3   in 2010-2011, I was doing comparisons for the -- on the whole

4   border.  Then I started noticing that the -- that the Border

5   Patrol was reporting a certain number of deaths, and the number

6   of deaths that they were reporting was half the number of

7   bodies that the coroner had in his possession.

8        And then we -- I made a whole series of phone calls trying

9   to find out what was happening, and just recently, talking to

10  Hess, it appears that the --

11            MS. WRIGHT:  Objection.  Hearsay, Your Honor.

12            MR. DUPONT:  I'll move admission for Exhibit 159.

13  It does not contain that hearsay, Judge.

14            THE COURT:  Okay.  It'll be admitted.

15  BY MR. DUPONT:

16  Q.   And that last map you sent was on July 12th, 2017, sir?

17  A.   This one's July the 13th.

18  Q.   Oh, I meant that last one.  Let me pull up that last one.

19            THE COURT:  159 was data from June 17th.

20            MR. DUPONT:  Thank you, Your Honor.

21  BY MR. DUPONT:

22  Q.   Can you see Exhibit 156 in front of you?

23  A.   Yes.

24  Q.   What is this?

25  A.   That -- that was -- I sent the map that was -- that

 1  recorded the RHRs for June 2017.

 2  Q.   In the same way and sent it to the same person, Catherine

 3  Gaffney?

 4  A.   Yes.  What I do is that I have one map that shows the

 5  whole Tucson sector, and then, because it's hard to locate

 6  exactly where those are, I put a map together just for the area

 7  west of the Tohono O'odham Reservation so they can more

 8  accurately locate the positions of these RHRs for the Ajo Organ

 9  Pipe area.

10  Q.   And I guess you're aware that this is an area of interest

11  to No More Deaths?

12  A.   Yes.

13  Q.   That's why you sent this section to them?

14  A.   Yes.

15          MR. DUPONT:  All right.  Move for admission of 156,

16  Your Honor.

17          THE COURT:  Sure.  It'll be admitted.

18  BY MR. DUPONT:

19  Q.   And what do we know is happening in June of 2017?

20  A.   In the letter I say, notice the clump of six RHRs just

21  west of the Growler Mountains.  This is a continuation of the

22  RHRs on a trail of death.

23          MR. DUPONT:  I'm going to switch.

24          THE CLERK:  Moving on?

25  BY MR. DUPONT:

1   Q.   You see Exhibit 155?

2   A.   (No response.)

3   Q.   Dr. McCullough?

4   A.   I'm sorry?

5   Q.   You see Exhibit 155?

6   A.   Yes.

7   Q.   What is that?

8   A.   It says, "Attached are more detailed maps showing the

9   areas of concern."

10  Q.   Sent to the same person?

11  A.   Yes, uh-huh.  All my correspondence with No More Deaths is

12  through Catherine.

13  Q.   And I'm seeing the dates are generally available around

14  the middle of each month that you're sending these out.

15  A.   There have been times -- I get these either the first or

16  the second of the month, and I try to get them out right away.

17  Sometimes it's a little later than others.

18  Q.   What are we -- what are we learning from July 16th in

19  this data?

20          MR. DUPONT:  Excuse me.  I'm sorry.  I'm a little

21  frazzled.  Judge, admit 155, please?

22          THE COURT:  That's this email?

23          MR. DUPONT:  Yes, sir.

24          THE COURT:  Sure.

25          MR. DUPONT:  No more questions.

1          THE COURT:  For the record, I took a geology class

2   from the professor.

3          THE WITNESS:  What kind of grade did you get?

4          THE COURT:  If I remembered, I'd be asking you about

5   it.  I decided to become a lawyer though.

6                       CROSS-EXAMINATION

7   BY MS. WRIGHT:

8   Q.   Good afternoon, Mr. McCullough.  I'm Anna Wright.  I'm

9   one of the prosecutors in this case, and I have a few things I

10  want to ask you to make sure I understand your testimony.

11         So first, my understanding is that you are a member of

12  the Tucson Samaritans group; correct?

13  A.   Correct.

14  Q.   And that the information you've gathered is based on the

15  Tucson Samaritans' activities; correct?

16         And let be me more specific with you.

17  A.   It's information I provide to the Samaritans for their

18  use.

19  Q.   And I'm asking about the information collected, so let me

20  be a little bit more specific.  Exhibit 190 that had that

21  green trail system, that's information you collected for the

22  Tucson Samaritans; correct?

23  A.   No More Deaths.  I started at Tucson Samaritans, and No

24  More Deaths were -- No More Deaths was formed within the Tucson

25  Samaritans for the first five or six years, and then after

 1  that, then they separated.

 2      And so all this started for the Samaritans and No More

 3  Deaths.

 4  Q.   Okay.  So my question for you, though, is the map,

 5  Exhibit 190 -- and if I could have the hard copy, dig that

 6  out, and I'll move on to something else to take off the time

 7  pressure there.

 8      Now --

 9  A.   It's the map of the green trails?

10  Q.   The map with the green trails.

11  A.   Yeah.

12  Q.   And the map with the green trails, Exhibit 190, that

13  shows the area around Arivaca, Arizona; correct?

14  A.   Correct, between --

15  Q.   It does not show Cabeza Prieta; correct?

16  A.   No.

17  Q.   All right.  Now, these emails that Mr. Dupont went over

18  with you, you only sent them to Ms. Gaffney; correct?

19  A.   Yes.

20  Q.   And you don't know -- you have no information about

21  whether or not the defendants in this case ever saw those

22  emails; correct?

23  A.   Do I know whether people read emails that were sent to

24  them?

25  Q.   Let me ask you this.  You didn't send this information

 1   directly to the defendants, did you?

 2   A.   I sent it to Catherine, and I have a copy of her email

 3   where she sent it out.

 4   Q.   My question to you is, you didn't send it to the

 5   defendants directly, did you?

 6   A.   Oh, no, I didn't, no.  It went right to -- all my

 7   correspondence is with Catherine.

 8   Q.   And sitting there today, you don't know whether these

 9   defendants ever looked at these emails, do you?

10   A.   No, I don't.

11   Q.   Now, your maps did not contain pinpoints for the

12   beacons, the water beacons, the rescue beacons.  I'm sorry.

13   Let me try that again with one word.

14        These maps don't contain pinpoints for the rescue

15   beacons, do they?

16   A.   You mean the coordinates?

17   Q.   They do not contain pinpoints showing where the rescue

18   beacons are.

19   A.   What do you mean by "pinpoint?"

20   Q.   Any information on that map that would tell someone where

21   a rescue beacon is.

22   A.   No, it doesn't, no.

23   Q.   So those aren't reflected on your maps at all?

24   A.   No.

25   Q.   And rescue beacons, you would agree with me --

1  A.   We have maps with all the rescue beacons on them.

2  Q.   But none of those you talked about with Mr. Dupont today,

3  did you?

4  A.   No.

5  Q.   Okay.  So the maps we've been looking at that you sent on

6  to Ms. Gaffney did not have any data points on them for the

7  rescue beacons, did they?

8  A.   No.

9  Q.   And you would agree with me that rescue beacons are a

10  permanent feature out there in the desert; correct?  They

11  don't come and go from day to day, do they?

12  A.   No, uh-huh.  That's true.

13  Q.   However, at times in the past, some of the water caches

14  that you have left, you have found that they have been empty;

15  correct?

16  A.   Yes.

17  Q.   And so in the past, there may have been times when

18  someone traveling through the desert came upon your water

19  cache and found no water; correct?

20  A.   We know that's the case.

21  Q.   Now, you talked a little bit about putting dates and

22  coordinates on gallons of water.  You cannot say, can you,

23  that every single gallon of water placed in the desert has

24  been picked up by an illegal alien, can you?

25  A.   No.

1  Q.   And you can't say that all of those water jugs that have

2  been placed in the desert by people associated with Samaritan

3  groups has been later picked up and recovered by someone from

4  a Samaritan group?

5  A.   No.

6  Q.   And am I correct, this chart we were talking about that

7  had data related to Chimney --

8  A.   Chimney Canyon.

9  Q.   That's not on Cabeza Prieta, is it?

10  A.   No.

11  Q.   Now, the data points that you've put in these maps that

12  you sent on to Ms. Gaffney that show where human remains were

13  recovered, you don't know when those particular individuals

14  died, do you?

15  A.   No one does.

16  Q.   And you don't know how those particular individuals died,

17  do you?

18  A.   No one does.

19          MS. WRIGHT:  If I could have one minute, Your Honor?

20          THE COURT:  Uh-huh.

21          MS. WRIGHT:  That's all I have, Your Honor.

22          THE COURT:  Anything further?

23          MR. DUPONT:  I can't.  No.

24          THE COURT:  You may step down, sir.  Thank you.

25          MS. CHAPMAN:  Your Honor, we call Bob Bartels.

1          MS. WRIGHT:  Your Honor, if we could approach for a

2     moment, please.

3               THE COURT:  Sure.

4          MS. WRIGHT:  Thank you.

5          (The following proceedings occurred at sidebar.)

6          MS. WRIGHT:  Are we waiting on Mr. Dupont?

7          MS. CHAPMAN:  Yes.

8          MS. WRIGHT:  Okay.

9          (Pause in proceedings.)

10         MS. WRIGHT:  Your Honor, we wanted to raise an issue

11    here before Mr. Bartels takes the stand.  My understanding is

12    that he formerly worked for the U.S. Attorney's Office here in

13    Arizona, and we just want to make sure that he will not be

14    testifying about any of his personal involvement with issues

15    at the U.S. Attorney's Office as the basis for his testimony

16    today.

17         There's some statutes on point, and we want to make

18    sure he's not going to get up there and violate those

19    statutes.

20              THE COURT:  Where did he work?

21         MS. WRIGHT:  My understanding is he worked in the

22    civil division in Phoenix.

23              THE COURT:  Okay.

24         MS. CHAPMAN:  Your Honor, he's a summary witness

25    with respect to some Fish and Wildlife Service FOIA Title 50

 1   CFR violations.  That's what he's going to testify about.  So

 2   it has nothing to do with his experience, which I believe was

 3   over 20 years ago, at the U.S. Attorney's Office.

 4          He will talk about the fact that he worked there and

 5   did land use cases for the U.S. Attorney's Office but nothing

 6   about those particular cases.

 7          THE COURT:  Okay.

 8          MS. WRIGHT:  Thank you, Your Honor.  Appreciate it.

 9          THE COURT:  Thank you.

10          (End of bench conference.)

11               ROBERT BARTELS, WITNESS, SWORN

12                   DIRECT EXAMINATION

13   BY MS. CHAPMAN:

14   Q.   Good afternoon, Professor Bartels.

15   A.   Good afternoon.

16   Q.   Could you please introduce yourself to the Court.

17   A.   I am Robert Bartels.

18   Q.   And could you tell the Court a little bit about your

19   background, education, and what you've been doing for the last

20   several years.

21   A.   Well, let me start with law school.  I went to law school.

22   Graduated in about -- actually, exactly 1969.  I worked in

23   Legal Services in Detroit, went back to do a fellowship at my

24   law school for a year, and then I started teaching at the

25   University of Iowa law school.

DIRECT EXAMINATION OF ROBERT BARTELS

1      I was there for 10 years and came -- went to ASU law

2  school to teach.  And I did that continuously until

3  2013, except for about two-and-a-half years, when I was an

4  Assistant U.S. Attorney in Phoenix, in the District of Arizona.

5  Q.   And what were the subjects that you taught at ASU?

6  A.   Well, predominantly civil procedure and evidence, in

7  recent years fact investigation, and I taught environmental

8  law, constitutional law, various other subjects.

9  Q.   Ran the gamut?

10  A.   Pardon?

11  Q.   Ran the gamut?

12  A.   Well, not tax.

13  Q.   And your work at the U.S. Attorney's Office, what kind of

14  work did you do while you were an Assistant United States

15  Attorney?

16  A.   I worked on civil rights cases, and I was a deputy chief

17  for affirmative civil action, so I supervised government fraud

18  cases.  I spent about half of my time on public land cases

19  primarily involving mining claims that were on BLM or Forest

20  Service lands, and a smaller part of that was cases having to

21  do with trees, forest sales, and one timber rustling case.

22  Q.   Okay.  And you are admitted to the Bar in Arizona or you

23  were admitted to the Bar in Arizona?

24  A.   I was, yes.

25  Q.   Any other Bars that you were admitted to?

1   A.   Pardon?

2   Q.   Any other Bars that you were admitted to?

3   A.   Yes.  California, Iowa, Michigan.

4   Q.   And you were admitted to practice in this Court, the

5   District of Arizona?

6   A.   Yes.

7   Q.   Any other Courts that you were admitted to practice in?

8   A.   Other District Courts, the Eighth and Ninth Circuits, and

9   the Supreme Court.

10  Q.   And how many cases did you argue before the U.S. Supreme

11  Court?

12  A.   Five.

13  Q.   And this might become relevant later, but what was your

14  undergraduate degree in?

15  A.   Mathematics.

16  Q.   Okay.  We might come back to that.

17       What were you asked to do in this case?

18  A.   I was asked to prepare a summary under Rule 1006 of a

19  number of documents that had to do with citations or warnings

20  for violations of sections of the Code of Federal Regulations

21  at the Cabeza Prieta Wildlife Refuge.

22  Q.   And what was the time frame that you were asked to review

23  documents from?

24  A.   2015 through 2018.

25  Q.   And did you prepare a summary chart as requested?

1   A.   I did.

2              MS. CHAPMAN:  And could I show -- could we show the

3   witness Exhibit 240?

4   BY MS. CHAPMAN:

5   Q.   Can you see that document on your screen?

6   A.   I can.

7   Q.   Is the --

8   A.   Except for the last line, but I remember it.  That's okay.

9   Q.   Is that the document -- does that document reflect the

10  work that you did on this case in reviewing the documents and

11  creating a summary?

12  A.   Yes.  That's a summary that I did.

13  Q.   And does the summary reflected in the document adequately

14  reflect the work that you did?

15  A.   Yes.

16             MS. CHAPMAN:  Your Honor, I would move for admission

17  of Exhibit 214.  I'm sorry.  It's not Exhibit 214.  It's

18  Exhibit 240.

19             MS. WRIGHT:  And Your Honor, can I have a moment to

20  confer with defense counsel about when this was disclosed to

21  us?

22             THE COURT:  Sure.

23             (A discussion was had off the record between

24             counsel.)

25             MS. CHAPMAN:  Your Honor, if we could take a short

 1   recess, Ms. Wright would like to review the document briefly,

 2   and we have no objection to that, before we continue with

 3   Mr. Bartels' testimony.

 4              THE COURT:  Sure.  We'll stand at recess until 3:00.

 5              MS. CHAPMAN:  Thank you.

 6              (Off the record.)

 7              THE COURT:  All right.  Where are we on Exhibit 240?

 8              MS. CHAPMAN:  I would move for its admission, Your

 9   Honor, under 1006.

10              MS. WRIGHT:  And Your Honor, I'm objecting to its

11   admission.  It is not an accurate summary of the information.

12   Also, my understanding, it's based on information previously

13   presented to the Court that did not amount to prima facie

14   information, so it is irrelevant as to selective enforcement.

15              And to the extent it refers to referrals to the

16   USAO, that refers to selective prosecution, so we would object

17   to it coming in for foundation and relevance reasons, Your

18   Honor.

19              THE COURT:  All right.  It'll be admitted subject to

20   cross.

21              Go ahead.

22              MS. CHAPMAN:  Thank you, Your Honor.

23   BY MS. CHAPMAN:

24   Q.   So Professor Bartels, I think you said this chart

25   summarizes the documents that you were asked to review; is

1    that correct?

2    A.   Yes.

3    Q.   And what were the documents that you were asked to

4    review?

5    A.   The chart is based primarily on violation notices and

6    incident reports, both by the Fish and Wildlife Service.  I

7    also looked at FOIA requests relating to incidents involving

8    violations of the CFRs at the wildlife refuge.

9         There were some emails that were exchanged as a result of

10   requests for information from the Central Violations Bureau.

11   That information didn't figure in this chart very much.  A

12   little bit.  It sometimes confirmed to me whether or not

13   somebody was referred for prosecution.  And in that regard, I

14   also saw the Informations in this case, and I think it's 339

15   and 340.

16   Q.   Thank you.  And so there are a couple of terms on this

17   charge.  "Incidents," I see and then also you have, "Number of

18   Violators."

19        Can you describe for the Court what you meant when you

20   put "Incidents" versus "Violators."

21   A.   Sure.  The incident reports would refer to a particular

22   encounter between somebody from Fish and Wildlife Service and

23   people on the wildlife refuge who -- and in all of those cases

24   I think they were violating some regulation.

25        And so I simply took, if there was one incident report,

1  that's an incident.  Some of those incidents involved more than

2  one person committing a violation.  For example, the incident

3  report that relates to this particular prosecution involved

4  four different people.

5  Q.   And so -- I'm sorry.  Go ahead.

6  A.   And so those, just looking at that incident report, one

7  incident, four violators in my chart.

8  Q.   In the nomenclature of your chart?

9  A.   Yes.

10 Q.   Okay.  So let's look at the incidents before June 17th,

11 2017, and you've got, "Number of incidents with No More Deaths

12 Members," "Referrals to USAO" -- and by that you mean the U.S.

13 Attorney's Office?

14 A.   Yes.

15 Q.   And then following horizontally, "Number of Incidents

16 Without No More Deaths Members," and then, "Referrals to

17 USAO," on the top.

18      Could you describe what the data reveals from your review

19 along this top portion of the chart?

20 A.   Well, there was one incident that I saw, one incident

21 report, that involved a No More Deaths member that occurred

22 before June 17th, 2017, and that case was referred to the

23 United States Attorney's Office.

24      The material that I saw seemed to make it pretty clear

25 that the referral did not take place until after June 17th.

DIRECT EXAMINATION OF ROBERT BARTELS

1   Q.   So the incident --

2   A.   The incident took place before June 17th.

3   Q.   Okay.  And so then moving over, "Number of incidents

4   Without No More Deaths Members," there were five incidents

5   before June 17th, 2017?

6   A.   Yes, and none of those was referred to the United States

7   Attorney's Office, according to any materials I saw.  Some

8   people received -- some of the violators in those incidents

9   received oral warnings, some written warnings, and I'm pretty

10  sure that five includes some written Notices of Violation.

11       And those typically would say toward the end, you have a

12  choice.  You can either go to court about this, or you can pay

13  what I think was described as a forfeiture, and the amount was

14  indicated there.

15       The materials I looked at indicated that, in every case

16  where there was a violation notice issued, the person who

17  received the notice did pay the forfeiture, and I think there

18  were five of those, but not all of them were before June 17th.

19  Q.   Understood.

20       So by, "Referral to the U.S. Attorney's Office," you

21  don't mean that the person didn't receive any Notice of

22  Violation or any kind of penalty, because they might have paid

23  a money penalty/forfeiture, but they were not referred to the

24  United States Attorney's Office for criminal prosecution.

25       Is that the distinction that you're drawing?

DIRECT EXAMINATION OF ROBERT BARTELS

1  A.   To my knowledge, none of the people who paid the

2  forfeiture and were given that option and paid it were referred

3  to the U.S. Attorney's Office.

4  Q.   Okay.  Let's move down the chart, then, to look at

5  "Incidents."  And again, here we're talking about incidents,

6  so it could involve a number of people, but by incidents after

7  June 16th, 2017, and could you please summarize for the Court

8  what the findings of your data were.

9  A.   Well, there were three incidents involving No More Deaths

10  members, a total of nine members, but just three incidents.

11  People from those incidents, from two of those incidents, were

12  referred to the United States Attorney's Office.

13       And actually, in -- well, some of the people in the third

14  incident were people who had already -- were being referred for

15  an incident that occurred the day before.

16  Q.   Okay.

17  A.   There was one person in that incident who was the only one

18  who received a warning, and she did not get referred to the

19  United States Attorney's Office, as far as I know.  I never saw

20  any information indicating that.

21  Q.   And that will be reflected under the next column, under

22  "Violators after June 17th," I guess two columns down,

23  right, 2017, the individual violators?

24  A.   Yes.

25  Q.   Okay.

1   A.   Though I'm not sure that person -- yes.  That's correct.

2   Q.   Okay.  So with respect to incidents after June 17th,

3   you've got three incidents with No More Deaths members.  Two

4   of those incidents were referred for criminal prosecution to

5   the United States Attorney's Office?

6   A.   And then there were four incidents without No More Deaths

7   members, and none of those were referred to the United States

8   Attorney's Office for prosecution.  Probably some of those were

9   the Notices of Violation.

10  Q.   And again, with the Notices of Violation, you may pay a

11  forfeiture amount, but you're not -- you're not referred for

12  criminal prosecution; correct?

13  A.   That's my understanding, yes.  I saw no evidence of that.

14  Q.   And again, the evidence you were reviewing, those were

15  incident reports, all incident reports from the Cabeza Prieta

16  for 2015, 2016, 2017, and 2018; is that correct?

17  A.   Correct.

18  Q.   Great.  So let's look at the "Violators," the next column

19  down, "Before June 17, 2017."  And again, this refers to

20  individuals who may be involved in an incident, and there may

21  be more than one person involved in an incident; correct?

22  A.   Yes.

23  Q.   Okay.  So before June 17th, 2017, I think you've got the

24  same number of violators.  One refers to the U.S. Attorney's

25  Office, also one.  That's the same as the incident above?

DIRECT EXAMINATION OF ROBERT BARTELS

1   A.   That one incident that occurred before June 17th involved

2   a number of people, but only one person who committed a

3   violation.

4   Q.   Okay.  And then the non No More Deaths members before

5   2017, or excuse me, before June 17th, 2017, what is that

6   number?

7   A.   Well, it's at least eight, and my problem was that, in one

8   of the incident reports, the report indicated that several

9   people were there and would have committed violations, and I

10  didn't -- I assumed several meant more than two, but I didn't

11  know how many, so I was basically trying to be as conservative

12  as possible.

13  Q.   And this -- I'm sorry.  This was an incident report that

14  referred to several vehicles; is that right?

15  A.   You know, I can't remember whether it was several vehicles

16  or several people.

17  Q.   Okay.  And you have a note here that it involves a group.

18  Do you recall whether that group was identified in the

19  incident report as a humanitarian group?

20  A.   Yes.  It was -- now I see my own footnote three, which it

21  was several vehicles, Aguilas del Desierto, which is described

22  in the report as a humanitarian group.

23  Q.   And none of those people who belong to that humanitarian

24  group who were found in violation were referred to the U.S.

25  Attorney's Office for criminal prosecution; is that correct?

DIRECT EXAMINATION OF ROBERT BARTELS

1  A.   That's correct.  One person in that group was given a

2  Notice of Violation, and he did pay the forfeiture amount.

3  That was Mr. Rodriguez.

4  Q.   Okay.  And then going down, violators after June 17th,

5  2017, can you tell us what your -- the documentation that we

6  received from Fish and Wildlife demonstrated?

7  A.   Well, there were -- we had three incidents with No More

8  Death members, but that was a total of nine people who would

9  have been in violation of CFRs, and of those nine people, eight

10 were referred to the United States Attorney's Office.

11      There was one person in an incident on June 20th -- there

12 had been a similar incident the day before, and on the June --

13 July 20th incident, all but one of those people had also been

14 there the day before.  The one person who was new was the

15 person who was the driver.  She was given a warning, but I've

16 seen no evidence that she was ever referred for prosecution.

17      And then, for the non No More Death violators, there were

18 a total of six after June 17th, and none of those were referred

19 to the United States Attorney's Office.

20 Q.   And again, these were all reflective of people who were

21 on Cabeza Prieta, incidents on Cabeza Prieta; is that correct?

22 A.   That's correct.

23 Q.   And they were all incidents involving people who

24 violated, in various ways, CFRs under Title 50; correct?

25 A.   Correct.

1  Q.   And did you determine the statistical probability of

2  these violators after June 17th, 2017, occurring randomly?

3  A.   The violators?

4  Q.   Yes, the number.

5  A.   That's, in my view, difficult to do, because the way to do

6  it would be to use the product rule for -- it's the same

7  problem as having colored ping-pong balls in a box and picking

8  them out.

9       But I don't -- I'm not sure I can say those are -- the

10 violators are independent events.  The incidents, though, I

11 think, clearly are, and I can give you the probability for the

12 incidents.

13 Q.   Please do.

14      MS. WRIGHT:  Objection, Your Honor.  We don't have

15 any foundation for this, and this was not part of -- this

16 testimony was not part of the notice we were given as part of

17 Document 141.  We were given no notice of some statistical

18 analysis by this witness.

19      MS. CHAPMAN:  Your Honor, I think it's simply a

20 mathematical equation based on the information in the

21 document.

22      THE COURT:  Well, yes, but I suppose it should be

23 disclosed, so it's sustained.

24 BY MS. CHAPMAN:

25 Q.   So just to summarize your findings, then, the difference

1    between non No More Deaths members who commit violations on

2    the Cabeza Prieta is that none of them were referred for

3    criminal prosecution in any of the documents that you

4    reviewed; is that correct?

5    A.    Correct.

6    Q.    And with respect to No More Deaths members after June

7    17th, 2017, eight out of nine were referred for criminal

8    prosecution to the U.S. Attorney's Office?

9    A.    Yes, and if you count the incident that happened before

10   June 17th as a referral after, then you could say it's nine out

11   of 10 referrals.

12   Q.    Of No More Deaths members?

13   A.    Yes.

14   Q.    Thank you.

15   A.    And zero, no matter how you look at it, what part of it

16   you look at, nobody who was not a No More Deaths member was

17   referred for prosecution.

18   Q.    And that includes members of humanitarian aid groups who

19   are not members of No More Deaths, as well, were not referred?

20   A.    That's correct.

21          MS. CHAPMAN:  Thank you.  No further questions.

22                    CROSS-EXAMINATION

23   BY MS. WRIGHT:

24   Q.    Good afternoon, Mr. Bartels.  My name is Anna Wright.

25   I'm one of the prosecutors in this matter, and I have a few

1   questions for you.

2        I'd like to start first with your experience as a lawyer,

3   and first I would note Defense Exhibit 214 is your résumé.  I

4   assume that what you provided to defense counsel is your most

5   recent résumé?  And here.  Let me show you.  I have this

6   sticker on here.

7        Sarah, if you could dig that out for me, 214.

8        Okay.  Take a look at that.  Is that your most recent

9   résumé?

10  A.   I think so.

11  Q.   All right.  Let me page through it.  And let me show you

12  the back page.  Is that your most recent résumé?

13  A.   It is except one thing that's changed since I provided

14  this résumé.  Last month I became inactive in California, one

15  week ago.

16  Q.   Now, as I look at this résumé, what I see, and tell

17  me, you do not have any criminal experience in a federal

18  court; correct?

19  A.   (No verbal response.)

20  Q.   Let's look at paragraph C.  You do not have listed there

21  any federal criminal experience; correct?

22  A.   Yes, that's correct.  I did have a couple of cases when I

23  was at the U.S. Attorney's Office back in the 1990s that were

24  criminal prosecutions.  One of them was a grand jury

25  investigation that resulted in an Information misdemeanor case

1    and a guilty plea.

2         And I also had my timber rustling case.  It never got

3    filed.  There was never an ongoing prosecution, but it was a

4    criminal investigation.

5         And then I had actually several civil rights, criminal

6    civil rights, investigations.

7    Q.   And so your federal criminal experience is limited to a

8    misdemeanor matter that was plea bargained out, a timber

9    rustling case that never got filed, and some civil rights

10   cases, all from the 1990s; correct?

11   A.   Yeah, and that's not counting the federal habeas corpus

12   cases, and those were not federal prosecutions, any of them.

13   Q.   You do not have any experience with the CVB docket here

14   in the Tucson federal courthouse, do you?

15   A.   I do not.

16   Q.   You have never appeared on the CVB docket for any party

17   here in the Tucson federal courthouse; correct?

18   A.   That's correct.  That's correct.

19   Q.   You have never been involved in the issuing of a ticket

20   for a CVB violation off of any of the land in this

21   jurisdiction; correct?

22   A.   Right.

23   Q.   And you have not been involved in any of the handling of

24   those matters once they are filed; correct?

25   A.   Right.

CROSS-EXAMINATION OF ROBERT BARTELS                    132

1    Q.   So you do not have any information about who makes the

2    decisions in the Tucson office of the U.S. Attorney's Office

3    about how to proceed on Civil Violations Bureaus matters, do

4    you?

5    A.   That's correct.

6    Q.   And you do not have any information about what

7    prosecution policy the U.S. Attorney's Office in Tucson may or

8    may not have with which matters get referred for prosecution

9    as an Information and which are handled otherwise, do you?

10   A.   I do not.

11   Q.   So you have no idea what the criteria is that is used by

12   the United States Attorney's Office in Tucson to decide how to

13   handle CVB matters, do you?

14   A.   No.

15   Q.   And so you would be completely unaware if perhaps one of

16   those criteria were committing multiple violations at the same

17   time; correct?

18   A.   That's correct.

19   Q.   And you would not know what, if any, direction the United

20   States Attorney's Office may give about its prosecution policy

21   out to the enforcement agencies and the land agencies, would

22   you?

23   A.   That's correct.

24   Q.   And you also wouldn't know whether or not intentional or

25   deliberate misconduct plays into the United States Attorney's

 1    Office criteria in accepting cases or having them referred for

 2    prosecution, would you?

 3    A.    That's correct.

 4    Q.    Now, in looking at these documents that you reviewed, the

 5    violations you reviewed to make this chart that is 240 --

 6              MS. WRIGHT:  If I can have just one moment, Your

 7    Honor, I want to make sure of one thing.

 8    BY MS. WRIGHT:

 9    Q.    So let's take them in turn.  And my understanding is you

10    have these tickets in front of you.  Is that correct?  Or do

11    you need a copy?

12    A.    I can.  I have them in a file here.

13    Q.    Let me grab a marked copy so we're both looking at the

14    same thing.

15    A.    When you refer to "tickets," I'm not sure.

16    Q.    That's -- let me grab the marked copy.

17              MS. WRIGHT:  Sarah, could we have 213, please.

18              THE CLERK:  213?

19              MS. WRIGHT:  213.

20              (A discussion was had off the record between

21              Ms. Wright and the clerk.)

22    BY MS. WRIGHT:

23    Q.    And I'll put these up on the Elmo for you, Mr. Bartels.

24          Let's start with Violation No. 4310642.  Do you see that

25    there?

1   A.   Yes.

2   Q.   And do you see just below the violation number the date

3   and time of offense?

4   A.   Yes.

5   Q.   And you see that the date is April 29th of 2015; correct?

6   A.   Correct.

7   Q.   And that there is only one violation described down here

8   in the offense description; correct?

9   A.   I'm sorry.  I need to...

10  Q.   And Mr. Bartels, are you looking at what's on the Elmo

11  screen, or are you looking at something else?

12  A.   I'm actually looking at -- it's easier for me to read the

13  piece of paper that I have that corresponds to it.

14       Yeah, there's only one charge on the Notice of Violation.

15  Q.   And let's take a look at the page that follows that

16  includes the statement of probable cause.

17       Do you see that there?

18  A.   Uh-huh.

19  Q.   And in this, it's correct that nowhere in here does it

20  state that this offense happened in a designated wilderness

21  area; correct?

22       MS. CHAPMAN:  Excuse me, Your Honor.  What exhibit

23  number is on the screen now?

24       MS. WRIGHT:  We are on 214 still.

25       THE CLERK:  213.

1              MS. WRIGHT:  213.  I'm sorry.  213.  This is the

2    whole packet.  Page two.

3              MS. CHAPMAN:  Thank you.

4    BY MS. WRIGHT:

5    A.   That's correct.  It's off of -- it's driving off the

6    designated route.

7    Q.   And so that's a yes.  Nowhere in here does it say that

8    this offense happened in a designated wilderness area; is that

9    correct?

10   A.   That's true.  That's true.

11   Q.   Let's look at the third page, which is Violation No.

12   4310643.

13        Do you see that there?

14   A.   Yeah.

15   Q.   You would agree with me that the offense date is February

16   16th of 2015; correct?

17   A.   Correct.

18   Q.   And that the offense description is, "Discharge of a

19   firearm on the refuge;" correct?

20   A.   Right.

21   Q.   And now let's move on to 431064 -- 0644.  Do you see that

22   there?

23   A.   Yeah.  That's the same incident, the other, Mr. Hernandez,

24   and also the same single charge.

25   Q.   And the same incident date in February of 2015; correct?

1  A.   Correct, yeah.

2  Q.   Let's move on to the next violation, 3198084.

3       You see here the offense date, right, July of 2016?

4  A.   Yes.

5  Q.   And looking at the probable cause statement, which I'll

6  put up here now, nowhere in there does it say that this

7  offense happened in a designated wilderness area; correct?

8  A.   That's correct.  It's off a designated roadway, yeah.

9  Q.   So it's correct that it does not state in there that this

10 offense happened on a designated wilderness area; right?

11 A.   Right.  That's correct.

12 Q.   And now let's look at the Offense No. 6976503, and I want

13 to show you the probable cause statement for that offense.

14      And nowhere in that probable cause statement does it say

15 that this offense happened on a designated wilderness area;

16 correct?

17 A.   That's correct, yes.  It's the same, not driving on the

18 designated route of travel.

19 Q.   So that's a yes.  Nowhere in this probable cause

20 statement does it indicate that this offense happened on a

21 designated wilderness area; right?

22 A.   That's correct, yeah.

23 Q.   And turning back now to your chart, Exhibit 240, there's

24 no column on your chart to indicate where these offenses

25 happened or whether they were on a designated wilderness area;

1    correct?

2    A.   That's correct.

3    Q.   And so it would be fair to say that, in your analysis of

4    these documents, you did not include in your analysis whether

5    these offenses happened on a designated wilderness area;

6    correct?

7    A.   That's correct.

8    Q.   And it would also be fair to say that, based on your

9    chart, you did not indicate the number of violations committed

10   by any individual person; correct?

11   A.   Oh, that's correct, yeah.

12   Q.   And so as part of your analysis in determining whether or

13   not these were referred for prosecution, you did not take into

14   account whether or not someone committed multiple violations

15   on the same day; correct?

16   A.   I wasn't asked to do anything about -- that had to do with

17   that.

18   Q.   And so that's correct.  Your analysis did not take into

19   account whether or not a person committed multiple violations

20   at the same time, did it?

21   A.   The information that's summarized on this chart does not

22   take that into account, no.

23   Q.   And your analysis did not take that into account, did it?

24   A.   I'm not sure what analysis there is besides the chart,

25   but --

CROSS-EXAMINATION OF ROBERT BARTELS

1   Q.   So that's a no?

2   A.   -- I haven't taken that into account.  That's correct.

3   Q.   Okay.  Now, the only thing that your analysis takes into

4   account, the only variable, is No More Deaths membership;

5   correct?

6   A.   Well, and whether there's a violation of the CFRs --

7   Q.   And so the information about whether or not a person --

8   A.   -- and if there was a referral for prosecution.  That's

9   it.  Yeah.

10  Q.   So let me ask you about this last column here, "Referral

11  For Prosecution."  You didn't review any documents from the

12  United States Attorney's Office in relation to this chart, did

13  you?

14  A.   No.  It's just reflecting that I had no information

15  indicating to me that there was a referral for prosecution.  I

16  would have found it odd to see that for the people who paid the

17  forfeitures and also for the people who just got warnings, but

18  no, I haven't seen the documentation, if there is any --

19  Q.   And you did not --

20  A.   -- between Fish and Wildlife and the U.S. Attorney's

21  Office.

22  Q.   So you have no information about any communications that

23  might have happened between Fish and Wildlife and the United

24  States Attorney's Office in reference to any of these

25  violations; correct?

1   A.   That's correct.  Yeah.

2   Q.   And so this chart is based off of your understanding of

3   the CVB process; correct?

4   A.   It's based off the information that I received about

5   incidents, records of incidents, and how those incidents were

6   disposed of.

7   Q.   Well, let's talk about the information you had.  Let's

8   look again at 4310642, and that relates to a Mr. Herritt.  Did

9   you interview -- you didn't interview Mr. Herritt, did you?

10  A.   No.

11  Q.   And so you haven't had any conversations with him about

12  his participation in any humanitarian group, have you?

13  A.   No, I have not.

14  Q.   And so you cannot say whether or not Mr. Herritt is a

15  member of any humanitarian group or not, can you?

16  A.   No.  All I can say is that the incident report does not

17  say anything about that.

18  Q.   And so the only thing you can say about that is that a

19  law enforcement officer did not document someone's membership

20  in a group in that incident report; is that correct?

21  A.   There is no mention of it, that's correct, yeah.

22  Q.   And let's look at 3198084.  Do you see that on your

23  screen?

24  A.   Yes.

25  Q.   And the offense there is operating a motor vehicle off a

1  designated route; correct?

2  A.   Yes.

3  Q.   And the person listed there is Vicente Rodriguez;

4  correct?

5  A.   Correct.

6  Q.   And you did not interview Mr. Rodriguez either, did you?

7  A.   No, I did not.

8  Q.   And so you have no information you can provide the Court

9  about whether or not Mr. Rodriguez is a member of any

10  humanitarian group, can you?

11  A.   All I know is that that's what the incident report says.

12  Q.   And the incident report does not mention any membership

13  in a humanitarian group, does it?

14  A.   It does.  It says they identified themselves as a

15  humanitarian group called Aguilas del Desierto.

16  Q.   Thank you for pointing that out.  Let's move on.

17       And now let's look at 6976503.  Do you see that on your

18  screen?

19  A.   Yes.

20  Q.   And that is an incident in March of 2018; correct?

21  A.   That's correct.

22  Q.   And this is, again, an offense related to driving off of

23  a designated route; correct?

24  A.   Yes.

25  Q.   And you did not interview this defendant either, did you?

1   A.   I did not.

2   Q.   And so you have no information about whether or not this

3   person is a member of No More Deaths; correct?

4   A.   No.  All I know is that there's no mention of that on

5   the --

6   Q.   And let's go back for just a second, Mr. Bartels, to

7   3198084, Mr. Rodriguez.  You would agree with me that it's

8   possible to be a member of multiple organizations at the same

9   time, wouldn't you?

10  A.   I'm sorry.  Could you repeat that?

11  Q.   You would agree with me that it's possible to be a member

12  of multiple organizations at the same time; correct?

13  A.   Oh, yes.

14  Q.   And so you have no information about Mr. Rodriguez's

15  membership in No More Deaths, do you?

16  A.   No, I don't.

17  Q.   And so when your chart here refers to people as being not

18  members of No More Deaths, you had no information about that,

19  did you?

20  A.   Oh, I wouldn't agree with that.  I have the information

21  that there was no mention of that in most of the incident

22  reports.  All I'm representing is I'm summarizing the

23  information that's in the incident reports and the Notices of

24  Violation, and there's -- I was not asked to do any further

25  investigation on that.

1    Q.   So it's correct this column that you labeled as not --

2    incidents without No More Deaths members, you did not

3    interview any of those individuals, did you?

4    A.   No.

5    Q.   You do not have any independent information about their

6    membership in No More Deaths, do you?

7    A.   No.

8    Q.   And you would agree with me that it's possible that those

9    people are No More Deaths members and that simply wasn't

10   reflected in a report; correct?

11   A.   It's possible.

12             MS. WRIGHT:  If I could have just one moment, Your

13   Honor?

14             THE COURT:  You may.

15             MS. WRIGHT:  That's all I have, Your Honor.

16             THE COURT:  Redirect?

17             MS. CHAPMAN:  Thank you.

18                         REDIRECT EXAMINATION

19   BY MS. CHAPMAN:

20   Q.   Professor Bartels, you were asked a series of questions

21   about whether you were aware of the U.S. Attorney policy with

22   respect to Notice of Violation and criminal prosecution

23   relating to a number of violations at one time; is that

24   correct?

25        Do you recall those questions?

1    A.    Yes.

2    Q.    And do you recall reviewing in the number of -- in No

3    More Deaths member violators after June 17th, 2017, the case,

4    I think you referred to it as No. 340, that involved four

5    defendants?

6          Do you recall that?

7    A.    Yes.

8    Q.    And do you recall that, of those four people, one of them

9    was charged with two violations, driving without a permit and

10   -- or excuse me -- driving in a place they shouldn't be

11   driving and not having a permit?

12         Do you recall that?

13   A.    Are we talking about 340?

14   Q.    Yes.

15   A.    Yes.  I do recall that.

16   Q.    And do you recall that the other three individuals were

17   charged with one violation?

18   A.    Yes, that's true in No. 340.  There's one person who's

19   charged with two offenses, and the other three are just charged

20   with one.  I think that's also true in 339.

21   Q.    And that would not be consistent with a policy that only

22   put to criminal referral for multiple violations at the same

23   time; correct?

24   A.    Yes.

25   Q.    And you noticed in reviewing the incident reports that

1  Fish and Wildlife Service did make identification of human

2  rights groups with respect to some of the incidents; correct?

3  A.   I'm sorry.  Can you repeat that?

4  Q.   With respect to the incident reports you reviewed, the

5  Fish and Wildlife Service in the incident reports did on

6  occasion identify the human rights group if a person was

7  associated with a human rights group; correct?

8            MS. WRIGHT:  Objection.  Leading, Your Honor.

9            THE COURT:  Overruled.

10 BY MS. CHAPMAN:

11 Q.   I'm sorry.  Could you repeat your answer?

12 A.   Yes.

13 Q.   You did see that?

14 A.   Yes.

15 Q.   On how --

16 A.   They did it on several occasions, yes.

17            MS. CHAPMAN:  Thank you.  No further questions.

18            THE COURT:  You may step down, sir.

19            THE CLERK:  Can someone give me those things?

20            MS. WRIGHT:  Yes.

21            MR. DUPONT:  Your Honor, the defense will call Oona

22 Holcomb.

23                  OONA HOLCOLM, WITNESS, SWORN

24                       DIRECT EXAMINATION

25 BY MR. DUPONT:

DIRECT EXAMINATION OF OONA HOLCOLM

1  Q.   Hello, Oona.

2  A.   Hi, Chris.

3  Q.   Could you introduce yourself to the Court, please.

4  A.   My name is Oona Holcomb.

5  Q.   How old are you, Oona?

6  A.   I'm doing well.

7  Q.   Pardon me?

8  A.   Did you ask how am I?  I can't hear you very well.

9  Q.   That would be fine.  How are you?

10  A.   I'm well.

11  Q.   Okay.  How old are you?

12  A.   I'm 39 years old.

13  Q.   And what do you do?

14  A.   Primarily I'm a master's student at St. Catherine

15  University in St. Paul, Minnesota.  I also work part-time and

16  do other things in my community.

17  Q.   What are you studying at St. Catherine?

18  A.   It's a master's program in public health and global

19  health.

20  Q.   And what kind of school is St. Catherine?

21  A.   It's a private university in the Catholic tradition.

22  Q.   And other employment?

23  A.   I also work part-time in a customer service job to pay the

24  bills.

25  Q.   Can you tell the Court how you came to be involved with

DIRECT EXAMINATION OF OONA HOLCOLM

1  No More Deaths in Arizona.

2  A.   Yeah, so over -- it was over a decade ago.  I was doing --

3  I was in relationship to similar work, organizations doing

4  similar work in California, and through some of that work I met

5  individuals who at the time were part of No More Deaths and

6  learned about the organization and the work that they were

7  doing here in Arizona.

8  Q.   What did you learn?

9  A.   I learned that they were, among other things, doing direct

10  humanitarian aid, providing water, food, medical care, et

11  cetera, to -- for the purpose of preventing the suffering and

12  dying that was happening in the desert in southern Arizona.

13  Q.   Why were they doing that?  Why did they have to do that?

14  A.   Because there had been a surge in migration from the

15  southern border from people coming from south of the United

16  States walking in across the desert, and there were -- there

17  was an upsurge in deaths that they were -- that they were

18  learning about, and so they were trying to directly prevent

19  those deaths from continuing to happen.

20  Q.   So addressing this surge in migration which led to

21  suffering and death on the border?

22  A.   Well, I would say there was a surge in deaths on the

23  border.  I don't know if that's the same as a surge in

24  migration.

25  Q.   In response to this surge in deaths and suffering and

1   dying on the border and deciding to come here, was -- did your

2   own personal moral and ethical beliefs play any part in you

3   making the decision to make that life move?

4   A.   Oh, most definitely.  I felt like when I learned what was

5   happening here, it was actually a relatively short amount of

6   time, I mean, in my life that I decided to come.  I felt

7   compelled to come and participate for weeks or months at a time

8   in the summer, making other arrangements in my life because it

9   felt so important to me to be here.

10  Q.   Why is it so important to help people suffering and

11  dying?

12  A.   I don't believe anyone should be suffering or dying simply

13  because they are trying to build a life that is fulfilling for

14  them.

15  Q.   Do you speak Spanish?

16  A.   Conversationally.  It was better at the time.  It's worse

17  now.

18  Q.   When you first got here a decade ago, can you talk about

19  what that process was like in terms of training.

20  A.   Training?

21  Q.   Yes.

22  A.   Yeah, so at that time you would come to Tucson, and there

23  -- there were three summers in a row that I was here, so it

24  varied a little bit summer to summer, but there would be a day

25  or two days of training that you would be required to go

1    through.

2        And then you would go out to the desert to participate in

3    what were generally broken down as weeklong sessions where you

4    were living and working every day doing this humanitarian aid

5    work.

6    Q.   During the training, what kind of topics would be

7    addressed?

8    A.   Some of them were more like logistical or tactical types

9    of things in terms of understanding the GPS system that

10   Dr. McCullough talked about.  There would be some level of at

11   least basic first aid and medical training for those of us who

12   did not have it.

13       And also there was -- so things like that, but then also

14   there were conversations about why we were called to do this

15   work, the history of the organization, you know, why the

16   mission -- you know, what the mission was and how that was

17   being played out, how that would look on a day-to-day basis.

18       Does that answer your question?

19   Q.   Sure.  And when you say "mission," do you mean the

20   ministry too?

21   A.   The ministry, yeah, exactly.

22   Q.   You heard John Fife talking about the ministry and the

23   spiritual basis of the work you're doing?

24   A.   I have in training.

25   Q.   Do you share those beliefs?

1   A.   Do I share those beliefs with John?

2   Q.   Yes.

3   A.   Yeah, I have very similar beliefs.  I think that we

4   probably speak about them and have lived them in different

5   ways, but I definitely share the belief that there is, like, a

6   deep, for me, I will say, like a deep spiritual need and a

7   calling to do work based on what I believe in the world.

8   Q.   And you worked a couple of summers, a couple or three

9   summers, did you say?

10  A.   Uh-huh, three summers.

11  Q.   And then you decided to come back in August of 2017?

12  A.   I did.

13  Q.   Why?

14  A.   I was in conversation at that time with people that I had

15  known from the time I had been here before and was encouraged

16  and was told it would be very -- I would be very welcome as

17  someone who had experience as a volunteer to come back because

18  of how dire the situation was in the area that they were

19  working.

20  Q.   What did you learn about how dire the situation is?

21  A.   So when I was here in 2008, '09, and '10, we worked in the

22  Arivaca area similar to the maps that Dr. McCullough showed.

23  Q.   We're mentioning Dr. McCullough.

24  A.   I'm sorry, the witness, yes.

25  Q.   Yes.  Do you guys use the same water tracking charts and

 1   stuff like that, the same basic model?

 2   A.   Oh, yes, definitely.

 3   Q.   So you learned about the dire situation.  If you could

 4   please --

 5   A.   Yeah, so, well, what I'm explaining, so at that time I was

 6   not part of any work that was happening in other areas.  What

 7   had happened in the time from when I stopped being a volunteer

 8   after 2010 until I was in a conversation with people before I

 9   came back in 2017 was the work had begun to happen in the Ajo

10   area, in this -- the Growler Valley, the area that we've been

11   talking about, and that they were seeing that it was just an --

12   it was even more remote and intense and dangerous than what we

13   had experienced in the Altar Valley, which was saying

14   something, and that there were remains being found on a daily

15   basis almost, that people were just seeing an immense amount of

16   suffering and death that even surpassed what we had seen 10

17   years ago, which was already a lot.

18   Q.   And did you begin to start to see some of the maps that

19   were going around?

20   A.   Uh-huh, of the area, the Ajo, like, Growler Valley area

21   that we're talking about?

22   Q.   Yes.

23   A.   Uh-huh, yes.

24   Q.   So you knew the work of leaving water had been going on

25   10 years, but people continued to die; is that right?

1   A.   Yes.

2   Q.   And did you learn about people destroying water that was

3   being left for migrants?

4   A.   Oh, yes.  That's been a practice as long as I've been a

5   part of this organization, seeing that people destroy the

6   water.

7   Q.   And before coming back in August of 2017, had you seen

8   that video depicted in Exhibit No. 184?

9            MR. WALTERS:  Objection, Your Honor.  Relevance.

10           THE COURT:  Overruled.

11  BY MR. DUPONT:

12  A.   Of the -- is that the exhibit where the Border Patrol is

13  pouring the water out of the jugs?  Is that what you're

14  referring to?

15  Q.   Yeah, the one you saw again, what, yesterday?

16  A.   Yes, yes.  No, I'd seen that, yes.

17  Q.   You'd seen that before you came back in August of 2017?

18  A.   Yes.

19  Q.   Did that play a part in your decision to come back and

20  your analysis of how dire the situation was?

21  A.   Yes.  I mean, I would say knowing that that was happening

22  is significant to me feeling the need to -- feeling compelled

23  to return, as one of many things, yes.

24  Q.   Was part of that the idea that we couldn't depend on the

25  Government to stem this death and suffering?

1    A.   Most definitely.

2             MR. DUPONT:  Move for admission of Exhibit 184, Your

3    Honor.

4             MR. WALTERS:  Which is what, the video?

5             MR. DUPONT:  Yes.

6             MR. WALTERS:  Again, I would object on relevance

7    grounds to this particular case, Your Honor.

8             THE COURT:  Overruled.

9             MR. DUPONT:  Permission to publish?

10            THE COURT:  Sure.

11            (The recording played in open court.)

12            MR. DUPONT:  We've only got it on one, this one.

13   Okay.

14            (The recording continued to be played in open

15            court.)

16   BY MR. DUPONT:

17   Q.   Any indication those agents who kicked over the water

18   were picking up the trash?

19   A.   I had no reason to believe that they did.

20            (The recording continued to be played in open

21            court.)

22   BY MR. DUPONT:

23   Q.   Had you ever personally witnessed this type of act?

24   A.   Yes.

25   Q.   Tell the Court, please.

1  A.   In the time that I was here approximately a decade ago,

2  there were often times when we would see Border Patrol out in

3  the field or in the desert, and on several of those occasions,

4  we saw them right in front of us pour out water.

5          (The recording continued to be played in open

6          court.)

7  BY MR. DUPONT:

8  Q.   Oona.  I'm sorry.  Did I cut you off?

9  A.   I was just going to say, this is -- what he is doing here

10  is something that I have seen, and then also, you know, as has

11  been brought up by a previous witness, the destruction of -- we

12  have found bottles that were cut clearly with a knife,

13  vandalism.  Obviously we don't know who did that, but there's

14  definitely destruction of the water out in the desert.

15  Q.   Do you see markings on this jug?

16          THE COURT:  Pardon me?

17          MR. DUPONT:  Oh, I'm sorry.  I was talking to the

18  witness.  I was just looking at you, Your Honor.

19  BY MR. DUPONT:

20  A.   I'm sorry.  What did you say?

21  Q.   I wanted to make a note, because I think this is

22  important, the markings on this jug --

23  A.   Uh-huh.

24  Q.   -- that the officer's pouring out --

25  A.   Yes.

1    Q.   -- what does that look like?

2    A.   I can't read what's underneath it, but it's a cross that's

3    drawn on the water jug.

4    Q.   A crucifix?

5    A.   I mean, I can see that it's a cross, possibly, yeah.  I

6    mean, it looks like a Christian cross, is what I can see from

7    this.

8    Q.   Is that a common practice for No More Deaths, to draw

9    Christian crosses on water jugs?

10   A.   I would say that, in my experience, it's a common

11   practice, and I've participated in drawing things on the water

12   jugs.  Sometimes, often, those are Christian symbols or other

13   religious or faith-based symbols, as well as, you know, things

14   like hearts and messages.

15            (The recording continued to be played in open

16            court.)

17   BY MR. DUPONT:

18   Q.   Is that officer slashing the water bottles?

19   A.   I mean, that's what it looks like.  It's a little hard to

20   see, but yeah.

21            (The recording continued to be played in open

22            court.)

23   BY MR. DUPONT:

24   Q.   All right.  When you get back, prior to August

25   13th, where do you go?

1    A.   When I come back to Arizona before August 13th?

2    Q.   Yes.

3    A.   The week prior to that week I was in the Arivaca area, and

4    then in the several days or so before August 13th, I was in the

5    Ajo area as a volunteer.

6    Q.   Tell me -- tell us what a day would look like as a

7    volunteer No More Deaths person whose duty is to put water out

8    in the desert.

9    A.   Sure.  I mean, it varies a little bit, but generally you

10   wake up pretty early, because it's already hot and it's just

11   going to get hotter, so the idea is to try to get things done

12   as soon as -- as early as possible to beat the heat and, you

13   know, have breakfast and, you know, clean up, et cetera, make

14   sure that, you know, you start the day, kind of like we all

15   would.

16        And then either the night before or that morning you have

17   a conversation, it would look like a collective meeting, to

18   make a decision as to what you're going to do that day.

19   Q.   And what do you look at while you're making the

20   decisions?  What kind of data do you analyze?

21   A.   So generally -- so as long as I've been in No More Deaths

22   camps, there are these, like, binders that we keep that

23   basically look like written versions of that chart that was

24   shown previously, so it says, you know, these are the places

25   where water drops are happening.

1    Q.    You mean the charts shown by Dr. McCullough?

2    A.    Yes, thank you.  These are where they're happening.  This

3    is the last time we were there.  This is what was left.  You

4    know, like the same thing, charting out what we can record from

5    what's happening and also when we're doing that so that we have

6    a sense of how much water is moving out of certain areas, and

7    that indicates to us that there are more people who are taking

8    it.  And we also record things like, you know, when animals get

9    into it and stuff like that.

10        But -- and then in places where it seems like there is a

11   high need, we try to go as much as possible, and also, if we

12   haven't been somewhere for some time, we try to make a point,

13   you know, like a week or two, we try to make a point to get

14   back there.

15        This all varies a little bit depending on where exactly

16   you're working, so we would be looking at that information in

17   that kind of like chart format and then also maps.  You know,

18   we're out in a camp or wherever in the desert, and so we're

19   actually looking at physical maps that have markings of where

20   things are and also at times refer to other important

21   information, for example, where remains have been found or, you

22   know, things like that.

23        So we're -- that's kind of what we're looking at, and

24   we're making a decision about our day and what we need to do.

25   Q.    Are you looking at the trends of where human remains are

1  found?

2  A.   Sometimes.

3  Q.   As you got ready to go out in that time period, had you

4  heard about the three people that had gone missing July 19th?

5  A.   Yes, I had.

6  Q.   What had you heard?

7          MR. WALTERS:  Objection, Your Honor.  Hearsay.

8  Calls for hearsay.

9          THE COURT:  Overruled.

10  BY MR. DUPONT:

11  A.   I had heard -- there was discussion that there were three

12  people.  Two people had been found.  There was concern about

13  the third person.

14      I'll be honest with you.  There was minimal discussion,

15  mostly because an incident had happened in the day or two,

16  maybe three at most, prior that was really traumatic around

17  finding a body that just more conversation was happening around

18  that, but there was some reference to the July 19th, the three

19  people and then being concerned about the third.

20  Q.   What -- I mean, what were people talking about, this

21  fourth person?

22  A.   Well, this was a separate incident that had happened where

23  the discussion that was happening was that people had gone to

24  do water drops.  They had parked a truck.  They had walked away

25  from the truck.  They had come back to the truck, and there was

1    a body of a deceased person at the truck.

2        There's only an assumption of whether that person walked

3    up to that truck and then died or someone carried that person

4    and left them.  There's -- at that point, I don't know if we

5    know now, but there wasn't knowledge as to what exactly had

6    happened, but there was someone who was assumed to be migrating

7    who had just died, which was obviously very traumatic.

8    Q.   Did it -- did you have any feeling, because of that, the

9    situation was more critical?

10   A.   Yes.  I -- based on the information I was given going into

11   the Ajo area that week, it was -- we were told to expect that

12   we would find human remains.  It was likely enough that we were

13   being prepared for it.

14   Q.   And that people were likely dying in the wilderness at

15   the time?

16   A.   Yeah.

17   Q.   So I want to kind of transition from the humanitarian

18   crisis to the bureaucratic crisis.

19   A.   Okay.

20   Q.   And the permit process.

21   A.   Okay.

22   Q.   By the time you got back in August, did you learn they

23   had changed the permitting?

24   A.   Yes.

25   Q.   What had you heard?

1   A.   What I had been informed was that there had been -- there

2   had been -- the permit had looked one way, and then recently,

3   within like the last month or so, they had altered the language

4   on the permit to be very specific about things that would be

5   left, which was basically the things that we do as humanitarian

6   aid workers, and so -- but that that had happened, and I was

7   told that by someone who was a core of No More Deaths who I

8   believe had heard it from, like, legal team folks.

9   Q.   Did you have some reason to believe you might be

10  ticketed?

11  A.   Oh, yes.  I mean, we thought it was possible we could be

12  ticketed.

13  Q.   Did you have any reason to think you could be charged

14  with a crime?

15  A.   Like a criminal?

16  Q.   Like a criminal offense --

17  A.   No, no.

18  Q.   -- like you're charged with now?

19  A.   No.

20  Q.   We heard some people talking about an April meeting

21  between, I think, Margo Cowan and Sid Slone.

22       Did you hear that testimony?

23  A.   In the courtroom today?

24  Q.   Yes.

25  A.   Yes.

1    Q.   Had you ever heard that before?

2    A.   No.

3    Q.   Nobody had ever told you about that meeting before?

4    A.   No.

5    Q.   What about the July 6th meeting where the Department of

6    Justice said they had no interest in prosecuting?

7    A.   Yeah.  That was communicated to us.  It was communicated

8    to us, like, given that we knew what was happening with the

9    permits, which also in that moment it felt kind of like we're

10   unsure, as this is a new thing, and so we're working this

11   out, but that we would, you know, yes, because of that, in

12   doing the work that we do, yeah, maybe we would get a ticket or

13   a fine, but we were told that there had been some level of

14   communication and that we did not have any reason to believe

15   that we would be criminally charged.

16   Q.   Were you aware of other people who had been in the

17   wilderness area driving and leaving water who had been stopped

18   by Forest Service, Fish and Wildlife?

19   A.   Uh-huh, yeah.

20   Q.   What had you heard about that?

21   A.   The people who had been stopped had been asked to leave or

22   like -- but --

23   Q.   No tickets, nothing?

24   A.   I mean, I don't recall if people had received tickets on

25   the spot or if they had just been stopped and asked to leave or

1    if it was a combination of both, but there had been no further

2    action taken against them.

3    Q.   Now, I understand that you've been involved in different

4    things that are just more political action.

5    A.   Uh-huh.

6    Q.   And in fact, you've been arrested before?

7    A.   I have.

8    Q.   And you've been cited before?

9    A.   Yes.

10   Q.   When you were arrested, that was an intentional thing?

11   A.   The first time, yes.

12   Q.   You went out to do what you were doing with the idea you

13   were going to get arrested?

14   A.   Yes.

15   Q.   What did you --

16   A.   What happened?

17   Q.   No, not what happened, but I mean, did you learn anything

18   about that?

19   A.   Oh, yeah.  I mean, you know, I was 19.  It was a long time

20   ago.  I was in college, and it was, you know, as an early -- a

21   young, young organizer learning things, and we, you know, were

22   arrested intentionally.

23        And coming away from that, I felt like that was just not

24   for me.  That's not part of what I think is genuinely a useful

25   political strategy.  That's just speaking for myself.  But I

1  didn't plan on doing it again.

2  Q.   You planned on never getting arrested again?

3  A.   Yeah, that was the goal.

4  Q.   Did you plan on getting arrested in Cabeza Prieta or

5  getting criminally charged?

6  A.   No.

7  Q.   And after hearing that the prosecutors were not

8  interested in prosecuting and that several people had been

9  stopped and no one was arrested, did you have any reason to

10 think maybe you'd be arrested?

11 A.   No.

12 Q.   August 13th, 2017.

13 A.   Uh-huh.

14 Q.   Tell us about your day.

15 A.   I'll try.  It was really hot, which makes it hard for our

16 brains to function.  We, like a normalish day, got up,

17 breakfast, all that stuff.  Made a decision about what we were

18 going to do, where it seemed like water was needed.  Proceeded

19 to carry that out, which was in the -- just basically, I mean,

20 you know, different people were doing different things, but the

21 role that I was going to play.

22      And there's decision-making as to why people, you know,

23 are put together in different groupings and things like that.

24 You know, we think through all of that.  We were going to

25 basically try to get water drops out along that, like, edge of

DIRECT EXAMINATION OF OONA HOLCOLM

 1    that ridge, kind of like right where it gets flat down at the

 2    bottom of the road.

 3         Sorry.  I don't -- that's the only time I've ever been out

 4    there, so I'm not good at referring to --

 5    Q.   As we looked at the maps, kind of the --

 6    A.   Yes, like where you drive down past Charlie Bell Well and

 7    basically to where it levels out and there's, like, a road that

 8    continues, to make water drops at places along that road.

 9    Q.   You guys stayed on the established road --

10    A.   Yeah.

11    Q.   -- with the vehicle?

12    A.   Uh-huh.

13    Q.   Why that particular area?

14    A.   Because we believed that those spots were places that

15    people would be able to access the water, because they were

16    walking there, and there were a lot of deaths happening and

17    people really suffering coming through that corridor.

18         I mean, it's easily the most, like, desolate place I've

19    ever been.  It's brutal.

20    Q.   Did you take your own -- were those gallon jugs, did

21    those belong to you, or did they belong to the church?  Whose

22    water was that?

23    A.   That we carried to put out?

24    Q.   Yes.

25    A.   Yeah, I mean, I don't know the specifics of it, but yeah,

```
 1  they're not mine.  They're, you know, part of the organization,
 2  or the organization provides them for the work we're doing.
 3  Q.   And before you went, did you get a -- did you obtain a
 4  permit?
 5  A.   No.
 6  Q.   Did that have anything to do with the new Hold Harmless
 7  Agreement?
 8           MR. WALTERS:  Objection, Your Honor.  Leading.
 9           THE COURT:  Overruled.
10  BY MR. DUPONT:
11  Q.   The new --
12  A.   I did not get a permit because the language in the permit
13  had changed, and I felt that it would be lying to acquire a
14  permit and sign it knowing what I was going to do what I was
15  going to do.  That felt dishonest.
16  Q.   Lying about what?
17  A.   I was going to put water.  My plan was to put water in the
18  desert, and I didn't want to lie and say, no, I'm not going to
19  do that.  That's dishonest.
20  Q.   As you drove closer to the wilderness area, is there a
21  place you're supposed to sign in, a visitors kiosk?
22  A.   Uh-huh, yeah, yes.
23  Q.   And you found that place?
24  A.   Yes.
25  Q.   And what did you do when you got there?
```

1   A.   We -- and I'll be honest with you, again, it was really

2   hot.  We signed in.  I don't know if we signed in as, like, a

3   vehicle or as individuals.  I honestly don't remember.  But the

4   idea was that we wanted to make sure that -- we were trying to

5   be transparent about the fact that we were there and not hide

6   that.

7   Q.   Is that one of the policies of No More Deaths, to be

8   transparent?

9   A.   Yes.  It's part of kind of the core, what we call civil

10  initiative.  It's possible Mr. Fife talked about that, but

11  yeah, being transparent is core to our work.

12  Q.   What's the difference between, for example, civil

13  initiative and civil disobedience?

14  A.   I am not an expert on this, but my understanding is, being

15  trained, is that civil disobedience is intentionally breaking a

16  law to show that it is unjust.

17  Q.   Kind of like when you got arrested as a 19-year-old?

18  A.   Sort of like that.

19  Q.   And you've evolved into someone who engages in civil

20  initiative.  What's that?

21  A.   Civil initiative is believing that the law -- the greatest

22  law that applies, in this case it would be humanitarian law,

23  international law, and moral law, moral code, that the

24  Government is not actually following the law or, like, you

25  know, refugee law, asylum law, these greater laws, that the

DIRECT EXAMINATION OF OONA HOLCOLM

1  Government is not doing that, and so we are acting in a way

2  so -- to show and push that the Government do that, and also we

3  are basically following the law, the higher law.

4  Q.   You're following your religious or spiritual or moral --

5  A.   Yes.

6  Q.   -- imperative?

7  A.   As well as, you know, international human rights law.

8  Q.   Got it.

9         MR. DUPONT:  Can we show on the -- just the witness,

10  I think.  We've gone blank.

11         THE COURT:  Excuse me.  I didn't -- you said there's

12  civil disobedience and what's the other one?  Civil --

13         THE WITNESS:  Civil initiative.

14  BY MR. DUPONT:

15  Q.   So could you tell the Court about going out there with

16  the truck.  What did you have?  What kind of supplies did you

17  have?

18  A.   In addition to personal supplies, we had crates with

19  gallon jugs of water, flats of beans.

20  Q.   Why beans?

21  A.   So dehydration is a primary concern, and dehydration is

22  helped by drinking water, but it's actually also an electrolyte

23  imbalance.  I believe that the --

24  Q.   Dr. Hess?

25  A.   Yeah, that Dr. Hess talked about this.  So not only is

 1  food important for survival, but also, if you're going to be

 2  drinking water and you're in these extreme conditions, having

 3  something to eat is one other way of helping balance that.

 4  Q.   So salt and carbohydrates balance your electrolytes a

 5  little better?

 6  A.   Better, yeah.

 7  Q.   All right.  And what kind of personal supplies?

 8  A.   It would depend on the person.  Given my training, I carry

 9  a medic kit with me, so things that would apply for basic first

10  aid, though given the specifics, you know, additionally things

11  like electrolyte packets, but you know, things that would be

12  more useful in the desert as opposed to, you know, if I were in

13  the tundra or something.  But first aid supplies, my own

14  water, and my own means of sustaining myself.

15  Q.   Can you see Exhibit 205 in front of you?

16  A.   Uh-huh.

17  Q.   It's already been admitted, if we could publish.

18  A.   Yep.

19  Q.   So this is the green truck --

20  A.   Uh-huh.

21  Q.   -- on Growler Road --

22  A.   Uh-huh.

23  Q.   -- right above the valley to the left; right?

24  A.   Yes.

25  Q.   Was that green truck there when you went down?  Was the

 1  green -- did you pass that green truck already, or do you

 2  remember the green truck?

 3  A.   Yes.  Are you saying, like, was it there when we drove

 4  down the road?

 5  Q.   Yes.

 6  A.   Yes.

 7  Q.   Okay.

 8  A.   As I recall.

 9  Q.   And this is the established road you went down in picture

10  two?

11  A.   Yes.  As I recall, yeah.

12  Q.   The sign saying, "Government Road," did you see the sign?

13  A.   I mean, to be honest, I didn't really pay attention to the

14  signs.  I mean, obviously they're there.

15  Q.   And you knew you were supposed to have a permit?

16  A.   Yeah.

17  Q.   According to the --

18  A.   Yes, but I didn't go and read the signs closely.

19  Q.   All right.  And then what did you guys do there in

20  picture five?

21  A.   I mean, we kept driving past this.  You're saying on the

22  way down?

23  Q.   Yeah, who's -- did you guys leave this water there?

24  A.   Yes.  As I recall, yeah.

25  Q.   Why?

1  A.    Like, why did we leave the water?

2  Q.    Yeah.

3  A.    For -- I mean, for -- if people -- if humanitarian aid

4  volunteers were in the area, that they could take from that and

5  further take it out to, like, other waypoints, as well as -- I

6  mean, and if people came across it and needed it, obviously

7  they could also drink it.

8  Q.    Because you knew this was animal water here; right?

9  A.    My understanding of that was, yes, that it was -- if there

10  was water in it, which actually apparently that is not

11  something that we generally assumed, that it wasn't -- it

12  wasn't good enough to support human life.

13  Q.    It can make people sick, was your understanding?

14  A.    Yeah, that it would make people sick if there was anything

15  in there, or it had the likelihood to.

16  Q.    So people could -- you were aware that, up in this

17  area, up in north, there were a lot of people being -- a lot

18  of remains being recovered?

19  A.    Yes.

20  Q.    So presumably people dying up in there?

21  A.    Yes.

22  Q.    This is the white truck you guys are in?

23  A.    Yes.

24  Q.    Is that your shirt there hanging off to the right?

25  A.    I don't think so.

DIRECT EXAMINATION OF OONA HOLCOLM

1   Q.   Another picture of your truck?

2   A.   Uh-huh.

3   Q.   You guys kind of pulled off in what looked like a parking

4   area or a barren area?

5   A.   Uh-huh, yeah.

6   Q.   You never drove to where the plants were and stuff?

7   A.   No.

8   Q.   Okay.  Now we're back on the back of the truck.  What's

9   back here?

10  A.   What do I see back there?

11  Q.   Yeah.

12  A.   Some of the crates that we put water in, some of the --

13  you can kind of see -- Sun Vista is the beans that we carry.

14  Q.   And that's over here?  These are beans?

15  A.   Yeah, those are beans.

16  Q.   Okay.

17  A.   The green box is granola bars, again, an easy --

18  Q.   Salt?

19  A.   -- snack that will keep in the heat, and some empty water

20  jugs.  And you can kind of see in the bottom these blue, if you

21  can see those, those are -- those carry water for us.

22  Q.   This is where you guys pack your water?

23  A.   Yeah.  So you know, I would -- personally I would carry a

24  couple of water bottles, and I can refill out of those tanks.

25  They're like these blue tank things that we carry.

DIRECT EXAMINATION OF OONA HOLCOLM                    171

1   Q.   And these are empties that you guys have brought back?

2   A.   Yes.  When we find empty bottles and debris in the desert,

3   we try our best to pack it out.

4   Q.   How could you tell they were yours?

5   A.   I mean, because there's writing on them.  So, I mean, I

6   would have to look carefully at it, but like I said, we write

7   on the bottles, and so when we find bottles with the writing

8   we've done, we know that they were ours.

9   Q.   The religious and spiritual messages that are put on the

10  bottles?

11  A.   Yeah.

12  Q.   Can you tell me again what kind of messages are being

13  put?

14  A.   I think that, you know, each volunteer has their

15  preferences.  Some people draw.  I'm not an artist, so I don't

16  draw things on them more than hearts.  But people would say

17  things, like, you know, in Spanish, "Good luck."  Often I like

18  to, like, "Go," basically, like, "Walk," "Go with God."

19  Q.   In Spanish?

20  A.   "Vaya con Dios."

21  Q.   Is that what you'd write?

22  A.   Sometimes, yeah, or "Suerte," or things -- the idea is to

23  both be encouraging and also to say, like, you know, we're here

24  with you, we're thinking of you, and we want you to be okay.

25  Q.   And do you have -- tell us about how leaving water feels

DIRECT EXAMINATION OF OONA HOLCOLM

1  like a spiritual experience through either rituals or through

2  the feeling you have when you do it.

3  A.   So in my experience of doing many water drops, countless

4  over the years, generally I feel like what happens when you get

5  to the spot you're going to drop the water, you know, maybe

6  you've been, like, talking as you're walking with people, with

7  other volunteers, but often there's this kind of like quiet

8  that happens.

9      I mean, on one hand you get to stop.  You get to rest.

10  It's usually in a shaded spot, if possible.  But also, and I

11  can only speak for myself, but there's this kind of intense

12  feeling in those spaces, especially when you have found things

13  that people who are migrating have left or empty water bottles

14  that they've left, because you know that they were there.

15      You can feel their presence, which I feel like then, for

16  me, feels like this really spiritual, like, tie to those people

17  and wondering where they are, are they okay, are they not okay.

18      But I feel like those spaces, especially the longer that

19  they are established in different places, often also, you know,

20  people will leave things in, like, alters, small alters.

21  Sometimes -- there's just -- it's clear -- it's like the shared

22  -- it's like the space that we share under really horrible

23  circumstances, but they feel very sacred, and you can almost --

24  when you walk in it, it's often just like this quiet moment,

25  even though we're -- you're sitting with a group of people.

1  Q.   Are there other rituals around camp, around the work, the

2  work you're doing?

3  A.   In my experience, there's often time taken, somewhat a

4  process, but also to just be together and kind of like honor

5  this experience that we're having.  So in my experience, that's

6  often, like, at the end of the day, usually like with a fire,

7  though not necessarily, sitting around together and talking

8  about our experiences and kind of having this just, like,

9  shared moment, sometimes just taking moments of silence.

10 Q.   And you're aware of, I think you talked about some of the

11 rituals around the artifacts found in the desert --

12 A.   Uh-huh.

13 Q.   -- that belonged to the people who are suffering and

14 dying there?

15 A.   Yeah.  I mean, at Bird Camp, a camp that existed for a

16 long time in the Arivaca area, there was a large alter, and I

17 know -- I mean, so there's alters like that in our space that

18 we've built, but also you see migrants build alters along the

19 paths, and you find them.

20      But yeah, I mean, I -- and I know people have personal --

21 you know, like, I, on my personal alter in my home, keep like a

22 ring of a water bottle that I picked up in the desert.

23 Q.   And if you can look at 193 on your screen.

24 A.   Uh-huh.

25 Q.   Are these examples of some of the rituals that go on

```
 1    around the artifacts found?
 2    A.    Yeah.  I mean, I think that people have different ways of
 3    interacting with them, but yeah, this would be one way, yeah.
 4              MR. DUPONT:  Move Exhibit 193.
 5              MR. WALTERS:  Objection on relevance grounds.
 6              THE COURT:  Did you create that?
 7              THE WITNESS:  No, I didn't create that.
 8              THE COURT:  Is it yours?
 9              THE WITNESS:  Huh-uh.  I did not create that.
10    BY MR. DUPONT:
11    Q.    But you're aware of it, and this helps you form your
12    spiritual experience?
13    A.    Yes, I'm aware of projects like this one, yes.
14    Q.    And it forms your spiritual experience?
15    A.    Uh-huh.  Yeah, I would say that.  That's true.
16              MR. DUPONT:  Move to admit.
17              THE COURT:  When did you first see this?
18              THE WITNESS:  This particular picture?
19              THE COURT:  Well, yes.
20              THE WITNESS:  Well, I don't know.  This more
21    recently, this particular example.
22              THE COURT:  After you got charged or before?
23              THE WITNESS:  I think after.  I've seen a lot of
24    projects like this, but I think this is from after.
25              THE COURT:  The objection's sustained.
```

1        MR. DUPONT:  No further questions -- or excuse me.

2        No further questions.

3                    CROSS-EXAMINATION

4    BY MR. WALTERS:

5    Q.   Let's talk about your failure to get a permit in this

6    case.  Okay?

7    A.   Sure.

8    Q.   Before you got to Cabeza Prieta, you knew that you had to

9    get a permit; right?

10   A.   Uh-huh, yes.

11   Q.   You knew that it was federal law that required you to get

12   a permit to go onto that National Wildlife Refuge?

13   A.   I don't know if I knew it was federal law.  I knew we

14   needed to get a permit.  That would be stretching my knowledge.

15   Q.   Were you counseled by anyone not to obtain a permit?

16   A.   Not to obtain a permit?

17   Q.   Yes.

18   A.   Define "counsel."

19       MR. DUPONT:  Objection, Your Honor.  Calls for

20   attorney-client privilege.  I don't know --

21       MR. WALTERS:  Not necessarily.  It could have been

22   anybody else in the organization as well.

23       THE COURT:  Yeah, ask her that.

24   BY MR. WALTERS:

25   Q.   Did anybody other than your attorneys, your current

CROSS-EXAMINATION OF OONA HOLCOLM

1    attorneys, advise you to not get a permit?

2            MR. DUPONT:  Objection, Your Honor.  She may have

3    had past counsel.  I just want to limit this part.

4            THE COURT:  Well, other than a lawyer, did somebody

5    tell you not to get a permit?

6            THE WITNESS:  No one told me not to get a permit.

7    That's not how decision-making happens.

8            MR. WALTERS:  But Your Honor, it's a specific

9    question about whether any lawyer other than these three

10   sitting at counsel table -- she at one point specifically said

11   that she had been given advice by the legal team, and the

12   defense, as far as I know, is relying on an entrapment by

13   estoppel defense which partly comes, I would imagine, from any

14   advice that she may have received from her -- from No More

15   Deaths' legal counsel.

16           I think you also have an issue of whether No More

17   Deaths' legal counsel applied to -- that attorney-client

18   privilege applied all the way down to this particular

19   defendant.

20           MR. DUPONT:  Your Honor, I don't know what principle

21   of law he's getting at that would allow -- that forces her to

22   waive attorney-client privilege.  She's not done that, if she

23   had previous counsel before, which I believe they did.  We

24   haven't -- I don't think reliance on counsel's advice is a

25   defense in this case.

 1            THE COURT:  All right.  Okay.  If that's -- I'll

 2   accept that.  Reliance on counsel is not a defense.

 3            MR. WALTERS:  That's fine.  That's what I'm saying,

 4   Your Honor, but the Ninth Circuit has been very clear that,

 5   when there is an entrapment by estoppel defense raised, in

 6   part because of -- and I should back up.

 7            I believe the Ninth Circuit is clear on that, that

 8   the Government should not be precluded from exploring

 9   that, exploring any conversations that she may have had with

10   legal counsel of No More Deaths because it goes specifically

11   to whether that reliance on counsel was unreasonable or not.

12   In order for us to determine whether that reliance was

13   reasonable, we first have to be able to establish that that

14   communication took place.

15            MR. DUPONT:  Your Honor, I think this is the third

16   time today I've heard the Government say there's all kinds of

17   Ninth Circuit case law, but I haven't seen a single case.

18   She's not waiving her attorney-client privilege.

19            THE COURT:  And as such, she won't be able to rely

20   on what her lawyer may have told her or if a lawyer told her.

21            MR. WALTERS:  That's fair enough, Your Honor.

22   BY MR. WALTERS:

23   Q.   Did anyone other than a lawyer that was representing you

24   or No More Deaths counsel you to not get a permit?

25   A.   Are you asking if anyone who was not a lawyer counseled

1   me?

2   Q.   Correct.

3   A.   No.  That's not how decisions are made.

4   Q.   Okay.  But despite that, you willfully chose not to get

5   one that day?

6   A.   That's correct.

7   Q.   And you knew -- you didn't get one because, frankly, you

8   knew you were going to violate it?

9   A.   Yes.  I wanted to be honest.

10  Q.   Because you knew you were going to violate it.

11  A.   Yes.

12  Q.   You also never got a special-use permit; correct?

13  A.   No.

14  Q.   Are you aware of what a special-use permit is?

15  A.   Vaguely.

16  Q.   You know that getting a special-use permit would allow

17  you to drive a motor vehicle into a wilderness area; correct?

18  A.   Oh, yes.

19  Q.   So you know what those are?

20  A.   I know what you just told me.

21  Q.   You know what those are?

22  A.   Yes.

23  Q.   And you never tried to get one of those?

24  A.   No.

25  Q.   Did anyone ever counsel you, other than a lawyer, again,

1    counsel you not to get a special-use permit?

2    A.    No one counseled me in that way.

3    Q.    Your testimony was that you didn't -- I'll scratch that.

4          You would agree with me that at the time that you were on

5    Cabeza Prieta, you possessed those supplies; correct?

6    A.    Can you define "possessed."

7    Q.    You had control over them.

8    A.    I don't know if I really understand your question, that I

9    -- what does that mean?

10   Q.    You took part in moving them; right?

11   A.    Some of them.

12   Q.    Okay.  And frankly, you intended to leave those supplies

13   at Charlie Bell Well and other places; right?

14   A.    Some of them.

15   Q.    Okay.  You wanted illegal aliens to find those supplies?

16   A.    I wanted people who were at risk of dying in the desert to

17   find water, yes.

18   Q.    That's not what I asked you.  You wanted illegal aliens

19   to find those supplies; right?

20             MR. DUPONT:  Objection.  Asked and answered, Your

21   Honor, in full.

22             THE COURT:  Try "undocumented migrants."

23             MR. WALTERS:  It's a legal term, Your Honor.

24             THE COURT:  I know it is, but --

25             MR. WALTERS:  The Court -- the audience can know

CROSS-EXAMINATION OF OONA HOLCOLM

1   that as well.

2   BY MR. WALTERS:

3   Q.   You wanted those people to take those supplies with them;

4   correct?

5   A.   To take them or drink them or whatever they needed to do

6   to survive, yes.

7   Q.   So is that a "yes?"

8   A.   Yes.

9   Q.   Okay.  Obviously if one of those people were to take some

10   of those supplies and carry them with them, you would not be

11   able to pick them up later; right?

12   A.   It's possible.

13   Q.   But you might not?

14   A.   Possibly not.

15   Q.   And if you didn't pick them up, that was something that

16   was okay with you because you knew that maybe they picked them

17   up instead?

18   A.   Yes, given how much we take out of the desert, yes, and

19   given someone's possibility of death, yes.  That was a tradeoff

20   I was willing to make.

21   Q.   Regardless of your intent, you left -- you and your

22   codefendants left those supplies there; right?

23   A.   Yes.

24   Q.   And after you parked the truck, you and your codefendants

25   went off into the desert; right?

CROSS-EXAMINATION OF OONA HOLCOLM

1  A.   Yes.

2  Q.   Did you drop off additional supplies there?

3  A.   Yes.

4  Q.   And again, your intent with those supplies was that

5  someone would come and take those supplies?

6  A.   Yes.

7  Q.   Let's talk about your testimony that you thought there

8  was an agreement between No More Deaths and the U.S.

9  Attorney's Office.  Okay?

10  A.   Okay.

11  Q.   You were never at any meetings with the U.S. Attorney's

12  Office?

13  A.   No.

14  Q.   You never spoke directly to any Assistant United States

15  Attorney?

16  A.   No.

17  Q.   You never spoke to someone who was appointed by the

18  President as the United States Attorney?

19  A.   No.

20  Q.   You never spoke to the First Assistant United States

21  Attorney?

22  A.   No.

23  Q.   You never spoke to anyone at all from the U.S. Attorney's

24  Office?

25  A.   No.

1   Q.   You only heard that you have -- that you may have

2   permission from a third party.  Is that fair?

3   A.   That I may have permission to do what?

4   Q.   That you may have permission to conduct your activities

5   out on Cabeza Prieta from a third party.  You heard that from

6   someone else?

7   A.   I don't think that that's a correct statement of what I

8   heard.

9   Q.   You heard that the U.S. Attorney's Office had no interest

10  in these cases from a third party?

11  A.   Yes, from a third party, yes.

12  Q.   Were you ever aware of a search warrant that was executed

13  at the Arivaca camp?

14         MR. DUPONT:  Objection.  Relevance.

15         THE COURT:  Overruled.

16  BY MR. WALTERS:

17  A.   Can you repeat the question?

18  Q.   Sure.  Were you ever made aware of a search warrant that

19  was executed at the Arivaca camp prior to your incident?

20  A.   I don't have any recollection of that.

21  Q.   That's fine.  Before you went to Cabeza Prieta, you

22  planned ahead; right?

23  A.   Uh-huh, yes.

24  Q.   You discussed with other people where you were going?

25  A.   Yes.

CROSS-EXAMINATION OF OONA HOLCOLM

1   Q.   What you were going to do there?

2   A.   Yes.

3   Q.   Where you were going to drop the supplies?

4   A.   Yes.

5   Q.   Were the plans made that day or were they made prior to

6   that day?

7   A.   That would be a both/and.

8   Q.   Okay.  You were not faced with a situation on August 13th

9   where you had to immediately act to save another person's

10  life; correct?

11  A.   No, not on that day.

12  Q.   So if you wouldn't have -- so if you would not have

13  acted, somebody would have died immediately?

14  A.   I don't understand the question.

15  Q.   Well, I'm asking you, did you know of an immediate harm

16  at that particular point in time when you went to Cabeza

17  Prieta?

18  A.   It's a difficult question to answer, to be honest.  I have

19  been in the desert dropping water and had someone almost die in

20  front of me, so a specific individual on that day, I don't know

21  which specific individual, but I had all likelihood an

22  experience to believe that it was possible that people not

23  finding water could die that day.

24  Q.   Did you have information that, at the particular time of

25  your actions, there was someone in need of immediate medical

1   assistance?

2   A.   I guess what I'm trying to ascertain is, if someone was in

3   the desert, walking for days in 110 degree heat, then yes, that

4   would be knowledge that they could possibly die if there wasn't

5   water put there.

6   Q.   Could die when?

7   A.   That day.  The next day.

8   Q.   Five days later?

9   A.   Sure.

10  Q.   Ten days later?

11  A.   I mean, I guess.

12  Q.   You are aware that Border Patrol has the ability to

13  conduct search and rescue missions; right?

14  A.   Yes.

15  Q.   So if you did know about someone who was in need of

16  immediate medical assistance, you could have called 911;

17  correct?

18  A.   If I knew where that person was.

19  Q.   Sure.  But you didn't know where anyone was that needed

20  immediate medical assistance?

21  A.   Not to that specific location -- not that specific of a

22  location knowledge, no.

23  Q.   Are you familiar with the rescue beacons on the refuge?

24  A.   I am.

25  Q.   You know there's one at Charlie Bell Pass; correct?

1   A.   Yes.

2   Q.   And these beacons, you know, allow people who are having

3   medical emergencies to call Border Patrol directly?

4   A.   Yes.

5   Q.   The downside is that the person may be removed or

6   deported; correct?

7   A.   That's a possibility.

8   Q.   And that's the part you disagree with; right?

9   A.   Which?  I disagree with what?

10  Q.   That as part of getting help, they may be deported or

11  removed.

12  A.   I don't disagree with that fact, that that is factually

13  possible.

14  Q.   Let me put it a different way.  You do not believe that

15  medical attention should be tied to deportation.

16       Is that a fair statement?

17  A.   Yeah.

18           MR. DUPONT:  Objection.  Irrelevant, Your Honor.

19  BY MR. WALTERS:

20  Q.   Was that a "yes?"  I'm sorry.

21  A.   Yeah.

22  Q.   Thank you.

23       So we've established that your intent was to leave

24  supplies on the refuge; correct?

25  A.   Yes.

1    Q.   You wanted a person to find the stash or cache of

2    supplies that you were leaving so that that person could

3    continue their journey north; right?

4    A.   I want them to find it so that they are less likely to

5    suffer and die.  Where they go after that is up to them.

6    Q.   You testified about No More Deaths being transparent;

7    right?

8    A.   Yes.

9    Q.   You never told Fish and Wildlife that you were going to

10   be on the refuge that day, correct, before you got there?

11   A.   I personally did not.

12   Q.   Okay.  You never personally told Fish and Wildlife where

13   you were going to place those stashes or caches of water;

14   right?

15   A.   Not me personally.

16   Q.   When you got to Cabeza Prieta, you didn't stop by the

17   main office to let the administration know that you were going

18   to be there and what your activities were going to be?

19   A.   No, I don't recall doing that.

20   Q.   You would never tell any law enforcement officer where

21   these stashes of supplies were.  Is that fair?

22   A.   Can you clarify the question?  I would not --

23   Q.   When you were approached by Officer West, did you tell

24   him where your stashes were?

25   A.   I don't think so.

CROSS-EXAMINATION OF OONA HOLCOLM

1    Q.    Why not?

2    A.    I don't know why I would.

3    Q.    If part of your testimony was that you try to be

4    transparent along with No More Deaths, why wouldn't you tell

5    him?

6    A.    I mean, if he asked, I might be faced with that question.

7    I don't recall him asking.

8    Q.    You didn't volunteer that information though; right?

9    A.    No.

10   Q.    In terms of the permit, your testimony was that you

11   didn't sign it because of the change that had occurred in the

12   permit; right?

13   A.    Yes.

14   Q.    Were you given any information about the permit changing

15   regarding being on the refuge without a permit?

16   A.    I don't understand the question.  Can you ask it again?

17   Q.    Were you given any information about the Hold Harmless

18   Agreement changing as to your requirement to get a permit?

19   A.    I'm sorry.  I don't understand the question.

20   Q.    Regardless of the change in the Hold Harmless Agreement,

21   you still knew that you had to get a permit; correct?

22   A.    Yes.

23   Q.    And regardless of the change in permit, you still knew

24   that you were not allowed to operate or be part of a motor

25   vehicle that was driving in the wilderness area?

1          MR. DUPONT:  Objection, Your Honor.  Misstates the

2    law.  Being a part of a vehicle?

3          THE COURT:  Rephrase your question.

4    BY MR. WALTERS:

5    Q.   Regardless of the change in the permit, you knew that you

6    couldn't drive -- and I understand that you weren't driving --

7    but that you knew you still could not drive in a wilderness

8    area?

9    A.   Are you asking me if I know that I can't drive in a

10   restricted area?

11   Q.   Correct.

12   A.   I mean, yeah.

13   Q.   And specifically a restricted area on the Cabeza Prieta

14   National Wildlife Refuge.

15   A.   Yeah, I suppose.

16   Q.   Okay.  Did you relay that information to Ms. Hoffman?

17   A.   No.

18   Q.   Okay.  You never told her, hey, we can't drive down

19   there?

20   A.   No.

21   Q.   Okay.  I want to talk about some of the messages that you

22   leave on the bottles.  Okay?

23   A.   Sure.

24   Q.   One of those messages you testified was, "Buena suerte";

25   correct?

CROSS-EXAMINATION OF OONA HOLCOLM

1    A.    Uh-huh.

2    Q.    And I believe that translates -- I don't speak Spanish,

3    but I believe that translates to, "Good luck;" right?

4    A.    Yeah.

5    Q.    Good luck with what?

6    A.    Surviving.

7    Q.    Just surviving?

8    A.    And thriving.  I want the best for people.

9    Q.    And it has nothing to do with good luck on your journey?

10   A.    I mean, I'm not quite sure exactly what you're trying to

11   ask me, but if someone is walking through the terrain -- and I

12   don't know if you've ever seen this terrain, but it is

13   incredibly rugged and difficult to get through.  I would wish

14   anyone good luck in surviving that.

15   Q.    Okay.  Your testimony was that you never thought that

16   you'd be prosecuted for any criminal charges relating to this;

17   correct?

18   A.    That's correct.

19   Q.    And just to be clear, you were not arrested in this case;

20   correct?

21   A.    Nope.

22   Q.    You were not arrested the day that you had interactions

23   with Officer West?

24   A.    No.

25   Q.    And you were given a summons in this case; correct?

```
 1    A.    That's correct.

 2    Q.    You were not hauled off in cuffs and put in jail; right?

 3    A.    Nope.

 4              MR. WALTERS:  Okay.  May I have a minute, Your

 5    Honor?

 6              THE COURT:  Yes.

 7              MR. WALTERS:  I have no further questions, Your

 8    Honor.

 9                          REDIRECT EXAMINATION

10    BY MR. DUPONT:

11    Q.    Hello again.

12    A.    Hi again.

13    Q.    You were asked whether you or anyone else you were aware

14    had told the Government that you intend -- that No More Deaths

15    intended to drive the roads and leave water; is that right?

16    A.    Uh-huh.

17    Q.    Now, you heard the testimony --

18    A.    Uh-huh.

19    Q.    -- also of Yurie Aitken reporting on a meeting?

20    A.    Yes.

21    Q.    And during that meeting, you heard him testify that No

22    More Deaths told the Government that they -- that No More

23    Deaths intended to drive the roads and leave water; right?

24              MR. WALTERS:  Objection, Your Honor.  It's

25    irrelevant.  She wasn't part of that meeting, and what she's
```

 1  heard here at testimony, you know, approximately a

 2  year-and-a-half later is not relevant.

 3          MR. DUPONT:  I'll get to that, Judge.

 4          THE COURT:  The objection is overruled.

 5  BY MR. DUPONT:

 6  Q.   You heard Yurie Aitken's testimony that No More Deaths

 7  told the Government --

 8  A.   Uh-huh.

 9  Q.   -- you intended to drive the roads and leave water;

10  right?

11  A.   Yes.

12  Q.   And you heard testimony that the response was the

13  Government does not intend to prosecute; right?

14  A.   Yes.

15  Q.   Had you heard basically those same facts before you went

16  out August 13th?

17  A.   Yes.

18  Q.   You were aware that many people had been stopped between

19  July 6th and August 13th driving and leaving water by Forest

20  Service, and no one had been prosecuted to your knowledge;

21  right?

22  A.   Yes.

23  Q.   You know, I looked at the video.  Did you -- the video of

24  you guys out there when it was 110 degrees that day.

25  A.   Uh-huh.

REDIRECT EXAMINATION OF OONA HOLCOLM

1   Q.   Do you remember being out there in that heat?

2   A.   Yeah.

3   Q.   Where had you come from, before you came to Arizona?

4   A.   Before I came to Arizona, I live in Minneapolis,

5   Minnesota.  I had come from there.

6   Q.   Different climate?

7   A.   Little bit.

8   Q.   How did it feel to be out there in 110?

9   A.   I mean, it's really difficult.  It's disorienting.  It's

10  really hard, I'll be honest with you.

11  Q.   Physically, how did you feel?

12  A.   Very physically -- it's incredibly straining on the body.

13  It's really tiring.  It takes -- it takes me days, even after

14  all these years, it takes me days to acclimate and be able to

15  be at my best.  It's exhausting.

16        To be in the -- you know, in my training, to be in the

17  desert at that -- in those conditions, at that temperature,

18  you're just -- you're dehydrated just by being there, so it's

19  really taxing on the body.  It makes you -- your brain kind of

20  fuzzy and hard to think clearly.  It's very intense.

21  Q.   Do you know how much water you drank that day?

22  A.   I mean, many, many water bottles.  You know, I carry more

23  or less, like, whatever, you know, like, a Nalgene kind of

24  thing is.  I mean, more of those than I can even remember.

25  Q.   More than a gallon?

1    A.    Oh, yeah.

2    Q.    From where you were down past Charlie Bell Well, I think

3    we heard testimony you were about 2.2 miles from the pass?

4    A.    Uh-huh.

5    Q.    And there's a beacon up there?

6    A.    Uh-huh.

7    Q.    That's kind of a steep hike.

8    A.    To say the least.

9    Q.    Without water, do you think you could have walked down

10   from there and walked back up?

11   A.    Oh, no.  I actually, just from trying to acclimate in the

12   few days I had been there, opted to be in this truck because I

13   was -- my body was, like, struggling to keep up, and I didn't

14   want to do that hike, and I get to rest and drink all the water

15   I want and have all the food I want.

16   Q.    Would you have been physically able to walk up that hill

17   with no water?

18   A.    No.  No way.

19              MR. DUPONT:  No other questions.

20              THE COURT:  Do you know the maximum punishment for

21   this offense is six months incarceration?

22              THE WITNESS:  I have been made aware of that, yes.

23              THE COURT:  Did you ever know that before you

24   started this?

25              THE WITNESS:  No.

```
1              THE COURT:  Okay.  Thanks.

2              MR. DUPONT:  May she be excused?

3              THE COURT:  Yes, she may step down.

4              (A discussion was had off the record between the

5              Court and the clerk.)

6              THE COURT:  Let's stop now.

7              MR. DUPONT:  Thank you.

8              THE COURT:  Thank you.  We'll stand at recess until

9     9:30.

10             (Proceedings conclude at 4:41 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2

3        I, Erica R. McQuillen, Federal Official Realtime

4   Reporter, in and for the United States District Court for the

5   District of Arizona, do hereby certify that, pursuant to

6   Section 753, Title 28, United States Code, the foregoing is a

7   true and correct transcript of the stenographically reported

8   proceedings held in the above-entitled matter and that the

9   transcript page format is in conformance with the regulations

10  of the Judicial Conference of the United States.

11        Dated this 29th day of January, 2019.

12

13                       s/Erica R. McQuillen
                    Erica R. McQuillen, RDR, CRR
14                  Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25