1          IN THE UNITED STATES DISTRICT COURT

2                   DISTRICT OF ARIZONA

3   United States of America                MJ-17-339-TUC-BPV

4   vs.

5   Natalie Renee Hoffman,                   January 17, 2019
    Oona Meagan Holcomb,                          9:37 a.m.
6   Madeline Abbe Huse, and               Tucson, Arizona
    Zaachila Isabel Orozco-McCormick,

7
            Defendants.
8   _____

9

10

11      REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS

12               BENCH TRIAL DAY THREE

13      BEFORE THE HONORABLE BERNARDO P. VELASCO
               UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22   Court Reporter:        Erica R. McQuillen, RDR, CRR
                            Official Court Reporter
23                          405 W. Congress Street
                            Tucson, Arizona 85701
24                          (520)205-4267

25      Proceedings Reported by Stenographic Court Reporter
        Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2   For the Government:

 3         Anna Roberta Wright
           Nathaniel Jacob Walters
 4         United States Attorney's Office
           405 West Congress
 5         Tucson, Arizona 85701

 6

 7   For the Defendants:

 8         Anne Michelle Chapman
           Mitchell Stein Carey Chapman, PC
 9         One Renaissance Square
           Two North Central Avenue
10         Suite 1450
           Phoenix, Arizona 85004
11

12         Christopher Baird Dupont
           Trautman Dupont, PLC
13         P.O. Box 431
           Phoenix, Arizona 85001
14

15         Louis S. Fidel
           Piccarreta & Davis, PC
16         145 South Sixth Avenue
           Tucson, Arizona 85701
17

18

19

20

21

22

23

24

25
```

1                        EXAMINATION INDEX

2   ZAACHILA OROZCO-McCORMICK

        DIRECT BY MR. FIDEL . . . . . . . . . . . . . . 10
3       CROSS BY MS. WRIGHT . . . . . . . . . . . . . . 24
        REDIRECT BY MR. FIDEL . . . . . . . . . . . . . 44

4

5   NATALIE HOFFMAN

        DIRECT BY MR. FIDEL . . . . . . . . . . . . . . 51
6       CROSS BY MR. WALTERS  . . . . . . . . . . . . . 65
        REDIRECT BY MR. FIDEL . . . . . . . . . . . . . 82

7

8   MADELINE HUSE

        DIRECT BY MS. CHAPMAN . . . . . . . . . . . . . 83
9       CROSS BY MS. WRIGHT . . . . . . . . . . . . . . 97
        REDIRECT BY MS. CHAPMAN . . . . . . . . . . . .114

10

11  JULIETTE FERNANDEZ

        DIRECT BY MS. WRIGHT  . . . . . . . . . . . . .123
12      CROSS BY MR. DUPONT . . . . . . . . . . . . . .151
        REDIRECT BY MS. WRIGHT . . . . . . . . . . . . 154

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S
2              THE CLERK:  Calling Case 17-MJ-339, United States of
3    America vs. Natalie Renee Hoffman, Oona Meagan Holcomb,
4    Madeline Abbe Huse, and Zaachila Isabel Orozco-McCormick, all
5    on for trial.
6              Counsel, please state your appearances.
7              MS. WRIGHT:  Good morning, Your Honor.  Anna Wright
8    and Nathaniel Walters on behalf of the United States.  With us
9    at counsel table is Officer West, our case agent.
10             Thank you.
11             THE COURT:  Thank you.
12             MR. FIDEL:  Good morning, Your Honor.  Louis Fidel,
13   Anne Chapman, and Chris Dupont representing the defendants,
14   Natalie Hoffman, who's here, Madeline Huse is here, Zaachila
15   Orozco-McCormick is here, and Oona Holcomb is just on her way
16   in.
17             THE COURT:  She's out in the hallway talking to
18   somebody.
19             You may be seated.
20             You may proceed.
21             MS. CHAPMAN:  Good morning, Your Honor.  We had a
22   couple of preliminary issues we wanted to raise with the Court
23   and bring to the Court's attention.
24             First, with respect to the selective
25   enforcement/selective prosecution, we wanted to raise with
```

1   Your Honor that we have been asking the Government since March

2   5th of 2018, by way of letter, and then followed by a motion

3   to compel, followed by a motion to dismiss and a motion to

4   reraise the motion to compel, for evidence related to the

5   policies and procedures with respect to the enforcement of

6   these claims, or excuse me, these offenses, and the Government

7   has refused to provide this information.

8           And yesterday, during Ms. Wright's questioning of

9   Professor Bartels, she raised those policies and procedures in

10  his --

11          THE COURT:  Professor who?

12          MS. CHAPMAN:  Bartels.

13          THE COURT:  Okay.

14          MS. CHAPMAN:  She raised the issue of his lack of

15  knowledge of those policies and procedures, which he doesn't

16  have knowledge of because the Government refused to provide

17  them.

18          At least as of the date that Your Honor denied their

19  motion in limine with respect to selective enforcement, the

20  Government was aware that that information was material to the

21  defense, and they have not provided it to us, Your Honor.

22          We've been asking for it, again, for almost a year,

23  since March 5th.  I have a series of communications from my

24  office to Ms. Wright asking for the information and explaining

25  its relevance.

1             THE COURT:  Thank you.

2             MS. CHAPMAN:  Your Honor, the other issue we'd like

3    to address is we have submitted declarations in support of a

4    prior motion related to the Religious Freedom Restoration Act.

5    They are marked as Exhibits 118, 119, and 120.

6             And Your Honor, we would ask that the Court would

7    make a finding now that, based on those declarations, we have

8    made a showing that the defendants have met their initial

9    burden of showing that there has been a substantial

10   infringement on their sincere exercise of religious beliefs

11   based on those declarations.

12            If Your Honor does that, that may affect the

13   defendants' decisions to testify, as been raised in prior

14   motions.

15            THE COURT:  Okay.

16            MS. CHAPMAN:  Thank you, Your Honor.

17            THE COURT:  Thank you.

18            MS. WRIGHT:  Your Honor, taking them in the order

19   Ms. Chapman raised them, first, as to selective prosecution,

20   this moment is the first time the defense has raised the

21   defense of selective prosecution.  They have always framed

22   their requests as request for discovery, dismissal, et

23   cetera, related to selective enforcement.

24            And as I think is clear from the briefing and case

25   law, the bar for proving, at least even to get discovery

1   related to selective enforcement, is higher than that -- I'm

2   sorry -- for selective prosecution is higher than that for

3   selective enforcement.

4          Based on what the defendants provided to the Court,

5   the Court has already found that they haven't even made prior

6   to trial a prima facie claim that would entitle them to

7   disclosure for selective enforcement.  So the request is

8   untimely as to selective prosecution.  Prior to trial they did

9   not meet their burden to get disclosure for selective

10  enforcement.

11         And I would also note for the Court that yesterday

12  was the first time the Government saw the defendants' summary

13  exhibit when it was presented to Mr. Bartels.  It was not

14  disclosed on January 2.  My understanding was that the plan

15  was to disclose it on the morning of the first day of trial,

16  but that did not happen.

17         And in addition, only after I asked did I find out

18  that some information that supported that exhibit had not been

19  disclosed to the Government, and it was not the plan to

20  disclose it until I asked for it.

21         We only got a full copy of the exhibits today, so in

22  terms of what they have presented at trial yesterday, there

23  were disclosure issues there, and frankly, based on the cross

24  of Dr. Bartels, it's clear that he did not have a sufficient

25  basis to make that exhibit, that that exhibit was inaccurate

1   in large respects, and regarding my questions about the

2   policies of the United States Attorney's Office, the questions

3   only showed that Mr. Bartels was unaware if there were

4   policies at all and that he didn't have a basis to make the

5   chart in the first place.

6          It did not show that there were actually policies,

7   that there is anything else to look into, just that

8   Mr. Bartels was unaware of anything related to policies,

9   whether or not they existed.  So I would ask the Court to deny

10  the defendants' relief on that issue.

11         As to the RFRA, frankly, the declarations are

12  insufficient of themselves.  The Court has already made the

13  finding on that.  Looking at them now, there is nothing there

14  that can support the request that -- the relief that

15  Ms. Chapman asked for.

16         The Government is entitled to cross-examine the

17  defendants if they're going to assert this defense, and that

18  is necessary for the Court to judge their credibility as to

19  their statements.  The Court -- it's a very difficult task

20  doing that from a cold record, a hard piece of paper with four

21  or five paragraphs.

22         The Government is under no obligation to stipulate

23  to this, and there are three defendants who need to testify

24  about their particular beliefs and how that affected what they

25  did on the particular day.

1           I would note for the Court that the declarations do

2   not address the events of that particular day or how their

3   beliefs cover what they did on that day, and that is their

4   burden.  So if the defendants are not intending to testify, we

5   would ask the Court to find that they have not established

6   their prima facie burden on RFRA.

7           And Your Honor, just -- I mentioned it in my

8   argument, but I did want to highlight for the Court that we

9   are asking the Court to not admit Exhibit 240, which was the

10  summary exhibit, based on the lack of foundation for it and

11  its inaccuracy.

12          Thank you.

13          MS. CHAPMAN:  Your Honor, if I may just respond?

14          THE COURT:  Sure.

15          MS. CHAPMAN:  Thank you.

16          The original motion to compel that was filed was

17  specific that it was with respect to selective prosecution.

18  It was broadened to include selective enforcement later, but

19  at least as of the time of that motion, and frankly, given the

20  letters that I can provide to the Court here from March, the

21  Government was aware that we were seeking information related

22  to selective prosecution with respect to their policies and

23  procedures.

24          With respect to the information that that chart was

25  based on, it was based on FOIA information, Freedom of

 1   Information Act requests that we received from Fish and

 2   Wildlife.  Fish and Wildlife automatically provided our FOIA

 3   request and responses to the U.S. Attorney's Office, and

 4   Ms. Wright acknowledged that yesterday, so there was no

 5   disclosure that that chart was based on of which she was

 6   unaware.

 7           Furthermore, Your Honor, the absence of a prima

 8   facie case is not the requirement in the U.S. Attorney's

 9   manual or Rule 16 with respect to the Government's disclosure

10   obligations.  That's not the point.  The point is it was

11   material to the defense, the Government knew it, and they

12   failed to provide the evidence.

13           THE COURT:  Exhibit 240 is admitted.  Exhibit 240

14   also is -- supports the Court's decision to deny the motion

15   for discovery.

16           With respect to the admission of Exhibits 118 and

17   119, that's denied, and the witnesses -- or the information

18   contained in the affidavits or statements, in order to be

19   introduced, they'd have to testify, so they're denied.

20           Who's your next witness?

21           MR. FIDEL:  Zaachila Orozco-McCormick.

22              ZAACHILA OROZCO-McCORMICK, WITNESS, SWORN

23                      DIRECT EXAMINATION

24   BY MR. FIDEL:

25   Q.   Do you need some water?

1    A.    Yes, please.

2    Q.    Could you introduce yourself to the Court, please.

3    A.    My name is Zaachila Orozco-McCormick.

4    Q.    And how old are you, Zaachila?

5    A.    I'm 21.

6    Q.    Do you live in Tucson?

7    A.    I do not.

8    Q.    Where do you live?

9    A.    I live in Seattle, Washington.

10   Q.    And how long have you lived there?

11   A.    My entire life.

12   Q.    All right.  Who do you live there with?

13   A.    I lived with my parents.  Very recently moved out.  Live

14   pretty close to them, though.

15   Q.    All right.  You still live nearby?

16   A.    Very, yeah.  I see them very often.

17   Q.    And what do you do up in Seattle?

18   A.    I'm a barista.

19   Q.    How long have you done that?

20   A.    Since I had, like, my first job pretty much.

21   Q.    And how far did you go in school?

22   A.    Minimal.  Like, one class in college, which I want to go

23   back to.

24   Q.    You want to go back, did you say?

25   A.    Yes.

1   Q.    What -- what do you want to study?

2   A.    I would like to have my own business.

3   Q.    All right.  And did you grow up with -- in the house with

4   your parents?

5   A.    Yes, I did.

6   Q.    What -- how would you describe your spiritual beliefs?

7   A.    My family is very close-knit.  I was taught from a very

8   young age -- I would say they were very giving, and even though

9   -- it was taught to me from a very young age that giving was a

10  very prominent part of our family dynamic, and I participated

11  in such.  I found myself giving a lot of love and support and

12  doing physical, like, acts on it towards anybody pretty much

13  that needed it or wanted it.

14  Q.    Why?  Is there, like, a traditional religious foundation

15  of those beliefs?

16  A.    I know my dad was raised Catholic, but for me, it was

17  necessary to love everyone, and it was taught to me as such, I

18  guess.

19  Q.    All right.  And is that something that was taught to you

20  by whom?

21  A.    My parents.

22  Q.    All right.  And is that belief of what is necessary, is

23  that something that drew you to work with No More Deaths?

24  A.    Most definitely.  I was aware of the border crisis from a

25  long time ago.  Like I said, since I was little.

1    Q.   How did you learn about that?

2    A.   I grew up watching documentaries of people crossing the

3    border.

4    Q.   Who showed you those things?

5    A.   My parents.

6    Q.   And was there -- and what in particular -- well, how did

7    you learn about No More Deaths?

8    A.   Online.  I believe I was -- I'd already graduated high

9    school.  I just -- I wanted to find a way to apply what I felt

10   were, like, my skills and my -- my skills, pretty much, to a

11   cause that I found was very just and very necessary.

12   Q.   So let me ask you a couple of things.  First, what skills

13   are you talking about?

14   A.   I am a native Spanish speaker.  I felt that, with the

15   information that I've been exposed to from a very young age

16   about the border crisis and about migrants dying on the border,

17   that I had, like, a little bit more previous knowledge and

18   wanted to learn more about how I could provide my skill set and

19   my effort in, like, directly, like, in direct action to that.

20   Q.   You mentioned that you're a native Spanish speaker.

21   A.   I am.

22   Q.   Where is your family from?

23   A.   My dad is from Mexico.

24   Q.   Got it.  Did you visit Mexico as a kid?

25   A.   Very often.  Every year.

1   Q.   And you mentioned that the cause, No More Deaths'

2   cause, was one that you saw as just.  What particular about

3   that spoke to you?

4   A.   I found that it provided direct aid to something that was

5   very obviously happening on the border, which was migrants

6   dying, and knowing that it is the desert, and knowing that it

7   is like it was that day, 110 degrees, very often in the summer,

8   I guess it was kind of like an obvious connection in my head to

9   be providing water and food and sustenance to people who needed

10  it.

11  Q.   When you were growing up, did your family talk about the

12  sanctity of life?

13  A.   Yes, not just the sanctity of life, but the sanctity of

14  death, because it's all connected.  I think that it's pretty

15  common knowledge that, in a lot of, like, Mexican households,

16  people celebrate Day of the Dead, and that was definitely

17  something that my family -- I grew up participating,

18  celebrating a person's life after death, and death is a very

19  big part of life and honoring the dead and giving the respect

20  that they deserve regardless of who it is.

21  Q.   And is that -- is that a core belief that has motivated

22  your actions throughout your life?

23  A.   Most definitely.

24  Q.   When did you come down to start volunteering with No More

25  Deaths?

1    A.    I believe it was April of 2017.

2    Q.    Okay.  And did you go through the training process that

3    we heard Reverend Fife talk about?

4    A.    I did.  I did not sign up as a -- I signed up as a local

5    volunteer, which means that I came and moved here, and so they

6    didn't -- I didn't volunteer in, like, the monthlong program

7    that they have.

8          But everybody who participates with No More Deaths and

9    does water drops does tend to, like, from what I know,

10   participate in the orientation.  John Fife is a part of that

11   orientation.  And like my codefendant Oona said, they do a

12   brief history of the organization, of how it started, and they

13   do a brief history of the border as well.

14   Q.    Did you feel a spiritual connection to your work with No

15   More Deaths?

16   A.    I did.  I felt very connected to the work that was

17   happening, especially with how it hit home for me, I

18   guess, especially having heard about it for so long.

19   Q.    What do you mean that it hit home?  How did that impact

20   your core beliefs or relate to those?

21   A.    I mean, hearing stories of people dying, even after --

22   even, like, besides it just being through No More Deaths or

23   besides it just being through the media, which is, like -- I

24   mean, the border crisis is there, and from having personal

25   stories told to me from people that I know, it was most

1   definitely moving, and I don't see how it couldn't be for

2   anybody.

3   Q.   What about the act of leaving water in the desert?  How

4   did that speak to your spiritual beliefs?

5   A.   Well, water is life.  Like, water is necessary for

6   everybody.  We're made of water.  We -- it's -- like

7   everybody's connected.  We can't expect -- like, I don't know.

8   It's -- I'm sorry.

9   Q.   It's okay.

10  A.   I believe that everybody who walks on this earth should be

11  able to drink some water.

12  Q.   That's fair.

13       Did you ever participate in prayers out in the desert

14  with No More Deaths?

15  A.   Of a kind, yes, moments of silence for people that have

16  crossed or are currently crossing the desert.

17  Q.   Okay.  Let's talk about August 13th.  What -- what time

18  did you guys wake up in the morning?  Do you remember?

19  A.   Very early.  Very early.  I don't think the sun was up.

20  Q.   Why?

21  A.   It takes a while to get out to where we were gonna drop

22  water.  I mean, with the sun comes the heat.  With the heat

23  comes exhaustion.  So it's best to start before it gets hot.

24       Yeah.

25  Q.   And you get in the truck.  You drive out.  What's the --

1  what's the ride like in the truck?

2  A.   Long and bumpy.  We have air conditioning in the truck, so

3  it's not, like, nearly as bad as anything else.  I've been in

4  plenty of cars without air conditioning.

5      But, I mean, it gets hotter as the day goes on.  We arrive

6  to where we're going to do a water drop or where we -- the

7  first moment that we step out of the car, by then the sun has

8  risen.  It's, I think, around eight, I think, in the morning.

9  Q.   What's it feel like when you get out of the truck?

10  A.   I mean, exhausting.  It's heavy.  Like, it feels like, I

11  mean, a blanket.  There's nowhere to, like, hide from the sun.

12  Q.   And you're not from Tucson or Ajo.  What's your -- how do

13  you react when you step out of an air-conditioned truck into

14  the desert?

15  A.   Well, it immediately becomes harder to breathe.  It's just

16  very tiring.

17  Q.   And are your -- is your pack -- you use a pack to bring

18  the water out?

19  A.   Yes.  Everybody has a backpack on them.  They -- we fill

20  as many gallon jugs as we can into the backpack, and then

21  usually hold about one, two, or like maybe three, depending

22  on -- I mean, you take what you personally can or feel capable

23  of taking.

24  Q.   How many -- how many gallon jugs of water can you carry

25  in a pack?

1  A.   I think I had about five or six.  It also depends on how

2  many fit, but -- in the backpack, but I think I had about five

3  or six in my backpack and two in my hands, like, one in each

4  hand, and then separately our personal water bottle.

5  Q.   And you set out on foot from there?

6  A.   Yes.

7  Q.   What's it like walking through the desert?

8  A.   I mean, it's not fun.  There's that -- I believe it's,

9  like, the jumping cactus is, like, pretty much everywhere.

10 Q.   Chollas?

11 A.   Yeah.  I know that a couple of us had to stop to unprick

12 ourselves.  I mean, it's, like, jumping cactus for a reason.

13 It's not like we're going and walking into it.  It can, like,

14 stick through your shoe, depending on how sturdy it is.  It's

15 very, like, rough terrain, definitely.

16 Q.   And when you get to the place where you're going to put

17 the water, let's talk about that.  What do you do when you get

18 there?

19 A.   Usually it's in, like, a shaded area, shaded as you can

20 get in somewhere so desolate, but I think it's, like, the first

21 moment that we really have to rest, so everybody just kind of

22 sets their stuff down and takes a moment to breathe, because

23 it's the first time you take your backpack off, essentially,

24 from the walk there.

25      I mean, it's hard.  Like, you see a lot of remnants, like

1  articles of clothing, shoes, just signs that there's obviously

2  been human activity there.  I know that it's not something you

3  can, like, touch or see, necessarily always, but it's very

4  palpable to feel what was somebody else's presence there.

5  Q.    What does that feel like?

6  A.    It feels, like, sacred to be walking on the same ground

7  that somebody else was walking on in probably a much more

8  different state of mind than you were.

9  Q.    Now, we all live in cities, lots of people walking

10 around.  Do you have that feeling when you're walking around

11 Tucson or Seattle, or is it something about that place?

12 A.    I mean, nobody stops and thinks about that always.  I

13 think it's fair to say that, with the knowledge that we have of

14 what is going on at the border, that yes, it is a very

15 different experience to be out in the desert and know that

16 there probably isn't a lot of people walking around just like

17 there is in a city, and that when you do come across evidence

18 of somebody having been there, like, very obvious, it's very

19 different to be standing on that same ground, and it's to be

20 revered.  It's to be respected.

21 Q.    And what's the attitude like among the group?  Is this --

22 is everybody chitchatting and having a good time?  What's that

23 like when you get to this place?

24 A.    Well, like I said, it's hard to -- I mean, personally, I

25 find it really hard to talk when it's so hot and you're walking

1   and exhausted, but there is, like, some conversation.  But it

2   usually pretty much, like -- it's, like, unspoken.  Like, as

3   soon as you arrive to where you're headed, to the water drop,

4   it's, like, silent.  It's like -- it's like being at a

5   graveyard.  Like, you stop talking.  Everybody sets their bags

6   down and prepares, like, the water bottles.

7   Q.   When you say prepare them, what do you mean?

8   A.   We usually set them in a shaded area, try to, like,

9   position them in a place that we think is safest for them, the

10  water bottles.  We bring Sharpies with us so that, when we do

11  the water drops, we also take a moment to write messages on the

12  water drops, on the water jugs themselves.

13  Q.   And what type of message do you write?  Do you have

14  anything in particular that you write?  We heard about

15  crucifixes, hearts, religious messages.

16  A.   I've seen a lot of, yeah, I mean, crucifixes, hearts.

17  Personally, I mean, I've never been in an area like that

18  before, that was my first time in Cabeza Prieta, and so I've

19  never -- it was a lot more intense than anything I've ever

20  experienced before, so I felt the need to think about carefully

21  what I wanted to write on the water jugs.

22       And I decided to write a message that spoke to me from a

23  book that my dad used to read me.  And it's, "Agua pasa por mi

24  casa, cate de mi corazón."

25  Q.   And that's Spanish?

1    A.    Yes.

2    Q.    And what -- what is that, just -- just for the Court?

3    A.    It's like a rhyme or a riddle of sorts.  It means, water

4    passes by my house, core or, like, meat of my heart.  And the

5    first two words, "agua" and "cate," are "avocado," which is

6    just, like, a funny little, like, saying, but I don't put the

7    avocado there.  I just put, "Agua pasa por mi casa," and I knew

8    that it was -- at least personally, it felt like something that

9    somebody else could maybe hopefully connect with.

10   Q.    Something that came from your father?

11   A.    Yes.

12   Q.    You mentioned finding artifacts or items along the way.

13   What kinds of things would you find?

14   A.    Shoes.  Discarded articles of clothing.  Some garbage.  We

15   always took plastic bags out to pick garbage up.  I know there

16   was definitely garbage in the surrounding area, very little,

17   but we take back almost as much as we put out.

18   Q.    What's it feel like to find items that others crossing

19   through have discarded along the way?

20   A.    Well, I'm, like, a very visual person.  I feel like I can

21   see the moments when it happens.  I mean, we all have an

22   imagination, but it's -- it makes people that much more real.

23   It's not just some sort of, like, entity.  It's, like, humans.

24   You know, like, somebody that was wearing that is no longer

25   wearing that, and it makes you wonder why.

1   Q.   Now, we talked or we heard some testimony about the

2   permit that was effective after July 1st, 2017.  Do you recall

3   that testimony?

4   A.   Yes.

5   Q.   Did you have a permit to go into the refuge on August

6   13th?

7   A.   I did not.

8   Q.   Had you ever had a permit?

9   A.   No.

10  Q.   Were you aware of the provision in the permit where the

11  language had been added that said you cannot leave water and

12  other personal items?

13  A.   I was.

14  Q.   Did you personally see the permit?

15  A.   I did not personally see the permit.

16  Q.   How did you learn about that?

17  A.   I remember that it was -- the language had been changed,

18  like, around a month before, so I remember hearing about it.

19  Q.   Was that from members of the --

20  A.   Yes.

21  Q.   -- desert aid --

22  A.   Of No More Deaths.  Sorry.  Yes.  I think it was by then,

23  like, pretty common knowledge.  It was very specific language

24  which was very, like, noticeable.

25  Q.   And so why did you decide not to get that permit?

 1   A.   Because I didn't want to sign something that said that I

 2   wasn't planning on leaving water and food in the desert when I

 3   was.

 4   Q.   And why were you planning on leaving water and food in

 5   the desert?

 6   A.   Because it's necessary.

 7   Q.   Okay.  Within No More Deaths, are there, like, weekly

 8   meetings?

 9   A.   Yes.

10   Q.   And is that the situation in which you and other members

11   were talking about that permit?

12   A.   Yeah.  They're all voluntary, yeah, like, we all just

13   discuss within each other.

14   Q.   And did you also hear in those meetings about that July

15   6th meeting that we heard testimony about yesterday?

16   A.   I did.

17   Q.   And what was your understanding of the Government's

18   position about prosecuting these cases?

19   A.   It was my understanding that the -- that they were not

20   planning to prosecute us.

21   Q.   Was that part of your decision in going out there that

22   day?

23   A.   Definitely.

24   Q.   Now, did you think you could potentially encounter some

25   law enforcement officers out there?

 1  A.   Yes, but I didn't think that we would be -- I didn't think

 2  anything more than a citation.

 3  Q.   Did you think you could be charged with a crime?

 4  A.   Absolutely not.

 5  Q.   Did you think you could be prosecuted?

 6  A.   No.

 7  Q.   What did you think a citation meant?

 8  A.   That we would get a fine and we would get possibly banned

 9  from the refuge.

10  Q.   That was worst-case --

11  A.   Kicked off.

12  Q.   That was the worst-case scenario?

13  A.   Yes.

14           MR. FIDEL:  Okay.  That's all my questions.

15                      CROSS-EXAMINATION

16  BY MS. WRIGHT:

17  Q.   Good morning, Ms. Orozco.

18  A.   Good morning.

19  Q.   And I just want to make sure, you prefer Orozco, not

20  anything else hyphenated, second last name, anything like

21  that?

22  A.   Orozco's fine.

23  Q.   Okay.  Just wanted to make sure.

24       Obviously you know my name.  I'm Anna Wright.  I'm one of

25  the prosecutors in this case.  I have some questions I want to

1   ask you.

2       Give me a minute to get my notes straight here.

3   A.    Okay.

4   Q.    And let's start off with what happened on August 13th of

5   2017.  Now, on that day, you drove out with your codefendants

6   to Charlie Bell Pass on the Cabeza Prieta National Wildlife

7   Refuge; correct?

8   A.    Yes.

9   Q.    And you did that in a white Dodge truck; right?

10  A.    Yes.

11  Q.    And that Dodge truck in the bed had green milk crates

12  with water jugs and cans of beans; right?

13  A.    Yes.

14  Q.    And you planned that trip the night before with others;

15  right?

16  A.    It was discussed the night before, yeah.

17  Q.    And this was your first trip onto the Cabeza; right?

18  A.    Yes.

19  Q.    And when you said you discussed it with others the night

20  before, you discussed where you were going to go on August

21  13th; right?

22  A.    Correct.

23  Q.    And you discussed the route you were going to drive;

24  right?

25  A.    Correct.

1  Q.  And you discussed what you were going to take with you;

2  right?

3  A.  Correct.

4  Q.  And you discussed where you were going to leave those

5  things you were taking with you; right?

6  A.  We did.

7  Q.  Let me be more specific.  Some of the things you were

8  going to take with you were one-gallon jugs of water; right?

9  A.  Yes.

10 Q.  And also cans of beans; right?

11 A.  Yes.

12 Q.  And you discussed the night before that you were going to

13 leave that water and those cans of beans on the refuge; right?

14 A.  We did.

15 Q.  And you also discussed where exactly on the refuge you

16 were going to leave those things; right?

17 A.  Yes.

18 Q.  And the night before, you packed your own bags with the

19 stuff that you needed for yourself that day; right?

20 A.  Or in the morning, I don't really remember, but yeah.

21 Q.  So the night before or the morning, but before you left,

22 you had a bag with what you needed for you that day; right?

23 A.  Yes.

24 Q.  And you planned also as part of your discussion to not

25 get a permit; right?

1  A.    I mean, that night?

2  Q.    Either in the night before or the morning of, you had a

3  discussion that you were not going to stop and get a permit;

4  right?

5  A.    Not that day.  It was before that we discussed not getting

6  permits.

7  Q.    And so when you went out to the refuge that day, it was

8  your intention to not get a permit to enter the refuge; right?

9  A.    Correct.

10  Q.    And so as a result of that, before you went out to the

11  refuge, you did not stop at the refuge office to sign a Hold

12  Harmless Agreement; correct?

13  A.    We did not.

14  Q.    And that was on purpose; right?

15  A.    Correct.

16  Q.    And you testified that you didn't want to sign the Hold

17  Harmless Agreement because you were intending to violate it by

18  leaving the water and the beans behind; right?

19  A.    I intended to leave water for people in the desert, yes.

20  Q.    So that's a "yes," you were intending to violate the Hold

21  Harmless Agreement by leaving water and beans behind; right?

22  A.    I did not sign the permit so that I wouldn't lie on the

23  permit, and my intention was to leave water in the desert.

24  Q.    And so you knew that the Hold Harmless Agreement told --

25  said that you -- that people visiting the refuge could not

1  leave water and other supplies behind; right?

2  A.   I'm sorry.  Can you repeat the question.

3  Q.   I can.  You knew that one of the provisions on that Hold

4  Harmless Agreement said that people visiting the refuge could

5  not leave water and other supplies behind; right?

6  A.   Yes, a provision that was changed a month earlier.

7  Q.   So that's a "yes," you knew that?

8  A.   Correct.

9  Q.   Now, on your drive out to Charlie Bell Pass on the

10 refuge, you and your codefendants passed a kiosk; right?

11 A.   Yes.

12 Q.   And that kiosk had rules posted and a sign-in sheet

13 there; right?

14 A.   Yes.

15 Q.   And it also had maps showing which roads were public and

16 which roads were not open to public vehicles; right?

17 A.   I don't recall seeing that, but I'm assuming it was there

18 if you --

19 Q.   And you and your codefendants stopped at the kiosk;

20 right?

21 A.   We did.

22 Q.   And you signed the sign-in sheet there; right?

23 A.   I honestly don't remember.

24 Q.   Okay.  But as part of your activities that day, you

25 didn't call the refuge office in Ajo to let them know that you

1  were out on the refuge, did you?

2  A.  No.

3  Q.  And you didn't tell the refuge office in Ajo where you

4  were going on the refuge that day, did you?

5  A.  No.

6  Q.  And you didn't tell them what you planned to do that

7  day, did you?

8  A.  No.

9  Q.  And that's true for all of the other land agencies that

10  control that area.  You didn't call anyone that manages that

11  area to tell them that you were out there that day, did you?

12  A.  No.

13  Q.  Now, once you got up to Charlie Bell Pass, you saw the

14  rescue beacon that's there; right?

15  A.  Yes.

16  Q.  And you stopped to read the sign that was on the rescue

17  beacon; right?

18  A.  Maybe I -- maybe.

19  Q.  And regardless of whether you read the sign or not, you

20  knew that, if activated, Border Patrol would respond

21  immediately to that beacon; right?

22  A.  Yes.

23  Q.  And you knew that a person could call for help from

24  Border Patrol from that beacon; right?

25  A.  Yes.

1  Q.   And you knew that Border Patrol is trained and is

2  equipped to do search and rescue operations; right?

3  A.   Yes.

4  Q.   And you knew that Border Patrol, members of Border

5  Patrol, have advanced medical training for the types of

6  medical emergencies that can happen out on the Cabeza Prieta;

7  right?

8  A.   I personally don't think at that time I had that

9  knowledge, but yes.

10 Q.   And you knew that Border Patrol had resources like

11 helicopters to help people who were in medical distress on the

12 refuge; right?

13 A.   Like I said, I didn't know the specifics of what they had

14 to do, but I knew that that beacon did call Border Patrol.

15 Q.   Okay.  And then let me ask you maybe a little bit -- you

16 knew that Border Patrol had the resources to help people in

17 distress on the refuge; right?

18 A.   Sure.

19 Q.   Now, after -- once you got to Charlie Bell Pass, you and

20 your codefendants continued to the west, down the dirt road,

21 past Charlie Bell Pass; right?

22 A.   Correct.

23 Q.   And that's a two-track road; right?

24 A.   A two-track road?

25 Q.   A road that has one track for one set of wheels and one

1  track for the other set of wheels.

2  A.   I'm sorry.  Like I said, it was my first time on Cabeza

3  Prieta.  Are you talking about going down the hill or arriving

4  to the hill?

5  Q.   Let me -- so going down the hill to the west, that road

6  is only wide enough for one vehicle; right?

7  A.   Yes.

8  Q.   Okay.  That's what I meant by "two-track."  Didn't mean

9  to confuse you there.

10  A.   All right.

11  Q.   Now, when you drove down the hill to the west, you saw

12  the signs posted on either side of that road; right?

13  A.   I don't recall.

14  Q.   You would agree with me that those are the only signs at

15  that particular point; right?

16  A.   I believe I think that I knew there were signs there, but

17  I don't remember reading them.

18  Q.   Okay.  So you would agree with me that you knew they were

19  there, you just don't remember if you read them that

20  particular day?

21  A.   Correct.  I'm sorry.  It's very hard.  It was a long time

22  ago, and it was very hot.

23  Q.   I'm not trying to confuse you, so if I ask you a question

24  that's confusing, I appreciate that you let me know.

25  Sometimes I can ask it a better way, like with "two-track" and

1   "single vehicle."  So I'm not trying to confuse you, and just

2   answer the best you can.  Okay?

3       Now, once you got down to Charlie Bell Well, you and your

4   codefendants dropped off some supplies; right?

5   A.   Yes.

6   Q.   And that included 70 gallons of water; right?

7   A.   Yes.

8   Q.   And 64 cans of beans, right, or approximately?

9   A.   Yes.

10  Q.   And as part of dropping off the supplies, you lifted some

11  crates out of the truck and set them on the ground there;

12  right?

13  A.   It was a joint effort, yeah.

14  Q.   I'm sorry.  I couldn't hear you.

15  A.   It was a joint effort, so yes.

16  Q.   Okay.  So you participated in doing that; right?

17  A.   I did.

18  Q.   And you intended to leave those supplies, the water and

19  the beans, at Charlie Bell Well?

20  A.   Yes.

21  Q.   And your intention was to leave them for undocumented

22  migrants to take and use; right?

23  A.   For anybody that needed it.

24  Q.   So that's a "yes."  That was for undocumented migrants,

25  as well as everyone else; right?

1   A.   They fall under, "anybody that needed it," so yes.

2   Q.   And you wanted undocumented migrants to find those

3   particular supplies; right?

4   A.   I wanted people that needed it to find it.

5   Q.   So that includes undocumented migrants to find those

6   supplies; right?

7   A.   Correct.

8   Q.   And once someone took those supplies, you had no way of

9   controlling what happened with those supplies next; right?

10  A.   Not always.

11  Q.   So if someone were to happen upon that cache and pick up

12  a gallon of water, you would have no way, once they took that

13  gallon of water, to get it back from them, could you?

14  A.   Not necessarily.

15  Q.   So somebody could come to that cache, pick up a gallon of

16  water, and carry it miles down the way, and you wouldn't know

17  where that gallon of water was, would you?

18  A.   Correct.

19  Q.   Okay.  So you wouldn't have a way of collecting those

20  particular jugs at a later date, no way of being sure that you

21  could do that; right?

22  A.   Correct.

23  Q.   Now, once you dropped off that cache of supplies at

24  Charlie Bell Well, you and your codefendants drove back up to

25  Charlie Bell Pass; right?

1   A.   I believe so.

2   Q.   And you drove past those same signs that were at Charlie

3   Bell Pass on either side of the road?

4   A.   Yes.

5   Q.   And you picked up the remainder of some supplies and

6   turned around and came back down the hill; right?

7   A.   Yes.

8   Q.   And when you came back down the hill, you came past the

9   signs again; right?

10  A.   I'm assuming we did, yes.

11  Q.   And then you drove -- you continued and you drove past,

12  this time, Charlie Bell Well; right?

13  A.   Yes.

14  Q.   And you drove past another set of signs on either side of

15  the road; right?

16  A.   I'm assuming we did.

17  Q.   You don't dispute that there were signs on either side of

18  the road there, do you?

19  A.   I do not.  I just don't recall.

20  Q.   Okay.  Just wanted to be clear there.

21       And once you got further on down the road, you and your

22  codefendants pulled off the side of the road and stopped

23  there; right?

24  A.   Yes.

25  Q.   And then you and your codefendants put water jugs in your

1  packs; right?

2  A.   As many as we could carry.

3  Q.   And for you, you testified that was five or six water

4  jugs for you, plus one in each hand; right?

5  A.   Approximately.

6  Q.   And you decided how much you could carry that day; right?

7  A.   I did.

8  Q.   Okay.  And so then you hiked south with those supplies;

9  right?

10  A.   Yes.

11  Q.   And that was into a designated wilderness area; right?

12  A.   As I now know, yes.

13  Q.   And when you hiked south with those five or six gallons

14  in your pack and one or two in your hands, you possessed those

15  water jugs; right?

16  A.   Yes.

17  Q.   And once you got to that spot that you picked out ahead

18  of time in the wilderness, you left behind those water jugs

19  that you carried; right?

20  A.   After replacing them with old jugs in my pack.

21  Q.   I think my question wasn't clear that time.

22        So you hiked south with the five or six in your pack and

23  one in each hand; right?

24  A.   Yes.

25  Q.   And you get to a spot where you had planned to leave

 1  them; right?

 2  A.   Yes.

 3  Q.   And then you do leave them in that spot; right?

 4  A.   Correct.

 5  Q.   And that spot was in designated wilderness, yes?

 6  A.   As I now know, yes.

 7  Q.   And like with the jugs that you left at Charlie Bell

 8  Well, you didn't have any assurance that you could come back

 9  and pick up those particular jugs at a later time; right?

10  A.   No, but that's why we pick up the old ones that are there.

11  Q.   Okay.  So my question is, you had no assurance that you

12  could pick up the particular jugs you left that day at a later

13  point in time; right?

14  A.   Personally, no.

15  Q.   Okay.  And your intention with leaving those there was

16  that other people could pick them up and use them as they saw

17  fit; right?

18  A.   Correct.

19  Q.   And so that meant people could pick them up and drink

20  them right there; right?

21  A.   Correct.

22  Q.   Or they could pick them up and carry them 10 miles in any

23  direction; right?

24  A.   If they were physically capable to, yes.

25  Q.   Okay.  So that's a "yes," they could take them 10 miles

1    in any direction, if that's what they wanted to do?

2    A.   Yes.

3    Q.   Now, you eventually -- after you set those down out

4    there, you eventually returned to the truck that had been

5    parked off the side of the road; right?

6    A.   Yes.

7    Q.   And when you got back, Officer West was there waiting for

8    you; right?

9    A.   Correct.

10   Q.   And you told Officer West that you intentionally didn't

11   get a permit on that day; right?

12   A.   Yes, I believe so.

13   Q.   Okay.  And you also told him that it was your first time

14   on the refuge that day; right?

15   A.   Yes.

16   Q.   And in your conversations with Officer West, you did not

17   tell him where you dropped the water that day, did you?

18   A.   He did not ask.

19   Q.   And so my question is, you did not tell him where you

20   dropped the water that day; right?

21   A.   Correct.  It didn't come up.

22   Q.   And during your conversations with Officer West, he

23   eventually told you that you had to leave the refuge; right?

24   A.   He did.

25   Q.   And so you and your codefendants got back in the truck,

1  and you drove out of the refuge; right?

2  A.   Yes.

3  Q.   And you eventually ended up back at the refuge office in

4  Ajo; right?

5  A.   Yes.

6  Q.   And at that point in time, along the way, he had stopped

7  and picked up the supplies that had been left at Charlie Bell

8  Well; right?

9  A.   Correct.

10  Q.   And he took them back to the office in Ajo; right?

11  A.   In his truck, yeah.

12  Q.   And once you all got there, he eventually let you take

13  all of those supplies and put them back into the white truck;

14  right?

15  A.   Yes.

16  Q.   And so then you all get back in your truck, then, and

17  drove back into Ajo; right?

18  A.   Yes.

19  Q.   And as you left the refuge office, a crate of supplies

20  fell off the back of the truck; right?

21  A.   Yes.  The truck was far too full.

22  Q.   And you did not stop and come back to get the crate, did

23  you?

24  A.   The car was so full that we didn't even realize it fell

25  off.

1   Q.   So you -- turning into Ajo, your testimony is that you

2   were unaware of what was happening in the back of the truck?

3   A.   I'm saying that I don't think that we realized that an

4   entire crate of beans fell off until later, when it was

5   missing, because the truck was way too full.

6   Q.   Now, I want to take us back to your decision to not get a

7   permit and not to sign -- to not sign the Hold Harmless

8   Agreement for the refuge.

9        Did anyone tell you not to get a permit?

10  A.   No single person told me not to get a permit.

11  Q.   Did anyone give you advice about obtaining a permit?

12  A.   No single person advised me to not get a permit.

13  Q.   Did multiple people advise you not to get a permit?

14  A.   No.

15  Q.   Okay.  And you decided not to get the permit because you

16  knew that you could be cited for the things you were going do

17  that day; right?

18  A.   Yes.  I mean, I didn't get a permit because I didn't want

19  to -- I knew that I was going to do something that the permit

20  specified not to.

21  Q.   Okay.  So you knew you could be cited that day; right?

22  A.   Correct.

23  Q.   And let's talk about -- that leads us into your testimony

24  that you thought that there was some sort of understanding

25  with the U.S. Attorney's Office.

1        You were never at any meetings with any representative of

2   the U.S. Attorney's Office; correct?

3   A.    Personally, no.

4   Q.    So that's a no?

5   A.    That's a no.

6   Q.    And you were not at any meeting on July 6th of 2017, were

7   you?

8   A.    I was not.

9   Q.    And you were never at any meetings with Fish and Wildlife

10  service, were you?

11  A.    I was not.

12  Q.    And you never spoke directly to anyone from the U.S.

13  Attorney's office, did you?

14  A.    I did not.

15  Q.    And prior to going out that day, you did not ever speak

16  directly to anyone from Fish and Wildlife, did you?

17  A.    No.

18  Q.    And no one ever you told that entering the refuge without

19  a permit was not in violation of the refuge regulations, did

20  they?

21  A.    I'm sorry?  Can you repeat the question?

22  Q.    No one from the U.S. Attorney's Office ever told you that

23  entering the refuge without a permit was not in violation of

24  the refuge regulations?

25  A.    No.

1    Q.    And same goes for Fish and Wildlife.  No one from Fish

2    and Wildlife ever told you that you could enter the refuge

3    without a permit and not violate the regulations; right?

4    A.    No.

5    Q.    And the same goes for abandoning supplies.  No one ever

6    told you that you could leave water and beans in the desert,

7    in the refuge, and do that not violating the regulations?

8    A.    No.

9    Q.    And the same goes for driving on restricted roads.  No

10   one ever told you that driving on a restricted road was not in

11   violation of those regulations, did they?

12   A.    I wasn't driving, and no.

13   Q.    So that's a no?

14   A.    That is a no.

15   Q.    And you never saw a document signed by any representative

16   of the United States Attorney's Office saying that there had

17   been a decision to not prosecute for these violations, did

18   you?

19   A.    Did I ever see, sorry, a signed --

20   Q.    You never saw a written document from the United States

21   Attorney's Office promising not to prosecute for these

22   violations, did you?

23   A.    I did not.

24   Q.    And that the one written document you knew about related

25   to these -- to violations was the Hold Harmless Agreement;

1   right?

2   A.   I'm sorry?  Can you repeat the question?

3   Q.   So -- and let me be clear with the verbiage, because it's

4   been a little confused.  The Hold Harmless Agreement, the

5   testimony is it's the thing you sign, and then the permit is

6   what you get to go out on the refuge.

7        So I'm talking about the thing you would sign at the

8   office.

9   A.   And the question was?

10  Q.   Okay.  And the question is, you knew that the one -- one

11  of the written documents about violations on the refuge was

12  the Hold Harmless Agreement?

13  A.   I knew that one of the written -- yes.

14  Q.   And you knew that the Hold Harmless Agreement now

15  clarified explicitly that leaving water and food behind on the

16  refuge was in violation of the regulations; right?

17  A.   Correct.

18  Q.   And I want to take us back now to that rescue beacon at

19  Charlie Bell Pass.  You talked a little bit about that.  And I

20  want to ask you a little bit more about -- about that.

21       You knew that that beacon could be seen from miles away

22  at night; right?

23  A.   At the time, no.

24  Q.   And you knew that the beacon could call Border Patrol

25  directly there; right?

```
 1              MR. FIDEL:  Objection.  This has been asked and
 2    answered.
 3              THE COURT:  Sustained.
 4    BY MS. WRIGHT:
 5    Q.   So with that knowledge, if a person is in distress or
 6    needs help, that person could call Border Patrol directly and
 7    get the help they needed; right?
 8    A.   If they could physically reach the beacon.
 9              MR. FIDEL:  This is asked and answered as well, Your
10    Honor.
11              THE COURT:  Move on.
12    BY MS. WRIGHT:
13    Q.   The downside to you of that rescue beacon is that, if
14    Border Patrol responded, they might take some immigration
15    action if that person didn't have the proper documents to be
16    in the United States; right?
17    A.   I don't understand the question.
18    Q.   So the downside of the beacons, the reason that your
19    group did not use the beacons, is because Border Patrol would
20    respond and might take immigration action; right?
21    A.   The reason that we didn't use the beacons?  We didn't have
22    a need to use the beacons.
23         You mean one of --
24              THE COURT:  There's no question.  You've answered
25    the question.
```

1          MS. WRIGHT:  If I could have a moment, Your Honor?

2   BY MS. WRIGHT:

3   Q.   Finally, no one ever told you that what you were planning

4   to do that day was legal, did they?

5   A.   No.

6   Q.   So no one from the U.S. Attorney's Office ever told you

7   that that was legal?

8   A.   No.

9   Q.   And no one from Fish and Wildlife ever told you that that

10  was legal; correct?

11  A.   Correct.

12          MS. WRIGHT:  That's all I have, Your Honor.  Thank

13  you.

14                     REDIRECT EXAMINATION

15  BY MR. FIDEL:

16  Q.   Just a couple questions, Zaachila.

17       Ms. Wright asked you about this two-track dirt road or

18  two-track road.  Can you describe what this road looks like.

19  A.   I wouldn't really call it a road.  It's a lot of rocks

20  mostly.

21  Q.   How -- what kind of truck is this?  Is this a big truck?

22  A.   Very.

23  Q.   Like a full-size pickup?

24  A.   Yes.

25  Q.   High clearance?

```
1    A.    Like it's tall?

2    Q.    Yeah, like it's tall; right?  You've gotta step up into

3    it?

4    A.    Yes.

5    Q.    Okay.  It's not like a monster truck, but it's a big

6    truck?

7    A.    Yes.

8    Q.    And are you driving fast on this road?

9    A.    No.

10   Q.    Could you drive fast on this road?

11   A.    Not -- no.

12   Q.    Okay.  There are rocks in the road?

13   A.    I mean, it's literally made of rocks.  It's like each

14   wheel is in a different place at a different time.

15   Q.    Would it be difficult to walk up this road?

16   A.    Very.

17   Q.    Or down this road?

18   A.    Very.

19   Q.    Okay.  You were asked if undocumented migrants could

20   possibly have found the water and food that you were leaving

21   out in the desert.

22   A.    Yes.

23   Q.    Do you recall that?

24   A.    Yes.

25   Q.    Those are humans; right?
```

1  A.   Yes.

2  Q.   People, like you and me?

3  A.   People in need.

4  Q.   Men, women?

5  A.   Correct.  Children.

6  Q.   Young, old?

7  A.   Yes.

8  Q.   People potentially suffering?

9  A.   Yes.

10 Q.   Is that the point of going out there and putting water

11 out there?

12 A.   Most definitely.

13          MR. FIDEL:  Okay.  Thank you.  That's all.

14          THE COURT:  Did you decide to do that whether you

15 broke the law or not?

16          THE WITNESS:  Did I -- I did that thinking that I

17 was helping someone, that I was going to maybe get cited.

18          THE COURT:  So what's your answer?

19          THE WITNESS:  I guess I don't really understand the

20 question.  I'm sorry.

21          THE COURT:  The question is, did you -- did you

22 believe, do you believe that your conduct, whether it was

23 legal or illegal, you were going to do it?

24          THE WITNESS:  I guess I didn't think of the clause

25 in the permit and doing what that clause said not to do was

1  breaking the law but just breaking the permit, which is why I

2  didn't sign the permit.

3          THE COURT:  When you were told about the brief

4  history of humanitarian aid in southern Arizona, did anybody

5  ever tell you about the prosecution of people engaged in

6  humanitarian activities in southern Arizona?

7          THE WITNESS:  It was a long time ago.  Maybe.

8          THE COURT:  So maybe you were told that people were

9  prosecuted?

10          THE WITNESS:  In general?  I know that there was a

11  case a really long time ago.

12          THE COURT:  You were told about it?

13          THE WITNESS:  Yes, but it was a very different

14  situation than this.

15          THE COURT:  Were you ever told that your behaviors

16  in some places might have criminal consequences?

17          THE WITNESS:  At the orientation?

18          THE COURT:  Well, let's start there.  At the

19  orientation.

20          THE WITNESS:  From what I remember, I believe I was

21  told that some people might think of it as criminal, and it

22  wasn't in my belief to be criminal to be providing

23  humanitarian aid.

24          THE COURT:  So you were aware -- you were made aware

25  of the fact that somebody might charge you with a crime?

1          THE WITNESS:  No.  I'm sorry.  That's not what I

2     meant.  I meant that some people might not agree with it and

3     think that it is a criminal thing.  I guess from what I'm

4     trying to say is that I did not understand that humanitarian

5     aid was criminal.

6          THE COURT:  But you knew that others might have that

7     opinion?

8          THE WITNESS:  By "others," I guess I should have

9     specified I meant other people I might interact with, not

10    necessarily, like, law enforcers.

11         THE COURT:  Okay.  So within people that you were

12    associating with, some thought it might be breaking the law,

13    and some thought it wasn't breaking the law?  Is that what

14    you're saying?

15         THE WITNESS:  No.  I'm sorry.  I've met people who

16    have maybe not agreed with what I've done and might consider

17    it to be criminal, I guess, but I'm not -- I wasn't reliant on

18    -- I was reliant on the information that I was given, which

19    was humanitarian aid work is not criminal.

20         THE COURT:  That's what you were told, and that's

21    what you believed?

22         THE WITNESS:  That humanitarian aid is not --

23         THE COURT:  That's what you believe?

24         THE WITNESS:  Yes.

25         THE COURT:  But you seem to agree that there are

1    people who think that it can be a crime, at least --

2              THE WITNESS:  Who hold that as their opinion, yes.

3              THE COURT:  Do you know -- did you know what a

4    designation of a wilderness or refuge meant at the time you

5    were there?

6              THE WITNESS:  Yeah, I mean, vaguely, yes.

7              THE COURT:  What did you vaguely think it meant to

8    go into a wilderness or a refuge?

9              THE WITNESS:  What did I think that it meant to go

10   into -- I mean, with a permit --

11             THE COURT:  No, no.  What is a wilderness area?

12             THE WITNESS:  A wilderness area is an area protected

13   by the National Wildlife, like Officer West.

14             THE COURT:  And what did that mean to you at that

15   time?

16             THE WITNESS:  At that time I honestly don't -- I

17   can't recall.  It was a long time ago.

18             THE COURT:  You live in Seattle; right?

19             THE WITNESS:  I do.

20             THE COURT:  There's forests up there; right?

21             THE WITNESS:  There is.

22             THE COURT:  Hiking trails; right?

23             THE WITNESS:  Yes.

24             THE COURT:  See signs that say, "Pack it in, pack it

25   out?"

1          THE WITNESS:  I'm sorry?

2          THE COURT:  Do you see signs that say, "Pack it

3     in, pack it out?"

4          THE WITNESS:  I have seen signs that say, "Pack it

5     in, pack it out."

6          THE COURT:  And does it have a meaning to you when

7     it says that?

8          THE WITNESS:  Yes, it --

9          THE COURT:  It has significance; right?

10          THE WITNESS:  Yes.

11          THE COURT:  And you knew that this particular area

12     required a permit to get on the roads; true?

13          THE WITNESS:  I did.

14          THE COURT:  You knew that area had restricted

15     roads, true, roads you couldn't travel?

16          THE WITNESS:  Yes.

17          THE COURT:  And whether you signed a piece of paper

18     or not, you knew you weren't supposed to leave things there?

19          THE WITNESS:  Correct.

20          THE COURT:  And you decided to do it whether you had

21     a permit or not?

22          THE WITNESS:  I decided to do it because I believe

23     that there was a greater necessity, which was providing

24     humanitarian aid to people who were dying.

25          THE COURT:  So you were willing to suffer the

 1   consequences for that behavior?

 2          THE WITNESS:  The consequences which I thought were

 3   getting a citation.

 4          THE COURT:  So you wouldn't do it if you knew -- if

 5   you had known it was a criminal prosecution?

 6          THE WITNESS:  I guess that wasn't something that I

 7   considered possible at the time.

 8          THE COURT:  Okay.  Thank you.

 9          Do you have anything of her?  She's stepped down.

10          MR. FIDEL:  No.  We're okay.  Thank you.

11          THE COURT:  Okay.  Let's take a break.

12          MR. FIDEL:  Thank you, Your Honor.

13          THE COURT:  20 minutes.

14          (Off the record.)

15          THE COURT:  You may proceed.

16          MR. FIDEL:  We call Natalie Hoffman.

17               NATALIE HOFFMAN, WITNESS, SWORN

18                    DIRECT EXAMINATION

19   BY MR. FIDEL:

20   Q.   Could you introduce yourself to the Court.

21   A.   I'm Natalie Hoffman.

22   Q.   And how old are you, Natalie?

23   A.   I'm 23 years old.

24   Q.   Do you live in Tucson?

25   A.   I do.

```
 1   Q.   What do you do here?

 2   A.   I work as a stagehand as my job.

 3   Q.   All right.  With the theaters in town?

 4   A.   Yes.

 5   Q.   All right.  And are you from here originally?

 6   A.   No.  I was born in New Jersey, but I mostly grew up in

 7   Charlottesville, Virginia.

 8   Q.   And when did you come out to Tucson?

 9   A.   I moved here when I was 19.

10   Q.   All right.

11   A.   Almost five years ago.

12   Q.   Did you come out here for school?

13   A.   No.  I came out to volunteer with the group No More

14   Deaths.

15   Q.   All right.  How far did you go in school?

16   A.   I completed an EMT program, and I've done two or three

17   semesters of community college.

18   Q.   All right.  Have you ever worked as an EMT?

19   A.   I briefly worked for the Arivaca Fire Department.  I was

20   technically a stipended volunteer.

21   Q.   Technically a what?

22   A.   A stipended volunteer for them.

23   Q.   Got it.

24        All right.  So you came out here to work with No More

25   Deaths?
```

 1    A.    Yes.

 2    Q.    Was that to be a volunteer?

 3    A.    Yes.

 4    Q.    And how long ago was that?

 5    A.    Well, that was in June of 2014, so about four-and-a-half

 6    years ago.

 7    Q.    And have you been continuously working with No More

 8    Deaths or an off-and-on type of situation?

 9    A.    It's been on and off the last couple years.  I

10    continuously worked with No More Deaths -- I spent a lot of

11    time for the first two or three years I lived here, and since

12    then I've -- it's intermittent.  I go out when I can.

13    Q.    All right.  Mostly you're doing stagehand work?

14    A.    Yeah, among -- among other things in the community.

15    Q.    All right.  In summer of 2017, were you working with No

16    More Deaths?

17    A.    Yes.

18    Q.    And again, I mean volunteering?

19    A.    Yes.

20    Q.    Okay.  And how -- how would you describe your spiritual

21    beliefs?

22    A.    Well, primarily, I believe that all life is sacred.  I

23    believe that all life is connected to the earth.  I believe

24    that, because life is sacred, I believe really firmly in human

25    rights.

1    Q.    Is that what drew you to No More Deaths?

2    A.    Yes.

3    Q.    I guess what I'm wondering is what would make you fly

4    across the country from Virginia to Tucson to volunteer with

5    this organization and then stay.

6    A.    Well, I was aware of the situation on the border and the

7    deaths that were occurring here, and I felt compelled to come

8    out here, especially because the skills I had as an EMT I

9    thought would be applicable.

10   Q.    So you felt compelled to come out here.  What compelled

11   you to do that?

12   A.    I found it very disturbing that the deaths were occurring

13   and the suffering, and I wanted to do something about it.

14   Q.    Was that informed by your belief in the sanctity of human

15   life?

16   A.    Yes.

17   Q.    Did you feel a spiritual connection to your volunteer

18   work with No More Deaths?

19   A.    Definitely, yes.

20   Q.    Tell us about that.  Explain -- explain that.

21   A.    Well, I felt a spiritual connection, well, because of what

22   I said about thinking that life is sacred, including human

23   life, and I think that water is sacred because it's a very --

24   it's, like, one of the most basic aspects of life are made out

25   of water, like Zaachila said before, and I feel spiritually

1   connected to the work of helping other people.

2   Q.   Did you hear Reverend Fife testify yesterday?

3   A.   I did.

4   Q.   Or maybe it was a couple days ago.  Were you at the

5   trainings where he spoke?

6   A.   I was.

7   Q.   Have you had conversations with him during your time as a

8   volunteer with No More Deaths?

9   A.   Yes.

10  Q.   And do you agree with the -- with the spiritual grounding

11  that he testified about for this work in this organization?

12  A.   Yeah, more or less, yes.

13  Q.   Okay.  More or less?  What do you mean, "more or less?"

14  A.   Well, what I mean is that I don't consider myself a part

15  of any specific congregation, and I don't -- but I agree with

16  his basic beliefs and human rights and having a spiritual

17  calling to help people.

18  Q.   Okay.  Did you ever participate in prayers with No More

19  Deaths out in the desert?

20  A.   I guess you could call them prayers, yeah.  I've

21  definitely participated in circles of -- where people would

22  share their thoughts and feelings and hold a moment of silence,

23  and I consider that to be a prayer.

24       I've also been present at, I guess you could say a

25  ceremony at our camp that used to exist in Arivaca where you'd

1    annually have different people of faiths.  A lot of people from

2    the churches come down and hold a ceremony to bless the camp

3    every year.  I've been present for that before.

4    Q.   Okay.  I'd like to talk about getting ready to go and do

5    a water drop.

6    A.   Okay.

7    Q.   What's -- what's your -- what's your headspace like as

8    you're preparing to go out into the desert to do this?  What

9    are you thinking about?

10   A.   Well, it's during the summertime.  It's knowing that it's

11   going to be really physically uncomfortable all day, and it's

12   going to be a long day, and so I tend to be quiet and kind of

13   trying to prepare myself for that.  It's usually pretty quiet,

14   and everybody's -- you know, we eat breakfast together.  We

15   wake up together.  We get ready to go together, and it's

16   usually a pretty quiet time.

17   Q.   Why do you do that?  Why do you wake up knowing it's

18   going to be a long, hot, physically uncomfortable day?  What

19   makes you get up and do it?

20   A.   Because that's what's necessary to get the work done that

21   we're trying to do.

22   Q.   How many gallons of water do you carry in your pack?

23   A.   It depends.  If I'm feeling good, I can carry -- I'll

24   carry, like, five or six gallons with me.

25   Q.   So you carry some in your hands too?

1   A.    Uh-huh.

2   Q.    How many do you carry in your hands?

3   A.    I usually carry one in my hand and switch it off, and I'll

4   carry four or five in my backpack.

5   Q.    What's a jug of water weigh?

6   A.    I think approximately eight pounds.

7   Q.    For a gallon?

8   A.    Yeah.

9   Q.    Okay.  What's that feel like, carrying a pack with four

10  or five gallons of water and another gallon of water, eight

11  pounds in your hand?  What's that -- what's that feel like in

12  the summer?

13  A.    Exhausting.

14  Q.    How do you feel when you get to the spot where you're

15  going to put the water in the desert?

16  A.    Well, it depends where the spot is.  Sometimes --

17  sometimes I get to the place, and there will be tons of

18  artifacts, you know, things that people have left behind,

19  trash.  Sometimes the gallons will be empty and appear to have

20  been drank.

21        Sometimes we'll get there and they'll be slashed and

22  vandalized.  I've arrived at water drops where there were

23  really horrible racist messages written on the bottle and

24  they're slashed.  I've even seen them have, like, gun holes in

25  them, bullet holes, I mean.

1          So sometimes it can be kind of, kind of intense, but

2     it's -- you know, it's also, like, a relief when you get to

3     where you're going.

4     Q.    On this particular day, August 13th, were you out in the

5     Cabeza Prieta wilderness?

6     A.    I was.

7     Q.    And did you get out of that -- did you drive that pickup,

8     the white Dodge pickup that we saw in the game photo?

9     A.    Yes.

10    Q.    All right.  And did you hike out with a pack of water and

11    a gallon jug in your hand?

12    A.    Yes.

13    Q.    We saw one of the game cameras said it was 110 degrees.

14    Does that sound accurate to you?

15    A.    Definitely.

16    Q.    And when you walk out through the desert to where you're

17    going to drop the bottles, do you stop, take breaks?

18    A.    Not until we get to where we're going.

19    Q.    Are there places to stop and take breaks?

20    A.    Well, no.  That's why we don't, because when it's that hot

21    out, and the ground is so rocky, you'll burn your skin if you

22    try to sit on the ground.  There's no shade.  It's better to

23    just keep going until you can find somewhere to rest.

24    Q.    It's 110 outside in the air.  What's the temperature of

25    the rocks?

1              MR. WALTERS:  Objection, Your Honor.  Foundation.

2    Calls for speculation.

3    BY MR. FIDEL:

4    Q.   Do you know what the temperature of the rocks is?

5    A.   I don't know exactly.  I would say probably 140 degrees,

6    130 degrees.

7    Q.   What's it feel like when you sit on the rocks out in the

8    desert?

9    A.   It burns.

10   Q.   So are there shady spots along the way?

11   A.   In that area, no, not unless you can find a rock overhang

12   or the occasional shrubby tree.

13   Q.   And then what do you do there?  Do you sit down there, or

14   how do you take a break, if you're going to take a break?

15   A.   Normally what I do is I would empty my backpack of all of

16   the supplies and then sit on my backpack or squat.

17   Q.   Okay.  So you mentioned that you find things along the

18   way, things that other people have left behind.  What kinds of

19   things have you found?

20   A.   A lot of shoes.  A lot of articles of clothing, food, food

21   wrappers, like, food trash.  That's the majority of it.

22   Abandoned backpacks.

23   Q.   And you pick that stuff up and you carry it out?

24   A.   Yes.

25   Q.   All right.

1   A.   Yeah, we carry trash bags, and we carry out as much trash

2   as we can.

3   Q.   All right.  When you got -- when you get to the drop

4   site, we heard testimony about drawing or writing messages on

5   the bottles.

6   A.   Uh-huh.

7   Q.   Are there other items or things that people leave at the

8   drop sites?

9   A.   Yeah.  We get boxes of rosaries from various churches

10  and --

11  Q.   Like actual rosary beads?

12  A.   Yeah, rosary beads, and I like to carry those and hang

13  them in the trees or the cactuses around the drops, put them on

14  the bottle.

15  Q.   Why do you do that?

16  A.   Just so that people know that it's, you know, coming

17  from -- you know, just so that it's more welcoming to people,

18  and I think that, you know, regardless of if somebody is

19  religious or not who happens across them, it's nice to know

20  where they're coming from, and I think it's encouraging to

21  people, especially if they are religious, to have that, and

22  just, you know, to make it look nice and welcoming.

23  Q.   Does it reflect on your understanding of the spirituality

24  of leaving water in the desert?

25  A.   I'm sorry.  Can you repeat that?

1  Q.   Yeah, when you leave a rosary in the tree near where

2  you're leaving this water or in the spot where you're leaving

3  this water, does that reflect on your belief, the spirituality

4  of that act, of leaving water out there?

5  A.   Yeah.  I mean, like I said, I don't identify with any

6  specific congregation or traditional organized religion, but I

7  definitely support and agree with a lot of Christian beliefs

8  about, like, helping your neighbor and providing for people in

9  need, and since that's a Christian symbol, you know, I'm fine

10  with putting that out.

11  Q.   Yeah.  All right.

12       Now, let's talk about the permit process.

13  A.   Uh-huh.

14  Q.   Was August 13th, 2017, the first time you've ever been on

15  the Cabeza Prieta refuge?

16  A.   No.

17  Q.   When was the previous time you were there?

18  A.   I don't remember exactly when it was.  It was sometime in

19  2015, was the last time I was there, I think.

20  Q.   Okay.  Did you have a permit at that time?

21  A.   Yes.

22  Q.   In 2015?

23  A.   Uh-huh, yes.

24  Q.   Did you have a permit in 2017?

25  A.   No.

 1  Q.   Had you seen the new permit that went into effect July

 2  1st, 2017?

 3  A.   I didn't read it personally.  I heard somebody summarize

 4  what it said for me, verbally, but I didn't read it.

 5  Q.   And where did you hear what was on it?

 6  A.   Mostly in No More Deaths meetings and emails.

 7  Q.   Okay.  You guys have weekly meetings?

 8  A.   Yes.

 9  Q.   All right.  And was that a topic of discussion, the

10  change to the permit?

11  A.   Yes.

12  Q.   And what did you understand the change to the permit to

13  be?

14  A.   I understood that they had added a paragraph specifically

15  addressing leaving food, water, and other supplies on the

16  refuge.

17  Q.   Did you decide not to get that permit?

18  A.   Yes, I did.

19  Q.   Why did you make that decision?

20  A.   Well, I heard that they had added that paragraph, and that

21  was what I was there to do, was to leave food, water, and other

22  supplies.

23  Q.   And did somebody tell you not to get a permit, or was

24  that your own decision?

25  A.   No, that was my own decision.

1  Q.   Okay.  And so why?  Why not get the permit?

2  A.   Because what's the point if I was lying?  I don't like to

3  lie.  I don't like to lie.

4  Q.   Did you think that you would be violating the permit by

5  going on the refuge without getting a permit?

6  A.   Did I think I'd be violating the permit by not getting a

7  permit?

8  Q.   Yes, and then going on the refuge.

9  A.   I'm not sure -- well, I never agreed to the permit, so I

10  don't know if I'd be violating it, but I mean --

11  Q.   Well, let me ask you this.  Did you know it was against

12  the rules to go on the refuge without a permit?

13  A.   Yes.

14  Q.   Did you know you were not allowed to drive on the

15  administrative road that went down from Charlie Bell Pass?

16  A.   Did I know I was allowed to drive?

17  Q.   Did you know that you were not allowed to?

18  A.   Oh, no.

19  Q.   Okay.  What did you think the punishment could be if you

20  were caught on the refuge without a permit?

21  A.   I thought that I would be asked to leave and potentially

22  banned from the refuge and that the -- I thought the most

23  extreme thing that would happen would be that I would get a

24  citation of some sort, like a fine, ticket.

25  Q.   Okay.  What's a citation?  What does "citation" mean to

1   you?

2   A.   I don't know the legal definition of a citation, but what

3   I meant was, like, a ticket, like, a traffic ticket or

4   something like that.

5   Q.   Did you think it was a crime for you to be on the refuge

6   without a permit?

7   A.   No.

8   Q.   Did you think it was a crime to be leaving water on the

9   refuge?

10  A.   No.

11  Q.   Did you know about -- were you at the July 6th meeting

12  we've heard about with No More Deaths people and

13  representatives of the U.S. Attorney's Office?

14  A.   No.

15  Q.   Did you hear about that meeting?

16  A.   I did.

17  Q.   Was that in those No More Deaths meetings?

18  A.   Yes.

19  Q.   And was that a topic of discussion?

20  A.   Yes.

21  Q.   And did you hear that the U.S. Attorney's Office

22  representative had said the Government was not interested in

23  prosecuting these cases?

24  A.   Yes, I heard that.

25  Q.   Had you heard about other No More Deaths volunteers in

 1    the past being prosecuted by the U.S. Attorney's Office?

 2    A.    Yeah, I heard of -- I heard of one case where No More

 3    Deaths volunteers were prosecuted and --

 4    Q.    When was that?

 5    A.    I don't know what year that was.  It was at least eight

 6    years ago, I think, and it was a completely different

 7    situation, and the charges got dropped.

 8    Q.    Did you hear -- from what you heard, did it involve

 9    leaving water on a refuge or something else?

10    A.    That case before?

11    Q.    Yeah.

12    A.    No, it had nothing to do with leaving water on the refuge.

13    Q.    Okay.  So as far as going on to the Cabeza refuge and

14    leaving water and driving on an administrative road, did you

15    believe that that conduct could result in you being charged

16    with a crime and prosecuted?

17    A.    Certainly not.

18            MR. FIDEL:  Okay.  That's all my questions.

19                           CROSS-EXAMINATION

20    BY MR. WALTERS:

21    Q.    Good morning, Ms. Hoffman.

22    A.    Good morning.

23    Q.    Before you got to Cabeza, you know that a permit was

24    required; correct?

25    A.    Yes.

1  Q.   And a permit was required for you even to step one foot
2  in the refuge; correct?
3  A.   Yes.
4  Q.   So again, your testimony was that you willfully chose not
5  to get one?
6  A.   Yes.
7  Q.   And you didn't get one because you knew that you weren't
8  going to follow it?
9  A.   Yes.
10 Q.   Did you attempt -- well, you didn't attempt to get a
11 special-use permit; correct?
12 A.   That's correct.
13 Q.   Are you aware of what a special permit is, special-use
14 permit is?
15 A.   I am aware of that now.  I was not aware of that until,
16 like, yesterday or the day before, when I heard it here.
17 Q.   Did you ever talk to Fish and Wildlife about the -- about
18 whether you could drive down into a wilderness area or about
19 your ability to get special-use permit?
20 A.   No.
21 Q.   Did you ever ask Fish and Wildlife if you could drive
22 down into a wilderness area?
23 A.   No.
24 Q.   You planned -- before you went to Cabeza, you planned
25 what you were going to do; right?

1  A.    Yes.

2  Q.    You planned when you were going to go?

3  A.    Yeah, yeah.

4  Q.    Generally speaking?

5  A.    Uh-huh.

6  Q.    Where you were going to go?

7  A.    Yes.

8  Q.    What you were going to do when you got there?

9  A.    Yes.

10  Q.    And what you were going to do was leave certain supplies

11  at that location; is that fair?

12  A.    Uh-huh, yes.

13  Q.    You wanted people to find those supplies; is that fair?

14  A.    Yeah, I -- yes, uh-huh.

15  Q.    And that -- those people would include undocumented

16  migrants?

17  A.    They are people, yes.

18  Q.    In terms of those supplies that you wanted people to

19  find, your intent in leaving those supplies was so that

20  someone could carry them somewhere else in the -- in that

21  area.

22        Is that fair?

23  A.    No.

24  Q.    Okay.  What was your intent?

25  A.    That people could drink that water and eat the food.

 1  Q.   Okay.  So if they -- if they picked it up, though, and

 2  they continued on their journey, it's fair that they have

 3  picked it up and taken it with them; right?

 4  A.   It's fair to say that, but that was not my intent.

 5  Q.   Regardless of your intent -- your intent was to leave

 6  supplies on the refuge; right?

 7  A.   Correct.

 8  Q.   And you left those supplies, or at least are part of

 9  those supplies, at Charlie Bell Well; right?

10  A.   Yes.

11  Q.   And then after you passed Charlie Bell Well, you parked

12  at some point; right?

13  A.   Yes.

14  Q.   And then you and your codefendants then walked off into

15  the desert; right?

16  A.   Correct.

17  Q.   Did you carry more supplies with you?

18  A.   Yes.

19  Q.   And your intent was to leave those supplies somewhere in

20  the desert; correct?

21  A.   Yes.

22  Q.   On the refuge, there are signs telling you where

23  wilderness boundaries begin; correct?

24  A.   Apparently so, yes.

25            MR. WALTERS:  Sarah, can I have our exhibits, the

1    ones that have been admitted?

2    BY MR. WALTERS:

3    Q.   Ms. Hoffman, is your screen up on your computer?

4    A.   Yeah.

5    Q.   Looks like a white screen?

6         Okay.  I'm showing you what's been admitted as

7    Government's Exhibit 22.

8    A.   Uh-huh.

9    Q.   This location is at Charlie Bell Pass; correct?

10   A.   Yes.

11   Q.   Or this picture is at Charlie Bell Pass?

12   A.   Yes.

13   Q.   And you see there on the right side of the screen a white

14   sign; correct?

15   A.   I do.

16   Q.   Did you see that when you drove down to Charlie Bell

17   Well?

18   A.   I don't recall.

19   Q.   You don't recall whether you saw it or you don't -- you

20   didn't see it?

21   A.   I don't recall seeing that sign.  I don't know.

22   Q.   There is another sign over here, correct, a yellow sign?

23   A.   Yes.

24   Q.   Do you recall seeing that sign when you drove down to

25   Charlie Bell Well?

1   A.   No.

2   Q.   I'm showing you what's been admitted as Government's

3   Exhibit 24.

4   A.   Uh-huh.

5   Q.   You heard prior testimony in this case that this was

6   taken from the driver's side of a truck; correct?

7   A.   I don't -- I don't remember when that was said.

8   Q.   You don't remember Officer West saying that he took this

9   picture from the driver's seat of his truck?

10  A.   Yeah, I guess, yeah, I heard that, yeah.

11  Q.   So I understand that they're not the same trucks, but you

12  would agree with me that is a similar vantage point that you

13  would have had on that day?

14  A.   Probably.

15  Q.   And do you recall seeing that sign?

16  A.   No.

17  Q.   And just to zoom in, that sign specifically says that

18  unauthorized vehicles are prohibited; correct?

19  A.   It does.

20  Q.   Showing you what's been admitted as Government's Exhibit

21  No. 21.

22  A.   Uh-huh.

23  Q.   This sign is at Charlie Bell Pass; correct?

24  A.   It appears to be.

25  Q.   Okay.  And before you get to -- before you drive down to

1  the wilderness area, just to orient you, this sign would be on

2  the passenger side of the truck; is that correct?

3  A.    Appears to be, yes.

4  Q.    And again, if we zoom in, it says, "Administrative

5  Trail;" correct?

6  A.    Uh-huh, yes.

7  Q.    And No More Deaths -- did No More Deaths give you any

8  information or training on administrative trails out on Cabeza

9  Prieta?

10  A.    No.

11  Q.    This is also at Charlie Bell Pass, before you go down to

12  Charlie Bell Well; correct?

13  A.    It appears to be, yes.

14  Q.    And this would be the left side of the road, the driver's

15  side; correct?

16  A.    Yes.

17  Q.    And you told Officer West that you didn't see the sign

18  either?

19  A.    Yeah, yes.

20  Q.    And if we look closely, it specifically says, "Government

21  Use Only;" correct?

22  A.    Correct.

23  Q.    I think this goes without saying, but you are not the

24  Government; right?

25  A.    I am not the Government.

1   Q.   And again, just one more picture.

2        You would agree with me that those signs stand out in

3   that picture; right?

4   A.   In that picture, yeah, they do.

5   Q.   You have a white sign amongst nothing but brown; is that

6   right?

7   A.   Yeah, I guess so.

8   Q.   You have a yellow sign amongst nothing but brown, a

9   bright yellow sign amongst nothing but brown; right?

10  A.   Yes.

11           MR. FIDEL:  Judge, excuse me.  Could we just clarify

12  for the record that these past few photos are individual

13  photos of the same signs?

14           MR. WALTERS:  Yes, that's fine.

15           MR. FIDEL:  We're all in agreement about that?

16           MR. WALTERS:  Yeah.

17           MS. WRIGHT:  Nate, they're not all the same sign.

18           MR. WALTERS:  Let me clarify.  The last few pictures

19  were all of the same sign.  However, Exhibit No. 24 was the

20  sign that was past Charlie Bell Well.

21           MR. FIDEL:  Agreed.

22           MR. WALTERS:  Okay.

23  BY MR. WALTERS:

24  Q.   So you would agree with me, then, that there is clearly

25  marked signs and signage on both sides of the road when you

1    enter the wilderness area?

2    A.    Yes, but I'd also say that that road is incredibly rocky,

3    and I was focusing on driving and not reading signs.

4    Q.    It's not rocky before you pass those signs, though;

5    right?

6    A.    It is, yes.

7    Q.    Before you get to those signs, in an open area, a flat

8    open area at Charlie Bell Pass, it's rocky?

9    A.    I would call it rocky, yes.

10   Q.    You actually at one point went down to Charlie Bell Well

11   for the first time; correct?

12   A.    Yes.

13   Q.    And then you went back up to Charlie Bell Pass?

14   A.    I did.

15   Q.    So in order to go down the first time, you would have

16   passed those signs?

17   A.    Yeah, I would have.

18   Q.    And then, when you came back up to Charlie Bell Pass, you

19   went back down to Charlie Bell Well; correct?

20   A.    I'm sorry.  What -- can you repeat that?

21   Q.    So you went down to Charlie Bell Well the first time;

22   right?

23   A.    Yeah.

24   Q.    And then you came back up to Charlie Bell Pass?

25   A.    Uh-huh.

1    Q.    And then you went back down to Charlie Bell Well;

2    correct?

3    A.    I think so.  I honestly don't remember exactly what we

4    did.

5    Q.    Do you recall testimony about the trail cameras that were

6    used in this case?

7    A.    From Officer West?

8    Q.    Yes.

9    A.    Yes.

10   Q.    And do you recall his testimony that you went -- that the

11   truck was seen going back and forth on the trail cam?

12   A.    Oh, yes.  I do remember that, yes.

13   Q.    Okay.  So you would agree with me, then, you made

14   multiple trips down to Charlie Bell Well?

15   A.    I do.

16   Q.    Specifically two?

17   A.    Yes.

18   Q.    So you would have passed those signs twice; is that fair?

19   A.    Yeah.

20   Q.    Okay.  And then, going past Charlie Bell Well, you would

21   have obviously passed that sign as well?

22   A.    Yeah.

23   Q.    And in none of those instances, your testimony is you

24   never saw those signs?

25   A.    I never read those signs.

1  Q.   But you saw them?

2  A.   I don't remember seeing them.  It's possible.

3  Q.   If you saw them, would you have read them?

4  A.   Not necessarily, no.

5  Q.   Let's talk about your testimony that you thought that

6  there was an agreement with the U.S. Attorney's Office.  Okay?

7  A.   Okay.

8  Q.   You were never at any meetings with the U.S. Attorney's

9  Office?

10  A.   No, and I never thought there was a written agreement or

11  anything.  I just was under the impression that they were not

12  interested in pursuing these cases.

13  Q.   And that might be my fault.  I wasn't speaking about a

14  written agreement.  I was speaking about any agreement.

15  A.   Okay.

16  Q.   Okay.  You never spoke to any Assistant United States

17  Attorney about your actions; correct?

18  A.   Correct.

19  Q.   You never spoke to any U.S. Attorney that had been

20  appointed by the President; correct?

21  A.   That's correct.

22  Q.   You never spoke to any First Assistant United States

23  Attorney about your actions?

24  A.   No, I didn't.

25  Q.   You never spoke directly to anyone from the Fish and

1   Wildlife Service?

2   A.   At any --

3   Q.   Prior to your actions.

4   A.   I've spoken to Fish and Wildlife.

5   Q.   Sorry.  That was -- let me clarify.

6        You never spoke to anyone from Fish and Wildlife about

7   whether you had permission to conduct your activities;

8   correct?

9   A.   On that -- on that particular day, no.  Correct.  Yes.

10  Q.   You heard that the U.S. Attorney's Office didn't have an

11  interest in prosecuting cases from a third party; is that

12  fair?

13  A.   Yeah.

14  Q.   And that third party being the leadership of No More

15  Deaths.  Is that fair too?

16  A.   No.

17  Q.   Okay.  Was it just a general discussion amongst everyone

18  then?

19  A.   Yes.

20  Q.   Okay.  No one from the U.S. Attorney's Office told you

21  directly that you had permission to conduct your activities at

22  Cabeza Prieta; is that correct?

23  A.   Yes.

24  Q.   No one from the Fish and Wildlife Service told you that

25  you had permission to conduct your activities that day;

1  correct?

2  A.   Correct.

3  Q.   No one from the Department of the Interior told you that

4  you had permission to conduct your activities that day;

5  correct?

6  A.   That's correct.

7  Q.   No one from the Department of Justice told you that you

8  had permission to conduct your activities that day; correct?

9  A.   Correct.

10  Q.   And none -- and nobody from those agencies, from any of

11  those agencies, told you that what you were doing was legal;

12  correct?

13  A.   That's correct.  I never talked to --

14  Q.   No one ever told you, if you do this, you are not

15  violating federal law.  Is that fair?

16  A.   That none of those people you just named?

17  Q.   Correct.

18  A.   Oh, I never talked to them.

19  Q.   Okay.  So no one told you that it was legal?

20  A.   Well, no.  I never talked to them.

21  Q.   Okay.  And I think you said it earlier, but just to

22  clarify, you never saw a written -- any written agreement

23  between No More Deaths and the U.S. Attorney's Office?

24  A.   I never saw one, no.

25  Q.   Okay.  Anybody ever tell you there was a written

1  agreement?

2  A.   No.

3  Q.   Your testimony was that you were told that the U.S.

4  Attorney's Office was not interested in prosecuting these

5  types of cases; right?

6  A.   Right.

7  Q.   So the flip side to that is that you knew you could be

8  prosecuted; correct?

9  A.   Yes.

10 Q.   Just that the U.S. Attorney's Office wasn't interested;

11 right?

12 A.   Yes.  I didn't -- yeah.  Yes.  Uh-huh.

13 Q.   Okay.  So you knew that you could be charged with a crime

14 when you went out there?

15 A.   Well, that's what I was going to say, is no, I didn't know

16 that I could be charged with a crime.  I knew that I could be

17 cited.  I didn't think that was a crime.

18 Q.   You thought the -- you thought the United States

19 Attorney's Office wouldn't prosecute you; correct?

20 A.   Correct.  I didn't think I was committing any crime.

21 Q.   Do you think a citation and a prosecution are the same?

22 A.   No.

23 Q.   So when someone says they won't -- they don't have an

24 interest in prosecuting you, you would agree with me that you

25 knew you could be prosecuted?

1   A.   Okay.  Well, no.  I mean, when you put it like that, no.

2   I thought that I could get a citation.  I didn't think that I

3   could be prosecuted for a crime.

4   Q.   You're familiar with the rescue beacons on the refuge;

5   correct?

6   A.   I am.

7   Q.   You know that those emergency beacons are a way for

8   anyone in distress, whether it be a citizen or an undocumented

9   migrant, to call for help if they are in distress; correct?

10  A.   I know that it calls the Border Patrol, yes.

11  Q.   Okay.  And that's for anyone to use; correct?

12  A.   Theoretically.

13  Q.   Okay.  If you had gone out to Cabeza that day and you

14  needed medical attention, you could have pushed the button;

15  right?

16  A.   I could have.

17  Q.   And you know that Border Patrol is trained to

18  specifically conduct search and rescue operations; correct?

19  A.   I know that they're trained.  I also know that there's a

20  lot of cases reported where they don't respond at all, and

21  that's a major problem that No More Deaths specifically has a

22  report about.

23  Q.   You testified that you had training as an EMT; correct?

24  A.   Correct.

25  Q.   And at one point you were -- I think you said you were a

 1  volunteer but you got a stipend; right?  Is that what you

 2  said?

 3  A.   As an EMT?

 4  Q.   As -- with the Arivaca Fire Department.

 5  A.   Yes.

 6  Q.   Okay.  So you've been trained on the signs and symptoms

 7  of dehydration, I take it?

 8  A.   I have.

 9  Q.   You know what the protocols are -- the protocols are for

10  handling or assisting someone who is suffering from

11  dehydration; correct?

12  A.   More or less, yeah.

13  Q.   And one of the basic things about dehydration is, of

14  course, water; is that fair?

15  A.   Yes.

16  Q.   One of the other basic procedures for treating someone

17  with dehydration is to cool their body off; correct?

18  A.   That's correct.

19  Q.   Cold packs maybe on the back of the neck?

20  A.   Uh-huh.

21  Q.   Under the armpits?

22  A.   Yes.

23  Q.   Behind the knees?

24  A.   Uh-huh.

25  Q.   Possibly the groin area?

1    A.    Yeah.

2    Q.    And that's in an effort to reduce the body temperature as

3    quickly as possible; correct?

4    A.    Correct.

5    Q.    So in your training as an EMT, you're aware that, if

6    someone is suffering from dehydration, that they should not

7    chug a gallon of water; is that fair?

8    A.    That is fair.

9    Q.    That they need to take controlled sips in order to

10   recover from that dehydration?

11   A.    Yes, and they need electrolytes.

12   Q.    Because if someone drinks a ton of water too quickly if

13   they are dehydrated, they can vomit?

14   A.    Yeah.

15   Q.    They can go into shock?

16   A.    Yeah.

17   Q.    They can die?

18   A.    Right.

19   Q.    And you have no -- and you had no training or you had no

20   information saying that you were giving undocumented migrants

21   advice on how to drink the water that you were setting out.

22   A.    I'm sorry.  Can you repeat that?

23   Q.    You had no -- let me rephrase.  You had no means to

24   control whether an undocumented migrant was going to sip that

25   water or chug that water; correct?

1   A.   No, I never -- no.

2   Q.   I want to talk about the kiosk that you and your

3   codefendants signed in to.  Do you remember that?

4   A.   Vaguely, yes.

5   Q.   At the kiosk -- there is a big map at the kiosk; correct?

6   A.   A map?

7   Q.   Uh-huh.

8   A.   I don't remember.

9   Q.   So you don't recall seeing a map that showed where the

10  designated wilderness areas were on the refuge?

11  A.   No.  I didn't look at any --

12  Q.   You don't recall seeing a big map at the kiosk showing

13  where the administrative roads began on the refuge?

14  A.   No.  I didn't look at any map.

15          MR. WALTERS:  May I have a minute, Your Honor?

16          THE COURT:  You may.

17          MR. WALTERS:  I have no further questions, Your

18  Honor.

19                    REDIRECT EXAMINATION

20  BY MR. FIDEL:

21  Q.   Natalie, were you aware of people who had driven out on

22  the refuge, left water, and not been cited?

23  A.   Yes.

24  Q.   Were you aware of that when you went out there on August

25  13th?

```
 1   A.    Yes.

 2              MR. FIDEL:  No further questions.

 3              THE COURT:  You may step down.

 4              MS. CHAPMAN:  Your Honor, we call Madeline Huse.

 5              THE COURT:  Okay.

 6                  MADELINE HUSE, WITNESS, SWORN

 7                      DIRECT EXAMINATION

 8   BY MS. CHAPMAN:

 9   Q.    Madeline, can you introduce yourself to the Court,

10   please.

11   A.    My name is Madeline Huse.

12   Q.    And how old are you?

13   A.    I'm 23.

14   Q.    Where do you live Madeline?

15   A.    I live in Bellingham, Washington.

16   Q.    And have you completed some college?

17   A.    I have.  Two years.

18   Q.    And what are you doing now?

19   A.    Now I'm just working in Bellingham and trying to get into

20   a program in Virginia.

21   Q.    And what kind of program are you trying to get into in

22   Virginia?

23   A.    Conflict analysis, a mediation and arbitration program.

24   Q.    Great.  And what brought you from Bellingham to Arizona?

25   A.    I learned about No More Deaths online, and I speak
```

1    Spanish, so I figured there was something that I could do out

2    here.  I've always been interested in helping other people in

3    need, and I figured I could apply my skills.

4    Q.   When was that that you came to Arizona for the first

5    time?

6    A.   December 2016.

7    Q.   And how long did you stay when you were here in December?

8    A.   I stayed -- well, I went straight to Ajo, Arizona, and I

9    stayed for a month, living in the desert out there.

10   Q.   And then did you leave for a time?

11   A.   I did.  I went to south Texas to work with some folks down

12   there.

13   Q.   And then you returned to Arizona in April of 2017?

14   A.   Yeah.  I actually came back around February.

15   Q.   And why did you return to Arizona?  What brought you

16   back?

17   A.   After working in south Texas, I realized that there was a

18   great need, especially in the west desert, just from some of

19   the experiences that I had out there in December.

20   Q.   And what training did you go through when you came and

21   decided to volunteer for No More Deaths?

22   A.   There's a pretty long training that new volunteers go

23   through.  It's a whole day, and there's several people that

24   talk and a big PowerPoint that they show you.

25   Q.   If we could show the witness the exhibit marked as

1   Exhibit 133.

2       Madeline, do you recognize this PowerPoint as one that

3   you may have seen or seen one like it as part of your

4   training?

5   A.   Yeah, I've seen that many times.

6   Q.   And what is covered in this training?

7   A.   Everything from protocols and procedures to why the need

8   is there and the history of the sanctuary movement, how we

9   ended up becoming No More Deaths.

10  Q.   So on the first page here, it looks like it organizes by

11  year and land jurisdiction recovered human remains.

12      Is that right?

13  A.   Yes.

14  Q.   Was that part of your training?

15  A.   It was, but I actually have witnessed human remains many

16  times as well.

17  Q.   Right, and I want to talk about that.

18      Let's look at the second page here.  These are some maps

19  that show recovered human remains in the west desert; is that

20  right?

21  A.   Yeah.

22  Q.   And you recognize this as part of training that you

23  received as a volunteer?

24  A.   Yeah, it is.

25               MS. CHAPMAN:  Your Honor, I would move admission of

1    Exhibit 133.

2            THE COURT:  Sure.

3            MS. CHAPMAN:  May we publish the exhibit, please?

4            THE COURT:  Sure.

5    BY MS. CHAPMAN:

6    Q.   So you're also advised about what it means.  Recovered

7    human remains don't necessarily mean, when they're found, it's

8    not necessarily the time that the person passed away; is that

9    right?

10   A.   Yeah.

11   Q.   And that's part of the training that you receive?

12   A.   Uh-huh.

13   Q.   And then we have some maps here.  Are these maps part of

14   the training?

15   A.   Yeah, I've seen lots of maps like that.

16   Q.   And do you know -- you heard the testimony of

17   Dr. McCullough.  Do you know if these maps are created with

18   his assistance and input?

19   A.   Yeah, I believe so.

20   Q.   And these maps show what I think Dr. McCullough called in

21   his testimony the trail of death?

22   A.   Yes.

23   Q.   And this is part of the training that you received as a

24   volunteer?

25   A.   Yes.  I also saw trainings when I was working as logistics

1   coordinator too.

2   Q.   Okay.  And you said you also have some personal

3   experience with recovered human remains  1  Tell the Court

4   about that experience.

5   A.   The first month I was here was in Ajo, and I was going out

6   in the desert every day, and I think that month we found over a

7   dozen human remain sets, just that first month.  It was a huge

8   shock and one of the main reasons I felt compelled to come back

9   after Texas, because it was traumatizing, I mean, to see the

10  tragedy out there.

11  Q.   And what do you do when you come upon or what did you do

12  when you came upon recovered human remains in that first month

13  when you were here?

14  A.   That had to do with training, so we would call the sheriff

15  right away.  It's a crime scene.  So we never collected

16  anything.  We just contacted the sheriff and then made GPS

17  waypoints to -- and he would do a grid search, trying to find

18  scattered -- scattered bones or other evidence.

19  Q.   And that's part of the training you received, as well, as

20  a No More Deaths volunteer?

21  A.   Yes, you're -- yeah.  And then generally we would

22  oftentimes have a moment of silence or just trying to be in

23  that space and really, you know, love that person and think

24  about them.

25  Q.   And that had a big effect on you, didn't it?

1  A.   It did, yeah.

2  Q.   And in some of the other trainings that you received,

3  were you trained on how to record the location of water that

4  you leave?

5  A.   Yeah, we have binders.  I think that was mentioned in the

6  previous.  The binders are just our system for logging what

7  water is used and how it's used.  You know, there's

8  vandalization that happens with the water.  If that happens,

9  you can go back and look at records and see whether or not a

10  water drop is useful.

11      And so there's the amount of jugs that were out there, and

12  you can tell if they've been drank or animalized, and so then

13  you can kind of reroute based off of that information from the

14  past.

15  Q.   So you're trained to record that information?

16  A.   Uh-huh.

17  Q.   And is that recording similar to the document that we saw

18  with Dr. McCullough's testimony?

19  A.   Yeah, it's almost exactly that.

20  Q.   Are there any No More Deaths protocols about trash?

21  A.   Yeah, we definitely pick up all the trash that we can see.

22  We bring -- I mean, our packs are empty by the time we get

23  there, and we replace that with the garbage that's around the

24  area, and it's not always necessarily our garbage either,

25  you know, if there's wrappers or jugs or, you know, anything,

1    clothes.

2    Q.    You pick it up and remove it --

3    A.    Yeah.

4    Q.    -- when you find trash?

5    A.    Put it in our packs and take it out.

6    Q.    Okay.  And so I know you said you were at some trainings.

7    Does No More Deaths -- how do they communicate with their

8    volunteers?

9    A.    We have meetings.

10   Q.    Are those weekly meetings?

11   A.    Yeah.

12   Q.    And did you attend those meetings?

13   A.    I did.

14   Q.    And does No More Deaths also have mailing lists?

15   A.    Yeah, there's an email list.

16   Q.    And we saw emails from Dr. McCullough that mentioned the

17   desert aid working group.  Are you on that mailing list, the

18   desert aid mailing list?

19   A.    I am.

20   Q.    And did you receive emails with Dr. McCullough's maps on

21   them as part of that desert aid working group?

22   A.    Yeah.  I continue to receive those.

23   Q.    And you saw the maps that he included in the emails that

24   showed the number of deaths in the west desert and the

25   increasing numbers?

1  A.    Uh-huh.

2  Q.    Is that right?

3  A.    Yes.

4  Q.    And did any of those emails include discussions about the

5  testimony we've heard here about that July meeting with the

6  United States Attorney's Office?

7  A.    Yeah.  I remember being in the meeting, actually, where we

8  talked about that.

9  Q.    And what was your understanding about the U.S. Attorney's

10 Office's intent with respect to prosecuting people for leaving

11 water in the desert?

12 A.    My understanding was that they were not interested in

13 prosecuting us.

14 Q.    And did you understand that that was something that was

15 said at a meeting with the U.S. Attorney's Office and members

16 of No More Deaths?

17 A.    Yeah.  There was -- I mean, it's a reliable meeting.

18 People report back.

19 Q.    Let's talk about August 13th.  What did you do to prepare

20 on that day?

21 A.    Well, I just woke up in the morning, and I packed enough

22 water for myself, made sure I had some food.  Put -- loaded the

23 water into the truck and snacks, blankets, first aid supplies,

24 and we headed out there.

25 Q.    And how did you decide where the water would be placed

1  that day?

2  A.   Charlie Bell Well is an important part of the Growler

3  Valley because it is advertised as a well, and so many people

4  tend to try and get there with the hopes of receiving water,

5  but as it was testified, I think it wasn't Mr. West, but the

6  other Fish and Wildlife officer, it's not potable, and it's

7  meant for animals.  And actually, in my experience, it's always

8  been dry every time I've been there.

9       So it's just logical that somebody would head there

10 looking for water if they needed it, and it makes sense for us

11 to put it there.

12 Q.   And what was the temperature that day?  Do you recall?

13 A.   It was hot.  I mean, when we got out there it was early,

14 and it was in the high '90s, and I think it was 110 by the time

15 we got down there, and that wasn't even noon.

16 Q.   And how many -- how much water did you pack in the truck

17 that day?  Do you recall?

18 A.   As much as we could.

19 Q.   And when you got there and you got out of the truck, you

20 packed water in your backpack?

21 A.   Uh-huh.

22 Q.   And then did you also carry water in your arms, in your

23 hands?

24 A.   Yes.

25 Q.   And had you been to Cabeza Prieta before?

1   A.   I had, yeah.

2   Q.   And when you had been before, did you have a permit?

3   A.   Yes.  I had always had a permit up until that point.

4   Q.   And in 2017, when you went in August, you did not have a

5   permit; is that correct?

6   A.   No, I did not.

7   Q.   And you knew that there had been a change to the permit?

8   A.   I did, yeah.  I had seen the change.

9   Q.   Had you actually seen the physical permit?  Had you read

10  it?

11  A.   Yeah, I'd read it.

12  Q.   And what did you understand the change to be?

13  A.   Well, they added that stipulation 13 to specify we could

14  not bring water or food or aid into the desert, and that is

15  exactly why we were there, so I chose not to sign it.  It does

16  say we were subject to civil penalties or debarment, and that

17  just seemed like a citation.

18  Q.   And so what did you think would happen to you if you went

19  onto the Cabeza without a permit and left water?

20  A.   I thought we would get, you know, kicked off, maybe, if

21  they saw us and --

22  Q.   Is that what you thought "debarment" meant?

23  A.   I don't know what "debarment" meant, but I definitely

24  figured that they would just tell us to leave, please.

25  Q.   And did you know that other No More Deaths volunteers had

 1   been in the west desert in that area in the days prior to you

 2   going out on August 13th and left water and had not been

 3   cited --

 4   A.   Yeah.

 5   Q.   -- or ticketed?

 6   A.   I think we try and cover that ground as much as possible.

 7   It's really important to be out there, especially in the

 8   Growler Valley.

 9   Q.   And you --

10          THE COURT:  Let's take a break until 1:20.

11          MS. CHAPMAN:  Thank you, Your Honor.

12          MR. DUPONT:  Your Honor, if I may, I think the

13   Government should know who their rebuttal witnesses are going

14   to be, and we'd ask as soon as possible to get any 16.1

15   statements or any other material that would be relevant to

16   their testimony.

17          MS. WRIGHT:  And Your Honor, we've provided notice

18   of who those witnesses are, and we've provided the appropriate

19   disclosure.

20          THE COURT:  Okay.

21          (Off the record.)

22          THE COURT:  Resume the stand, please.  You realize

23   you're still under oath?

24          THE WITNESS:  Yes.

25   BY MS. CHAPMAN:

1   Q.   So Madeline, excuse me, we were talking about -- when we

2   broke, we were talking about what you had been told about the

3   risks of going onto the Cabeza Prieta without a permit, and I

4   think you told us that you had heard about the July meetings

5   that we heard testimony about; is that right?

6   A.   Yes.

7   Q.   And you had looked at the permit itself?

8   A.   I had, yeah.  I've read it.

9   Q.   Okay.  And so, when you got to the refuge that day, did

10  you sign in at a kiosk?

11  A.   I did.  I signed in.

12  Q.   And tell us what you did after you signed in at the

13  kiosk?

14  A.   I got in the car.

15  Q.   And then did you drive to Charlie Bell Pass?

16  A.   We did.

17  Q.   And when you got there, what did you do?

18  A.   Then we drove down the hill.

19  Q.   And when you got down the hill, what did you do next?

20  A.   We unloaded the water that was in the back of the truck

21  and drove back up.

22  Q.   Okay.  And when you drove back up, did you get additional

23  water and drive back down?

24  A.   Yes, we did.

25  Q.   Okay.  And then what did you do?

1  A.    Then we continued driving west.

2  Q.    Okay.  And at some point did you hike some water into the

3  lower part of the desert?

4  A.    Yes, we did.

5  Q.    And how -- about how far did you hike when you went with

6  the water?

7  A.    Probably a mile-and-a-half out.

8  Q.    And what happened when you got there?  What did you do?

9  A.    Then we unloaded our water, and general practice is to sit

10  down and take a break, drink water for ourselves.  We put

11  markings on the water jugs, you know, crosses, rosary.  I have

12  a personal little drawing I like to do on the jugs.

13  Q.    And you did that?

14  A.    I did that, yeah.

15  Q.    And so you said you sat down.  You took a break.  You

16  drew on the bottles.  What else happens when you leave water

17  at a specified location?  What else happens at that time?

18  A.    Oftentimes it's just a way to be present in the moment and

19  think of those who are suffering and just put some love out for

20  them, whether that's prayer or meditation or just drawing

21  hearts and, you know, making sure that we're making the water

22  jugs look friendly enough for people to want to drink them.

23  Q.    And do you take some time for yourself, then, in those

24  moments to pay -- I think you said pay respect or to take a

25  moment of silence?  What are you doing at that moment, and

1  what did you do on that day?

2  A.   I definitely always just pay my respects and try and be

3  conscious of why I'm there, and it's always a reminder.  Every

4  drop of water that I drink out there is a reminder.

5  Q.   And when you say, try to take a moment to think about why

6  you're there, why are you there?

7  A.   We're there because there's tragedy in the desert,

8  especially that area, and because I've seen -- I've seen death

9  there, and that's why I'm there.

10 Q.   And why is that important to you personally?

11 A.   Well, life is sacred, and I just believe in love and

12 compassion and kindness and the sanctity of human life, whoever

13 you are.

14 Q.   And do you see placing water as an act of honoring the

15 sanctity of human life, or how -- are those things related for

16 you at all?

17 A.   Yeah.  Well, I mean, living in the desert is not -- it's

18 hard.  And you know, hiking around in 110 degrees is not what I

19 want to be doing with my time, but I do it because I feel the

20 need to and obligated to be there and do my part.

21 Q.   And did you hear the testimony of Reverend Fife?

22 A.   I did.

23 Q.   And have you been at any prayers in the desert?

24 A.   Yeah, I have been, and I mean, it's always welcome.

25 Q.   And do you identify with or understand what Reverend Fife

1    said was the spiritual basis or foundation for No More Deaths?

2    A.    Yeah.  I grew up going to church, and that's definitely

3    where I learned a lot of those values.  That internalized, and

4    I agree with a lot of John Fife's beliefs, and along with the

5    UUC, the Unitarian Church.

6    Q.    And have you attended the Unitarian Church?

7    A.    I have.  I've attended several services in multiple

8    states, so not just Tucson.

9    Q.    And what did your time at No More Deaths in the west

10   desert during the spring and summer of 2017, what did that

11   mean for you?  What was that experience like for you?

12   A.    It was really hard, but it was really important too, and I

13   mean, I felt compelled to be there, and like I said, to just do

14   my part as a fellow human being.

15   Q.    And did it have any effect on what you plan to do next

16   with your life?

17   A.    It's definitely a main reason why I want to be in conflict

18   analysis.

19   Q.    That's why you want to be in conflict analysis?

20   A.    Yeah, to, you know, help continue work all around and keep

21   working with people who are suffering.

22         MS. CHAPMAN:  Thank you, Your Honor.  No further

23   questions.

24                          CROSS-EXAMINATION

25   BY MS. WRIGHT:

1  Q.   Good afternoon, Ms. Huse.  I want to start by talking

2  with you about the event of August 13th of 2017.

3       Now, on that day, you drove -- you drove out in a vehicle

4  to Charlie Bell Pass on the Cabeza Prieta; right?

5  A.   I wasn't driving, but yeah.

6  Q.   So you were in a vehicle that drove out onto the Cabeza

7  Prieta; right?

8  A.   Yes, I was.

9  Q.   And you were there with your codefendants; right?

10 A.   I was.

11 Q.   And you were in a white Dodge truck?

12 A.   Yes.

13 Q.   And that truck had been loaded with green milk grates

14 filled with water jugs and cans of beans; right?

15 A.   Along with some other supplies.

16 Q.   And the night before and on the morning of, you'd done

17 some planning about this trip with others; right?

18 A.   We always kind of meet, whether it's in the night before

19 or the morning of, about where we're going.

20 Q.   So either way you'd done some planning before you entered

21 the refuge that day?

22 A.   Yeah, making sure everyone's on the same page.

23 Q.   And as part of that planning, you planned to drive into a

24 designated wilderness area; right?

25 A.   We did.

1   Q.   And prior to going out that day, you packed your own bag

2   with your own supplies for that day?

3   A.   Uh-huh.  Water, lunch.

4   Q.   And prior to going out to the refuge, you helped load up

5   that white Dodge truck; right?

6   A.   I did.

7   Q.   And so you helped put the crates into the truck bed;

8   right?

9   A.   Yes.  Everyone works together.

10  Q.   And part of the plan for those crates and the supplies in

11  those crates was that those would be left behind on the

12  refuge; right?

13  A.   That's what we're there to do.

14  Q.   So that was the plan, was to leave those supplies behind;

15  right?

16  A.   The water and beans.

17  Q.   So that's a "yes?"

18  A.   Yes.  We go put water out.

19  Q.   And also part of the plan was to not get a permit; right?

20  A.   I mean, that kind of was the result of the permit changing

21  the month prior.

22  Q.   So the reason you didn't get a permit that day wasn't

23  because you forgot to get one, was it?

24  A.   No.  It's because it directly targeted our work there.

25  Q.   And so you planned that day to not get a permit; correct?

1    A.   Yes, because it -- we were going to violate the section 13

2    that was changed.

3    Q.   And so it goes almost without saying that, before you

4    went out to the refuge that day, you didn't stop by the refuge

5    office in Ajo, did you?

6    A.   No.

7    Q.   And so you didn't sign the Hold Harmless Agreement;

8    correct?

9    A.   No, I did not.

10   Q.   And that's because you didn't intend to follow the

11   provisions of the Hold Harmless Agreement; correct?

12   A.   It interfered with, you know, my moral beliefs and

13   obligations to be putting water out for people who needed it.

14   Q.   So that's a "yes," you didn't intend to follow it?

15   A.   I definitely hold, yeah, myself to a higher standard than

16   that.

17   Q.   So that's a "yes?"

18   A.   Yes.

19   Q.   And what you didn't intend to follow is that you intended

20   to leave supplies behind?

21   A.   Water and food.

22   Q.   And you also didn't get a special-use permit; correct?

23   A.   Special use for what?

24   Q.   It's a special-use permit.  You did not get a special-use

25   permit, did you?

1    A.    What is that?

2    Q.    Okay.  So that's a no, you didn't get one?

3    A.    Are you talking about the driving a vehicle?

4    Q.    I'm asking if you got something from the Fish and

5    Wildlife called a special-use permit.  You did not do that,

6    did you?

7    A.    No.

8    Q.    And on the drive out to Charlie Bell Pass, you've

9    testified that you passed a kiosk?

10    A.    Yeah.

11    Q.    And that you stopped there and signed in at the kiosk;

12    right?

13    A.    I did.

14    Q.    And so at the kiosk, there are rules for the refuge

15    posted; correct?

16    A.    I believe it's the same permit that I had read previously.

17    Q.    So the rules are posted at the kiosk; right?

18    A.    Yes.

19    Q.    And also posted at the kiosk are maps showing the roads

20    that are on the refuge; right?

21    A.    Possibly.

22    Q.    And so those maps show which roads the public can drive

23    on; right?

24    A.    I don't recall looking at a map.

25    Q.    And you also, before you went out to the refuge that day,

CROSS-EXAMINATION OF MADELINE HUSE

1    didn't call the Ajo refuge office to tell them that you were

2    going to be on the refuge, did you?

3    A.   I did not, no.

4    Q.   And you didn't call them and tell them where you would be

5    on the refuge, did you?

6    A.   No.

7    Q.   And you didn't call and tell them what you were going to

8    do there either, did you?

9    A.   No.

10   Q.   So you didn't give notice to anyone at the Ajo refuge

11   office that you were going to leave supplies behind or that

12   you were going to drive on a road that you were not allowed to

13   drive on, did you?

14   A.   I don't know why we would have done that.

15   Q.   Now, once you got to Charlie Bell Pass, you saw the

16   rescue beacon there; right?

17   A.   Yes.

18   Q.   And then you drove past the rescue beacon and down the

19   hill to the west on Charlie Bell Road; correct?

20   A.   We did.

21   Q.   And you saw the signs that are there on either side of

22   the road; right?

23   A.   Yeah.  I saw the signs.  It was really rocky, and the -- I

24   was sitting in the back seat, so I was mostly worried about us

25   getting over the giant boulders.

CROSS-EXAMINATION OF MADELINE HUSE

1   Q.   And after you drove past those signs, you stopped at

2   Charlie Bell Well; right?

3   A.   We did, yes.

4   Q.   And there you and your codefendants dropped off 70

5   gallons of water and some crates of beans; right?

6   A.   Uh-huh.

7   Q.   And you intended to leave those supplies behind at

8   Charlie Bell Well; right?

9   A.   Yeah, because the well was dry, and that's where people

10  go.

11  Q.   And you were leaving them there for other people to take;

12  right?

13  A.   Yeah, those who needed it.

14  Q.   And you didn't put a GPS tracker on the supplies, did

15  you?

16  A.   No.

17  Q.   And you had no other way of tracking those supplies down

18  if they left Charlie Bell Well, did you?

19  A.   I mean, besides the markings that we put on the gallons.

20  I said earlier I have markings that I would recognize.

21  Q.   But that wouldn't help you find it if it was not within

22  your line of sight, would it?

23  A.   No, but I mean, I spend plenty of time hiking around

24  there.

25  Q.   So once someone else took any of those supplies away from

1    Charlie Bell Well, you had no way of controlling what that

2    person did with those items, did you?

3    A.   I mean, if you're referring to somebody bringing it 10

4    miles north, it's quite possible that we could walk there in

5    the future.

6    Q.   So my question to you is, if someone else took those

7    supplies, you couldn't control what someone did with those

8    supplies, could you?

9    A.   No.

10   Q.   And so regardless of your intent, you left those supplies

11   behind at Charlie Bell Well; right?

12   A.   Yes.

13   Q.   And once you left the supplies behind at Charlie Bell

14   Well, you and your codefendants drove back up to Charlie Bell

15   Pass; right?

16   A.   Yes.

17   Q.   And you drove past those signs again, and you picked up

18   more supplies; right?

19   A.   Yes, the rest of the water.

20   Q.   And then you drove back out onto Charlie Bell Road to the

21   west; right?

22   A.   We did.

23   Q.   And you drove past those signs again; right?

24   A.   If they were still there.  They were.

25   Q.   You drove past those signs; right?

1  A.    Yes.

2  Q.    And then you actually drove past Charlie Bell Well that

3  time; right?

4  A.    We did.  We continued west on the road.

5  Q.    And as you did that, you traveled past another set of

6  signs; right?

7  A.    Possibly.  I don't recall that.

8  Q.    And eventually you stopped and parked off the side of the

9  road; right?

10  A.    Yes, we did.  We pulled over into a parking spot.

11  Q.    And then all of you loaded up your packs with water;

12  right?

13  A.    Yeah, as much as we could carry.

14  Q.    And then you hiked one-and-a-half miles, about, south,

15  into the designated wilderness?

16  A.    We did.

17  Q.    And once you got to where you were going, you left the

18  supplies, the water jugs, behind; right?

19  A.    After signing them and taking a break ourselves.

20  Q.    And just like the supplies you left at Charlie Bell Well,

21  you had no way of controlling what someone might do with them

22  later; right?

23  A.    I mean, ideally, they would drink them.

24  Q.    But you had no way of making sure that would happen, did

25  you?

CROSS-EXAMINATION OF MADELINE HUSE

1   A.   No.

2   Q.   And you had no way of making sure that they didn't carry

3   them further into the refuge, did you?

4   A.   I mean, based on our research that we do, we do pick the

5   spots that we put water, you know, based off of those times.

6   Q.   But you have no way of controlling if that -- if any one

7   person would take a jug anywhere else on the refuge, do you?

8   A.   I mean, no, I don't.

9   Q.   And so, again, regardless of your intent, your plans,

10  your research, you intended to leave those supplies behind in

11  the designated wilderness area; right?

12  A.   Yes.

13  Q.   Now, you hiked back north the one-and-a-half miles to the

14  truck; right?

15  A.   Uh-huh.

16  Q.   And Officer West was waiting for you when you returned;

17  right?

18  A.   He was.

19  Q.   And you told Officer West at that time, when he asked

20  you, that you didn't -- you intentionally did not get a permit

21  for that day; right?

22  A.   In order to not violate the permit, we didn't get a

23  permit.

24  Q.   And you didn't tell him where you had been, did you?

25  A.   Well, I don't recall him ever asking.

1   Q.   So you didn't volunteer any information to him, did you,

2   about where you had placed the supplies?

3   A.   If he would have asked, maybe we would have told him.

4   Q.   Now, on August 13th of 2017, you didn't have any

5   information that day when you entered the refuge that there

6   was a particular person in danger of dying that day, did you?

7   A.   Besides it being 110 degrees.

8   Q.   So my question is, you didn't have any information about

9   a specific person in danger of dying?  You did not?

10  A.   No specific individuals, but there was plenty of evidence

11  of that around us.

12  Q.   And if you had had information about a specific

13  individual, you would have called 911; right?

14  A.   Yeah.  I mean, we have satellite phones that we can use.

15  Q.   So that's a "yes?"

16  A.   There's plenty of things that you can do in that

17  situation.

18  Q.   So if you knew and had specific information about a

19  specific person in danger of dying, you would not have called

20  911?

21  A.   Getting them help is my first priority.

22  Q.   And you're aware, as one of the tools you can use to get

23  help to someone who might be in distress, that there is a

24  search and rescue beacon at Charlie Bell Pass?

25  A.   Up the really steep hill at the top.

CROSS—EXAMINATION OF MADELINE HUSE

1  Q.   That's a "yes?"

2  A.   Yeah, it's at the top.

3  Q.   And so you're aware that it's there?

4  A.   Yes.

5  Q.   And you know that there are other rescue beacons on the

6  refuge; right?

7  A.   I mean, it was during the day, so it was a hard to see

8  them.  There's no lights actually flashing during the day, so

9  it's only at night that you would be able to see the ones that

10 are far away.

11 Q.   Okay.  But you're aware that there are other rescue

12 beacons on refuge; right?

13 A.   I have seen them before.

14 Q.   And you know that those beacons allow people to activate

15 the beacon and speak directly with Border Patrol; right?

16 A.   Yes, there is a button.

17 Q.   And if activated, Border Patrol can send a person

18 directly to that beacon to help that person; right?

19 A.   They could, theoretically.

20 Q.   Let's talk for a minute about your testimony that you

21 thought that there was an agreement with the United States

22 Attorney's Office.

23          MS. CHAPMAN:  Misstates the testimony, Your Honor.

24 Excuse me.

25 BY MS. WRIGHT:

1  Q.  Well, let's talk about your testimony about what you

2  thought might happen.  You testified that you were not at the

3  meeting on July 6th with the United States Attorney's Office;

4  right?

5  A.  I don't remember testifying to that, but I don't recall

6  being at the meeting.

7  Q.  So you were not at any meeting with the United States

8  Attorney's Office on July 6th; right?

9  A.  I was not, no.

10 Q.  And any information you had about what happened in that

11 meeting came to you through a third party; right?

12 A.  Yeah, during the meetings with the rest of my coworkers.

13 Q.  You never spoke directly, prior to August 13th, with

14 anyone from the United States Attorney's Office, did you?

15 A.  No.  I heard about it through kind of a debrief meeting.

16 Q.  And prior to August 13th of 2017, you never spoke

17 directly with anyone at Fish and Wildlife, did you?

18 A.  I mean, I've met Fish and Wildlife officers in the field

19 before.

20 Q.  So let me clarify.  Prior to August 13th, 2017, you never

21 spoke directly to anyone at Fish and Wildlife about whether or

22 not you had permission on August 13th to do what you did?

23 A.  No.

24 Q.  And the same goes for Border Patrol?  You never got

25 permission or had any conversations with anyone from Border

1   Patrol about permission to conduct your activities?

2   A.   On the wildlife refuge?

3   Q.   Yes.

4   A.   I mean, I was in meetings about that.

5   Q.   No one ever told you from any agency that you could enter

6   the refuge without a permit, did they?

7   A.   No, but we were told that they were uninterested in

8   pursuing anything with regard to that.

9   Q.   No one ever you told that you could abandon supplies in

10  the refuge, did they?

11  A.   No.

12  Q.   And no one ever told you that you could drive on

13  restricted roads on the refuge, did you?  Did they?  Sorry.

14  A.   They did not tell us we could drive on restricted roads.

15  Q.   So you never saw any document signed by the United States

16  Attorney's Office or anyone from the United States Attorney's

17  Office telling you that your conduct was legal, did you?

18  A.   I did not realize my conduct was illegal.

19  Q.   My question is, did you ever see a document from the

20  United States Attorney's Office telling you that your conduct

21  was legal?

22  A.   I didn't see a document saying that, no.

23  Q.   And in fact, you had read the Hold Harmless Agreement

24  which indicated that leaving behind supplies like water and

25  food on the refuge was against the rules on the refuge; right?

1    A.    Yes.  It was against the rules on the refuge.

2    Q.    I want to talk to you about how you became aware of No

3    More Deaths.  You testified on direct that you became aware of

4    No More Deaths by doing some research online when you were

5    still living in Washington?

6          That's right?

7    A.    Yes, that's right.

8    Q.    And then you came and volunteered for No More Deaths for

9    about a month; right?

10   A.    Yes.

11   Q.    And from your No More Deaths volunteer position, then you

12   went to a center in Texas; is that right?

13   A.    That's true.

14   Q.    And that's the South Texas Human Rights Center that you

15   went to?

16   A.    It is.

17   Q.    And after being at that center for a while, you testified

18   that you decided to return to No More Deaths in Arizona;

19   right?

20   A.    Yeah.  Based off of what I'd experienced in Ajo, I felt

21   compelled to come back.

22   Q.    Now, Ms. Huse, you remember writing a declaration for

23   this case; right?

24   A.    I do.

25   Q.    And you wrote that or signed that on April 24th of 2018;

 1   right?

 2   A.   Yes.

 3   Q.   And you signed that and you signed it under penalty of

 4   perjury stating that what you put in that declaration was

 5   true?

 6   A.   Yes, I did.  I mean --

 7            MS. WRIGHT:  Sarah, could I have Exhibit 119 from

 8   the defendants?

 9            MS. CHAPMAN:  I have it over here.

10   BY MS. WRIGHT:

11   Q.   Now, Ms. Huse, looking at paragraph one, in your

12   declaration that you previously filed, you stated that you

13   learned about No More Deaths after you were working at the

14   South Texas Human Rights Center; correct?

15   A.   I could see how that would be confusing.  When I was in

16   Bellingham, I was researching a bunch of different

17   organizations on the border, and I was planning on going to

18   South Texas Human Rights Center first, but I got called to No

19   More Deaths really last minute.

20   Q.   Tell me if I'm reading this line correctly.  "I learned

21   about No More Deaths while working with the South Texas Human

22   Rights Center."

23        Did I read that accurately?

24   A.   Yes.

25   Q.   Thank you.

1        Now, let's talk about the South Texas Human Rights Center

2   for a second.  That is headquartered in a place called

3   Falfurrias, Texas; is that correct?

4   A.   Yes, it is.

5   Q.   And that's in Brooks County?

6   A.   Yes.

7   Q.   And that's about 80 miles from the international border

8   there; right?

9   A.   Approximately.

10  Q.   And according to the South Texas Human Rights Center,

11  Texas has the most migrant deaths of any border state;

12  correct?

13            MS. CHAPMAN:  Foundation, Your Honor.

14            MS. WRIGHT:  I'll go ahead and ask the question.

15  BY MS. WRIGHT:

16  Q.   Ms. Huse, are you aware of what the South Texas Human

17  Rights Center reports about deaths in its area of

18  responsibility?

19  A.   I have been aware, yes.

20  Q.   Okay.  So you're aware that they report that Texas has

21  the most migrant deaths of border states; right?

22  A.   I've heard that before.

23  Q.   And the South Texas Human Rights Center, one of the

24  things or the main thing that they do is that they build water

25  stations in the desert area in Brooks County and the

1    surrounding counties; right?

2    A.   That's true.

3    Q.   And they do that in order to prevent the death of those

4    walking through the desert, the area there; right?

5    A.   Yes.  It's a different -- it's different down there

6    because it's not BLM land, so there's lots of ranches.

7    Q.   And the South Texas Human Rights Center, through its

8    volunteers, install water stations that are permanent on

9    private land; right?

10   A.   With the permission of the owners, yeah.

11   Q.   So it's with the permission and the cooperation of those

12   owners; right?

13   A.   Yes.

14            MS. WRIGHT:  If I could have a minute, Your Honor?

15            That's all I have.  Thank you.

16                      REDIRECT EXAMINATION

17   BY MS. CHAPMAN:

18   Q.   Madeline, looking at Exhibit 119, it says that you

19   learned about No More Deaths while working with South Texas

20   Human Rights Center, and the center has a mission very similar

21   to No More Deaths.

22       Is it correct to say that you learned about No More

23   Deaths while you were planning -- when you were planning to go

24   work at the Southern Texas Human Rights Center and they have

25   similar missions?

REDIRECT EXAMINATION OF MADELINE HUSE

1   A.   I learned about them both about the same time.

2   Q.   Okay.  And you had originally planned to go to South

3   Texas Human Rights Center?

4   A.   Yes.  I was in communication with both organizations, and

5   it just worked out to be at No More Deaths first.

6   Q.   Okay.  The rest of this declaration, other than --

7   actually, I think there is one other correction, right, in

8   paragraph two?  Could you tell us what it is?

9   A.   Yeah.  The date, when I came here was 2016, not 2017.

10  Q.   Okay.  Other than that date and that chronological error

11  about learning about No More Deaths and the South Texas Human

12  Rights Center at the same time, is the declaration true and

13  correct?

14  A.   It is.

15            MS. CHAPMAN:  Your Honor, I'd move for the admission

16  of Exhibit 119.

17            MS. WRIGHT:  Your Honor, I would object.  The

18  witness' testimony stands as it is, and admitting this adds

19  nothing to that.  It is hearsay and it's inadmissible.

20            THE COURT:  Sustained.

21  BY MS. CHAPMAN:

22  Q.   All right.  We'll go through it.

23       So Madeline, in paragraph three, it says your work with

24  No More Deaths is motivated by the belief that people should

25  have access to the basic needs of life.

1          Is that true?

2   A.    Very true, yes.

3   Q.    And it says, "I am obligated as a service to humanity to

4   try to provide these necessities to other human beings in

5   need."

6          Is that still true?

7   A.    Yes.

8   Q.    Does that accurately state your beliefs?

9   A.    Yes.

10  Q.    Does it accurately state why you were motivated to be in

11  the west desert in the summer of 2017?

12  A.    It does.

13  Q.    "I believe in the power of good and the greater ideals of

14  love and compassion."

15         Still true?

16  A.    Always true.

17  Q.    "This is in accord with the first principle of the

18  Unitarian Universalist Church that I use those gifts given to

19  me to offer love, heal injury, and support my fellow human

20  beings."

21         Still true?

22  A.    Yes, anywhere on the border.

23  Q.    And this is the last paragraph.  "I firmly believe I am

24  morally, ethically, and spiritually bound to offer assistance

25  to human beings in need of basic necessities.  I hold these

1    beliefs with the strength of traditional religious

2    convictions."

3        Still true?

4            MS. WRIGHT:  Objection, Your Honor.  Calls for a

5    legal conclusion.

6            THE COURT:  Overruled.

7    BY MS. CHAPMAN:

8    Q.   I'm sorry, Madeline.  Still true?

9    A.   Yeah, still true.

10   Q.   And when you were receiving -- I just want to go back.

11   You recall questions from Ms. Wright about learning about this

12   July 2016 meeting with the U.S. Attorney's Office?  Do you

13   recall those questions?

14   A.   I do.

15   Q.   And you recall that you testified that you heard about

16   the meeting and about the statement from the U.S. Attorney's

17   Office that they weren't interested in prosecuting those cases

18   from third parties?  Do you remember that?

19   A.   Yes, I do.

20   Q.   Were those third parties, to your knowledge, at the

21   meeting in July?

22   A.   I believe so, yeah, they were.

23   Q.   And they communicated to you that they were at the

24   meeting, and that's what they were told?

25   A.   Yes.

1              MS. WRIGHT:  Objection.  Calls for hearsay.

2              MS. CHAPMAN:  It goes to state of mind, Your Honor.

3              THE COURT:  Yeah, it doesn't go to the truth of the

4    statement.

5              MS. CHAPMAN:  Right.  It goes to state of mind.

6    BY MS. CHAPMAN:

7    Q.   So you were told by the people who told you about the

8    meeting that they were at the meeting; is that correct?

9    A.   Yes.

10   Q.   And you relied on those statements when you decided to go

11   into the desert to leave water; correct?

12   A.   Yes.

13   Q.   And the other thing you relied on is what the permit

14   said; correct?

15   A.   Yes.

16   Q.   And you were aware that the permit said that you could be

17   debarred; correct?

18   A.   Yes.

19   Q.   And you weren't quite sure what that meant?

20   A.   No.

21   Q.   And you were aware that the permit said you could be

22   subject to civil penalties; correct?

23   A.   Yes, which I figured was fines or just getting, you know,

24   a slap on the wrist.

25              MS. CHAPMAN:  Okay.  No further questions.  Thank

1    you.

2            THE COURT:  I have one.  On your affidavit, would

3    you put a paragraph five that says, I'm prepared to serve time

4    in prison for my belief?

5            THE WITNESS:  You know, that wasn't something that

6    I --

7            THE COURT:  No, I'm asking you right now.

8            THE WITNESS:  Would I amend my affidavit now?

9            THE COURT:  Right.

10           THE WITNESS:  When I went on the refuge, I was not

11   prepared to go to prison.  I was prepared to deal with fines

12   in court.

13           THE COURT:  Let me ask you a question.  When you

14   look at that permit, that permit basically says, if you sign

15   this, you could be debarred or you could be fined.  That's

16   kind of what it says to you; right?

17           THE WITNESS:  Yeah.

18           THE COURT:  Okay.  That's if you enter into a signed

19   agreement with the wilderness; right?

20           THE WITNESS:  Sure, if I sign the permit.

21           THE COURT:  And if you don't sign it, what happens?

22           THE WITNESS:  You know, we thought it would be

23   less --

24           THE COURT:  You -- go ahead.

25           THE WITNESS:  I thought that was the lesser.  I

 1   didn't want to lie and sign something that I knew I was going

 2   to violate.

 3            THE COURT:  I understand that, but what I'm trying

 4   to ask you is, did it enter your mind, your thought process,

 5   that by not signing, you might be exposing yourself to a

 6   greater harm?

 7            THE WITNESS:  No.

 8            THE COURT:  All right.  Did anybody who provided you

 9   any training and guidance ever tell you, this is what we

10   think, but there may be other people, specifically law

11   enforcement, who might think this is a crime punishable by

12   incarceration?

13            Anybody ever tell you that?

14            THE WITNESS:  I never heard that, no.

15            THE COURT:  Do you think that would have been

16   important?

17            THE WITNESS:  I don't know if opinions are

18   necessarily the most important.  It's more about what the

19   Court believes and, you know, what we were -- we decided.

20            THE COURT:  Well, did they ever tell you, you might

21   be charged with a crime, you might be in front of a judge, you

22   might be looking at penalties?

23            THE WITNESS:  I didn't I believe I was committing a

24   crime, Your Honor.

25            THE COURT:  I didn't ask you that.  I asked you if

 1  somebody warned you about what could happen if somebody

 2  thought about things differently than you.

 3          THE WITNESS:  I mean, I know people think about

 4  things different than I do.

 5          THE COURT:  Okay.  And that's why we're here today;

 6  right?

 7          THE WITNESS:  Yes.

 8          THE COURT:  Okay.  Do you think you and these other

 9  three ladies should have been told about the possible

10  consequences?

11          THE WITNESS:  It didn't seem like a risk at the

12  time.

13          THE COURT:  Well.

14          THE WITNESS:  To be here a year later did not cross

15  our minds.

16          THE COURT:  Okay.  Do you have a sister?

17          THE WITNESS:  I have two sisters.

18          THE COURT:  Okay.  Younger than you?

19          THE WITNESS:  Yes.

20          THE COURT:  Assuming they don't know anything about

21  this, would you want them to be told about your experience?

22          THE WITNESS:  To be told about my experience?

23          THE COURT:  Told, to be told -- let's say they are

24  thinking about joining this organization, these activities.

25          THE WITNESS:  I would --

1          THE COURT:  Would you want them to know that there's

2    a possibility that somebody would charge them with a crime and

3    they'd end up in court?

4          THE WITNESS:  I would encourage them to follow their

5    beliefs and do what they believe is right.

6          THE COURT:  Okay.  And in making that assessment,

7    would you tell them there's a consequence, there is a possible

8    consequence?

9          THE WITNESS:  I think there's consequences to

10   everything.

11         THE COURT:  So you don't care if your sister ends up

12   in the same situation as you?

13         THE WITNESS:  I care if my sister -- I care about my

14   sisters' well beings.

15         THE COURT:  Okay.  Would you want her to know what

16   the possible consequences are before she makes decisions?

17         THE WITNESS:  Sure, yeah.

18         THE COURT:  Don't you think you should have been

19   given the same right from the organization you belong to?

20         THE WITNESS:  I think we are all trying our best,

21   and I think I would have been warned if we would have foreseen

22   something like that.

23         THE COURT:  If they had foreseen something like

24   that?

25         THE WITNESS:  I believe so.

 1            THE COURT:  Okay.  Thank you.

 2            MS. CHAPMAN:  One moment, please, Your Honor.

 3            THE COURT:  Okay.

 4            MS. CHAPMAN:  No further questions.  Thank you, Your

 5   Honor.

 6            THE COURT:  You may step down.

 7            MS. CHAPMAN:  Your Honor, the defense rests.

 8            THE COURT:  Does the Government have anything?

 9            MS. WRIGHT:  Yes, Your Honor, please.  We have one

10   witness.  The Government calls Juliette Fernandez.

11            JULIETTE FERNANDEZ, WITNESS, SWORN

12                    DIRECT EXAMINATION

13   BY MS. WRIGHT:

14   Q.  Ms. Fernandez, if you could state your name for the

15   record and tell the Court where it is that you work.

16   A.  Juliette Fernandez, and I work for the U.S. Fish and

17   Wildlife Service.

18   Q.  And what is your current position with the Fish and

19   Wildlife Service?

20   A.  I'm the refuge supervisor for Arizona and New Mexico.

21   Q.  Do you have any other current positions with Fish and

22   Wildlife?

23   A.  Not current.

24   Q.  And as the -- how long have you been the refuge

25   supervisor?

1    A.    Since 2015.

2    Q.    And what sorts of duties do you have as the refuge

3    supervisor?

4    A.    I supervise the National Wildlife Refuges located in the

5    states of Arizona and New Mexico.  Part of that responsibility

6    is overseeing personnel.  I might advise on various compliance

7    issues, NEPA, biological priorities.  I assign work and I

8    review performance with my subordinates.  I work with them on

9    various management issues that they may be working through,

10   habitat management, public use, a variety of issues that may

11   arise on any of the wildlife refuges within my designation.

12   Q.    Prior to becoming the refuge supervisor, were you a

13   wilderness coordinator?

14   A.    I am a wilderness coordinator in addition to my current

15   position.

16   Q.    How long have you had that responsibility?

17   A.    Since 2015 as well.

18   Q.    And are those basically the same duties you just

19   described, or do you have additional duties as the wilderness

20   coordinator?

21   A.    As wilderness coordinator, within the southwest

22   region, there are refuges with designated wilderness in New

23   Mexico, Arizona, and Oklahoma, so for those three states and

24   for refuges with wilderness, I help to advise on Wilderness Act

25   and our policies and help to facilitate that process.

1  Q.    Now, prior to becoming the refuge supervisor and

2  wilderness coordinator for this region, did you hold any other

3  positions with Fish and Wildlife?

4  A.    I did.

5  Q.    And what were that?  Excuse me.  What were those?

6  A.    Prior to this position I worked at Buenos Aires National

7  Wildlife Refuge in southern Arizona, and I was there in two

8  different capacities.

9       More recently I was the supervisory wildlife refuge

10  specialist, which is essentially an assistant manager, and in

11  that position I oversaw the maintenance program, visitor

12  services and biology program, namely the work with the

13  endangered masked bobwhite quail and habitat improvements and a

14  lot of that oversight.  And in an acting capacity, I was also

15  -- I also served as refuge manager at times.

16  Q.    And altogether between those duties how many years were

17  you at Buenos Aires?

18  A.    About eight.

19  Q.    And prior to that did you have any other positions with

20  Fish and Wildlife?

21  A.    I did.

22  Q.    And what was that?

23  A.    I worked at Imperial National Wildlife Refuge located on

24  the Colorado River.  I was the biologist there.  And for that

25  position I did all of the studies and surveys for that refuge,

 1   analysis, recommendations to refuge management.  I worked with

 2   local, state, and other federal entities to manage endangered

 3   species populations and habitat.  Those were some of my primary

 4   duties.

 5   Q.   How long did you do that for?

 6   A.   About three years.

 7   Q.   And prior to that, did you have any other positions with

 8   Fish and Wildlife?

 9   A.   That was my first permanent position.

10   Q.   Okay.  And prior to joining Fish and Wildlife, did you

11   have any education that prepared you for those positions?

12   A.   Yeah, I have a bachelor of science in wildlife science.

13   Q.   And what sorts of things do you study as a wildlife

14   science major?

15   A.   Some of the different courses that I was required to take

16   was a lot of identification courses such as mammology,

17   ornithology, herpetology.  We also take wildlife management

18   courses, wildlife disease, statistics, environmental law.

19   Those are some of the main -- some of the main coursework.

20   Q.   And since joining Fish and Wildlife, have you had

21   opportunities to continue your education and professional

22   development?

23   A.   I have.

24   Q.   If you could briefly summarize what some of those

25   opportunities are.

DIRECT EXAMINATION OF JULIETTE FERNANDEZ

1   A.   I've taken refuge management academy, advanced refuge

2   management academy, courses in NEPA --

3   Q.   And stop there.  What's NEPA?

4   A.   National Environmental Protection Act.

5   Q.   Thank you.

6        Okay.  Carry on.

7   A.   And I've taken courses in fire management, law enforcement

8   for supervisors, wilderness courses, and I've helped to teach

9   some wilderness courses within that as well.  So it's a little

10  bit of a mix of what I've done.

11  Q.   Now, through your training and your experience that

12  you've just described, have you become familiar with the

13  principles of wilderness management?

14  A.   I have.

15  Q.   And when I say "wilderness," does that word have a

16  particular meaning to you?

17  A.   So wilderness is undeveloped federal land with a specific

18  designation.  It's designated by Congress, and it's undeveloped

19  federal land where we are required to uphold certain qualities

20  of wilderness character.

21  Q.   And before we get to those qualities, I just want to help

22  the Court understand a little bit.  Where does a piece of land

23  that's designated as wilderness fall within the spectrum of

24  federal public lands that might have some protection?

25  A.   Sure.  So various land management agencies have

DIRECT EXAMINATION OF JULIETTE FERNANDEZ

1   wilderness, but for the U.S. Fish and Wildlife Service, we

2   first have a mission, which is to preserve, conserve, protect,

3   and enhance fish, wildlife, plants and their habitats for the

4   American people, and that's the mission of the U.S. Fish and

5   Wildlife Service.

6        On top of that, various wildlife refuges will have a

7   specific purpose for which they're established, and as the --

8   as the federal agency in charge of those lands, we're required

9   to uphold the mission and the purpose for which they are

10  established.

11       When you get a wilderness designation, that is

12  supplemental to the mission and purpose that we're already

13  managing for on refuge land, so it's a more specific

14  requirement for how these lands have to be managed.

15  Q.   Now, within the lands managed by Fish and Wildlife, is

16  there a land designation that is more restrictive than

17  wilderness?

18  A.   Wilderness is probably one of the highest designations,

19  aside from some refuges that may be closed to the public for

20  sensitive species, or if we have an overlay with the military

21  installation, for example, there is some more restricted areas.

22  Q.   And you mentioned previously some qualities of wilderness

23  character.  In your -- are you charged with managing the Fish

24  and Wildlife -- I'm sorry.  I'm trying this again.

25       Are you charged with managing areas designated as

DIRECT EXAMINATION OF JULIETTE FERNANDEZ

1  wilderness for what's called qualities of wilderness

2  character?

3  A.   That's correct.  The Wilderness Act of 1964 outlines the

4  laws and the qualities by which we need to manage wilderness

5  areas, and so within that there's five specific qualities that

6  all wilderness areas across the nation all follow.

7  Q.   And so let's just take them, each of the five, in turn

8  and briefly describe them, and I'd like to start with the

9  first, which I understand is a combo.

10      Is one of the qualities the combination of primitive,

11  solitude, and unconfined?

12  A.   Right.  So we are supposed to manage for the opportunity

13  for primitive solitude and unconfined recreation, so

14  essentially somebody that's visiting a wilderness area should

15  be able to go out into the wilderness and have minimal

16  interaction with other people.  They should be able to feel

17  that they're truly having a primitive experience as they

18  recreate, and they're unconfined by other human interactions.

19      So for example, in a traditional refuge, you might have a

20  visitor services specialist out there greeting people and

21  teaching them about plants and animals and directing

22  them, whereas in a wilderness designation you wouldn't have any

23  of that, because it would detract from that quality.

24  Q.   And is untrammeled one of the five qualities?

25  A.   Untrammeled is.

DIRECT EXAMINATION OF JULIETTE FERNANDEZ

1  Q.   If you could describe that briefly, please.

2  A.   Untrammeled essentially means not restricted.  So in

3  wilderness we're supposed to allow natural processes to take

4  place and have minimal interaction to obstruct that.  For

5  example, on a traditional wildlife refuge, you may plan a fish

6  barrier in a stream, whereas in designated wilderness you're

7  supposed to allow natural processes to happen on their own

8  without a lot of human interaction altering the landscape.

9  Q.   Is undeveloped the third quality?

10 A.   Undeveloped is another quality, yes.

11 Q.   Please describe that.

12 A.   Undeveloped is ensuring that a wilderness area is free

13 from a human development, so structures, human habitation

14 inside wilderness would not be allowed.  Roads, motor

15 vehicles, airplanes, anything motorized would deter from the

16 undeveloped quality of the wilderness.

17 Q.   And when we're talking about the quality of being

18 undeveloped, does that also extend to the tools that might be

19 used to manage the land?

20 A.   Yeah, so for all of these, when you need to do something

21 in wilderness, you need to use the minimum tool to get a job

22 done.  So for example, in a wilderness area, having a chainsaw

23 would disrupt the undeveloped quality of a wilderness area, so

24 you should be using a hand axe, a primitive tool, to the

25 greatest extent possible, to complete your management action.

DIRECT EXAMINATION OF JULIETTE FERNANDEZ

1  Q.   And is natural one of the qualities that is managed for?

2  A.   It is.

3  Q.   And please describe what that means in this context for

4  the Court.

5  A.   Often with the natural quality we do look at the plant and

6  animal communities within the area and try not to alter what

7  occurs there naturally.  So allowing native species to exist

8  there and not -- for example, on a traditional refuge you might

9  plants crops for waterfowl.  In a wilderness area, you would

10 not want to do anything that would -- that would change the

11 plant communities and the ecosystems that exist there.

12 Q.   And we've done four now.  Is the last quality of

13 wilderness awkwardly named "other features of value?"

14 A.   It is.

15 Q.   And what does that mean?

16 A.   Other features of value are specific to each different

17 wilderness areas.  They can vary, but it can be something

18 scientific or educational or scenic or historic.  So for

19 example, a ruin in a wildlife refuge, even though it was

20 obviously made by a human, because of its historic value, it

21 would be something that would be allowed to remain within that

22 wilderness area.

23 Q.   And so when we're talking about these, I think you said

24 ruins or maybe other structures, are these things that predate

25 the wilderness designation?

DIRECT EXAMINATION OF JULIETTE FERNANDEZ

1   A.    They would be, right.

2   Q.    Now, you mentioned briefly in describing these five

3   qualities something called the minimum tool or minimum

4   requirements analysis.

5   A.    Right.

6   Q.    Please describe briefly what that analysis is.

7   A.    So sometimes certain things do need to take place within a

8   wilderness area, and our requirement per the Wilderness Act of

9   1964 is that we will do a minimum requirements analysis.  And

10  essentially what that means is, if there's something that needs

11  to be done that is consistent with the U.S. Fish and Wildlife

12  Service mission or consistent with the purpose for which that

13  individual refuge was established, then we can do a management

14  action within the wilderness area, but we're required to first

15  determine if that action is at all necessary, because ideally

16  you wouldn't do any of it, but is that action necessary, can it

17  be done outside a designated wilderness, and if not, what is

18  the minimum tool that can be used in order to complete that

19  action with the least disturbance to the qualities of

20  wilderness character.

21  Q.    And so if you could illustrate this concept with perhaps

22  a tree that has fallen within an area in wilderness.

23  A.    So if there's a tree, let's say, that falls in wilderness

24  in a sensitive area and it needs to be moved, for example, you

25  would need to do a minimum requirements analysis, number one,

1    to say, for example, how are you going to get there, can you

2    hike it?  That would be the least, the minimum tool.  If

3    not, can you drive there?  Do you have to get there by

4    helicopters?  It's evaluating all alternatives to determine

5    what the minimum opportunity is.

6         And then, once you get to that tree, can you -- do you

7    have to cut it down with a chainsaw or, again, can you do it

8    with a hand axe or a hand saw, because those primitive tools

9    should be followed in order to meet the minimum requirement for

10   administering those actions.

11   Q.   And when you talk about minimum requirement, are you

12   talking about minimum impact on the environment, or are you

13   talking about a different concept there?

14   A.   Minimum, it could be minimum impact on the environment,

15   but more so minimum impact to wilderness qualities.

16   Q.   So those five qualities you just described are the

17   benchmarks for what you're looking at?

18   A.   Correct.  And within those qualities, the environment

19   falls.  I'm sorry.

20   Q.   I'm sorry?  Say again.

21   A.   And within those qualities, the environment would fall.

22   Q.   Okay.  Thank you.

23        Now, this minimum tool analysis, does it apply to all

24   steps of a proposed action within a wilderness area?

25   A.   It does.  So again, let's say there was a fire in

1    wilderness, and you would need to do a minimum tool -- minimum

2    requirements analysis to not only determine if you're going to

3    put the fire out, but how you're going to get there, what

4    methods are you going to use in order to put it out.  It goes

5    over every step of that process to minimize any impacts to

6    quality.

7    Q.    Now, where does life-saving activity fall within this

8    minimum tool requirements analysis?

9    A.    The Wilderness Act of 1964 does allow for entrance into a

10   wilderness area for emergency, emergency access, such as search

11   and rescue, and in those cases, because the emergency is

12   imminent, you have to get out there right away, they do not

13   require you to do a minimum requirements analysis prior to

14   entering for the search and rescue, but you should follow up

15   afterwards for reporting and analysis of any impacts to that

16   wilderness area.

17   Q.    And in taking life-saving activity in a wilderness area,

18   does it ever happen that Fish and Wildlife needs to coordinate

19   with another agency or another entity?

20   A.    Yes.  So we would coordinate with another entity that has

21   the ability to have the quickest means to ensure that that

22   person's search and rescue can be done immediately.

23   Q.    And in doing a life-saving activity, under the Wilderness

24   Act, are you allowed to do the quickest action, or are there

25   other things that come into play?

DIRECT EXAMINATION OF JULIETTE FERNANDEZ

1  A.   Yeah, so generally, for a management action, you know, if

2  it was a nonemergency, the time it takes doesn't factor in.

3  You need to use the minimum tool.

4      But for an emergency situation, it should be the quickest

5  means by which you can take somebody out, because that

6  emergency would be imminent.  So we don't want to hold up the

7  process with paperwork or anything like that.  We need to allow

8  these emergency services to get in as quickly as possible and

9  provide help to that individual.

10 Q.   So after a life-saving activity of this imminent nature

11 has happened, is there a procedural follow-up that happens

12 afterwards?

13 A.   We do document and ensure that we assess any impacts to

14 wilderness, wilderness character, and we do annual analysis, as

15 well, on top of that to evaluate the wilderness area and make

16 sure that we're upholding the qualities.

17 Q.   I'd like to turn your attention more particularly now to

18 the Cabeza Prieta National Wildlife Refuge.  Does that fall

19 within your management responsibilities?

20 A.   It does.

21 Q.   And how many refuges are within your area of

22 responsibility?

23 A.   I have 17 refuges under my supervision.

24 Q.   Now, Cabeza Prieta, can you give the Court an idea of how

25 large Cabeza Prieta is in -- well, first, how large is Cabeza

1   Prieta?

2   A.   Cabeza Prieta is 860,000 acres.  It is the largest, I'm

3   sorry, the third-largest wildlife refuge in the lower 48

4   states.  It's the largest designated wilderness in the lower 48

5   states, and it's -- on the refuges, I should specify -- and

6   it's the largest designated wilderness within the state of

7   Arizona among any land management agency.

8        So it's a big refuge.

9   Q.   Of the 860,000 acres that is the refuge, how much of that

10  is designated wilderness?

11  A.   A little over 803,000, so the majority of -- the vast

12  majority of the refuge is designated wilderness.

13  Q.   Can you put a percentage on it?

14  A.   93 percent.

15  Q.   Thank you.

16       And is that unusual among the refuges that you manage?

17  A.   That's the highest percent, certainly, and another refuge

18  in Arizona, Kofa, has a lot of designated wilderness, but not

19  as much as the Cabeza Prieta.

20       And among wildlife refuges, so for example, in the

21  southwest region there's 47 refuges total, only seven of which

22  have designated wilderness, so it's not a typical thing

23  necessarily, but Cabeza is very prominent for being such a

24  strong wilderness -- wilderness refuge.

25  Q.   And before we move on, for the benefit of the record, you

 1  said "Kofa."  Could you please spell that for us.

 2  A.    K-o-f-a.

 3  Q.    Thank you.

 4        Now, are you aware of the staffing or of the number of

 5  positions that have been assigned to manage the Cabeza Prieta?

 6  A.    In total, there are 13 staff on site.

 7  Q.    Are any of those positions law enforcement positions?

 8  A.    Because it's a border refuge, we have more there, and so

 9  there are five law enforcement officers.

10  Q.    And so you said you have more there.  Is having five out

11  of 13 staff members be law enforcement unusual at all?

12  A.    On a border refuge, we do have more law enforcement

13  officers.  It's pretty atypical for a traditional wildlife

14  refuge.  For example, the state of New Mexico, which I also

15  supervise, there is only two law enforcement officers for the

16  entire state.

17  Q.    And do any of the refuges in New Mexico have as part of

18  their border the international border?

19  A.    None of them are right on the border the way that Cabeza

20  Prieta is.

21  Q.    And are you aware of the reasons why there might be more

22  law enforcement officers assigned to a refuge that has the

23  international border, the southern border, as part of its

24  boundary?

25  A.    So typically on a refuge our federal wildlife officers are

DIRECT EXAMINATION OF JULIETTE FERNANDEZ                138

1   able to enforce wildlife-specific laws as their main

2   responsibilities.  So for example checking in with hunters or

3   checking boundary lines or looking into poaching cases, for

4   example, are some things that you would do on a typical refuge.

5        On a border refuge, such as the Cabeza Prieta, they have

6   additional duties related to borders, such as, you know, the

7   amount of undocumented aliens coming in or smuggling coming

8   in, safety of the staff that are working out there, so there's

9   coordination with Customs and Border Protection.

10       There's just an additional layer of enforcement

11  responsibility on border refuges.

12  Q.   And in your capacity, are you aware of various law

13  enforcement activity on the Cabeza Prieta?

14  A.   I am.  For serious incidents, I am informed of those.

15  Q.   And how do you become aware of those, I think you said

16  serious incidents?

17  A.   Through -- the refuge manager would notify me if there was

18  something that's taking place on the refuge, and then I would

19  notify my upper command as well.

20  Q.   So it would be fair to stay it comes up through the chain

21  of command to you?

22  A.   That's correct.

23  Q.   So you're not directly involved in the law enforcement?

24  A.   No, not on site.

25  Q.   Okay.  Now, in terms of -- you described some of the

1   concerns related to illegal activity that might happen on a

2   border refuge, including Cabeza Prieta.  Does illegal activity

3   happening, could that have impacts on the qualities of

4   wilderness that you're managing for?

5   A.   It could.  With people coming through the desert, some of

6   the impacts could be trail networks, which can alter some of

7   the natural quality.  You know, any materials that are left

8   behind as they're walking through can alter wildlife behavior.

9        If there are roads used or areas that are frequently

10  traveled as opposed to just an individual here or there, that

11  can alter the natural -- natural quality.  And also the

12  undeveloped qualities, if there's a road, for example, it can

13  alter the habitat for wildlife out there, cause some

14  fragmentations.

15       So there's various issues that can arise from additional

16  activity in wilderness.

17  Q.   And let me ask you about that last phrase you used.  You

18  talked about fragmentation.  Can you please describe what that

19  is to the Court.

20  A.   Sure.  So fragmentation, when you have a large area of

21  habitat, for example, and the Cabeza Prieta is the primary area

22  responsible for the Sonoran pronghorn -- and I can tell you a

23  little bit of background on that.

24  Q.   Nope.  Not necessary.  Let's focus on what fragmentation

25  is.  If you want to use the pronghorn as an illustration, that

1  would be fine, I think.

2  A.    Sure.  Okay.  So pronghorn are endangered species, and so

3  they rely heavily on their habitat.  So if you have a large

4  area of habitat, and let's say a road goes through the center

5  of it and it's frequently traveled, that can alter the behavior

6  of the pronghorn so that they no longer use that full extent of

7  their habitat and, rather, stay to a subsection of what they

8  would normally use to forage or to rest.

9       And so fragmentation is when you have a large area that

10  something divides and causes wildlife to remain in the

11  subsection of that area.

12  Q.    Would it be fair to say that fragmentation is something

13  that can happen on a continuum?

14  A.    Yes.

15  Q.    And so it could be more or less serious or more or less

16  impactful depending on what's happening?

17  A.    Yes.

18  Q.    And I wanted to ask you if, based on human activity on a

19  wilderness area, if that can have impact on wildlife behavior.

20  A.    It can.

21  Q.    And how can that happen?

22  A.    So if there's -- and just speaking of a fragmentation

23  example, if there's a lot of activity in one area that

24  traditionally they would use, they might alter their behavior

25  and no longer use that area.  For pronghorn especially, that

DIRECT EXAMINATION OF JULIETTE FERNANDEZ

1  could be very detrimental, because it is an endangered species,

2  and they only have so much area where they exist now.

3      In addition, human scents, like if things are left behind,

4  the smell of them may either attract wildlife or scare them,

5  and so they might opt to not use a specific area, so it can

6  alter wildlife behavior in that way as well.

7  Q.   Are you familiar with the Hold Harmless Agreement that is

8  in use at the Cabeza Prieta Refuge?

9  A.   I am.

10 Q.   Have you had a chance to review that?

11 A.   I have.

12 Q.   And based on your experience and the things that you've

13 just talked about, have you formed an opinion about whether or

14 not the Hold Harmless Agreement promotes managing for

15 wilderness character?

16 A.   I think the Hold Harmless Agreement, you know, it notifies

17 of risks and regulations within that area, and within that they

18 do address a number of qualities you would find in wilderness.

19 For example, it's remote.  It's extreme environment.  There's

20 minimal patrol, as opposed to what you would find on another

21 refuge.  There's potential to need search and rescue

22 operations, and there's minimal signage, which is something

23 that's important in wilderness.

24      So it does speak to a lot of the things you would find in

25 a wilderness area.

1    Q.   Is it important when managing for wilderness character

2    that the visitors to a wilderness area be aware of those

3    dangers in the nature of how that land is?

4    A.   Absolutely.  Often people that specifically seek out

5    designated wilderness are looking for that primitive

6    experience, and so being aware that they need to be prepared to

7    enter some more rugged terrain, where there is not a lot of

8    people, there is not a lot of refuge staff around, is something

9    that they need be aware of.

10   Q.   Is it important when managing for wilderness character to

11   limit the amount of life-saving search and rescue activities

12   on a wilderness area?

13   A.   To the greatest extent possible.  Well, we don't want to

14   have to do any search and rescue operations in wilderness at

15   all, so I would say yes.

16   Q.   Now, I want to turn your attention to the general topic

17   of road management within wilderness areas.  Are there

18   supposed to be roads in wilderness areas?

19   A.   There's not.  The Wilderness Act specifically says there

20   are not to be roads or vehicles or mechanized transport within

21   designated wilderness.  So even in maintaining roads, like if

22   there is an administrative road that has to be kept in

23   wilderness, traditionally on a refuge you would use a road

24   grader in going in and fix the road.  In this case it would

25   have to all be primitive, moving a rock, you know, one at a

1   time.

2        But there's not to be any kind of, as part of the

3   undeveloped quality, there's not to be any roads or vehicle or,

4   like I said, mechanical transport.

5   Q.   And how does this general prohibition on roads fit within

6   your responsibilities to manage for wilderness character, for

7   the qualities of wilderness?

8   A.   It is -- it does fall under the undeveloped quality, and

9   so it's the Service's responsibility to ensure that that is

10  upheld.

11  Q.   And what happens if there is already a road in an area

12  when it is designated as wilderness?

13  A.   If there is a road in an area, it's not to be used,

14  except, like I said, in emergency situation, and through the

15  minimum requirements analysis, roads may be used if they are --

16  if it is for administering refuge lands for the mission of the

17  Fish and Wildlife Refuge, or the purpose for which that refuge

18  was established, or for managing wilderness character.

19  Q.   And let's say none of those exceptions apply.  What

20  happens to a road that predates a wilderness?

21  A.   Then you would let the road grow back or do a treatment to

22  remove that road.

23  Q.   Now, are you aware of any roads on the Cabeza Prieta?

24  A.   Not so much on site, but --

25  Q.   Are you aware that there are roads on Cabeza Prieta?

DIRECT EXAMINATION OF JULIETTE FERNANDEZ

1  A.    I am, yes.

2  Q.    Ask a better question.  And are you aware of a road that

3  is designated for public use that is on the refuge?

4  A.    The public use roads are outside of designated wilderness,

5  but yes.

6  Q.    Okay.  So they're outside of wilderness but still on the

7  refuge?

8  A.    Correct.

9  Q.    So they're in that small percent that hasn't been

10 designated as a wilderness area?

11 A.    Correct.

12 Q.    And do you know the name of that primary road?

13 A.    Camino del Diablo and also Christmas Pass is another one.

14 And Charlie Bell Well Road before it goes into wilderness is

15 the other.  So those are the three public, public roads.

16 Q.    So a portion of Charlie Bell Road is outside of

17 wilderness; is that correct?

18 A.    Correct.

19 Q.    Okay.  And once it enters wilderness, does its

20 designation change?

21 A.    It's Charlie Bell -- it enters wilderness at Charlie Bell

22 Pass, and then at that point it's no longer a public road.

23 Q.    Now, along the Camino del Diablo, are you aware -- let me

24 ask you a different question.

25        Now, the roads that are in the -- excuse me.  Are there

DIRECT EXAMINATION OF JULIETTE FERNANDEZ

1   roads in the wilderness in Cabeza Prieta?

2   A.   There are.

3   Q.   Okay.  And those roads, can they be used by law

4   enforcement officers operating in the area?

5   A.   The Arizona Wilderness Act of 1990, which actually

6   established the designated wilderness within the Cabeza Prieta,

7   did say that the U.S. Fish and Wildlife Service will not

8   preclude INS, DEA, or Customs from using those roads for law

9   enforcement operations, so they are used.

10  Q.   Are there limitations on how law enforcement can use

11  them, either in the Act or from subsequent agreements, et

12  cetera?

13  A.   Yes.  So the 2016 MOU between -- it's a nationwide MOU

14  of -- in which the Department of Interior and Customs and

15  Border Protection are two of the signatories.  It does say that

16  they will use the minimal tool or have the least amount of

17  impact possible while doing those operations.

18  Q.   And as part of that, is there an understanding of when

19  using the roads may be allowed?

20  A.   They may use it for -- for operations, law enforcement

21  operations, when in pursuit or, you know, managing border law

22  enforcement.

23  Q.   And refuge staff, can they use these same roads as part

24  of their regular duties?

25  A.   Refuge staff are not to use any roads in wilderness unless

DIRECT EXAMINATION OF JULIETTE FERNANDEZ

1    it's, like I said, to further the mission of the U.S. Fish and

2    Wildlife Service or the purposes for which the refuge was

3    established.

4    Q.   And I'd like now to take a second to put these particular

5    roads in context with managing for wilderness quality, and

6    let's talk first about non Fish and Wildlife law enforcement,

7    I think you said Border Patrol, using roads for their

8    enforcement activities.

9         How does that use fall within, say, your minimum

10   requirements analysis?

11   A.   So because the Arizona Wilderness Act of 1990 said that

12   they are allowed to use these areas, that's a law, and so the

13   Customs and Border Protection is able to use those without

14   having to do a minimum requirements analysis, although they do

15   inform us when they are, you know, have to go offroad or, you

16   know, any issues within wilderness that we might have to

17   address.

18   Q.   As a land manager for Fish and Wildlife charged with

19   managing for these qualities, does allowing Border Patrol to

20   conduct its enforcement activities, is that consistent with

21   managing for those qualities?

22   A.   It is -- well, driving on a road is not consistent with

23   managing for those qualities.  However, you know, we're a small

24   agency.  We don't have a lot of capacity, so having enforcement

25   out in some of these areas does help us to manage some of those

1    qualities.

2    Q.   And so let me ask you this.  Is one of the effects of

3    having Border Patrol out there conducting their enforcement

4    activities that they are addressing illegal activity on the

5    refuge?

6    A.   Yes.

7    Q.   And is the illegal activity present on the refuge

8    something that you need to manage as part of your duties?

9    A.   Yes.  It's something that does have impact to wildlife

10   resources, so it's something that we do need to address.

11   Q.   Would it be fair to say that steps taken to reduce this

12   illegal activity generally enhances the wilderness quality

13   that is there?

14   A.   It can.

15   Q.   And I want to take us now to the refuge staff, the Fish

16   and Wildlfe law enforcement officers, and we talked about that

17   they can sometimes, under the minimal tool analysis, use these

18   roads.

19        Would doing an enforcement activity related to a

20   violation on the refuge be something that falls within those

21   parameters?

22   A.   Yes.  We need to protect the land with which we're

23   entrusted, and so enforcement of these areas in conjunction

24   with the Customs and Border Protection is important.

25   Q.   And you had mentioned earlier and I hit pause on talking

DIRECT EXAMINATION OF JULIETTE FERNANDEZ

1   about the Sonoran pronghorn.  Can you please just tell the

2   Court about how the Sonoran pronghorn plays into how the

3   Cabeza Prieta is managed.

4   A.    Sure.  So the Sonoran pronghorn traditionally had a much

5   larger range, and they would migrate quite a bit.  But with

6   urbanization and development, by the 1920s, they used only

7   eight percent of their historic range.

8        By 2002, the population was thought to be down to about 20

9   individuals.  So in 2003, Cabeza Prieta started a captive

10  breeding program and started doing releases again in 2006, and

11  today the population estimate is closer to 230 individuals.  So

12  we've had some really excellent success on this landscape, and

13  having a wilderness area that is protected and that we ensure

14  is providing optimal habitat for these pronghorn is something

15  that we really strive to achieve.

16  Q.    And we discussed fragmentation earlier.  Is that

17  something that's of concern in managing the Sonoran pronghorn?

18  A.    It is.  In fact, as I mentioned, fragmentation of its

19  habitat is one thing that was very detrimental to the pronghorn

20  historically, so as much as we can protect the species and

21  avoid things like fragmentation from impacting them and their

22  behaviors, that's something that we do.

23       They can be sensitive to that disturbance, especially in

24  fawning season, and so it's something that we are very cautious

25  about.

DIRECT EXAMINATION OF JULIETTE FERNANDEZ

1  Q.   And I want to turn your attention now, we had talked

2  about life-saving activities generally within wilderness

3  areas.  Are you aware of any life-saving steps that the Fish

4  and Wildlife Service has taken regarding Cabeza Prieta?

5  A.   Yes.  So on the Cabeza Prieta, we have worked with Customs

6  and Border Protection to install 10 rescue beacons within the

7  refuge.  Even within designated wilderness, we did a minimum

8  requirements analysis and determined that these rescue beacons

9  could provide immediate emergency relief to anybody in

10 distress.

11      And so they're stationary.  They're always in the same

12 location and available for somebody to use.  And so when --

13 when an individual does go to a rescue beacon, we are able to

14 get immediate help to them and get them a Life Flight out of

15 the Cabeza Prieta for life-savings measures.

16      In addition to that, there's blue flags.  In working with

17 Humane Borders, there are blue flags at a number of wildlife

18 waters for cooling on the refuge, and there's also a stationary

19 drum with Humane Borders out of designated wilderness on the

20 Camino that is available for individuals.

21      But the rescue beacons have really -- were something that

22 we put in place as an immediate measure to help individuals.

23 Q.   Now, using the minimum tool or minimum requirements

24 analysis, could you place more of these drums like the one

25 that is on the Camino within the wilderness area?

DIRECT EXAMINATION OF JULIETTE FERNANDEZ

1    A.    The rescue beacon?  Oh, that --

2    Q.    No, the stationary water sources like the one that's on

3    the Camino.

4    A.    Within designated wilderness, the rescue beacons have

5    really been the tool of least impact that we've decided to go

6    with.  Because they are stationary, they are -- will be there,

7    we can decide areas that will have the least impact, and

8    because they will get immediate help to whomever gets to the

9    beacon, we feel that that is the minimum tool to -- for the

10   emergency purpose of getting help out there.

11   Q.    And so stationary water sources, let's say, like a

12   drinking tank or something like that, would that pass the

13   minimum requirements analysis for the Cabeza Prieta?

14   A.    I think in evaluating those drinking stations versus the

15   rescue beacons, we found the rescue beacon to be the minimum

16   tool because it will truly get life-saving help out

17   immediately.

18   Q.    So it would be fair to say, since the rescue beacon has

19   been identified as the least impactful tool, that anything

20   more impactful will fail the analysis?

21   A.    Right.  Our requirement in doing a minimum requirements

22   analysis is to evaluate alternatives and determine the least --

23   the tool that will have the least impact on wilderness quality.

24   Q.    And I want to be sure, I think I heard you say this, but

25   the water drum that you discussed that Humane Borders has on

1   the Camino, do you know if that's within wilderness area, or

2   is it outside of wilderness area?

3   A.   That's outside of wilderness area.

4   Q.   Now, in terms of managing a wilderness area, particularly

5   the refuge, Cabeza Prieta, would deposits or caches of

6   one-gallon plastic jugs cause you any concern regarding

7   managing for wilderness quality?

8   A.   It would.  Because they're mobile, that is one concern.

9   They can -- whereas a beacon, for example, is in one location

10  where we can determine that's the -- will have the minimum

11  impact.

12       Having multiple jugs, having plastic containers that can

13  break down in the sun and create microtrash that can be

14  dispersed would be concerning, but also for, in thinking about

15  the wilderness qualities, it would not be consistent with

16  natural, for example, or undeveloped as legal requirements that

17  we need to uphold within our wilderness.

18            MS. WRIGHT:  Your Honor, if I could have a moment?

19            THE COURT:  Sure.

20            MS. WRIGHT:  That's all I have for now, Your Honor.

21  Thank you.

22            THE COURT:  All right.

23                      CROSS-EXAMINATION

24  BY MR. DUPONT:

25  Q.   Good afternoon.

```
 1    A.    Hi.

 2    Q.    I'm Chris Dupont.

 3    A.    I'm sorry?

 4    Q.    I'm Chris Dupont.  I only have a couple of questions for

 5    you.

 6    A.    Okay.

 7    Q.    So from my understanding, the Sonoran pronghorn sheep are

 8    doing great.

 9    A.    Yes.

10    Q.    They're numbers have gone up 11 times?

11    A.    I'd say about that, yes.

12    Q.    Up to 230 times?  Up to 230 animals?

13    A.    Individuals, correct, yes.

14    Q.    And what about the bighorn sheep?

15    A.    The bighorn sheep population is also doing well.

16    Q.    Doing very well also, but they're sensitive to

17    fragmentation?

18    A.    They are.

19    Q.    How many Sonoran pronghorns have died in the last 10

20    years?

21    A.    I wouldn't have that number.

22    Q.    Do you know of one?

23    A.    I'm not located on the refuge, so I couldn't tell you.

24    Q.    You're responsible for the refuge?

25    A.    Yes.
```

CROSS-EXAMINATION OF JULIETTE FERNANDEZ

```
 1   Q.   Has a single Sonoran pronghorn died on your watch?

 2   A.   I couldn't tell you.

 3   Q.   How many human beings have died?

 4   A.   I don't know that number.

 5   Q.   We've got some evidence that they found 249 human remains

 6   there.  Would that surprise you?

 7             MS. WRIGHT:  Objection.  Calls for speculation.

 8             THE COURT:  Overruled.

 9   BY MS. FERNANDEZ:

10   Q.   Would that surprise you?

11   A.    No.  I'm aware that they happen on the wildlife refuge.

12   Q.   What have you done to gather data on how many people are

13   dying in the Cabeza?

14   A.   We -- the mission of the U.S. Fish and Wildlife Service is

15   specifically wildlife, so it's not within my job

16   responsibilities to do that.

17   Q.   So you've taken zero effort to collect data?  Is that

18   what you're saying?

19   A.   It's not within my responsibility.

20   Q.   Okay.  I hear you saying that.  I want you to know --

21   answer this question.  Is it true that you've taken no effort

22   at all to find out or collect data on how many human beings --

23   A.   That's correct.

24   Q.   So the pronghorn are sensitive to fragmentation; people

25   are sensitive to heat.
```

 1       Right?

 2  A.   Yes.

 3  Q.   Desolation, being in desolate areas, sensitive to that;

 4  right?

 5  A.   I suppose they can be, yes.

 6  Q.   Lack of water; right?

 7  A.   Yes.

 8  Q.   Assuming 249 people have died in Cabeza Prieta, is there

 9  some number of people that will have to die before you

10  transform this --

11          MS. WRIGHT:  Objection.  Argumentative.  Calls for

12  speculation.

13          THE COURT:  Sustained.

14  BY MR. DUPONT:

15  Q.   Have you applied the minimum requirements analysis to

16  figure out how to avoid 249 people dying on Cabeza Prieta?

17  A.   The minimum requirements analysis evaluates specific tools

18  for management actions.

19          MR. DUPONT:  Thank you, Your Honor.

20          THE COURT:  Anything further?

21          MS. WRIGHT:  Yes, Your Honor.

22                       REDIRECT EXAMINATION

23  BY MS. WRIGHT:

24  Q.   Ms. Fernandez, the Sonoran pronghorn, are they still

25  designated as an endangered species?

1   A.   They are.

2   Q.   And is that also true for the bighorn?

3   A.   They are not endangered.

4   Q.   Have they moved up a level?

5   A.   Yes.

6   Q.   And we were discussing earlier -- well, on cross-

7   examination, Mr. Dupont asked you about the minimum tool

8   requirements analysis for life-saving activity; right?

9   A.   Yes.

10  Q.   And correct me if I'm wrong, but that analysis was done,

11  and that led to the placement of the rescue beacons on the

12  refuge; correct?

13  A.   The rescue beacons are the mechanism that we have

14  determined would be the greatest opportunity for live saving,

15  correct.

16          MS. WRIGHT:  Thank you.

17          I have nothing further, Your Honor.

18          THE COURT:  You may step down.  You're excused.

19          THE WITNESS:  Thank you.

20          THE COURT:  Anything further?

21          MS. WRIGHT:  No, Your Honor.  The United States

22  rests.

23          THE COURT:  We're going to take a break.  When I

24  come back -- we'll take a break until 3:10 -- I want to hear

25  about, first of all, whatever you want to tell me.  Second of

```
 1   all, I want to get to how do I evaluate the defendants'
 2   beliefs, taking into consideration their apparent ignorance of
 3   the consequences of the criminal law, deceptive information
 4   they receive.
 5           Then I want to hear you talk to me about RFRA, about
 6   whether it's a positive right, negative right, or some other
 7   combination, and as I said, anything else you think that needs
 8   to be brought to my attention.
 9           MR. DUPONT:  Yes, Your Honor.
10           MS. CHAPMAN:  Thank you.
11           THE COURT:  Stand at recess until 3:10.
12           (Off the record.)
13           THE COURT:  All right.  The record should reflect
14   that we're back in session.
15           Government, you may proceed.
16           MR. WALTERS:  Thank you, Your Honor.
17           Your Honor, this case is about choices at the end of
18   the day.  The defendants had other options available to them
19   that could have reduced the number of illegal alien deaths,
20   but they made a choice to break federal law.  Their choice to
21   break the law came because these defendants thought their
22   personal beliefs were more important than acting in a legal
23   way.  And Your Honor, no one is above the law.
24           First I will run through each charged offense, Your
25   Honor, and discuss how the United States has proven each
```

1  element of each charge beyond a reasonable doubt, and then I

2  will go through some of the various defenses that were raised

3  either in the pretrial litigation phase or at trial and show

4  that the defense has failed to make a prima facie showing for

5  any of those defenses.

6         At the outset, Your Honor, I would -- in terms of

7  the substantive offense, I would note that, even though the

8  United States has proven that each defendant knowingly

9  committed each of these charged offenses, that there is no

10 mens rea requirement in this case.  All three defendants were

11 charged with class B misdemeanors without a knowing mens rea.

12 So in other words, they are strict liability offenses.

13        The first offense that I will discuss is operating a

14 motor vehicle in a wilderness area, and obviously this offense

15 only applies to Defendant Hoffman.  The first element, Your

16 Honor, is whether Ms. Hoffman used a motor vehicle, and during

17 the trial, Your Honor heard testimony from Fish and Wildlife

18 Officer Mike West who testified that, when he initially spoke

19 to the defendants, it was Defendant Hoffman who admitted to

20 being the driver of the truck.  Finally, Defendant Hoffman in

21 her own testimony admitted to being the driver of the truck,

22 so the United States has proven this element.

23        The second element is that the defendants then used

24 or drove a truck in a wilderness area, and the Court heard

25 testimony from Officer West that he located the white truck

1  and the defendants near -- a little further past Charlie Bell

2  Road or Charlie Bell Well, excuse me, on an administrative

3  road that was off limits to the public.

4         The Court also heard testimony from Fish and

5  Wildlife Officer Brian Krukoski regarding the geographical

6  boundaries of Cabeza Prieta, and Officer West's testimony

7  included information that the wilderness boundaries on Charlie

8  Bell Road began at Charlie Bell Pass and that Charlie Bell

9  Well and anything past Charlie Bell Well on that

10  administrative road is well within the boundaries of the

11  wilderness area.

12         In this case, Defendant Hoffman passed clearly

13  marked signage on at least three occasions while they were

14  loading and unloading supplies.  The Court heard testimony

15  from Defendant Hoffman today stating that she didn't -- she

16  didn't recall seeing the signs, and if she did, she just

17  didn't think they were important enough to read.

18         The idea that she did not see those signs or take

19  time to read them on at least three different occasions is not

20  credible in the slightest, Your Honor.  So as a result of --

21  as a result of this, the Government has proven beyond a

22  reasonable doubt that she did drive a truck into a designated

23  wilderness area.

24         The third element we need to prove is that Cabeza

25  Prieta has wilderness area on the refuge.  And frankly, Your

1    Honor, no one disputes this element.  So the Government would

2    submit that we have proven this element beyond a reasonable

3    doubt.

4         Finally, we have to show that Defendant Hoffman, or

5    frankly any of the defendants, had a special-use permit or

6    some type of lawful authority that allowed them to drive or

7    allowed Defendant Hoffman to drive into the wilderness area.

8    Since Defendant Hoffman is the only one charged, we'll stick

9    with her.

10        But again, the Court heard testimony from Officer

11   Krukoski that, for a wilderness area, members of the public

12   are strictly prohibited from operating a motor vehicle in that

13   area.  There was clear signage stating that it is an

14   administrative road and that only government vehicles are

15   allowed to go past Charlie Bell Pass and into -- and into the

16   wilderness area.

17        Officer Krukoski also testified about something

18   called special-use permit, which he noted as something that is

19   only granted by the refuge manager, and as the Court heard,

20   that was Sid Slone.  Officer Krukoski talked about how those

21   records are kept, that he checked those records about a

22   week-and-a-half prior to his testimony, and none of the

23   defendants had a special-use permit, specifically Defendant

24   Hoffman, that allowed her to drive that truck into a

25   wilderness area.

1          And frankly, Your Honor, she also admitted during

2    her testimony that she did not have the special-use permit

3    that allowed her to do that.  Your Honor, as such, the United

4    States has proven each element of this charge beyond a

5    reasonable doubt, and we ask that you find Defendant Hoffman

6    guilty of this charge.

7          Your Honor, the second charge, the abandonment of

8    property, has also been proven beyond a reasonable doubt.

9    Now, the first element of this charge requires that the

10   defendants abandoned, discarded, or otherwise left personal

11   property.

12         Here it is undisputed that these defendants left

13   crates full of supplies on different locations in the refuge.

14   The Court also heard testimony that Officer West had waited

15   for the defendants when he located the truck, and they had

16   been gone for some time before he -- before they arrived back

17   to the truck.

18         All the defendants admitted to carrying jugs of

19   water and other supplies with them after they got out of the

20   truck and left those supplies at an unknown location before

21   returning to the truck where they encountered Officer West.

22         Your Honor, there's no question these defendants

23   possessed these supplies.  All of them took part in loading

24   the truck.  They took part in getting the -- in assisting in

25   getting the supplies to the refuge before and after their

 1    contact with Officer West, and all of them took part in

 2    transporting those supplies to different areas of the refuge.

 3            Officer West also testified that he found crates

 4    full of supplies, frankly, a large amount of supplies, at

 5    Charlie Bell Well, and all the defendants admitted on Officer

 6    West's body camera footage, which was admitted, that those

 7    crates belonged to them and that they left those supplies at

 8    Charlie Bell Well.

 9            And finally, each defendant acknowledged in their

10    testimony to doing those things, and also to -- and also what

11    is noted on the video, on Officer West's body camera footage,

12    is that all of the defendants loaded those supplies once they

13    were back at the Ajo visitor center and then drove off with

14    those supplies together.

15            Finally, Your Honor, the United States has to prove

16    that this personal property was abandoned, discarded, or

17    otherwise left in a national wildlife refuge.  Again, there is

18    no dispute that the Cabeza Prieta is a national wildlife

19    refuge, and there's no dispute that the defendants left

20    property on Cabeza Prieta, and so thus the United States has

21    met its burden.

22            In conclusion, Your Honor, the United States has met

23    its burden of proving this charge beyond a reasonable doubt,

24    and the United States thus asks the Court to enter a judgment

25    of guilty.

1          The final charged offense, Your Honor, is entering a

2   National Wildlife Refuge without a permit.  I would submit to

3   the Court that this is probably the easiest charge in terms of

4   the United States' burden in that every single defendant

5   admitted to willfully not obtaining a permit prior to entering

6   the Cabeza Prieta National Wildlife Refuge.

7          Again, there is no dispute that Cabeza Prieta is a

8   National Wildlife Refuge, so we have met that -- we have met

9   that element, and we also have to prove that the defendants

10  actually entered Cabeza Prieta, which, again, is not in

11  dispute.

12         So based on the defendants' testimony, Your

13  Honor, as well as Officer West's testimony, the United States

14  would submit that we have proven each element of each charge

15  beyond a reasonable defense and therefore ask that you find

16  the defendants guilty on that charge as well.

17         Your Honor, now I will transition to some of the

18  defenses raised, not only during the pretrial litigation

19  stage, but also here at trial.  As I'm sure the Court is

20  aware, and we pointed out during our pretrial litigation, the

21  United States does not have a burden of disproving a defense

22  until the defendants have made a prima facie showing of that

23  defense.

24         And here, Your Honor, the defendants have not made a

25  prima facie showing of any defense.  But even if the Court

 1   disagrees with that, the United States has still proven each

 2   element of each charge beyond a reasonable doubt and that each

 3   -- that each defense does not entitle the defendants to an

 4   acquittal.

 5        Your Honor, I'll start very briefly with a few,

 6   specifically with selective enforcement.  Here, Your Honor,

 7   the defendants simply cannot show that a similarly situated

 8   person was not referred for prosecution.  Without this

 9   showing, they cannot make a prima facie showing.  And in

10   addition, there was no evidence presented at trial that would

11   cause this Court to overturn its previous ruling.  As such,

12   they have completely failed to meet their burden.

13        In terms of any violations of international law or

14   the Administrative Procedure Act, again, there was no -- there

15   was no evidence presented here at trial that would cause the

16   Court to overturn its prior rulings, and the Government would

17   submit, Your Honor, that those are purely legal issues in

18   nature, and those were dealt with during the pretrial

19   litigation phase.

20        Your Honor, I will spend some considerable time on

21   RFRA, or the Religious Freedom Restoration Act, as I think

22   that's probably going to be the crux of the defendants'

23   closing argument.  First, in answering one of the Court's

24   questions prior to the break, the Court had asked about

25   whether RFRA was a positive right, a negative right, or both,

1   and the United States would submit to the Court, Your Honor,

2   that RFRA is both.

3           It's both a positive right because -- and a negative

4   right because any defendant can use RFRA as a proactive

5   exercise of religion, but they can also use it as a shield if

6   the Government decided to prosecute someone for the sincere

7   exercise of one's religion.

8           But I want to be very clear that RFRA is not a First

9   Amendment analysis, Your Honor.  There is no -- there is no

10  analysis when it comes to RFRA about the rule of general

11  applicability.  It is a separate -- a separate analysis

12  altogether from the First Amendment.

13          The first thing I'll point out, Your Honor, is that

14  the defendants' actions in this case were not an exercise of

15  religion because their beliefs are political and philosophical

16  and not religious in nature.  In this case, the defendants

17  have completely failed to articulate a scope of beliefs, and

18  thus they have not shown that their beliefs are equivalent to

19  some type of religious system of beliefs.

20          Also, the defendants are not credible in general,

21  but they are also not credible as to their beliefs, and I want

22  to point out that the Court can gauge the defendants'

23  credibility specifically about whether they have a

24  sincerely-held religious belief based on the overall

25  credibility of the defendants, including testimony that is not

1    relevant to their religious beliefs.

2            Your Honor, furthermore, nothing in the defendants'

3    stated beliefs is about the specific actions in this case.

4    Their stated beliefs both in, well, in their testimonies, is

5    more akin to, let's say, the Golden Rule.  Here the

6    defendants' attempt to frame the Golden Rule into a belief

7    structure as the -- and try to characterize that belief

8    structure as the most effective way possible to achieve their

9    belief shows that those beliefs are political or philosophical

10   in nature because they are concerned about implementing policy

11   for humanitarian aid on the Cabeza Prieta National Wildlife

12   Refuge.

13           There was no testimony about water jugs and their

14   effectiveness versus methods that point to religious thinking.

15   For example, ultimate ideas, metaphysical beliefs, or moral or

16   ethical systems.  The defendants are simply -- the defendants

17   are simply trying to skirt criminal liability by draping

18   religious garb over their political or philosophical activity,

19   and that is language that comes from United States vs.

20   Christie.

21           For all of these reasons, Your Honor, the defendants

22   have not demonstrated the existence of a sincerely-held

23   belief, and they therefore have not even made a prima facie

24   showing for RFRA, let alone proven RFRA in order to require an

25   acquittal.

1        Your Honor, in order to carry their burden of making

2   a prima facie showing, they must also show that Cabeza Prieta

3   regulations do not impose a substantial, or sorry, do impose a

4   substantial burden on their exercise of religion.  Your Honor,

5   the Government regulating access to and control of its own

6   land can never be a substantial burden on these defendants.

7        Also, similar to the analysis for necessity, the

8   defendants must have been put in a position where there was no

9   other -- no other alternative to practicing their religion

10  other than to break the law.  The regulations at Cabeza Prieta

11  do not put the defendants to a choice or impose a

12  significantly great restriction on their exercise of religion.

13       Finally, there were no stated beliefs about or

14  regarding driving in a wilderness area or the defendants'

15  failure to obtain a permit.  Helping people in need does not

16  absolutely require the defendants, Defendant Hoffman, to for

17  example drive her truck in a wilderness area, but as it

18  relates to all the defendants, helping people in need does not

19  require that they forgo their legal obligation to obtain a

20  permit prior to entering the refuge.

21       Your Honor, the defendants have also failed to make

22  a prima facie showing of this element, and therefore, they

23  should not be entitled to relief from this defense.  If the

24  Court believes the defendants have met their burden of making

25  a prima facie showing that they have a sincerely-held

religious belief that was substantially burdened by the
Government, only then does the burden shift to the Government
to show that it has a compelling interest to enforce the
regulations as to these particular defendants.

First, the wilderness designation requires
restrictive management, and the defendants' actions in this
case impinge on the wilderness experience.  The Court heard
from Juliette Fernandez that driving in a wilderness area even
one time brings the modern world, for example, sight, smell,
noise, et cetera, of those vehicles into Cabeza Prieta and
ruins the experience for the visitors.

Under federal law, Fish and Wildlife is tasked,
specifically tasked, with preserving that experience for the
enjoyment of all visitors.  But Fish and Wildlife is also
tasked, and again, under federal law, with preserving the
habitats of so many species of animals that call Cabeza Prieta
their home.

Illegal activity can drive wildlife away.  I think
that was very clear in Ms. Fernandez's testimony.  It can
fragment animals' habitats.  The point is that there are so
many considerations that Fish and Wildlife must take into
account that the defendants simply do not, and they don't have
the expertise to take those into account.

Second, Your Honor, during this trial, the Court has
heard evidence about signage regarding motor vehicle use in

1    the wilderness area.  And as the Court heard from

2    Ms. Fernandez, that signage reduces the need for rescue, which

3    is in line with Fish and Wildlife's mission, because rescue

4    operations bring the modern world, for example, law

5    enforcement vehicles, ATVs, helicopters, et cetera, that ruin

6    the experience of other visitors and can have a significantly

7    detrimental effect on wildlife migration patterns, as well as

8    the fragmentation of their habitats.

9           Finally, supplies like the supplies the defendants

10   left and abandoned in this case can also alter wildlife

11   patterns and, again, bring the modern world into Cabeza

12   Prieta.

13          Your Honor, to the extent that the defendants'

14   actions were motivated by a desire to help illegal aliens

15   avoid apprehension and certain deportation, the Government

16   always has a compelling interest in enforcing the border and

17   controlling immigration.  Border Patrol's presence on Cabeza

18   Prieta to discourage illegal activity does not mean the

19   Government could or should allow the defendants' presence on

20   Cabeza Prieta to encourage illegal activity.

21          However, with that said, the Government -- the

22   United States Government has brought the modern world into the

23   wilderness area in an effort to reduce the illegal alien

24   deaths on Cabeza Prieta.  The Government has placed dozens of

25   emergency rescue beacons throughout the refuge so that any

1   illegal alien in distress or any person, frankly, for that

2   matter in distress can call for help.

3         But the defendants' actions of abandoning these

4   supplies encourage illegal activity on Cabeza Prieta, which

5   equals more roads, more foot paths, more interference with

6   wildlife through human interaction and garbage that is tossed

7   away through that illegal activity, and more safety concerns

8   throughout the refuge.

9         With regard to the emergency beacons, Sid Slone, the

10  refuge manager, testified that these beacons are the preferred

11  way to save lives in the desert.  That was undisputed during

12  this trial, Your Honor.  The testimony during trial

13  specifically pointed out that the rescue beacons are

14  stationary, meaning they never move, they're always there, and

15  they are always -- and the Court also heard testimony from

16  Officer Krukoski that, in the dark, those -- the lights, the

17  blue lights on top of the emergency beacons, can be seen for

18  up to five to six miles away.

19        There was no evidence presented that any illegal

20  alien, or any person, for that matter, who was in need or

21  distress can find or locate a stash of water or food in the

22  complete darkness of Cabeza Prieta.  Your Honor, those

23  emergency beacons will always be there if an illegal alien or

24  any other person needs help, but there is no guarantee that a

25  water stash will be there.  The defendants, however, want this

 1  Court to adopt their inexperienced belief that putting

 2  nonstationary water jugs in the desert is the best way to

 3  reduce illegal alien deaths.

 4        In cases like this, Your Honor, the United States

 5  Government cannot enforce the regulations on Cabeza Prieta any

 6  less strictly without falling short of meeting its compelling

 7  interest.  As noted, one vehicle impairs the wilderness

 8  experience of all visitors but can have a, again, seriously

 9  detrimental effect on wildlife in the area that call the

10  refuge their home.

11        Permits are required to enter the refuge not only

12  for liability concerns, but to raise awareness for those

13  different issues, specifically about the wilderness area, the

14  dangers of going onto the Barry Goldwater bombing range, as

15  well as any other potential harms of being on the refuge.  The

16  purpose of the supplies that the defendants left in this case

17  and that they abandoned on Cabeza Prieta have already been met

18  through various water stations located just off wilderness

19  areas, as well as the rescue beacons.

20        In sum, Your Honor, the defendants cannot make a

21  prima facie showing that they hold a sincerely-held religious

22  belief, religious or spiritual belief, that was substantially

23  burdened by the United States Government.  Even if they could

24  make that showing, the United States Government has a

25  compelling interest that would override any of those charges,

 1    and therefore, the Government -- sorry -- the Court should

 2    still find the defendants guilty on all charges.

 3            Your Honor, now I will move on to necessity, and

 4    it's something that maybe was not raised specifically by name

 5    during the trial, but I think it was definitely presented

 6    through the defendants' testimony.

 7            Here the defendants cannot prove the first element

 8    of necessity, which requires the defendants to show that they

 9    were faced with a choice of two evils and that they chose the

10    lesser evil.  The defense of necessity has traditionally

11    arisen in situations where someone finds themselves in an

12    immediate -- in a situation where they have to make an

13    immediate decision.

14            So for example, a prisoner breaking out of a prison

15    cell in order to escape a fire, for example.  Here the

16    defendants did not find themselves in some immediate

17    situation.  They planned what they were going to do, when they

18    were going to do it, how they were going to do it, where they

19    were going to do it, and then they deliberately placed

20    themselves in that situation.  They did not act out of

21    necessity.  They acted out choice, Your Honor, and as such

22    they cannot meet this element.

23            The defendants also have to show that they acted to

24    prevent an immediate harm.  The defendants testified --

25    several of the defendants testified that they had no knowledge

1    of an illegal -- that an illegal alien was in need of supplies

2    at the particular point in time where the defendants broke the

3    law.  Thus there was no immediate harm, Your Honor.

4           They also testified -- there was no testimony that

5    they knew when an illegal alien would come up on this stash of

6    supplies they left.  They couldn't even testify if an illegal

7    alien would come upon the stash of supplies that they left.

8           Again, there was no immediate harm of trying to

9    prevent -- there was no immediate harm they were trying to

10   prevent because any harm that they were trying to prevent in

11   this case was purely a future harm, which is not -- which is

12   not how the elements make a prima facie showing of necessity.

13          The defendants must also show there were no legal

14   alternatives to their illegal actions.  The Court heard

15   testimony about how the defendants could have chosen to try

16   and obtain a special-use permit, but none of them chose to

17   even do that.  None of to them spoke to any Fish and Wildlife

18   officers or management at the Cabeza Prieta National Wildlife

19   Refuge about their abilities to try and go about performing

20   their actions in a legal way.

21          In addition, Your Honor, if they had some

22   information on an immediate harm, they could have chosen to

23   call 911.  Despite the defendants' knowing there were several

24   legal alternatives to their illegal actions, they deliberately

25   chose to break the law because, again, they believed their

1  political beliefs overrode the law.  As such they cannot meet

2  this element or any of those elements that I've discussed

3  regarding their prima facie showing of necessity, and

4  therefore, they have not met their burden of a -- of making a

5  prima facie showing, as I stated.

6        The last defense I will argue against, Your Honor,

7  is entrapment by estoppel, and I suspect this might be another

8  crux of the defendants' closing argument, but again, it's a

9  defense to which these defendants have failed to make a prima

10 facie showing.

11       The first element is that the defense must show that

12 someone with authority to bind the U.S. Government made the

13 statement.  Simply put, Your Honor, the defense -- simply put,

14 Your Honor, the defense did not present any evidence

15 whatsoever that any AUSA who had authority to bind any

16 Government agency made any statement to the defendants.

17       Every single one of the defendants admitted to never

18 hearing anything directly from the United States Attorney's

19 Office, the Department of Justice, the Department of the

20 Interior, or Fish and Wildlife Service.  But even if they had

21 heard one of -- someone from one of those agencies say that

22 what they were doing was permissible, there was still no

23 evidence that that person had the authority to bind any of

24 those agencies, and thus they have not, again, failed -- they

25 have failed to make a prima facie showing for the first

 1   element.

 2          Another element that is problematic for them, Your

 3   Honor, in terms of their entrapment defense, entrapment by

 4   estoppel defense, excuse me, is that an AUSA or any Government

 5   official affirmatively told them that their proscribed conduct

 6   was permissible.

 7          The Ninth Circuit has consistently held in as

 8   recently as United States v. Lynch, which was -- the opinion

 9   came out in September of 2018, that this element must be

10   proven by a clear and unambiguous statement to the defendants.

11          Your Honor, the Government would submit that, in

12   terms of the question that was raised by the Court about how

13   does the Court evaluate beliefs in terms of deceptive

14   information, that I would respond, the Government would

15   respond, Your Honor, that that is precisely why this element

16   exists.

17          That is precisely why the defendants must show that

18   there was an affirmative statement directly made to them, so

19   that we don't come Court, and we're not faced with a situation

20   where we said, well, he said or she said or we're talking

21   about gossip that was told to someone about how they could

22   violate federal law or had permission to break the law.

23          In other words, Your Honor, the defendants must show

24   that the Government actively told them they could violate

25   federal law or that their conduct was legal.  Here the only

1  statements offered by the defendants are that some AUSA said

2  he had no interest in prosecuting these types of cases.

3           First, assuming -- let me back up.  Assuming that

4  that is true, Your Honor, it is problematic for defendants for

5  several reasons, at least two.  First, the AUSA stating he had

6  no interest in prosecuting these cases is not a clear and

7  unambiguous statement that they have permission to break the

8  law or that their conduct was legal.

9           Presumably, even if a prosecutor has no interest in

10  prosecuting a specific type of case, that case can still be

11  prosecuted because there is no legal requirement that a

12  prosecutor have an interest in prosecuting cases in order for

13  them to do their job.

14           Second, Your Honor, no reasonable person could

15  believe that the AUSA saying he has no interest in prosecuting

16  these types of cases means that he was telling the defendants

17  that their actions were legal.  Quite the opposite, Your

18  Honor.  If the defendants admit that their belief was that the

19  United States Attorney's office had no interest in prosecuting

20  these cases, they logically and necessarily have to admit that

21  it was possible for them to be prosecuted.  It was a matter of

22  whether the AUSA had an interest in prosecuting, and I think

23  those are two separate things that the Court should take

24  notice of that the defense frankly failed to articulate during

25  testimony.

1          What is clear and unambiguous in this case, Your

2    Honor, is that no one, not a single person from the

3    Government, told any of these defendants, or any member of No

4    More Deaths for that matter, that they had permission to go on

5    to the National -- Cabeza Prieta National Wildlife Refuge and

6    break the law, and no one from the United States Government

7    told these defendants or any member of No More Deaths that

8    their activities out on Cabeza Prieta was legal in any way.

9    And as such, Your Honor, they have failed to meet this element

10   as well in terms of making a prima facie showing.

11         Finally, Your Honor, assuming they can meet the

12   other elements of entrapment by estoppel, their reliance was

13   completely unreasonable.  The Ninth Circuit has held, again in

14   Lynch, that the determination of reasonable reliance is a

15   relatively common sense inquiry.  Reasonable reliance occurs

16   if a person who sincerely desires to obey the law would have

17   accepted the information as true and would not have been put

18   on notice to make further inquiries.

19         The first part, Your Honor, about a person having a

20   desire to break the law, there is no question whatsoever that

21   any of these defendants had any desire to obey the law

22   whatsoever.  They went out there and knew that they were

23   breaking federal regulations because they thought that they

24   were only going to get cited, or in other words, a slap on the

25   wrist.

1          On at least two of those -- two of those defendants

2     testified that, had they known about the penalties ahead of

3     time, that they would not have gone out there, and I would say

4     that that not only goes to the sincerity of their religious

5     beliefs, but it also goes to whether they reasonably relied on

6     the advice of anybody in No More Deaths.

7          Frank, Your Honor, I know there was a lot of

8     discussion as to the Court's final point of how -- how to

9     evaluate their beliefs in terms of ignorance about whether or

10    not they could have been prosecuted, criminally prosecuted,

11    and face the penalties in this case.  Your Honor, the United

12    States would respond by saying that that is dangerously close

13    to an ignorance of the law defense, which is not a defense

14    under any case law or statute that I am aware of.  Just

15    because they didn't know that they could be criminally

16    prosecuted does not mean that they should be able to skirt

17    criminal liability because of their illegal actions.

18         In terms of the second part of that, Your Honor, if

19    we really stretch the truth and assume that they had a desire

20    to obey the law in this case, they have reason to make further

21    inquiries in this case.  They knew that people had been

22    charged in the past, and there was a vague statement about not

23    having an interest in prosecuting.  And to any reasonable

24    person, Your Honor, that would have required them to at least

25    make an inquiry about whether it was possible to still be

1  prosecuted.  Either way you cut it, Your Honor, the defendants

2  have failed to meet all of the elements of entrapment by

3  estoppel, and therefore, they have not met their burden

4  entitling them to an acquittal.

5          Your Honor, these defendants made deliberate choices

6  to break federal law because of their shared personal belief

7  and disagreement about how the Government does its business.

8  The fact of the matter is the defendants are guilty of the

9  charged offenses, they did not act out of necessity, the

10  United States Government made them zero promises, and yet they

11  ask this Court to accept that religion motivated their illegal

12  behavior.

13          The evidence proved the defendants are guilty beyond

14  a reasonable doubt, and thus the United States asks the Court

15  to come to the only logical conclusion based on the evidence

16  here at trial that the defendants are guilty.

17          MR. FIDEL:  Your Honor, in the summer of 2017, there

18  was a trail of death in the Cabeza Prieta Wildlife Refuge.  A

19  trail of death.  Bodies, skeletons, human remains, and bones,

20  all through the desert, specifically here, up the western

21  phase of the Growler Mountains on the Cabeza Prieta Wildlife

22  Refuge.  Each of these dots is a set of human remains that was

23  found on the refuge, on the western slope of those mountains.

24          And these women went out in the heat of summer to

25  place life-saving aid in the middle of this trail.  And we

1   heard the agent who put an arrow right in the middle of it.

2   That's where these women were doing their work.  And this map

3   is shocking.  We heard that this is just remains.  This is not

4   the deaths.  We heard testimony that it's estimated the actual

5   deaths could be 10 times as much.  These are just the ones

6   that are found.

7            So that's -- that's what this case is about.  It's

8   about what do you do when you know that people are dying in

9   droves, agonizing, suffering death of hyperthermia and

10  exposure.  And you know that dehydration is a factor, because

11  that's how we cool off as humans.  You sweat, and that helps

12  you cool off, and when you don't have water, you can't sweat,

13  and when you can't sweat, you can't cool off, and then you die

14  of hyperthermia.

15           And we heard from Dr. Hess, the Medical Examiner,

16  that access to aid is key in somebody who's suffering from

17  hyperthermia.  Access to aid is key because hyperthermia makes

18  you act erratically.  It affects your thinking, your

19  decisionmaking.  It makes you nauseous, dizzy, disoriented.

20  It can make you hallucinate.  They find bodies of people, and

21  when they examine them, they find that they've been eating

22  dirt before they die.

23           So it makes it difficult to walk two miles up a

24  steep hill in a pass in a mountain range in the Growler

25  Mountains to a beacon that could be flashing in the dead of

 1  night, or maybe in the bright sun of the day you can't see it,

 2  as we heard our clients' testimony, or maybe you're going to

 3  walk five miles, 10 miles, 12 miles across the flat Growler

 4  Valley under the sun in August.

 5          The beacons are a gesture, and it's a nice gesture,

 6  but they're not enough, because access is key.  Maybe they do

 7  work great, and I hope they do, if somebody can get to them.

 8  But how do you get to them when you're dying of hyperthermia?

 9          The problem is we know they don't work, and we know

10  they don't work because the remains are tracked.  Here's

11  another exhibit.  Look at this.  Cabeza Prieta Wildlife

12  Refuge.  These are recovered human remains, RHRs, based on

13  land jurisdiction, tabulated year by year and region by

14  region.

15          Cabeza Prieta Wildlife Refuge.  2012, four remains.

16  '13, three remains.  2014, eight remains.  2015, 19.  2016,

17  19.  2017, 32.  There are beacons there, but the deaths keep

18  climbing.  Access is key.  You've gotta get to the beacon for

19  it to save your life.

20          Now, it is an unquestionable truth that people in

21  the desert need water, and we heard from the agents or the

22  officers that there is one tank of water along this trail of

23  death from the Mexico border down here, between there and up

24  at the top of the Cabeza Prieta Wildlife Refuge.  When you get

25  onto the bombing range, there's another one.  And it's not

1   potable water.

2          The only other one between the Mexican border and

3   the northern stretch of the Cabeza Prieta Wildlife Refuge is

4   at Charlie Bell Well.  And what did Officer West say?  I don't

5   know if those tanks are evaluated to see how clean the water

6   is.  Would you drink out of it?  That's it.  That's the only

7   water there is between Mexico and the end of the Cabeza Prieta

8   Range.

9          There's another 12-15 miles across the desert, but

10  we don't know, is that potable?  Remember, we saw that on the

11  map too, out in the middle of the Growler Valley.  We heard

12  from a witness that it is devastating to the human body to

13  drink dirty water.  So what is there along this trail of death

14  for people who are suffering?  What other water is there?

15         So what do you do in the face of this crisis?  These

16  are public records.  The Medical Examiner published these

17  maps.  This is the Medical Examiner's web site.  They collect

18  this information.  They put the dots on the maps that show

19  where the people are dying.  That's how No More Deaths and

20  their volunteers learn where the deaths are happening and

21  decide where we're going to put this water.

22         So what do you do when you learn about that?  We

23  heard from the regional manager today that Fish and Wildlife,

24  if they had their druthers, doesn't want to do search and

25  rescue.  Well, it's essential.  There are people dying in

1    droves on the Fish and Wildlife Refuge at Cabeza Prieta.

2              Whether they want to do it or not, it's a situation

3    that calls for action, and these women took action.  They

4    traveled across the country, from Minnesota, from Seattle,

5    from Virginia, to come and volunteer with No More Deaths.

6              And the Court asked how you evaluate the beliefs of

7    these women, their religious beliefs.  Well, you look at the

8    things they did, and you look at the organization that they

9    chose to join and what Reverend Fife had to say about that

10   organization and its principles and it's -- and what it was

11   founded to do and the way volunteers are trained.

12             These women knew what they were compelled to do.

13   They felt a spiritual calling that was informed by their own

14   beliefs, the way they were raised by their parents.  And it's

15   different for each one, but each of them spoke to the sanctity

16   of life and the centrality of that principle to their beliefs

17   and the decisions they make, and that's why they came out

18   here.

19             And Reverend Fife talked about the spiritual calling

20   to act and the role it plays with this organization, but I

21   think it's telling -- we'll get back to Reverend Fife.  I

22   think it's telling that these women came to the desert to help

23   people.  They didn't ask who.  They didn't ask where these

24   people came from.  They didn't ask how they got here to the

25   Cabeza Prieta.  They did not seek to label them as illegal

1  aliens or something else.  They're just people who are

2  suffering and dying and leaving their bones in the dirt, in

3  the sun, on Cabeza Prieta.

4         So Reverend Fife said that this act of helping

5  strangers, people who are not known to you, people who come in

6  to this country and suffer in the desert, people you don't

7  know, it is a fundamentally religious act, and that cuts

8  across all traditions of faith, whether it's the Torah that

9  tells us to love our neighbors, but also to love the strangers

10  among us, or whether it's the New Testament, which Reverend

11  Fife described as giving a profound mandate.

12         And he quoted the passage, and I'll try to do it

13  justice, but it's, "For I was hungry and you fed me; for I was

14  thirsty, and you gave me something to drink; for I was a

15  stranger, and you took me in.  As you do it to others, you do

16  it to me."  That's what Reverend Fife told us.

17         He said any of the traditions of wisdom, all of

18  them, we are all commanded to love without exception.  That's

19  the spiritual obligation that formed this group No More

20  Deaths, and it drew these women to it to do this act of

21  helping people dying in the desert by leaving water.

22         And we heard each of these women testify about their

23  beliefs, and that's how -- that's how the Court evaluates it.

24  They testified about what compelled them to come out here,

25  their core belief, sanctity of human life.  They described the

1   spirituality of the work, of the connection they felt to No

2   More Deaths and the mission of No More Deaths, the ministry of

3   No More Deaths, and to the work they did that day, whether it

4   was the meditative quality of preparing to go on a water drop

5   for those who had done it before, preparing your gear, getting

6   the truck ready, getting the things together that you need,

7   preparing yourself for a long, physical, uncomfortable, hot,

8   spiritually difficult day where you might find a dead body

9   next to your truck when you get back or bones in the desert or

10  shoes that somebody left behind.

11          And you can close your eyes and you can picture the

12  strength of these beliefs as you wake up before the sun, and

13  you get the truck ready, and it's early, and you're in Ajo,

14  and it's hot.  And the game camera tells us that by 11:30,

15  it's 97 degrees, and half-hour later it's 100, and then by

16  3:00 in the afternoon it's 110, which is literally a lethal

17  temperature.

18          Dr. Hess talks about that modeling study that at 104

19  degrees there is a 50 percent chance somebody's going to die

20  out there on the refuge.  At 110 it's as high as 80 percent.

21  70 to 80 percent chance there's going to be another red dot on

22  this map when it's 110.

23          So they prepare to go out and carry this water,

24  eight pounds per gallon, five or six of them.  Your pack's

25  full, you've got one in each hand, and you're going to go trek

 1   through the desert, over the rocks, between the chollas.

 2   There is no shade and you can't sit down because there's no

 3   shade to sit down in, and if you do find some, the rocks will

 4   burn your backside.

 5          That's the strength of their spiritual beliefs that

 6   compelled them to do this work.  And as you go, you find these

 7   artifacts, signs of people who have crossed through there, and

 8   you take a moment to think about their journey.  Then you get

 9   to the place where you're going to leave the water, and

10   there's a moment of silence.  You put a rosary in the tree,

11   write messages on the bottles.  Maybe it's a crucifix.  Maybe

12   you draw a rosary.  Maybe you write, "Go with God," or

13   something you learned from your father that will have meaning

14   to other people who grew up in Mexico.

15          And when you go back, you try and be a good steward,

16   and you pick up trash you find along the way.  You carry your

17   full pack in of water, and you carry a full pack out with

18   things you find.  And when you get back to town, you reflect

19   together on the experience that you've been through.  That is

20   a profoundly spiritual experience, and it is absolutely a

21   sincere and deeply spiritual reflection of their religious

22   beliefs.

23          So -- so that brings us to the question, and the

24   question the Court asked is that, is this a crime?  And what

25   about RFRA?  And we agree with the Government, I guess, on one

1  thing, which is that RFRA is both a positive and negative

2  defense, because on the one hand you have the right not to

3  have your religious beliefs infringed upon, and on the other

4  hand, you can assert your religious beliefs as a defense.  So

5  it's both.

6          And the burden is initially on the defense.  It's on

7  the defendants.  The defendants have to show at the outset

8  that there was a substantial burden on a sincerely-held

9  religious belief.  Well, we talked about their religious

10  belief and how sincere it was, and the fact that this may

11  overlap with some political ideologies, it has no bearing on

12  the analysis.  That's clear from the Hobby Lobby case.  Just

13  because the religious beliefs of the Hobby Lobby owners

14  overlap with a politically conservative position about

15  contraception did not preclude them from asserting a religious

16  freedom belief, religious freedom defense.  The two are not

17  mutually exclusive.

18          And in this case, the political beliefs are not part

19  of -- are not part of what motivated these women.  If you have

20  a political belief, you go and you picket the Governor's

21  office, or you send a letter, or you go work for a campaign,

22  or you vote.  You don't fly across the country to Ajo, in the

23  middle of summer, to carry a 40-pound pack of water out to the

24  desert when it's 110 degrees outside.  And is it a substantial

25  burden?  You bet.  Look at this trail of death.  That's the

1    substantial burden.  They couldn't take no action.  They were

2    compelled to act.

3         Once that burden is satisfied, the Government has an

4    enormous burden.  They have to show that there is a compelling

5    interest, and it's not a compelling interest in border

6    enforcement.  That's not what the Cabeza Prieta Refuge is

7    about.  The Cabeza Prieta Refuge is about protecting the

8    pronghorns and preserving wilderness and the bighorn sheep and

9    the other flora and fauna that live there.

10        And they have to show a compelling interest, and

11   they have to show that the action is the least restrictive

12   possible.  And the analysis is not -- it's not whether all

13   border crossers harm the environment.  It's not whether all

14   humanitarian aid work in Arizona's west desert, or even all

15   humanitarian aid work in Cabeza Prieta, challenges a --

16   presents a problem to the compelling Government interest.

17        It's whether these four women's actions did.  That's

18   the analysis.  In other words, can the Government provide an

19   exception to these four women on that day for what they were

20   doing and still protect the interest of Fish and Wildlife on

21   the refuge?  And what did Ms. Fernandez talk about today with

22   regard to a water jug, microdegradations of the environment?

23   That's -- that's what these women are up against.

24        So the next question that I think is important to

25   ask is, can we convict these women when the Government has

1   told them by words and by conduct that it is not interested in

2   prosecuting cases like this?  Because since at least April, No

3   More Deaths as an organization had been telling Fish and

4   Wildlife and Cabeza Prieta specifically what they were doing

5   and wanted to do on the refuge.  They wanted to drive the

6   roads.  They wanted to leave water.  There was no secrecy.

7            And in July 2017, there was a meeting set up.  July

8   6th, we've heard about that, for further discussions.

9            Can we click over to this, the Elmo?  Thank you.

10           Now, we know what was said because we have Officer

11   Aitken's report about it.  And the Department of Justice was

12   at that meeting.  We know the Department of Justice was at

13   that meeting because the Department of Justice's statements --

14   how do I make that -- statements are right there on the memo.

15           Officer Aitken was there to take notes that were

16   accurate and write this briefing report.  I forget the exact

17   thing he called it, but it's for his supervisor.  It says

18   right on there the purpose is to advise the R2 division of the

19   refuge law enforcement chief.

20           That's who it's for, to advise his chain of command

21   about what happened at this meeting and what was told at this

22   meeting, not just in No More Deaths's view, not just the way

23   these women understood it and heard it from people who were at

24   the meeting, but in Officer Aitken's report, that here we are.

25   "Tickets that are issued are dismissed/not prosecuted if the

 1    person shows up to court.  DOJ has them commit to not violate

 2    again."

 3              That's what these women heard.  The Government is

 4    not interested in prosecuting these cases.  And that's a

 5    reasonable thing for them to understand to have been said at

 6    the meeting, because Mr. Aitken heard it too.  Not only did he

 7    write it down in that section of his report, but at the end,

 8    on page two.

 9              His impression, his understanding of what was said,

10    DOJ does not appear to want to prosecute violations regarding

11    this group.  Was it reasonable for these women to understand

12    exactly that?  Absolutely, because Officer Aitken understood

13    that too, and he put it in his report for his supervisor to go

14    up the chain.

15              But it's not just -- it's not just that meeting.

16    It's not just what was told to them verbally.

17              Can we go back to the computer?  Thank you.

18              It's also the language of the permit, because the

19    language of the permit says, some things, if you do them on

20    the refuge that you are not permitted to do, like violate

21    here, paragraph 10, if you violate the air space over the

22    refuge, you're subject to criminal charges, civil penalties,

23    and other administrative actions.  That's what they tell the

24    public.  That's in the Government's writings.  So yes, there

25    is a Government writing.

1            And then, if we go down, anyone who violates the

2   parameters for access to this permit, paragraph 11, subject to

3   judicial penalties to include fines, civil action, and/or

4   debarment.  It doesn't say criminal.

5            THE COURT:  Does it say anywhere in there that they

6   can speak for the Court?

7            MR. FIDEL:  It does not.  It does not.  But this is

8   what the Government represents to the public and what these

9   women understood was the language of this permit.  And so it

10   restricts the Government's ability to prosecute these people

11   for a crime when they say you could --

12            THE COURT:  Perhaps if you sign this.

13            MR. FIDEL:  Perhaps if you do.

14            THE COURT:  Certainly not if you don't.

15            MR. FIDEL:  But these women signed it knowing what

16   was in the document.

17            THE COURT:  No, they didn't sign it.

18            MR. FIDEL:  No, these women, excuse me, did not sign

19   it because they knew what was in the document, and they did

20   not want to sign paragraph 13.

21            THE COURT:  No, no.  They didn't want to sign at

22   all.

23            MR. FIDEL:  No.  They testified that they couldn't

24   sign this document because they didn't want to initial

25   paragraph 13.

1          THE COURT:  But we both agree they don't -- nobody

2   speaks for the Court.

3          MR. FIDEL:  Agreed.  Without question.

4          THE COURT:  All right.

5          MR. FIDEL:  But what the Government told these women

6   and told the public is that the abandonment of personal

7   property and possessions, this new paragraph 13, which was

8   added in July 2017, that I may be subject to judicial

9   penalties, to include civil action and/or debarment, for

10  failure to remove all items.  That's what they were told, and

11  so that's what they were put on notice of.

12         They had -- these women received information from

13  two places, and ultimately they received it from others in No

14  More Deaths, but the information came from others in No More

15  Deaths who received it from the Government, at the meeting and

16  in the permit, which says civil penalties and we are not

17  interest in prosecuting these cases.  That's what these women

18  understood when they went on the refuge.  They expected

19  perhaps we will get a ticket, and that is an acceptable risk

20  to us for this work that we feel obligated to do because of

21  our beliefs.

22         They did not think that it was a criminal risk that

23  they were taking, and so if there is blame for that, it is not

24  on these women.  It is on those who told them.

25         THE COURT:  It's on who?

1          MR. FIDEL:  It's on those who told them what they

2    could expect.

3          THE COURT:  Who told them?

4          MR. FIDEL:  Well, they received information from two

5    sources, from the Government and from others at No More Deaths

6    who heard it from the Government.

7          THE COURT:  Who?

8          MR. FIDEL:  We did not hear testimony about that.

9          So these women went out into this trail of deaths to

10   leave water, which is the least they could do to be effective,

11   the least they could do to leave clean, drinkable, life-saving

12   water for people crossing through the desert, to give them

13   strength to carry on a journey, perhaps to a beacon to be

14   rescued so that they could make it up a hill and avoid being

15   entered on a column in Dr. Hess' list as a skeletal remain or

16   a mummified remain or a fully-fleshed remain.  Those are the

17   categories.

18         Do they harm the refuge?  We heard that the

19   wilderness is meant to be an untrammeled area, and perhaps

20   some of them are, but not Cabeza Prieta.  This is a vast,

21   vast, 800,000, I think, square-kilometer area that is a former

22   bombing range.  It's littered with unexploded bombs, missiles,

23   artillery shells, such that you have to sign a waiver of

24   liability to set foot in there.  And it's full of cisterns and

25   tanks and catchments dug for sheep and pronghorns, up to

1   11,000-gallon tanks that can be reloaded by trucks, tanker

2   trucks, or helicopters, but no water for people.

3           They went into that zone, they went into that

4   trail, they went into that sea of red dots, and they left jugs

5   of water, and these women should not be labeled as criminals

6   because of that action.  They do not bear that responsibility.

7   They were acting out of their religious beliefs based on the

8   information they had, and they should not be convicted as

9   criminals.

10          Thank you.

11          THE COURT:  Thank you.

12          Does the Government have anything?

13          MR. WALTERS:  Very briefly, Your Honor.

14          Your Honor, in terms of the entrapment by estoppel

15  defense, I think it's interesting to point out that an AUSA

16  said, essentially, I, AUSA, have no interest in prosecuting

17  this case.  The reason there is a requirement that someone

18  with authority to actually make that decision and to bind

19  specific government agencies into that decision is because,

20  just because one prosecutor doesn't have an interest in

21  prosecuting cases doesn't mean that another prosecutor in that

22  same office could -- that doesn't mean they couldn't prosecute

23  that case.  It's essentially -- that's exactly why someone

24  with authority has to do it, so that it specifically covers an

25  entire agency.

 1          A couple things that I just wanted to clarify, Your

 2     Honor.  I think I mentioned dozens of beacons out on the

 3     Cabeza Prieta Refuge.  I just wanted to clarify that

 4     Ms. Fernandez testified to there being 10 beacons on the

 5     refuge.

 6          And Your Honor, I want to talk about this trail of

 7     death that the defense has kept raising in this case.  The

 8     United States Government put up emergency rescue beacons to

 9     specifically save the lives of anybody who chose to push a

10     button or make a phone call, but what these defendants do by

11     putting gallon jugs of water and beans is you give illegal

12     aliens a false hope that, if they drink this gallon jug of

13     water, if they eat this can of beans, that they will survive.

14          And even according to their chart, leaving water out

15     at Charlie Bell Well, if you look, just looking at the map on

16     how far they have to travel north, it does not mean that this

17     is going to be a life-saving measure.  The only reliable life-

18     saving measure out on the Cabeza Prieta National Wildlife

19     Refuge are those emergency beacons because it is a direct line

20     to a government agency who can save their life.

21          Your Honor, I wanted to clarify something the

22     defense said.  The Government is not arguing that their

23     political -- that the defendants' political and philosophical

24     beliefs overlap with their religious or spiritual beliefs.

25     The Government is asserting that the evidence during this

1   trial showed that their actions are completely political and

2   philosophical.

3           I also wanted to talk about Mr. Aitken's testimony.

4   If the Court were to look at that exhibit again, there was

5   nothing from No More Deaths telling the United States

6   Government that they are going to willfully fail to get

7   permits, that they are willfully going to drive in a

8   wilderness area.  So even if there was a promise, there

9   certainly wasn't full disclosure from No More Deaths about

10  what they were going to do in terms of relying on any promise

11  that was made by the Government.

12          In terms of the Hold Harmless Agreement that the

13  defense raised, there was no evidence presented at this trial

14  that the United States Attorney's Office for the District of

15  Arizona had any input whatsoever in drafting that Hold

16  Harmless Agreement, whether it be the original copy or the

17  modified copy.

18          And as I'm sure the Court knows, the United States

19  Attorney's Office makes the ultimate decision about whether to

20  charge federal crimes.  That is not up to the Fish and

21  Wildlife Service.  It's not up to the Department of Interior.

22          But Your Honor, again, the defense essentially

23  coming up here and saying, these defendants didn't know, they

24  didn't know that it was against the law or that they could be

25  criminally prosecuted for violating the law, and so therefore

1   this Court should find them not guilty, is exactly arguing an

2   ignorance of the law defense, which as I stated earlier is not

3   a defense.

4         That would be like somebody -- a drug trafficker

5   arguing that you can't convict me because I didn't know there

6   was a 10-year mandatory minimum.  It doesn't make sense, and

7   it's not a legal defense to make.

8         And finally, Your Honor, in terms of RFRA, there was

9   no testimony that these particular defendants investigated any

10  other ways to comply with any alleged religious or spiritual

11  beliefs.  In fact, Defendant Huse testified that she was

12  volunteering in another state doing essentially the exact same

13  thing but in a completely legal way.

14        And that is a substantial burden that the defense

15  must make a prima facie showing.  They must show that there

16  were no other legal alternatives to do what they had -- to do

17  what they were going to do based on their religious or

18  spiritual beliefs except for break the law.  So if Defendant

19  Huse could do it in a completely legal way, there is

20  absolutely no reason why the other defendants couldn't have

21  done the same thing.

22        Again, Your Honor, the evidence proves that all of

23  these defendants are guilty beyond a reasonable doubt, and

24  none of the defendants have made a prima facie showing of any

25  defense in this case, and therefore, again, they are not

1  entitled to an acquittal, and we would therefore ask the Court

2  to find them guilty on all charges.

3          THE COURT:  Thank you.  I'll take the matter under

4  advisement.  We'll stand at recess.

5          MR. DUPONT:  Your Honor, should we all just wait

6  here?

7          THE COURT:  No.  Go home.  You'll get -- find out by

8  minute entry.

9          MR. DUPONT:  By minute entry?

10          THE COURT:  Yes.

11          MR. DUPONT:  Thank you, Your Honor.

12          (Proceedings conclude at 4:22 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3          I, Erica R. McQuillen, Federal Official Realtime

4    Reporter, in and for the United States District Court for the

5    District of Arizona, do hereby certify that, pursuant to

6    Section 753, Title 28, United States Code, the foregoing is a

7    true and correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations

10   of the Judicial Conference of the United States.

11          Dated this 30th day of January, 2019.

12

13                          s/Erica R. McQuillen
                       Erica R. McQuillen, RDR, CRR
14                     Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25